# Exhibit A

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### SOUTH32 SA INVESTMENTS LIMITED

**V.**

### REPUBLIC OF COLOMBIA

### (ICSID CASE NO. ARB/20/9)

I hereby certify that the attached documents are true copies of the English and Spanish versions of the Tribunal's Award dated 21 June 2024, and the English and Spanish versions of the Dissenting Opinion of Prof. Andrés Jana Linetzky.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., 21 June 2024

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**SOUTH32 SA INVESTMENTS LIMITED**

Claimant

and

**REPUBLIC OF COLOMBIA**

Respondent

**ICSID CASE NO. ARB/20/9**

---

# AWARD

---

***Members of the Tribunal***
Ms. Deva Villanúa, President of the Tribunal
Prof. Guido S. Tawil, Arbitrator
Prof. Andrés Jana Linetzky, Arbitrator

***Secretary of the Tribunal***
Ms. Catherine Kettlewell

***Assistant to the Tribunal***
Ms. Francisca Seara Cardoso

*Date of dispatch to the parties:* 21 June 2024.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

### REPRESENTATION OF THE PARTIES

*Representing South32 SA Investments Limited*:

Mr. Nigel Blackaby KC
Ms. Caroline Richard
Ms. Natalia Zibibbo
Ms. Maria Julia Milesi
Ms. Madeline Snider*
Mr. Diego Rueda
Mr. Nicolás Córdoba
Ms. Rosario Galardi
Mr. Juan Ignacio Amado Aranda
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

Mr. Jean Paul Dechamps
Mr. Juan González Mayer
Ms. Sofia Ottaviano
Ms. Manuela Moreno
Dechamps International Law
10 Bloomsbury Way
London, WC1A 2SL
United Kingdom

Ms. Carolina Posada
Mr. Daniel Posse
Ms. Laura Vengoechea
Posse Herrera Ruiz
Cra 7 No. 71-52, Tower A, 5th Floor
Bogotá 110231
Colombia

\* Until July 2023

*Representing the Republic of Colombia*:

Mr. Jhon Jairo Camargo Motta
Director General (E)
Ms. Juana Martínez Quintero
Agencia Nacional de Defensa Jurídica del
Estado
Carrera 7 No. 75-66 – 3er piso
Bogotá, Colombia

Mr. Álvaro Rodríguez Rodríguez
Acting Director of Foreign Investment,
Services and Intellectual Property
Ministerio de Comercio, Industria y Turismo
Calle 28 #13 A-15
Primer Piso
Local No. 1
Bogotá, Colombia

Mr. Fernando Mantilla-Serrano
Ms. Esperanza Barrón Baratech
Mr. Diego Romero
Mr. Hugo Varenne
Mr. Kevin Cubeddu
Mr. Nicolás Esguerra
Latham & Watkins LLP
45 Rue Saint-Dominique
Paris 75007
France

Mr. Samuel Pape
Latham & Watkins LLP
99 Bishopsgate
London, EC2M 3XF
United Kingdom

i

# INDEX

TABLE OF ABBREVIATIONS/DEFINED TERMS ............................................................ IV

LIST OF CASES CITED ............................................................................................... 11

I.      INTRODUCTION .......................................................................................... 14

II.     PROCEDURAL HISTORY ............................................................................ 15

III.    FACTS ........................................................................................................... 20

        1.    Cerro Matoso Mine .................................................................... 21

        2.    The Concessions ........................................................................ 22

        3.    CMSA ......................................................................................... 23

        4.    The Authorities .......................................................................... 24

        5.    The Issues in Dispute ................................................................ 25

        6.    Brief Chronology ....................................................................... 28

        7.    A summary of the Claims .......................................................... 29

IV.     CLAIMS OF THE PARTIES .......................................................................... 31

        1.    The Claimant's relief ................................................................ 31

        2.    The Respondent's relief ............................................................ 32

V.      ANALYSIS ...................................................................................................... 34

V.1.    JURISDICTIONAL OBJECTIONS ............................................................... 34

        1.    Treaty Shopping ......................................................................... 34

              1.1.   The Acquisition of CMSA ............................................. 34
              1.2.   The Existence of a Dispute .......................................... 39

        2.    Nature of the Dispute ................................................................ 42

              2.1.   Domestic and Contractual Dispute .............................. 42
              2.2.   Prematurity of the claim ............................................. 49

        3.    Non-compliance with Procedural Requirements ....................... 50

V.2.    ANALYSIS OF LIABILITY ......................................................................... 55

V.2.1.  The Matters in Dispute ...................................................................... 55

        1.    Nickel Royalty Rate and Percentage of Cost Deduction ............. 55

              1.1.   Factual Background ..................................................... 55
              1.2.   Arguments ................................................................... 58
                     1.2.1. The Royalty Rate ................................................. 58
                     1.2.2. The Cost Deduction Rate .................................... 63
              1.3.   Measures Relating to the Royalty Rate and the Deduction of Expenses ................... 64

        2.    Nickel Reference Price .............................................................. 65

              2.1.   Factual Background ..................................................... 66

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

|  |  |  |  |  |
|---|---|---|---|---|
| | 2.2. | Arguments | | 72 |
| | | 2.2.1. | Incorrect FOB Price | 72 |
| | | 2.2.2. | Retroactive Implementation of Resolution 293 | 80 |
| | 2.3. | The Nickel Reference Price Measures | | 87 |
| 3. | Deductible Costs | | | 92 |
| | 3.1. | Relevant facts | | 93 |
| | | 3.1.1. | Regulation | 93 |
| | | 3.1.2. | State Actions on Deductible Costs | 94 |
| | 3.2. | Arguments | | 100 |
| | | 3.2.1. | Positions of the Parties | 100 |
| | | 3.2.2. | Position of the Arbitral Tribunal | 101 |
| 4. | Iron Royalty | | | 112 |
| | 4.1. | Arguments | | 114 |
| | 4.2. | The Iron Royalty Measures | | 119 |
| 5. | Settlement of the accounts of the Contracts | | | 120 |
| | 5.1. | Factual Background | | 120 |
| | 5.2. | Settlement and Transversal Measures | | 122 |
| | | 5.2.1. | Cundinamarca Petition | 122 |
| | | 5.2.2. | Resolution 576 | 130 |
| | | 5.2.3. | Order 63 | 131 |

V.2.2. Violation of the BIT ........ 135
1. Scope of FET ........ 135
   1.1. Positions of the Parties ........ 136
   1.2. Decision of the Arbitral Tribunal ........ 137
2. Violation of FET ........ 141
   2.1. Issues ........ 142
   2.2. Assessment of the Violation ........ 147

V.2.3. Claim for Compensation ........ 150
1. Historical Damages ........ 150
2. Future Damages ........ 156

V.3. COSTS AND POST-AWARD INTEREST ........ 166
1. Costs of the Arbitration ........ 166
   1.1. Applicable rules ........ 166
   1.2. Requests from the Parties ........ 170
   1.3. Decision of the Arbitral Tribunal ........ 171
2. Interest ........ 173

VI. DECISION ........ 174

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

# <u>TABLE OF ABBREVIATIONS/DEFINED TERMS</u>

| | |
|---|---|
| 1985 Agreement | Agreement between CMSA and the Republic of 23 August 1985 |
| 2011 Agreement | Agreement between CMSA and Ingeominas of 30 August 2011 |
| 2016 Notification | Letter entitled "*Notification of Dispute between South32 SA Investments Limited and the Republic of Colombia and Notice to Submit to International Arbitration*" of 20 June 2016 |
| 2018 Notification | Follow-up letter to the 2016 Notification dated 20 November 2018 |
| Administrative Costs | The fees and expenses of the arbitrators, as well as ICSID's administrative fees and expenses, as set out in section V.3 below |
| Arbitration Rule(s) | ICSID Rule(s) of Procedure for Arbitration Proceedings of 10 April 2006 |
| Billiton | Billiton Overseas Limited, main and then majority shareholder of CMSA |
| BIT | Bilateral Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and Republic of Colombia signed 17 March 2010 |
| Centre or ICSID | International Centre for Settlement of Investment Disputes |
| Claimant or South32 | South32 SA Investments Limited |
| Claimant's Costs | Claimant's Statement of Costs of 25 August 2023 |
| Claimant's PHB | Claimant's Post Hearing Brief, dated 28 July 2023 |

| | |
|---|---|
| CMSA | Cerro Matoso S.A., the company holding the concession for the development of the Cerro Matoso mine |
| Compass Lexecon ER I | Compass Lexecon's first expert report dated 23 April 2021 |
| Comptroller General's Office or the Comptroller | Comptroller General's Office of the Republic |
| Concession 1727 | The smaller of the two concessions granted for the development of the Cerro Matoso mine, extending over 186 ha of land |
| Concession 866 | The larger of the two concessions granted for the development of the Cerro Matoso mine, extending over 500 ha of land |
| Concessions | Concessions 866 and 1727 collectively |
| Contract 51 | Contract dated 13 November 1996 governing the operation of the Concessions since 1 October 2012, in addition to another 278,700 ha in various municipalities throughout Colombia |
| Contract 866 | Contract dated 30 March 1963, as amended on 22 July 1970, governing the operation of Concession 866 |
| Contract 1727 | Contract governing the operation of Concession 1727, dated 10 February 1971 |
| Contracts | Contracts 866 and 1727 collectively |
| COP | Colombian pesos |
| Costs of the Arbitration | Administrative and Legal Costs |
| Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 10 September 2021 |
| Cundinamarca Petition | Petition by the National Mining Agency before the Administrative Court of Cundinamarca dated 10 February 2018 |

| | |
|---|---|
| H 1 | Claimant's opening statements at the beginning of the Hearing |
| H 2 | Respondent's opening statements at the beginning of the Hearing |
| Hearing | The hearing on jurisdiction, merits and quantification of damages held in Washington, D.C. on 15-17 March 2023 |
| HT-BL | Blended transcript of the Hearing that took place on 15-17 March 2023 |
| HT-EN | English language transcript of the Hearing that took place on 15-17 March 2023 |
| I | First quarter |
| II | Second quarter |
| III | Third quarter |
| Ingeominas | Colombian Institute of Geology and Mining, one of the agencies receiving delegated authority from the Ministry of Mines |
| Iron Royalties Award | Award of 11 May 2022 |
| IV | Fourth quarter |
| Joint Opinion on Question 5 | Joint Expert Opinion on Tribunal's Question 5 in Procedural Order No. 5 by both Parties' experts dated 21 July 2023 |
| Joint Valuation Model | Joint damages valuation model from both Parties' experts dated 21 July 2023 |
| July 2005 Amendments | Amendments to Contracts 866 and 1727 dated 22 July 2005 |
| Kaczmarek ER I | First expert report of Brent Kaczmarek, dated 10 September 2021 |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

| | |
|---|---|
| Law 153 of 1887 | Law 153 of 1887 which adds to and amends the National Codes, Law 61 of 1886 and Law 57 of 1887 |
| Law 610 of 2000 | Law 610 of 2000 which establishes the procedure for fiscal responsibility proceedings under the jurisdiction of the comptroller's offices |
| Law 962 of 2005 | Law 962 of 2005 which establishes provisions on the streamlining of formalities and administrative procedures of the agencies and entities of the state and of the individuals who perform public functions or provide public services |
| Law 1530 of 2012 | Law 1530 of 2012 which regulates the organization and operation of the General Royalties System |
| Legal Costs | Reasonable costs incurred by the Parties in defending themselves in the arbitration, as set out in section V.3 below |
| Legislative Decree 2053 of 1974 | Legislative Decree 2053 of 1974 reorganizing income tax and complementary taxes |
| LME | London Metal Exchange |
| Memorandum | The National Mining Agency Memorandum of 7 December 2012 |
| Memorandum on Fees | ICSID Memorandum on the Fees and Expenses (2022) dated 1 July 2022 |
| Memorial | Memorial on the Merits dated 23 April 2021 |
| Mining Code | Law 886 of 2001, which establishes the Mining Code and other provisions |
| Ministry of Mines | Initially the Ministry of Mines and Petroleum and then the Ministry of Mines and Energy |
| National Mining Agency | National Mining Agency |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

| | |
|---|---|
| Notice of Registration | Notice of Registration of the Request with ICSID dated 27 March 2020 |
| Notification of Dispute | Notification to Respondent required by Art. IX of the BIT to initiate a dispute |
| Notification of Intent | Notification to Respondent required by Art. IX of the BIT in order to submit the dispute to arbitration |
| Order 50 | Ingeominas Order SFOM-50 of 25 August 2011 |
| Order 63 | Comptroller General's Office Order 63 of 7 February 2020 |
| Order 217 | Comptroller General's Office Order 217 of 26 February 26 2018 |
| Order 1334 | Comptroller General's Office Order 1334 dated 9 August 2017 |
| Order VSC 26 | National Mining Agency Order VSC 26 issued on 12 March 2015 |
| Order VSC 62 | National Mining Agency Order VSC 62 of 11 March 2020 |
| Order VSC 206 | National Mining Agency Order VSC 206 of 23 August 2019 |
| Order VSC 351 | National Mining Agency Order VSC 351 of 1 November 2017 |
| Overview of Joint Valuation Model | Overview of the Joint Valuation Model Update on the Assessment of Damages and Indemnities to South32 SA Investments Limited's Assets in Colombia by both Parties' experts dated 21 July 2023 |
| Parties | Claimant and Respondent jointly |
| Pre-Hearing Conference | Preliminary organizational meeting, carried out by videoconference between the Parties and the Tribunal on 2 February 2023 |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

| | |
|---|---|
| Purdy WS | Witness Statement of Brian Purdy dated 18 March 2022 |
| Reference Price Award | Award of 27 April 2022 |
| Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 11 August 2022 |
| Rejoinder on Jurisdiction | Claimant's Rejoinder on Jurisdiction dated 10 November 2022 |
| Reply | Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction dated 21 March 2022 |
| Republic | The Republic of Colombia, the Respondent |
| Request | Claimant's Request for Arbitration against Respondent |
| Request for Provisional Measures | Claimant's Request for Provisional Measures, together with its Annexes A and B and legal authorities CLA 169 a CLA 187, dated 27 February 2023 |
| Resolution 293 | National Mining Agency Resolution 293 issued on 15 May 2015. |
| Resolution 576 | National Mining Agency Resolution 576 issued on 27 September 2018 |
| Respondent or Colombia | The Republic of Colombia |
| Respondent's Costs | Respondent's Statement of Costs of 25 August 2023 |
| Respondent's PHB | Respondent's Post Hearing Brief, dated 28 July 2023 |
| Royalties Law | Law 141 of 1994 which creates the National Royalties Fund and National Royalties Commission, regulates the state's right to receive royalties for the exploitation of non-renewable natural resources, establishes the rules for their settlement and distribution, and establishes other provisions |

| Special Visit | Inspection of CMSA by the Comptroller General's Office on 21 September 2012 |
| --- | --- |
| Treaty | Bilateral Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia signed on 17 March 2010 |
| Tribunal or Arbitral Tribunal | Tribunal in this case, composed of Ms. Deva Villanúa, Prof. Dr. Guido S. Tawil and Prof. Andrés Jana Linetzky |
| UPME | Mining and Energy Planning Unit (*Unidad de Planeación Minero Energética*) |
| USD | United States Dollar |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

# LIST OF CASES CITED

| | |
|---|---|
| ***Achmea*** | *Achmea B.V. v. Slovak Republic*, PCA Case No 2013-12, Decision on Jurisdiction and Admissibility, 20 May 2014 (**Doc. RL 50**). |
| ***AES*** | *The AES Corporation and Tau Power B.V. v. Republic of Kazakhstan*, ICSID Case No ARB/10/16, Award, 11 March 2013 (**Doc. RL 97**). |
| ***Bayindir*** | *Bayindir Insaat Turizm Ticaret Ve Sanayi AŞ v. Islamic Republic of Pakistan,* ICSID Case No ARB/03/29, Award, 27 August 2009 (**Doc. CLA 63**). |
| ***BBVA*** | *Banco Bilbao Vizcaya Argentaria (BBVA) S.A. v. Plurinational State of Bolivia*, ICSID Case No ARB(AF)/18/5, Award, 12 July 2022 (**Doc. RL 127**). |
| ***Bilcon*** | *William Ralph Clayton, William Richard Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware, Inc v. Government of Canada*, PCA Case No. 2009-04, Partial Award on Jurisdiction and Liability, 17 March 2015 (**Doc. CLA 87**). |
| ***Biwater Gauff*** | *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania*, ICSID Case No ARB/05/22, Award, 24 July 2008 (**Doc. RL 23**). |
| ***Cairn*** | *Cairn Energy PLC and Cairn UK Holdings Limited v. Republic of India, PCA Case No 2016-07*, Award, 21 December 2020 (**Doc. CLA 99**). |
| ***Cargill*** | *Cargill, Incorporated v. United Mexican States*, ICSID Case No ARB(AF)/05/2, Award, 18 September 2009 (**Doc. RL 32**). |
| ***Chorzów*** | *Case Concerning the Factory at Chorzów (Germany/Poland),* ICCJ Series A, No 17, Award, 13 September 1928 (**Doc. CLA 1**). |
| ***Crystallex*** | *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No ARB(AF)/11/12, Award, 4 April 2017 (**Doc. CLA 90**). |
| ***Cube*** | *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No ARB/15/20, Decision on Jurisdiction, |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

|  | |
|---|---|
|  | Liability and Partial Decision on Quantum, 19 February 2019 (**Doc. RL 75**). |
| ***ECE*** | *ECE Projektmanagement International GmbH and Kommanditgesellschaft Panta Achtundsechzigste Grundstücksgesellschaft Mbh & Co v. Czech Republic*, PCA Case No 2010-5, Award, 19 September 2013 (**Doc. CLA 128**). |
| ***Eco Oro*** | *Eco Oro Minerals Corp v. Republic of Colombia*, ICSID Case No ARB/16/41, Decision on Jurisdiction, Merits and Quantification Guidelines, 9 September 2021 (**Doc. CLA 154**). |
| ***EDF*** | *EDF (Services) Limited v. Romania,* ICSID Case No. ARB/05/13, Award, 8 October 2009 (**Doc. CLA 64**). |
| ***Eiser*** | *Eiser Infrastructure Limited and Energía Solar Luxembourg S.a.r.I. v. Kingdom of Spain*, ICSID Case No ARB/13/36, Award, 4 May 2017 (**Doc. RL 66**). |
| ***ELSI*** | *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, ICJ Reports 1989, Award, 20 July 1989 (**Doc. RL 78**). |
| ***Glencore*** | *Glencore International AG and CI Prodeco SA v. Republic of Colombia,* ICSID Case No ARB/16/6, Award, 27 August 2019 (**Doc. CLA 96**). |
| ***Hamester*** | *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No ARB/07/24, Award, 18 June 2010 (**Doc. CLA 163**). |
| ***Lion*** | *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No ARB(AF)/15/2, Award, 20 September 2021 (https://www.italaw.com/sites/default/files/case-documents/italaw16302.pdf). |
| ***Masdar*** | *Masdar Solar & Wind Coöperatief U.A. v. Kingdom of Spain*, ICSID Case No ARB/14/1, Award, 16 May 2018 (**Doc. RL 69**). |
| ***Murphy*** | *Murphy Exploration & Production Company International v. Republic of Ecuador*, PCA Case No 2012-16, Partial Final Award, 6 May 2016 (**Doc. CLA 91**). |
| ***Opera Fund*** | *Opera Fund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No ARB/15/36, Award, 6 September 2019 (**Doc. CLA 97**). |
| ***Philip Morris*** | *Philip Morris Asia Limited v. The Commonwealth of Australia,* PCA Case No 2012-12, Partial Award on Jurisdiction and Admissibility, 17 December 2015 (**Doc. RL 56**). |

| | |
|---|---|
| ***Quiborax*** | *Quiborax SA and Non Metallic Minerals SA v. Plurinational State of Bolivia*, ICSID Case No ARB/06/2), Award, 16 September 2015 (**Doc. CLA 137**). |
| ***RREEF*** | *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No ARB/13/30, Decision on Liability and the Principles of Quantum, 30 November 2018 (**Doc. RL 71**). |
| ***Rumeli Telekom*** | *Rumeli Telekom AS and Telsim Mobil Telekomikasyon Hizmetleri AS v. Republic of Kazakhstan*, ICSID Case No ARB/05/16, Award, 29 July 2008 (**Doc. CLA 50**). |
| ***Rusoro Mining*** | *Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, ICSID Case No ARB(AF)/12/5, Award, 22 August 2016 (**Doc. CLA 140**). |
| ***Saluka*** | *Saluka Investments BV v. The Czech Republic,* PCA Case No 2001-04, Partial Award, 17 March 2006 (**Doc. CLA 36**). |
| ***Swisslion*** | *Swisslion DOO Skopje v. Former Yugoslav Republic of Macedonia*, ICSID Case No ARB/09/16, Award, 6 July 2012 (**Doc. CLA 126**). |
| ***Tenaris*** | *Tenaris SA and Talta - Trading e Marketing Sociedade Unipessoal LDA v Bolivarian Republic of Venezuela*, ICSID Case No ARB/12/23, Award, 12 December 2016 (**Doc. CLA 92**). |
| ***Urbaser*** | *Urbaser S.A.and Consorcio de Aguas Bilbao Bizkaia, Bilbao Biskaia Ur Partzuergoa. v. Argentine Republic*, ICSID Case No ARB/07/26, Award, 8 December 2016 (**Doc. CLA 166**). |
| ***World Values*** | *Valores Mundiales, SL and Consorcio Andino SL v. Bolivarian Republic of Venezuela*, ICSID Case No ARB/13/11, Award, 25 July 2017 (**Doc. CLA 94**). |
| ***Vivendi*** | *Suez, Sociedad General de Aguas de Barcelona SA, and Vivendi Universal SA v. Argentine Republic*, ICSID Case No ARB/97/3, Partial Award on Liability, 30 July 2010 (**Doc. CLA 71**). |
| ***Von Pezold*** | *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No ARB/10/15, Award, 18 July 2015 (**Doc. CLA 88**). |
| ***Yukos*** | *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No 2005-04/AA227, Award, 18 July 2014 (**Doc. CLA 133**). |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

# I.   <u>INTRODUCTION</u>

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ["**ICSID**" or the "**Centre**"] on the basis of the Bilateral Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia signed on 17 March 2010 [the "**Treaty**" or the "**BIT**"] which entered into force on 10 October 2014, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 [the "**ICSID Convention**"].

2.   The claimant is South32 SA Investments Limited ["**South32**" or the "**Claimant**"], a limited liability company incorporated under the laws of England and Wales, with registered office in London and with commercial activities in the United Kingdom.

3.   The respondent is the Republic of Colombia ["**Colombia**", the "**Respondent**" or the "**Republic**"].

4.   The Claimant and the Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5.   This dispute relates to a series of measures adopted by Colombia when it sought to assess royalties supposedly owed by Cerro Matoso SA ["**CMSA**"] under several concession contracts, with CMSA being a wholly-owned subsidiary of South32. The concession contracts relate to the mine located at Cerro Matoso, and specifically to (i) concession contract 866 of 1963 ["**Concession 866**"]; (ii) concession contract 1727 of 1971 ["**Concession 1727**", jointly with Concession 866, the "**Concessions**"]; and (iii) Exploration and Exploitation Contract 051-96M of 1996 ["**Contract 51**"].

# II.    PROCEDURAL HISTORY

6.    On 11 March 2020, ICSID received a request for arbitration from South32 SA Investments Limited against the Republic of Colombia [the "**Request**"].

7.    On 27 March 2020, the Secretary-General of ICSID registered the Request in accordance with Art. 36(3) of the ICSID Convention and notified the Parties of the registration [the "**Notice of Registration**"]. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the ICSID Institution Rules of Initiation.

8.    In the absence of agreement between the Parties as to the method of constituting the tribunal, the tribunal was constituted in accordance with the formula set forth in Art. 37(2)(b) of the ICSID Convention.

9.    The tribunal is composed of Ms. Deva Villanúa, a national of Spain, President, appointed by agreement of the Parties; Prof. Dr. Guido S. Tawil, a national of Argentina and Portugal, appointed by the Claimant; and Prof. Andrés Jana Linetzky, a national of Chile and Portugal, appointed by the Respondent [the "**Tribunal**" or "**Arbitral Tribunal**"].

10.    On 17 November 2020, the Secretary-General, in accordance with Arbitration Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings of 10 April 2006 ["**Arbitration Rules**"], notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to be constituted on that date. Ms. Catherine Kettlewell, ICSID Legal Counsel, was appointed to act as Secretary of the Tribunal.

11.    On 15 December 2020, after consultation with the Parties, the Tribunal appointed Ms. Francisca Seara Cardoso as Assistant to the Tribunal in the present case.

12.    In accordance with Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 21 December 2020 by videoconference.

13.    Following the first session, on 29 December 2020, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural issues and the Tribunal's decision on disputed issues. Procedural Order No. 1 provides, *inter alia,* that the applicable Arbitration Rules shall be those in effect as of 10 April 2006, that the procedural languages shall be English and Spanish, and that the place of the proceedings shall be Washington, D.C. Procedural Order No. 1 also sets out the agreed Procedural Timetable.

14.    In accordance with Procedural Order No. 1, on 23 April 2021 South32 filed its Memorial on the Merits, together with (i) the witness statement of Mr. Ricardo Gaviria

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

Award

Jansa; (ii) the witness statement of Mr. Ciro Ávila del Vecchio; (iii) Compass Lexecon's expert report; (iv) Exhibits C 1 to C 141; and (v) legal authorities CLA 1 to CLA 99.

15.   On 10 September 2021, Colombia filed its Counter-Memorial on the Merits and Memorial on Jurisdiction, together with (i) the expert report of Mr. Brent Kaczmarek; (ii) Exhibits R 1 to R 73; and (iii) legal authorities RL 1 to RL 77.

16.   Following exchanges between the Parties, on 28 October 2021 each Party submitted a request for the Tribunal to rule on the production of documents.

17.   On 10 November 2021, the Tribunal issued Procedural Order No. 2 on the Parties' Document Production Requests.

18.   The Parties agreed to modify the Procedural Calendar set out in Procedural Order No. 1, and the Tribunal issued Procedural Order No. 3 granting the requested extension and confirming the adjustments agreed by the Parties.

19.   On 21 March 2022, South32 filed its Reply on the Merits and Counter-Memorial on Jurisdiction, together with (i) the witness statement of Mr. Brian Purdy; (ii) the second witness statement of Mr. Ciro Ávila del Vecchio; (iii) Compass Lexecon's second expert report; (iv) Exhibits C 142 to C 191; and (v) legal authorities CLA 100 to CLA 155.

20.   On 11 August 2022, Colombia submitted its Rejoinder on the Merits and Reply on Jurisdiction, together with (i) the second expert report of Mr. Brent Kaczmarek; (ii) Exhibits R 74 to R 89; and (iii) legal authorities RL 78 to RL 132.

21.   On 10 November 2022, South32 filed its Rejoinder on Jurisdiction, together with (i) Exhibits C 192 to C 193; and (ii) legal authorities CLA 156 to CLA 168.

22.   On 22 December 2022, the Tribunal circulated a draft procedural order concerning the organisation of the hearing for the Parties to discuss, confer and respond with a joint proposal advising the Tribunal of the agreements they were able to reach on the draft, or of their respective positions where they were unable to reach an agreement.

23.   On 2 February 2023, at 1:00 p.m. EST the Parties and the Tribunal held a preliminary organizational meeting by videoconference [the "**Pre-Hearing Conference**"] to deliberate on any outstanding procedural, administrative, and logistical matters in preparation for the hearing. During the Pre-Hearing Conference, the Parties and the Arbitral Tribunal discussed Draft Procedural Order No. 4 and the Parties' respective positions where no prior agreement had been reached.

24.   A recording of the Pre-Hearing Conference was made and deposited in the ICSID archives. This recording was made available to the Parties and the Arbitral Tribunal.

25.   Following the Pre-Hearing Conference, on 15 February 2023 the Arbitral Tribunal issued Procedural Order No. 4 concerning the organisation of the hearing.

26.   On 23 February 2023, South32 filed a request for leave from the Arbitral Tribunal to introduce new evidence relating to the valuation of damages, which included (i) an updated damages and compensation valuation model; (ii) a brief explanation of the updates of no more than 10 pages; and (iii) updated supporting documentation.

27.   On 27 February 2023, South32 filed a Request for Provisional Measures, together with (i) Annexes A and B; and (ii) legal authorities CLA 169 to CLA 187 ["**Request for Provisional Measures**"].

28.   On 1 March 2023, the Arbitral Tribunal held a session with the Parties on the Claimant's Request for Provisional Measures.

29.   In response to an invitation from the Arbitral Tribunal, on 3 March 2023, Colombia submitted its observations on South32's request for authorisation to introduce new evidence.

30.   On the same day, South32 withdrew its Request for Provisional Measures.

31.   On 8 March 2023, the Arbitral Tribunal ruled on the admissibility of the new evidence requested by South32 on 23 February 2023. On the same day, South32 requested clarification of the Tribunal's decision on its request.

32.   In response to an invitation from the Arbitral Tribunal, on 10 March 2023, Colombia submitted its comments on South32's request for clarification.

33.   By letter dated 11 March 2023, South32 filed further observations on its request, and, on 12 March 2023, the Arbitral Tribunal provided clarification of its decision of 8 March 2023.

34.   On 13 March 2023, Colombia filed a request for leave from the Arbitral Tribunal to introduce new evidence. On the same day, in light of the agreement already expressed by South32 in its letter dated 11 March 2023, the Tribunal granted Colombia's request.

35.   From 15 to 17 March 2023, a hearing on jurisdiction, merits and *quantum* was held in Washington, D.C. [the "**Hearing**"]. The following persons were present at the Hearing:

  *Tribunal:*
  Ms. Deva Villanúa                    President
  Prof. Guido S. Tawil                 Co-arbitrator
  Prof. Andrés Jana Linetzky           Co-arbitrator

  *Assistant to the* Tribunal:
  Ms. Francisca Seara Cardoso          Assistant to the Tribunal

*ICSID Secretariat:*
  Ms. Catherine Kettlewell                   Secretary of the Tribunal

*For the Claimant:*
  Mr. Nigel A. Blackaby                      Freshfields Bruckhaus Deringer
  Ms. Caroline S. Richard                    Freshfields Bruckhaus Deringer
  Ms. María Julia Milesi                     Freshfields Bruckhaus Deringer
  Ms. Madeline Snider                        Freshfields Bruckhaus Deringer
  Ms. María del Rosario Galardi              Freshfields Bruckhaus Deringer
  Mr. Juan Ignacio Amado Aranda              Freshfields Bruckhaus Deringer
  Mr. Rubén Castro                           Freshfields Bruckhaus Deringer
  Ms. Sandra Díaz                            Freshfields Bruckhaus Deringer
  Mr. Jean-Paul Dechamps                     Dechamps International Law
  Ms. Sofia Ottaviano                        Dechamps International Law
  Ms. Carolina Posada                        PHR Legal
  Ms. Laura Vengoechea                       PHR Legal
  Ms. T-Zady Guzmán / Mr. Jorge              FTI Consulting (*support*)
  Salazar

  Ms. Diana Suárez                           CMSA
  Mr. Thomas A. N. Bedford                   South32 SA Investments Limited

*For the Respondent:*
  Mr. Fernando Mantilla-Serrano              Latham & Watkins
  Ms. Esperanza Barrón Baratech              Latham & Watkins
  Mr. Kevin Cubeddu                          Latham & Watkins
  Mr. Nicolás Esguerra                       Latham & Watkins
  Ms. Nuria Casas Cano                       Latham & Watkins
  Ms. Ana María Ordóñez Puentes              ANDJE - Remote Access
  Ms. Elizabeth Prado López                  ANDJE

*Court Reporters:*
  Ms. Dawn Larson                            B&B Reporters
  Mr. Rodolfo Rinaldi                        D-R Esteno
  Ms. Elizabeth Cicoria                      D-R Esteno

*Interpreters:*
  Ms. Silvia Colla                           Interpreter esp-eng
  Mr. Charlie Roberts                        Interpreter esp-eng
  Mr. Daniel Giglio                          Interpreter esp-eng

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

| *Technician:* | |
| Mr. Bryan Charles Royster | World Bank Group |

36.    During the hearing, the following persons were examined:

| *On behalf of the Claimant*: | |
| Mr. Brian Purdy | Witness |
| Mr. Ricardo Gaviria Jansa | Witness |
| Mr. Ciro Avila del Vecchio | Witness |
| Dr. Manuel Abdala | Compass Lexecon |
| Mr. Pablo López-Zadicoff | Compass Lexecon |

| *On behalf of the Respondent*: | |
| Mr. Brent C. Kaczmarek | IAV Advisors |
| Mr. Gabriel Perkinson | IAV Advisors |

37.    On 12 April 2023, the Arbitral Tribunal issued Procedural Order No. 5 concerning post-hearing issues.

38.    On 14 April 2023, the Parties requested clarification of the Arbitral Tribunal's instructions contained in Procedural Order No. 5. On 19 April 2023, the Arbitral Tribunal confirmed the Parties' understanding.

39.    On 10 May 2023, the Parties submitted consolidated and revised versions of the transcripts of the Hearing.

40.    On 4 May 2023, South32 submitted a request for leave to introduce a new document into the record and to comment on it in post-hearing briefs. On 15 May 2023, the Respondent confirmed that it did not object to the introduction into the record of this document.

41.    On 16 May 2023, the Arbitral Tribunal admitted the document into the file as Exhibit C 197.

42.    The Parties' experts submitted their Joint Valuation Model on 21 July 2023.

43.    The Parties filed simultaneous post-hearing briefs on 28 July 2023.

44.    The Parties filed their submissions on costs on 25 August 2023.

45.    The procedure was declared closed on 14 May 2024.

# III.  FACTS

46. This arbitration arises out of the Claimant's[1] development of a nickel mine in Colombia[2], whose ore it transforms into ferronickel, and the royalties owed on account of its exploitation.

47. The Claimant rejects the conformity with the BIT of nine[3] measures adopted by Colombia relating to royalty settlements and, more specifically, debates:

   - What the reference price used to calculate the settlement is;

   - What the chosen royalty rate is;

   - What the costs that the Claimant could deduct are and by what percentage;

   - Whether royalties could be charged for the iron contained in the ore that is extracted and exploited.

48. The most relevant facts are set out below, and the analysis of each of the issues discussed will include a detailed description of the particular facts that are significant for each specific issue.

---

[1] Strictly speaking, CMSA, its local subsidiary.
[2] Such assertions are without prejudice to the Arbitral Tribunal's decision later in this award regarding the Claimant's status as an investor.
[3] Originally, there were 10 (H 1, p. 63), but in Claimant's PHB (footnote 439), the Claimant considers that VSC 153 (Doc. C 136) has been rendered ineffective.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

1.  **CERRO MATOSO MINE**

49.    In Montelíbano, in the department of *Córdoba*, Colombia, there is a nickel mine, called Cerro Matoso[4].



50.    The mined nickel ore is transformed through complex furnace processing into ferronickel, which is the marketed product.

51.    Ferronickel is composed of nickel and iron, in an intimate bond, in a ratio of approximately 20-40% nickel and 60-80% iron (for simplicity: 30% nickel and 70% iron). Ferronickel is also known as Class 2 nickel; Class 1 nickel is pure nickel – the appearance of the two products is very different:



---

[4] Memorial on the Merits of 23 April 2021 [the "**Memorial**"], para. 4. The images are from Claimant's Opening Statement at the beginning of the Hearing ["**H 1**"], p. 6.
[5] H 1, p. 8.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

52.     There is no dispute between the Parties that, due to the characteristics of the ore mined at Cerro Matoso and the limitations of the steelmaking processes, the only marketable product that can be produced at Cerro Matoso is ferronickel. In particular, there is no possibility of obtaining Class 1 nickel or iron as a product suitable for commercial exploitation[6].

53.     The operation of the Cerro Matoso mine dates back to 1982 and today is one of the world's largest producers of ferronickel[7] and the only nickel mine in Colombia[8].



**2.    THE CONCESSIONS**

54.     The concession for the development of the Cerro Matoso mine is split into two concessions (Concessions 866 and Concession 1727, collectively the Concessions), the terms of which are regulated in three concession contracts, with different physical and temporal scopes of application:

-     Concession 866 was granted on 30 March 1963. The original contract was amended on 22 July 1970 [the "**Contract 866**"][9] and provided for the concession to extend over 500 ha[10] for a term of 25 years, extendable for a further five years[11] (this period ended up being extended). Concession 866 is the main concession.

-     Concession 1727 was obtained on 10 February 1971[12], for 30 years[13], over 186 ha [the "**Contract 1727**"][14].

---

[6] Claimant's Post Hearing Brief of 28 July 2023 ["**Claimant's PHB**"], para. 15.
[7] Memorial, para. 4.
[8] Memorial, para. 10. The image comes from the Respondent's opening statements at the beginning of the Hearing ["**H 2**"], p. 4.
[9] Doc. C 7.
[10] Clause 1.
[11] Clause 30.
[12] Doc. C 9.
[13] Clause 9.
[14] Clause 1.

Exploitation of the mine under both Concessions commenced on 1 October 1982. There is no dispute between the Parties that the terms of Contract 866 (as extended) and Contract 1727 [together, the "**Contracts**"] expired on 30 September 2012.

Below is an aerial photo of the Concessions[15]:



-   **Contract 51**, signed on 13 November 1996[16], covered 278,700 ha in various municipalities and already established that, upon expiry of Contracts 866 and 1727, the exploitation areas of those Concessions would be incorporated into the Contract 51 area, with this in fact occurring on 1 October 2012. The original term of Contract 51 was 30 years (from 2 August 1999), extendable by at least 15 more[17] – the term is currently scheduled to expire in 2044[18].

55.   In consideration for the exploitation rights granted, CMSA had to pay royalties to the Colombian state.

**3.    CMSA**

56.   CMSA is a Colombian company, incorporated in 1979. CMSA is the concession holder for the exploitation of the Cerro Matoso mine and has been so for the last 40 years.

---

[15] Memorial, p. 11.
[16] Doc. C 17.
[17] Clause 3.
[18] H 1, p. 9.

57.    In those 40 years, CMSA's shareholding has been in different hands, both private and public[19]:

58.    From its incorporation until 1997, the Colombian state held 45% of CMSA's share capital[20].

59.    The other main shareholder was Billiton Overseas Limited ["**Billiton**"], which originally held 34.99%, increasing its share in 1994 to 52.31% and thus replacing the Colombian state as majority shareholder[21].

60.    In February 1997, Colombia submitted the privatisation of its shareholding to a bidding process[22]. Billiton was the successful bidder and thus held almost 100% of the shareholding[23].

61.    Years later Billiton would carry out a corporate restructuring of the companies that were part of the group. The restructuring included the demerger of certain companies, including CMSA. The demerged companies were placed under the ownership of BHP Billiton SA, later renamed South32 Limited – the current Claimant.[24] The Respondent argues that the Claimant lost its status as a protected investor under the BIT by acquiring ownership of CMSA in order to benefit from the arbitral forum offered in the BIT – so-called *treaty shopping*[25] – something denied by the Claimant[26]. This issue will be dealt with in detail in section V.1.1 below.

**4.    THE AUTHORITIES**

62.    The facts of this arbitration, which span more than 40 years of mining, primarily involve two authorities:

63.    *On the one hand,* there is the mining authority which, over those 40 years, has changed its name, initially being known as the Ministry of Mines and Petroleum and later the Ministry of Mines and Energy [the "**Ministry of Mines**"][27]. The latter delegated its authority first to the Empresa Nacional Minera Ltda and then to the Colombian Institute

---

[19] Memorial, footnote 9.

[20] H 1, p. 11.

[21] H 1, p. 11.

[22] Memorial, para. 15.

[23] Memorial, para. 15.

[24] Rejoinder on Jurisdiction of 10 November 2022 ["**Rejoinder on Jurisdiction**"], para. 45.

[25] Counter-Memorial on the Merits and Memorial on Jurisdiction of 10 September 2021 ["**Counter-Memorial**"], paras. 314 and 330.

[26] Reply on the Merits and Counter-Memorial on Jurisdiction of 21 March 2022 ["**Reply**"], para. 394.

[27] Memorial, footnote 7.

of Geology and Mining ["**Ingeominas**"][28]. As of 2011, the relevant authority is the *Agencia Nacional de Minería* ["**National Mining Agency**"][29].

64. *On the other* is the *Contraloría General de la República* [the "**Comptroller General's Office**"], an entity that "oversees the fiscal management of the administration and of the individuals or entities that handle funds or assets of the Nation".[30] The state itself has described its Comptroller General's Office as "fearless and fearsome".[31]

65. The rationale for the existence of these two supervisory bodies is as follows:

 - The National Mining Agency is the contractual counterpart[32] of CMSA in the Contracts and, in its supervisory role, ensures compliance with the Contracts. In addition, it has other functions assigned to it by law, one of which has taken centre stage in this Award: the normative development of Art. 23 of the Royalties Law ["**Royalties Law**"] through Resolution 293 ["**Resolution 293**"].

 - The Comptroller General's Office, through fiscal responsibility actions, is the body in charge of overseeing public funds and ensuring sound management of the state's assets.

## 5.   THE ISSUES IN DISPUTE

66. The Colombian state has issued several orders[33] regarding the calculation of the royalties owed by CMSA as consideration for the concession of the right to develop the mine.

67. These are the main issues discussed, divided into three main groups:

 - Nickel royalty: the royalty rate and percentage of deductible costs (**A.**), the reference price used for calculation of the royalties due (**B.**) and the deductible costs applicable to the nickel royalty (**C.**);

 - Iron royalty (**D.**);

 - And as a transversal issue, the settlement of accounts of the Contracts (**E.**).

68. What follows is only a very brief overview – just enough to provide an understanding of the subsequent sections of this Award.

---

[28] Counter-Memorial, para 85.
[29] Counter-Memorial, para 86.
[30] Doc. R 2, Art. 267. "*vigila la gestión fiscal de la administración y de los particulares o entidades que manejan fondos o bienes de la Nación*" Free translation by the Arbitral Tribunal.
[31] Counter-Memorial, para 96.
[32] Or the successor entity to the original counterpart.
[33] Broad term, which also includes orders and other types of orders.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

### A.    Royalty rate and cost deduction rate

69.    The Concessions are very old, dating from a time when the notion of royalties – or consideration for the exploitation of a natural resource of the state – although known, was not regulated.

70.    The only regulation was of a contractual nature. The Contracts contained a formula for the determination of the amount to which the royalty rate would be applied. This formula, in essence, estimated the value of the mineral extracted and applied a royalty rate of 8%, with certain costs being deducted beforehand at 80% or 100% (depending on the type of expenditure). The contractual formula was applied for many years, with no major disruptions.

71.    In 1994 Colombia enacted the Royalties Law[34]. It established a minimum royalty on nickel of 12% (i.e. 4% more than provided for in the Contracts) and allowed only 75% of costs to be deducted.

72.    In addition, there is another issue: the Royalties Law was not immediately applicable to the Concessions; it would only apply to new concessions or extensions of existing contracts. Colombia considers that the royalty rate in the Royalties Law has been applicable to the Concessions since 2005 and therefore has recalculated past royalties, applying the 12% rate and deducting 75% of the costs. The Claimant alleges that this course of action is unlawful as, in its view, it entails a retroactive application of the law.

### B.    Reference price

73.    The Contracts estimated the value of the ore through prices quoted on international markets – the so-called "reference price".

74.    The Royalties Law modified the reference price used for the calculation of the royalty but did so through a new and very basic formula – a formula that was set to be later developed through specific legislation.

75.    The specific legislation was passed some 20 years later, through Resolution 293 of May 2015. The Parties dispute whether the resulting formula is consistent with the guidelines given in the Royalties Law.

76.    The issue of supposed normative retroactivity also affects the reference price, as Colombia also intends to apply the new formula from 2005 – something that the Claimant opposes as unlawful.

---

[34] Law 141 of 1994, which creates the National Royalties Fund, the National Royalties Commission, regulates the state's right to receive royalties for the exploitation of non-renewable natural resources, establishes the rules for their settlement and distribution, and establishes other provisions.

## C.    Deductible costs

77.    In state-ordered audits of past royalty settlements, it was found that only costs directly related to exploitation could be deducted.

78.    The state authorities shared the auditors' view and recalculated previously paid royalties to exclude the costs which, in their view, were wrongly deducted because they were not related to exploitation.

79.    The Claimant criticises the revision of historical settlements as being unlawful, as it introduces additional requirements not contemplated in the Contracts.

## D.    Iron royalty

80.    CMSA extracts nickel ore from the Cerro Matoso mine containing a small proportion of iron oxide and, after industrial processing, CMSA converts this ore into the product called ferronickel, which contains both nickel and iron. For nearly 40 years, CMSA has only paid royalties on the percentage of nickel contained in the ferronickel.

81.    As of 2019, the Colombian state has demanded the payment of quarterly royalties on the iron contained in the ferronickel, accounted for since the fourth quarter ["**IV**"][35] 2012; and CMSA has paid, under protest, the royalty settlements on the iron. The Claimant objects on the grounds that, as iron is not the product sold, it should not be obliged to pay any royalties.

82.    The state has also exercised its right to charge royalties on iron also for periods prior to 2012 on account of the settlement of accounts of the Contracts. The Claimant objects to such retroactive collection.

## E.    The settlement of accounts of the Contracts

83.    The Contracts foresee that, upon termination, a final settlement statement be signed in which the unfulfilled obligations, among other matters linked to the payment of royalties, are to be set out.

84.    Based on the foregoing, the state has sought to review the correctness of the royalties paid since exploitation began, starting in 1982. The Claimant contends (among other arguments) that the act of settling is not designed to reopen those settlements and, moreover, that any rights related to the execution of the settlement statement are time-barred.

---

[35] First quarter will be referred to as **I**, second quarter as **II** and third quarter as **III**.

6. <u>**BRIEF CHRONOLOGY**</u>

85.    Having explained the issues in dispute, it is appropriate to list the most relevant facts affecting those issues and other arguments brought to this arbitration:

-    30 March 1963: Contract 866;

-    22 July 1979: amendment to Contract 866;

-    10 February 1971: Contract 1727;

-    1 October 1982: start of operations;

-    23 August 1985: agreement on royalties between CMSA and Colombia ["**1985 Agreement**"];

-    28 June 1994: enactment of the Royalties Law;

-    15 August 2001: enactment of the Mining Code;

-    22 July 2005: contractual amendment;

-    1 October 2007: first extension of Concession 866;

-    30 August 2011: agreement to amend the 1985 Agreement;

-    30 September 2012: expiry of the term of Contracts 866 and 1727;

-    1 October 2012: incorporation of Concessions 866 and 1727 into Contract 51;

-    2 February 2015: acquisition by the Claimant of its shareholding in CMSA;

-    12 March 2015: Order VSC 26 of the National Mining Agency re-assessing royalties on account of the deductible costs (period 1998 to 2003);

-    15 May 2015: Resolution 293 of the National Mining Agency developing the FOB price in the formula for calculating the base price for the settlement of royalties;

-    July 2015 onwards: resolutions of the Mining and Energy Planning Unit publishing the base price, in application of the FOB price in Resolution 293 of the National Mining Agency;

-    21 September 2017: Resolution 562 (as amended by resolution 293) of the Mining and Energy Planning Unit re-assessing royalties on account of the reference price (period 2007 to 2012);

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

- 6 February 2018: judicial petition (Cundinamarca Petition) to settle the accounts of the Contracts and re-assess royalties on account of the reference price (period 2005 to 2007), deduction of costs (period 1982 to 1997 and 2009 to 2012) and demanding royalties on iron (period 1982 to 2012);

- 26 February 2018: Order 217 of the Comptroller General's Office re-assessing royalties on account of deductible costs (period 1998 to 2003);

- 27 September 2018: Resolution 576 of the National Mining Agency re-assessing royalties on account of the royalty rate and cost deductions (period 2007 to 2012), reference price (period 2007 to 2012) and cost deductions (period 1998 to 2003);

- 23 August 2019: Order VSC 206 of the National Mining Agency claiming iron royalties (period 2012 to 2019);

- 11 March 2020: Order VSC 62 of the National Mining Agency claiming iron royalties (period 2012 to 2019);

- 7 February 2020: Order 63 of the Comptroller General's Office re-assessing royalties on account of the royalty rate and cost deductions (period 2005 to 2012), reference price (period 2007 to 2012), cost deductions (period 1982 to 2012) and the liquidation of iron royalties (period 1982 to 2012).

7.    <u>A SUMMARY OF THE CLAIMS</u>

86.    The following is a brief summary of what each Party claims:

87.    The Respondent requests that the Arbitral Tribunal reject its competence both on the grounds of treaty shopping, and because it considers that the substantive discussion deals with purely local issues, which are being heard before ordinary Colombian courts. Therefore, the matter would be barred from being decided before this Arbitral Tribunal. The Claimant does not see it this way and accepts the competence of this Arbitral Tribunal.

88.    The Claimant, for its part, considers that Colombia treated it unfairly and inequitably by frustrating its legitimate expectations regarding CMSA's royalty obligations and adopting arbitrary and inconsistent measures. Moreover, Colombia failed to provide a stable legal and business environment for the investment[36]. For all of these reasons, the Claimant is seeking:

- Historical damages suffered for having paid royalties on nickel under the new formula, which it considers to be wrong, at a higher rate than the one actually

---

[36] Reply, para. 353.

applicable, and with a lower cost deduction than the correct one. It also claims reimbursement for the iron royalties paid.

- Compensation for future damages arising if royalties continue to be settled in the unlawful manner outlined above.

- A cease-and-desist order to prevent the passing of specific measures causing an internationally unlawful act or, alternatively, compensation for the damage that may be caused by the unlawful measures.

# IV.  CLAIMS OF THE PARTIES

1.  **THE CLAIMANT'S RELIEF**

89.  In the Claimant's PHB, the Claimant set out its claims as follows[37]:

> "(a) DECLARE that Colombia has breached Article II(3) of the Treaty;

> (b) ORDER that Colombia:

>> (i) pay Claimant the value at the date of the award of the payments made by CMSA that would not have been made but for Colombia's Measures in breach of the Treaty in the amount of US$90,037,984;

>> (ii) through the National Mining Agency, the Comptroller General's Office and the UPME, cease any and all actions in furtherance of its breaches of the Treaty, namely through: *(i)* the immediate withdrawal by the National Mining Agency of Payment Order VSC 26; *(ii)* the immediate withdrawal by the National Mining Agency of its Resolution 293 and its opposition to CMSA's legal challenge thereto; *(iii)* the immediate cessation and withdrawal by the National Mining Agency of the Cundinamarca Petition; *(iv)* the immediate withdrawal by the National Mining Agency of its Resolution 576 and of its opposition to CMSA's legal challenge thereto; and *(v)* the immediate cessation by the Comptroller General's Office of the Order 63 fiscal liability proceedings;

>> (iii) through UPME, set any future base price for the payment of nickel royalties in a manner consistent with the declaration of illegality at paragraph 261(a) above; and

>> (iv) provide appropriate assurances and guarantees, including from the National Mining Agency, the Comptroller General's Office and UPME, that Colombia will refrain from issuing any measure inconsistent with the declaration of illegality requested in paragraph 261(a).

> (c) in the event that Colombia fails to cease its unlawful Measures in violation of paragraph 261(b)(i)-(iv) above within 180 days of this award (or such other period as the Tribunal deems appropriate), that Colombia provide full reparation for its breaches, ORDERING that Colombia:

>> (i) pay Claimant damages as of the date of the award in the amount of US$73,570,987, or such other sum as the Tribunal deems appropriate, representing the difference in the net present value of net revenues until the end of Contract 51's terms in 2044 between a scenario with and without the

---

[37] Claimant's PHB, para. 261.

**Award**

unlawful Measures in relation to the implementation of the reference price methodology set out in Resolution 293;

(ii) fully indemnify and hold Claimant harmless in respect of any payments that CMSA may be ordered to make in respect of Colombia's unlawful Measures (including, without limitation, in respect of Payment Order 26; the proceedings relating to Resolution 576; the Cundinamarca Petition; and Order 63);

(d) AWARD to Claimant post-award interest on amounts awarded under (b) and (c) above, at a rate equal to CMSA's WACC compounded semi-annually, or other such rate and/or compounding period as the Tribunal determines will ensure full reparation, to run from the date of the award to the date of full and final payment;

(e) DECLARE that: (i) the award of any damages and interest is made net of applicable Colombian taxes; and (ii) Colombia may not deduct taxes in respect of the payment of the award of any damages and interest;

(f) ORDER Colombia to indemnify and hold Claimant harmless in full with respect to any Colombian taxes imposed on the compensation awarded to the extent that such compensation has been calculated net of Colombian taxes;

(g) ORDER Colombia to indemnify and hold Claimant harmless in respect of any double taxation liability in the United Kingdom that may arise and that would not have arisen but for Colombia's unlawful Measures; and

(h) ORDER Colombia to pay all of the costs and expenses of this arbitration, including but not limited to Claimant's legal and expert fees, the fees and expenses of the Tribunal and ICSID's administrative and other costs, plus interest until the date of payment; and

(i) AWARD such further or alternative relief as the Tribunal considers appropriate."

## 2.   THE RESPONDENT'S RELIEF

90.   The Respondent set out its *petitum* in its Post-Hearing Brief as follows[38]:

"a. Decide that it lacks jurisdiction;

b. In the alternative, find that the Claimant's claims are inadmissible;

c. In the further alternative, dismiss all of the Claimant's claims and declare that:

---

[38] Respondent's PHB, para. 214.

Award

(i) the Republic of Colombia has not breached the BIT; or

(ii) in the event and to the extent that Colombia is found to have breached the BIT, that the Claimant has suffered no compensable loss;

d. In all events, order the Claimant to pay all costs and expenses of this arbitration proceedings, plus pre-award and post-award interest thereon until the date of payment; and

e. Grant such relief that the Tribunal may deem just and appropriate."

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

# V. ANALYSIS[39]

91.  The Arbitral Tribunal has to decide whether it has competence (**V.1.**) and, if so, it will analyse the merits of the case (**V.2.**). Finally, it will decide the ancillary issues such as costs and post-award interest (**V.3.**).

92.  In the following analysis of the Parties' positions, the Arbitral Tribunal has chosen the facts, arguments and evidence that it considered decisive, omitting those of a subsidiary or ancillary nature. Accordingly, the Arbitral Tribunal clarifies that, even if a fact, argument or piece of evidence is not expressly reflected in this Award, this does not mean that it has not been analysed and considered by the Arbitral Tribunal in reaching its conclusions.

# V.1. JURISDICTIONAL OBJECTIONS

93.  The Respondent has raised various jurisdictional objections[40], which allow for some grouping, depending on the criticism contained therein: treaty shopping (**1.**), the underlying dispute (**2.**) and, finally, failure to comply with procedural requirements (**3.**).

## 1. TREATY SHOPPING

94.  The Respondent suggests that the Claimant acquired its shareholding in CMSA (**1.1.**), aware of the existence of a dispute with the Colombian state (**1.2.**); thus resulting in a fraudulent action, aimed at obtaining protection through the BIT.

### 1.1. THE ACQUISITION OF CMSA

95.  The Arbitral Tribunal will give a chronological account of the evolution of CMSA's shareholding (**A.**); then present the positions of the Parties (**B.**); and finally make a decision (**C.**).

---

[39] The arbitrator Prof. Andrés Jana has issued a partial dissenting opinion attached to this Award. Prof. Jana disagrees with the majority's decision to award an indemnity for future damages to the Claimant, with some of the reasons on which the Majority bases the Arbitral Tribunal's conclusion that the Respondent has breached Art. II.3 of the BIT, and with the decision on costs. The reasons and specific aspects of the dissent are contained in the dissenting opinion. Consequently, Prof. Jana's concurrence regarding the reasoning and conclusions in this Award must be considered in light of said dissenting opinion.

[40] The Respondent initially raised a total of eight jurisdictional objections, some of which were left undeveloped in the following stages of the arbitration. The following are the objections raised both at the Hearing and in the subsequent Post Hearing Brief ["**Respondent's PHB**"].

### A. The shareholding of CMSA

96. The timeline can be divided into two sections: before and after a corporate demerger that took place in 2015.

### a. Before the demerger

97. CMSA was created in March 1979, with Billiton Overseas Limited and Compañía de Níquel Colombiano SA as shareholders[41]. Billiton Overseas Limited had a 35% shareholding[42]. Billiton Overseas Limited belonged to the Billiton group. Over the following years, the shares Billiton Overseas Limited held in CMSA were held by other companies in the same Billiton group.

98. The next notable change in shareholding occurred in 1994, when Billiton's ownership increased to 52.31% – the shares were held (within the Billiton group) by Billiton (BVI) Limited and Conicol (BVI) Limited[43].

99. In February 1997, the Billiton group became virtually the sole shareholder of CMSA by acquiring the state's 46.88% shareholding[44], doing so through the company Billiton Group (BVI) Limited.

100. In 2001 the Billiton group was renamed BHP Billiton[45]. This was what the chain of ownership looked like at CMSA as of June 2014[46]:

---

[41] Memorial, footnote 9.
[42] Memorial, para. 11.
[43] Memorial, footnote 11.
[44] Memorial, footnote 19.
[45] Memorial, para. 16.
[46] Reply, p. 223. Note that some of the ownership percentages differ slightly from those set out in the preceding paragraphs.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**



CMSA's corporate chain prior to the Demerger internal restructuring (June 2014)

### b.    **After the demerger**

101.  In 2014 BHP Billiton decided to split its businesses into two categories[47]: core assets[48] and non-core assets[49]. CMSA belonged to the second category.

102.  BHP Coal Holdings Pty Limited was the subsidiary chosen to acquire the non-core assets, while the core assets would remain with BHP Billiton[50].

103.  BHP Coal Holding Pty Limited would change its name to South32 Limited. South32 Limited would then head the South32 group[51].

104.  As a result of the demerger and the creation of the South32 group, two of CMSA's shareholders, which had "BHP Billiton" in their name, changed their name to "South32"; so that:

-    Billiton Group (BVI) Limited., with a 47.57% shareholding, became South32 Group BVI Limited; and

---

[47] HT-EN, Day 3, p. 825, ll. 2-3.
[48] Rejoinder Jurisdiction, para. 44.
[49] Reply, para. 384: oil, copper, iron, potash and coal.
[50] Reply, para. 384.
[51] Reply, para. 384.

- Billiton (BVI) Limited., with 46.93% of the share capital, became known as South32 BVI Limited.

105. Conicol BVI Limited, the other shareholder with 5.44%, did not change its name.

106. The chain of ownership in CMSA, in 2015, was thus[52]:



CMSA's corporate chain following the Demerger (2015)

107. South32 SA Investments Limited is the Claimant in this arbitration: it holds 100% of the shares in South32 BVI Limited, which in turn owns directly 46.93% of CMSA's shareholding and indirectly another 53.01%[53]; in total 99.94%.

## B.    Positions of the Parties

108. It is undisputed that BHP Billiton SA Investments Limited (incorporated in the United Kingdom) bought the indirect shareholding in CMSA from BHP Billiton Jersey Limited (incorporated in Jersey). BHP Billiton SA Investments Limited would later change its name to South32 SA Investments Limited (the Claimant).

109. Since BHP Billiton Jersey Limited, as a Jersey company, does not have access to the protection of the BIT, but BHP Billiton Investments Limited does, the Respondent infers that the transfer was made in order to obtain such protection[54].

---

[52] Reply, p. 224.
[53] 47.57% through South32 Group BVI Limited and 5.44% through Conicol BVI Limited.
[54] Counter-Memorial, para. 317.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

110. The Claimant denies that the motivation for the transfer was the one alleged the Respondent: CMSA shares would always have been in the hands of protected investors, both before[55] and after the demerger[56] – this would preclude any abuse[57], especially as the applicable standard is very high[58].

## C.    Decision of the Arbitral Tribunal

111. The Arbitral Tribunal sides with the Claimant:

112. The witness Purdy testified that, prior to the demerger, at the top of the chain of ownership of CMSA was BHP UK (incorporated in the United Kingdom). BHP UK thus indirectly owned almost 100 % of CMSA. This being so, BHP UK fulfilled the requirements set out in Art. I of the BIT to be considered:

- An investor ("corporations ... incorporated ... under the law of any part of the United Kingdom");

- With a protected investment ("investment means ... shares in a company [in Colombia] ... owned or controlled directly or indirectly").

113. After the demerger, the Claimant (incorporated in the United Kingdom) became the indirect owner of almost all of CMSA's share capital, thus also fulfilling the requirements of Art. I of the BIT to be considered an investor with a protected investment.

114. It is not relevant that the Claimant acquired the investment from a company not protected by the BIT because, in any event, this unprotected company was at an intermediate position in the chain of ownership; the protection under the BIT was never in doubt as it was granted by the fact that BHP UK was at the top of the chain of ownership.

115. This jurisdictional objection is therefore rejected.

---

[55] Reply, para. 392.
[56] Reply, para. 376.
[57] Reply, para. 394.
[58] Reply, para. 377.

## 1.2. THE EXISTENCE OF A DISPUTE

116. Having already decided that CMSA was always an investment protected by the BIT, the Respondent's second argument, which sought to prove treaty shopping, is no longer relevant.

117. In any event, and in deference to the Parties' efforts, the Arbitral Tribunal will address it below, albeit briefly.

118. There are (at least) two actions by the Colombian state that allegedly constitute a breach of the BIT and that, in the Respondent's view, occurred at a time prior to the acquisition of CMSA by the Claimant:

    - The review of which costs constitute deductible costs: the Respondent recalls that already in 2010 CMSA appealed the payment orders issued by the state on account of an external audit on deductible costs[59];

    - The determination of the reference price of nickel in the development of the formula in the Royalties Law: this was a long process, which started back in 2010 and of which CMSA was fully aware; moreover, the Respondent highlights that in 2014 CMSA disagreed with the methodology that the National Mining Agency proposed to use to estimate the price of nickel[60].

119. Based on the foregoing, the Respondent submits that, as of 2 February 2015, when the Claimant acquired its interest in CMSA, CMSA and the Colombian state were already engaged in a dispute[61]; such that there was a high probability and a reasonable expectation that such a dispute would result in an international claim[62] – thus constituting impermissible treaty shopping[63].

120. The Claimant argues that the applicable standard for assessing an abuse of rights through treaty shopping must be very high[64]; the Respondent does not dispute that the standard is high but considers that cases such as *Philip Morris*[65] have lowered it so that a reasonable prospect of a dispute arising would suffice[66]. The Arbitral Tribunal does not consider that the standard is met, even assuming that it is the lowered standard proposed by the Respondent:

121. *First*, the Claimant has submitted sufficient evidence that the acquisition of CMSA by South32 SA Investments Limited was the result of a corporate decision to demerger

---

[59] Counter-Memorial, para. 325.
[60] Counter-Memorial, para. 328.
[61] Counter-Memorial, para. 317.
[62] Counter-Memorial, para. 321.
[63] Counter-Memorial, paras. 314 and 330.
[64] Reply, para. 377.
[65] **Doc. RL 56**, *Philip Morris (Partial Award)*.
[66] Counter-Memorial, para. 321.

assets globally, in which CMSA was but one of many assets considered to be secondary. It is hard to believe that a corporate group such as BHP Billiton – one of the world's largest mining groups, with listed companies subject to strict stock exchange supervision[67], would embark on a global corporate restructuring operation on account of a possible dispute over an asset located in Colombia, estimated at the time at USD 155 million ["**M**"][68].

122. *Second*, this global restructuring strategy was devised in early 2014[69] and made public in April 2014[70]. Up to that moment, as the Respondent correctly points out, the following had occurred:

123. (i) On 30 October 2008 Colombia had contracted an accounting audit on the costs deducted by CMSA for the calculation of royalties for the years 2004 to 2007; the result was that there were miscounted costs, so that royalties amounting to some COP 24.9 billion were due[71].

124. The Respondent notes that CMSA appealed this payment order, from which it infers that the dispute concerning the deductible costs was already foreseeable. The Claimant responds that a mere generic dispute over requests for additional payments does not demonstrate that it was foreseeable (and with a high probability) that such a dispute would develop into an international dispute[72].

125. The Arbitral Tribunal does not believe that the facts support the Respondent's position:

- Although CMSA initially lodged an appeal against the payment order (which it lost)[73], it finally complied with it without reservation[74] – thus, any debate that might have existed was put to rest.

- The audit carried out simply checked the correctness of the accounting of the costs deducted, in respect of the previous four years; as will be seen in more detail below, the dispute regarding deductible costs brought to this arbitration concerns other issues, such as: reviews going back much further in time (to 1982[75] and 1998[76]) and imposing a causality requirement to allow their deduction[77] – none of which were the subject of that audit.

---

[67] Witness Statement of Brian Purdy ["**Purdy WS**"], paras. 10 and 18.
[68] Doc. C 29, p. 8.
[69] HT-EN, Day 3, p. 825, ll. 2-3.
[70] Doc. C 163.
[71] Doc. C 74.
[72] Reply, para. 406.
[73] Doc. C 72.
[74] Doc. C 75.
[75] Doc. C 32.
[76] Doc. C 35.
[77] Docs. C 35 and 111.

126. (ii) Although the National Mining Agency was engaged in the open process of establishing the formula for determining the nickel reference price since 2010, there is no evidence that in 2014 CMSA knew how the final formula would turn out:

127. Between late 2014 and early 2015, meetings took place between state entities and CMSA to discuss which formula should be chosen[78]. In these conversations, CMSA went so far as to prepare a presentation exploring three different alternatives for implementing the instructions contained in the Royalties Law[79]; the first of these is the one that the Claimant now defends, in this arbitration, as the correct formula for determining the price of nickel. Another of the alternatives is very similar to the formula that would eventually be adopted in Resolution 293.

128. The Claimant submits that, until March 2015, when the state published the first draft of Resolution 293, it could not be known whether the joint working sessions noted above had borne the fruit intended by CMSA[80]. The Arbitral Tribunal considers that this argument is reasonable.

129. The Respondent disputes this, however, arguing that the reference price finally adopted in Resolution 293 closely resembles one of the alternatives proposed by CMSA in those dialogues with the mining authority[81]. Colombia would seem to indicate that, with CMSA's reference price formula being similar to the one eventually adopted by the state, CMSA could anticipate the existence of a dispute. However, this argument cannot be sustained: if, as the Respondent suggests, CMSA itself had accepted the validity of a formula similar to the one finally adopted, this would mean that there was no dispute in sight.

130. The Arbitral Tribunal finds that from the enactment of the Royalties Law in 1994 until the adoption of Resolution 293 in May 2015 there was uncertainty as to how the state would normatively develop the reference price for the nickel royalty. However, mere regulatory uncertainty does not equate to a reasonable prospect of a dispute arising.

131. It follows that in February 2015, when the Claimant acquired indirect ownership over CMSA, the Claimant could not reasonably contemplate the occurrence of the future dispute that would emerge with the Colombian state. Having reached this conclusion, it is unnecessary to enter into the ancillary debate on the degree of foreseeability applicable to determine whether there has been an abuse of process. This jurisdictional objection is thus rejected.

---

[78] Counter-Memorial, paras. 191 and 192.
[79] Doc. R 41.
[80] Reply, para. 408.
[81] Doc. R 42, p. 25; Counter-Memorial, paras. 192-194.

## 2.  NATURE OF THE DISPUTE

132. Colombia notes that the dispute in this arbitration arises out of the Claimant's disagreement with the royalty settlements made. A disagreement that the Claimant has raised before the local ordinary and arbitral courts, with the aim of annulling those settlements; and, in fact, some of the domestic actions have been successful for the Claimant[82]: there are two awards (one final and one subject to annulment proceedings still in progress) that have found in favour of the Claimant. This Award considers *infra* the analysis of those awards.

133. The Respondent raises several jurisdictional objections linked to the domestic and contractual nature of the dispute (**2.1.**) and the prematurity of the claim (**2.2.**).

## 2.1.  DOMESTIC AND CONTRACTUAL DISPUTE

134. The Arbitral Tribunal shall first set out the positions of the Parties (**A.**) and then the decision of the Arbitral Tribunal (**B.**).

## A.  Positions of the Parties

135. The Republic's jurisdictional objection is twofold:

## a.  Lack of jurisdiction to decide on legality under local law

136. The first objection is based on Art. IX.13 of the BIT:

> "The tribunal shall not be competent to rule on the legality of a measure taken by a Contracting Party as a matter of domestic law".

137. In Colombia's view, the BIT excludes domestic disputes from the jurisdiction of the Tribunal[83], and here, the main dispute between the Parties would be a domestic one: the obligation to pay royalties under the Concessions[84].

138. The Claimant challenges this objection as inadmissible, as it was raised by the Respondent for the first time in the Rejoinder, in contravention of Arbitration Rule 41.1 which allows jurisdictional objections to be raised no later than in the Counter-Memorial[85]. There is no response from the Respondent to this allegation of inadmissibility.

139. In any event, the Claimant does not deny that it has questioned the propriety of certain measures with respect to Colombian law and the Contracts – something inevitable, given that its investment is channelled through the Contracts. Therefore, in analysing

---

[82] Rejoinder, para. 199.
[83] Rejoinder, para. 180.
[84] Rejoinder, paras. 176-177.
[85] Rejoinder Jurisdiction, para. 23.

all the facts underlying the dispute, the Arbitral Tribunal must take into account Colombian law and the Contracts[86]. It is however, one thing to take into consideration legal or contractual issues[87], and quite another to decide or pronounce on them[88]. The Claimant is not asking the Tribunal to decide on the legality of the measures as a matter of local law, but as a matter of a breach of an international obligation[89].

140.   The Respondent contests that, however much the Claimant creates the appearance that its dispute is about the breach of the BIT, in reality it is nothing more than a purely domestic[90] and, moreover, contractual dispute. With each Contract having its own dispute resolution forum[91], those are the correct ones to adjudicate the dispute, and not this Arbitral Tribunal.

141.   The Claimant sees it differently: even if the Contracts contain a jurisdictional clause, this does not mean that the investor is precluded from commencing an investment arbitration[92]; and all the more here, where the state's counterparty to the Contracts is not the investor, but CMSA[93].

**b.   Fork in the road**

142.   As a second objection, Colombia recalls that all the measures challenged by the Claimant have been litigated before the Colombian courts[94], with identical claims to those in this arbitration[95]. In fact, the Claimant has achieved a considerable degree of success, as some measures have already been annulled and the damages caused have been compensated[96].

143.   The Respondent thus invokes the fork in the road objection, since according to Art. IX.3 and 9 of the BIT:

"3. Disputes between an investor of one Contracting Party and the other Contracting Party ... shall ... be submitted to the local courts or to international arbitration if the investor concerned so wishes…".

"9. Once the investor has submitted the dispute to one of the procedures in paragraphs 3 and 4, the choice of the procedure shall be final".

---

[86] Rejoinder Jurisdiction, para. 14.
[87] Claimant's PHB, paras 194 and 195.
[88] Rejoinder Jurisdiction, para. 15.
[89] Rejoinder Jurisdiction, para. 30.
[90] Rejoinder, para. 183.
[91] Counter-Memorial, para. 338.
[92] Reply, para. 345.
[93] Reply, para. 344.
[94] Rejoinder, para. 192.
[95] Rejoinder, para. 196.
[96] Rejoinder, para. 199.

144. In Colombia's view, the Claimant here has already opted, with binding effect, for ordinary Colombian jurisdiction to decide on the legality of the measures at issue in this arbitration[97].

145. The Claimant, however, considers that, for a fork in the road to be triggered, the investor should have chosen to submit its dispute to local jurisdiction. However, here the local actions were neither initiated by the investor, nor do they address an international dispute[98].

## B.   Decision of the Arbitral Tribunal

146. The Arbitral Tribunal sides with the Claimant.

147. Both objections start from a common point: that, according to the terms in which the dispute has been submitted, this Arbitral Tribunal is called upon to rule on the legality of the measures under Colombian law. The Arbitral Tribunal rejects this premise (**b**.), but as a preliminary question, it will rule, briefly, on the admissibility of the first objection (**a**.).

### a.   Admissibility of the objection

148. As to the first objection, Arbitration Rule 41.1 is clear that any jurisdictional objection must be raised as soon as possible and in no event later than the Counter-Memorial. Here, however, the jurisdictional objection based on Art. IX.13 of the BIT was only raised by Colombia in its Rejoinder. It should be noted that the Respondent has neither contested the untimeliness, nor has it provided arguments to defend the admissibility of its objection. The objection would therefore, in principle, be inadmissible as a matter of timing.

149. That being said, the Arbitral Tribunal is aware that the problem created by the untimely submission of jurisdictional objections has not received uniform treatment in previous awards, given that Arbitration Rule 41.2 requires the Arbitral Tribunal to verify compliance with all jurisdictional requirements[99].

150. Be that as it may, the objection is irrelevant since the Arbitral Tribunal is not going to rule on the legality of any of the measures as a matter of Colombian law.

151. And even if it did (*quod non*), it is highly questionable whether such a hypothetical pronouncement would imply a jurisdictional transgression for the reasons set out below.

---

[97] Rejoinder, para. 192.
[98] Reply, para. 415.
[99] **Doc. RL 122**, pp. 527-528.

### b.  Legality under international law

152. The Claimant has commenced an arbitration based on an alleged breach of the obligation to provide fair and equitable treatment – an internationally wrongful act.

153. Respondent suggests that such an international dispute would be mere facade: in reality, here there is nothing more than a domestic dispute over the legality under Colombian law of the measures adopted and this dispute:

  -  Would be outside the jurisdiction of the Arbitral Tribunal and;

  -  It would already be being settled before other courts.

154. The Tribunal is not convinced that the dispute before it is of a domestic nature for three reasons: the possible pronouncement on the legality of a measure would constitute a factual premise to be subsumed under the international standard (**i.**), international and domestic wrongs operate at different levels (**ii.**), and the dispute resolution mechanism provided by the BIT must operate autonomously in order to safeguard its purpose (**iii.**).

155. (i) Art. IX.13 of the BIT prevents the Arbitral Tribunal from ruling on the legality of a measure "as a matter of domestic law".

156. However, here the Arbitral Tribunal is not called upon to declare the legality of the measures as a matter of Colombian law, but as a matter of international law. Any determination of whether the measures conform with Colombian law would be a legal assessment that would then become a factual premise for the Arbitral Tribunal to then apply the standard contained in the BIT to those facts and thus decide whether the BIT was duly complied with.

157. This Award does not pronounce on the legality of the measures as a matter of Colombian law. But even if any determination contained in the Award were to be construed as such a pronouncement, it would constitute a factual premise for the determination of the existence of an international wrong.

158. This conclusion is supported both in the text of other treaties and in previous arbitral decisions:

159. With respect to other treaties, while it is unusual to find such an explicit limitation as that contained in Art. IX.13 of the BIT – as stated by the Respondent itself[100] – the content of Art. IX.13 is not unique. Colombia has referred to another in force treaty which contains the same restriction on the jurisdiction of the arbitral tribunal, that being Art. 8.31.2 of the Comprehensive Economic and Trade Agreement between the European Union and Canada (CETA)[101].

---

[100] Rejoinder, para. 180.
[101] Rejoinder, para. 182.

160. It explicitly states that the arbitral tribunal shall lack jurisdiction to determine the legality of a measure which is alleged to be in breach of the treaty under the domestic law of a party[102]. However, the same Agreement explains that this does not prevent the tribunal from taking domestic law into account as a factual matter and, in doing so, it must follow the prevailing interpretation given by the courts or authorities of the state. Any meaning that the arbitral tribunal might attribute to domestic law is not binding on the courts or authorities of that state[103].

161. The wording of the treaty – although broader than that of the BIT – thus endorses the conclusion reached by the Arbitral Tribunal above. As to previous arbitral decisions, the Arbitral Tribunal also finds in them support for its interpretation:

162. In *Bayindir*[104] the arbitral tribunal admitted that its jurisdiction was limited to treaty disputes and not to contractual disputes. That being said, the tribunal proclaimed its jurisdiction to consider both the contract and local law, as it was to consider factual issues relevant to any determination to be made as to whether there was a breach of the treaty.

163. In *AES*[105] the arbitral tribunal emphasised that its role was not that of a local court: it was not to determine whether the state action was in accordance with local law, but to analyse the manner in which the law was applied and to determine whether this resulted in a breach of the treaty.

164. In *Hamester*[106] the arbitral tribunal confirmed its jurisdiction to analyse possible breaches of contract and in *Urbaser* the arbitral tribunal did the same with respect to violations of the local regulatory framework[107].

165. The Respondent has argued that none of the above cases were based on a BIT with a wording similar to that contained in Art. IX.13, thereby precluding the Arbitral Tribunal from ruling on the legality of the measures under local law[108]. The Arbitral Tribunal shares this assessment: it is an irrefutable fact that, as Colombia points out, the treaties underlying the cited cases did not contain a text similar to the present one in Art. IX.13 of the BIT.

166. However, the Arbitral Tribunal does not consider that the provision of Art. IX.13 of the BIT alters the premises under which the tribunals cited above rendered their

---

[102] "The Tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of a Party."

[103] "For greater certainty, in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of a Party as a matter of fact. In doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party and any meaning given to domestic law by the Tribunal shall not be binding upon the courts or the authorities of that Party."

[104] **Doc. CLA 63**, *Bayindir* (*Award*), para. 135.

[105] **Doc. RL 97**, *AES* (*Award*), paras. 306 and 307.

[106] **Doc. CLA 163**, *Hamester* (*Award*), para. 322.

[107] **Doc. CLA 166**, *Urbaser* (*Award*), para. 105.

[108] Respondent's PHB, para. 26.

decisions: the arbitral tribunal in an investment arbitration is not called upon to rule on the legality of conduct under local law – whether or not the treaty expressly says so; but, insofar as domestic law must be taken into account as a factual premise from which an international wrongful act may arise, the tribunal has jurisdiction to assess it.

167. (ii) The Tribunal does not consider that the dispute before it is of a domestic nature:

168. The Claimant's investment has a contractual basis, as the Concessions are formalised in Contracts; this means that the Arbitral Tribunal must take into account the content of the obligations contained in these Contracts and the state's actions in relation to them within the context of Colombian law. However, this analysis will not determine the nature of the dispute, the competence of the Arbitral Tribunal or its conclusions on the merits:

- A breach of national law may or may not give rise to a breach of the obligation to provide fair and equitable treatment. In fact, in this regard, the Respondent itself points out that it cannot be sufficient that a measure is contrary to Colombian law for it to entail a breach of the BIT and requires the Claimant to "prove something more"[109] – the Arbitral Tribunal agrees with this approach.

- An illegal act at an international level, consisting of a breach of fair and equitable treatment, involves a breach of high standards of conduct that may also have resulted in an illegal act at a domestic level – i.e., the fact that the same conduct may give rise to acts that are wrongful both domestically and internationally does not make it irrelevant in determining whether the internationally wrongful act has occurred.

169. The Arbitral Tribunal sees no bar to analysing the disputed measures, as well as the Contracts and domestic law, in the context of the international standards required to establish a breach of the BIT. This debate is a matter for the Arbitral Tribunal alone, as the Claimant opted for this arbitral route in a binding manner – the Claimant did not choose the ordinary Colombian courts, or any other jurisdiction, as a forum for the adjudication of breaches of the BIT.

170. (iii) Furthermore, one of the criteria for interpreting treaties, according to Art. 31 of the Vienna Convention on the Law of Treaties, is that of good faith, in accordance with the ordinary meaning of their terms and in keeping with the object and purpose of the treaty.

171. If the Arbitral Tribunal were to follow the Respondent's position it would lead to an undesirable situation: when conduct constitutes a domestic wrongful act, arbitration would be barred as a forum for the adjudication of internationally wrongful acts, thus defeating the very purpose of the Treaty.

---

[109] Respondent's PHB, para. 33.

172. An internationally wrongful act may be based on a domestic wrong, as is in fact often the case, but the threshold of non-compliance for an international wrong is higher and based on a different legal standard. Thus, for example, in order to determine the wrongfulness of an expropriation, under Art. VI.1 of the BIT it must be ascertained whether there has been due compliance with the law ("in accordance with due process of law"). If the interpretation suggested by the Respondent were to be followed, no arbitral tribunal would be able to rule on the fulfilment of this requirement. The same would be true in the case of a breach of fair and equitable treatment: when this stems from conduct regulated by law, the determination of international wrongfulness will have to look at compliance with such regulation and then assess whether it is of such a magnitude as to elevate the breach to an internationally wrongful act.

173. If the assessment of conduct that potentially constitutes a breach of local law were to remain outside the scope of appreciation of the Arbitral Tribunal and solely in the hands of local judges, the investment arbitration mechanism would lose a significant part of its utility.

174. The BIT dispute settlement mechanism is configured as an autonomous avenue of protection, access to which cannot depend on the local judge's determinations as to the legality of a measure under domestic law.

175. The real utility of Art. IX.13 of the BIT is not to become a barrier to accessing the international forum, but to prevent an arbitral tribunal from issuing binding decisions on states declaring the illegality of their measures under national law. This is indeed not the task of investment arbitration tribunals: their binding decisions concern only internationally wrongful acts.

176. In fact, the treaty cited in para. 159 above endorses this conclusion, as it explicitly states that the pronouncements that the arbitral tribunal may make on the basis of domestic law will not be binding on local courts and authorities.

177. <u>In conclusion</u>, the Arbitral Tribunal rejects these jurisdictional objections.

178. That being said, the Arbitral Tribunal wishes to make two additional points:

179. *First*, in its analysis of the measures alleged to be in breach of the BIT it will adhere to the mandate contained in the BIT and will avoid pronouncing on the legality of the measures as a matter of domestic law. If any irregularity is found, such a determination will be adopted as a factual premise against which to draw a legal consequence under the BIT. Therefore, the consideration that the Arbitral Tribunal may make of Colombian law or in relation to the Contracts limits its effects on the present case under the BIT.

180. *Second*, the existence of parallel judicial or arbitral proceedings, judging the legality of the measures adopted by Colombia from a purely domestic perspective, may have an impact on the decision to be taken by the Arbitral Tribunal on the issue of

compensation, if any: the Claimant cannot claim compensation for damage that has already been compensated to CMSA in those forums and vice versa. The Arbitral Tribunal will return to this issue in para. 792 below.

## 2.2. PREMATURITY OF THE CLAIM

181. Two of the measures challenged by the Claimant are part of ongoing legal proceedings, on which no judgment has yet been rendered.

182. For the Respondent, it would make no sense to decide on these measures, which may or may not result in harm[110]. Even more so when the BIT requires that the measure must have caused damage[111].

183. The Claimant contends that there is no jurisdictional requirement for a finding of damage in order to commence an action[112]; therefore, the existence of ongoing judicial proceedings in Colombia does not preclude the Claimant from claiming violations of the BIT[113].

184. The discussion raised is to a certain extent futile, as the Claimant has brought a claim for damages in this arbitration. However, in any event, the Arbitral Tribunal does not consider that the BIT explicitly requires proof of damage in order to establish a claim, as the Respondent contends.

185. In support of its position, the Republic refers, in a footnote, to Art. IX.4 and 14 of the BIT, without further explanation[114]. The Arbitral Tribunal finds that these articles refer to injury in the following context:

- Art. IX.4 deals with (among others) the content of the Notification of Intent: it must include the name and address of the investor, the BIT regulation allegedly violated, the facts underlying the dispute and the estimated value of the damages and compensation sought. The Arbitral Tribunal considers that the requirement to include the estimated damage caused by the violation of the BIT does not necessarily mean that the investor loses the right to claim other non-compensatory remedies, such as a cease-and-desist order.

- Art. IX.14 establishes a limitation period of five years from the investor's knowledge of the alleged breach of the BIT and the alleged loss and damage; again, the BIT does not make the existence of a breach of the BIT conditional on the existence of damage, but rather, where a claim for damages associated with a

---

[110] Rejoinder, para. 200.
[111] Respondent's PHB, para. 39.
[112] Reply, para. 448.
[113] Rejoinder Jurisdiction, para. 96.
[114] Respondent's PHB, footnote 41.

breached measure is sought, the limitation period begins to run from the time the investor became aware of it.

186. This being said, the Arbitral Tribunal understands the Respondent's criticism, but does not consider it to have the relevance intended; in the context of the text of the Treaty, the lack of damage seems to be more relevant in the analysis of compensation than in the determination of the Arbitral Tribunal's competence.

187. This jurisdictional objection is <u>therefore</u> deemed to be rejected.

### 3. NON-COMPLIANCE WITH PROCEDURAL REQUIREMENTS

188. The Arbitral Tribunal will first set out the relevant regulation and facts (**A.**), then the positions of the Parties (**B.**) and finally make a decision (**C.**).

### A. Regulation and facts

189. Art. IX of the BIT, in the relevant sections, reads as follows:

> "1. Any disputes arising between an investor of a Contracting Party and the other Contracting Party in connection with the interpretation or application of this Agreement ... shall be settled, as far as possible, amicably. Any dispute shall be notified by submitting a written notification ("**Notification of Dispute**")"[115].

> "3. Disputes between an investor of one Contracting Party and the other Contracting Party which have not been settled ... shall, after a period of 6 months from the Notification of Dispute, be submitted to the local courts or the international arbitration if the investor concerned so wishes."

> "4. Where the dispute is referred to international arbitration, the investor shall give the Contracting Party written notification of its intent to do so at least 6 months in advance ("**Notification of Intent**"). Such a notification shall indicate the name and address of the disputing investor, the provisions of the Agreement which it deems to be breached, the facts which the dispute is based on, the estimated value of the damages and compensation sought. [...]"[116].

190. On 20 June 2016, the Claimant submitted a letter to the Republic entitled "Notification of Dispute"[117] [the "**2016 Notification**"]. The 2016 Notification identified the investment, the measures adopted by Colombia that, in the Claimant's view, violated the protections provided in the BIT, and the contact details for an amicable resolution of the dispute. The 2016 Notification also indicated that, if negotiation was not possible, the investor would resort to international arbitration.

---

[115] Emphasis added.
[116] Emphasis added.
[117] Doc. C 29.

191. On 20 November 2018, the Claimant filed another letter with the Republic, entitled "Follow-up letter to the letter of Notification of Dispute between South32 SA Investments Limited and the Republic of Colombia and Notification of Intent of 20 June 2016" [the "**2018 Notification**"][118]. Throughout its 14 pages, the Claimant described new measures that had occurred since the 2016 Notification, which also constituted (in its view) a breach of the BIT. The Claimant showed its interest in resolving the dispute amicably and, only if this did not occur, would it resort to arbitration.

## B.   Positions of the Parties

192. According to the Respondent, the BIT requires that the Parties exchange two separate written notifications: the Notification of Dispute and the Notification of Intent[119]. The 2018 Notification, however, would serve merely as a reservation of rights, but not as a Notification of Intent[120], as it omits to state the articles breached, the facts, and the estimated value of the damage and compensation, as required by Art. IX.4 of the BIT[121]. Moreover, in the Request for Arbitration the Claimant added new measures to the dispute that had not been previously notified – all in breach of the BIT[122].

193. The Claimant, on the other hand, considers that the BIT only requires that:

   - At least six months elapse between the Notification of Dispute and the commencement of arbitration (Art. IX.3);

   - The Notification of Intent must be given at least six months before the commencement of the arbitration (Art. IX.4).

194. The Claimant sees no impediment to both Notifications being made simultaneously[123].

195. As to their content, the Claimant asserts that the Notifications complied with the requirements set out in the BIT[124]. The only real dispute is whether the emergence of new facts and measures related to an already notified dispute require a separate notification – the Claimant suggests that there is no such need.[125]

## C.   Decision of the Arbitral Tribunal

196. Art. IX of the BIT requires the host state of the investment to be aware, six months prior to the commencement of legal action, of two points:

---

118 Doc. C 37.
119 Counter-Memorial, para. 354.
120 Counter-Memorial, para. 359.
121 Counter-Memorial, para. 361.
122 Counter-Memorial, para. 366.
123 Reply, para. 429.
124 Reply, para. 436.
125 Reply, para. 440.

-   The existence of a dispute with the investor (Art. IX.1), with details[126] of the name and address of the investor, the provision of the BIT that is alleged to have been violated, the facts underlying the dispute and the estimated value of the claim for damages (Art. IX.4);

-   Whether the investor has chosen arbitration or litigation to resolve the dispute (Art. IX.3).

197.  The Claimant filed its Request for Arbitration on 11 March 2020; therefore, the notification of the above-mentioned points should have been made at least 6 months earlier. The deadline is therefore 11 September 2019, but it could have been made much earlier (the BIT establishes a minimum, not a maximum, time limit); and in this case this did occur, as the 2016 and 2018 Notifications are prior to 11 September 2019. As to the content, the Arbitral Tribunal finds that the 2016 and 2018 Notifications mention:

-   The dispute, with a description of state measures alleged to violate the BIT[127];

-   The name and address of the investor[128];

-   The articles of the BIT allegedly violated[129];

-   The relevant facts[130];

-   Damage estimated at no less than USD 155 M[131].

198.  The Arbitral Tribunal finds that the Claimant duly complied with its notification obligation as required by Art. IX of the BIT.

199.  The question that remains to be addressed is whether, once new measures had occurred, the Claimant could claim their violation in this arbitration[132] or whether, on the contrary, it was under an obligation to give advance notice of their existence.

200.  The Claimant has referred to several previous cases, which dealt with the same issue:

Previous decisions

201.  In *Eco Oro*[133] the arbitral tribunal established that a claim cannot be frozen in time with the notification; the investor must be allowed to bring new claims arising from related

---

[126] In the case that arbitration is chosen.
[127] Doc. C 29, p. 6 and Doc. C 37, p. 1 and 2.
[128] Doc. C 29, p. 1 and Doc. C 37, pp. 1 and 4.
[129] Doc. C 29, p. 7 and Doc. C 37, p. 3.
[130] Doc. C 29, p. 6 and Doc. C 37, pp. 1 and 2.
[131] Doc. C 29, p. 8.
[132] Reply, para. 436.
[133] **Doc. CLA 154**, *Eco Oro* (*Decision on Jurisdiction, Merits and Quantification Guidelines*), para. 328.

measures to arbitration. *Crystallex*[134] considers that the relevant test is whether the subsequent disputes are different or simply the evolution of the dispute – if they are related, no new notifications would be necessary. The arbitral tribunal in *Swisslion*[135] allowed the investor to raise new BIT violations in the arbitration to the extent that it considered that they did fall within the scope of the initial applications.

202.  The above cases seem to support the Claimant's position: if the new measures are related to other measures already set out in the Notifications, it would not be necessary to issue new notifications. The relevant issue is therefore whether, in this case, the later measures were related to the earlier, already notified measures.

203.  As seen in the previous sections, the contested measures address four substantive issues:

-    Royalty rate and percentage of deductible expenses;

-    Reference price;

-    Deductible costs;

-    Iron royalty.

204.  In the 2016 Notification the Claimant referred to resolution 293 of the National Mining Agency, two resolutions of the Mining and Energy Planning Unit and Order VSC 26, as facts underlying the dispute[136]. These measures affect matters relating to the reference price and deductible costs.[137]

205.  In the 2018 Notification the Claimant added Resolution 576 of the National Mining Agency and mentioned the Cundinamarca Petition and the process of the judicial settlement of the Contracts, as part of the disputed facts[138]. Resolution 576 addresses the issues of the royalty rate and the percentage of deductible expenses, reference price and deductible costs[139]. The Cundinamarca Petition, which judicially pursues the settlement of the Contracts, adds the question of the iron royalty[140].

206.  The Arbitral Tribunal therefore considers that all the measures at issue in this arbitration relate to facts mentioned in the Notifications. It was therefore not necessary for the Claimant to have communicated subsequent Notifications of Dispute and of Intent.

---

[134] **Doc. CLA 90**, *Crystallex (Award)*, paras. 450 et seq.
[135] **Doc. CLA 126**, *Swisslion (Award)*, paras. 135 to 139.
[136] Doc. C 29, p. 6.
[137] H 1, p. 63.
[138] Doc. C 37, p. 2.
[139] H 1, p. 63.
[140] H 1, p. 63.

207. <u>In conclusion</u>, the Arbitral Tribunal rejects this jurisdictional objection.

\* \* \*

208. Throughout this section, the Arbitral Tribunal has analysed the Respondent's jurisdictional objections, grouped into three categories, and has rejected all of them.

209. The Arbitral Tribunal thus confirms its competence and jurisdiction to decide on the merits.

210. The following section will therefore focus on the merits of the dispute.

# V.2. <u>ANALYSIS OF LIABILITY</u>

211.  The Claimant alleges that there are five matters (**V.2.1.**) on which Colombia adopted measures (**V.2.2.**), which violate the standards contained in the BIT (**V.2.3.**).

## V.2.1. <span style="font-variant: small-caps">The Matters in Dispute</span>

212.  The Claimant mentions nine measures[141] – each affecting one or more of the matters at issue and some of the measures overlapping with each other. Therefore, the Arbitral Tribunal will undertake its analysis by subject matter: the nickel royalty rate and percentage of deductible costs (**1.**), the nickel reference price (**2.**), the deductible costs (**3.**) and the iron royalty (**4.**). There is a fifth subject which is transversal to the previous ones: the settlement of accounts of the Contracts (**5.**).

213.  The Arbitral Tribunal has already determined that it is beyond its mandate to determine the legality of the measures as a matter of Colombian law. The Arbitral Tribunal will limit the following analysis to establishing as a factual matter whether it observes any irregularity in the state's actions. In the following section, it will analyse its findings according to the standard required to find a breach of the BIT. If the Arbitral Tribunal does not find any irregularity in the state's conduct, this further determination will not be necessary.

## 1. <span style="font-variant: small-caps">Nickel Royalty Rate and Percentage of Cost Deduction</span>

214.  The Arbitral Tribunal will first present a lengthy account of the factual background (**1.1.**), then it will raise the issue and take a position on it (**1.2.** and **1.3.**).

### 1.1. <span style="font-variant: small-caps">Factual Background</span>

215.  Concessions 866 and 1727 date from a time long before the enactment of the Royalties Law. Therefore, for more than 30 years the royalties paid for the exploitation of the Cerro Matoso mine were governed solely by contractual agreements (**A.**). The Royalties Law would not arrive until 1994 (**B.**). The Royalties Law raised the royalty rate and reduced the percentage of deductible costs, but these modifications would not become applicable to the Concessions until sometime later – as will be seen, the Parties debate when exactly this was. To understand this debate, it is important to describe the impact of the enactment of the Mining Code (**C.**), as well as of the contractual amendment that occurred in 2005 (**D.**).

---

[141] Initially there were 10, see footnote 3 above.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

### A.    Contractual arrangements (I)

216.    Clause 16 of Contract 866[142] provided that the applicable royalty rate was 8%. The Parties do not dispute that the same percentage also applied to Concession 1727, as the July 2005 Agreements explicitly recognised.

217.    The percentage of deductible costs varied according to the type of cost, it would either be 80% or 100%[143].

218.    There is no dispute between the Parties that these arrangements were in force from 1982 until at least 2005.

### B.    Royalties Law

219.    The Royalties Law was enacted in 1994.

220.    Art. 16.2 of the Royalties Law established that the royalties applicable to the exploitation of nickel in Cerro Matoso's mines would be: an initial 4% as royalties and the remaining 4% as compensation ("*compensaciones*")[144] – in total, the same percentage of royalties foreseen in the Contracts. Therefore, nothing changed.

221.    However, the same article added that "for future contracts or extensions of the existing contract, if any, the royalty rate ... of 7% for royalties and the remaining 5% for compensation"[145] – 12% in total would apply.

222.    In addition, Art. 23 – which will be discussed in depth in the debate on the reference price (section V.2.1.2 below) – established a formula for the calculation of royalties, according to which "75% of the costs [should be] deducted"[146]. The discount percentage was thus reduced from 80% or 100%, according to the contractual agreement, to 75%. However, this reduced percentage would only apply "to new concessions or extensions of the existing contract"[147].

### C.    Mining Code

223.    In August 2001 Colombia enacted the Mining Code[148]. It was mandatory only for new and extended concessions[149]; but it also allowed existing concession holders, who

---

[142] Doc. C 8.

[143] Doc. C 13, Clause 1, pp. 5-6.

[144] For simplification, the Arbitral Tribunal will refer to royalties and compensation generically as "royalties".

[145] "*para los contratos futuros o prórrogas del contrato vigente, si las hubiere, se aplicará el porcentaje de regalías ... del 7% a título de regalías y el 5% restante a compensaciones*". Free translation by the Arbitral Tribunal.

[146] "*desconta[r] el 75% de los costos ...*". Free translation by the Arbitral Tribunal.

[147] "*en las nuevas concesiones o en las prórrogas del contrato vigente*". Free translation by the Arbitral Tribunal.

[148] Doc. C 19.

[149] Clause 46.

voluntarily accepted its application, to benefit from an extension of their concession for a further 30 years[150]. This undoubtedly constituted a significant incentive to freely submit to the Mining Code.

224. Note that Contract 866 had a duration of 25 years from the start of exploitation, i.e., until 30 September 2007, with a possible extension for a further five years, until 30 September 2012[151]. Contract 1727 was already signed directly for 30 years, expiring on the same date of 30 September 2012, but without the need for previous extensions[152].

225. CMSA voluntarily opted into the Mining Code regime on 10 March 2003[153] and on 22 July 2005 CMSA and the mining authority signed contractual amendments, allowing the extension of both Concessions as of 1 October 2012 for a further 30 years[154].

226. On 1 October 2012 both Concessions were integrated into Contract 51[155].

## D.    **Contractual Agreements (II)**

227. As anticipated, CMSA decided to voluntarily opt into the Mining Code. Thus, on 22 July 2005, the Government and CMSA each signed amendments to Contracts 866 and 1727[156], on the occasion of the implementation of the Mining Code [the **"July 2005 Agreements"**].

228. The amendments were intended to "comprehensively modify" the Contracts.

229. One of the modifications affected the duration of the contracts, as both expired on 1 October 2012, they would benefit from a further 30 years extension[157]. However, this was not the only modification.

230. Clause 7.1.d) included, among CMSA's obligations for Concession 866, the payment of the minimum royalties of Art. 16.2 of the Royalties Law; and Clause 7.2 went on to state that "the amount of the royalties and the system for settling and readjusting them shall be those established in the [Royalties Law]"[158]. The content is identical to that of Clauses 6.1(d) and 6.2[159] of the agreement applicable to Concession 1727[160].

---

[150] Clause 77.
[151] Doc. C 8, Clause 30.
[152] Doc. C 9, Clause 9.
[153] Doc. C 63; the willingness to submit to the Mining Code was already stated in a previous letter (Doc. R 6).
[154] Doc. C 20, Clause 5, for Concession 866 and Doc. C 21, Clause 4, for Concession 1727.
[155] Doc. C 17.
[156] Docs. C 20 and 21, respectively.
[157] Doc C 20, Clause 5 and Doc C 21, Clause 4.
[158] Doc. C 20. *"el monto de las regalías y el sistema para liquidarlas y reajustarlas serán los establecidos en la [Ley de Regalías]"*. Free translation by the Arbitral Tribunal.
[159] By mistake the agreement is numbered 7.2.
[160] Doc. C 21.

231. As will be seen, the Respondent considers this comprehensive amendment of the Contracts to be an instance of "a future contract or extension of the existing contract"[161] under Art. 16 of the Royalties Law or of a "new concession"[162] under Art. 23 of the Royalties Law. This would allow for the application of the higher royalty rate of 12% (Art. 16) and the reduced rate of 75% of costs (Art. 23). This would be the case as of III 2005, which is the quarter following the adoption of the July 2005 Agreements.

232. The Claimant objects and argues that Concession 866 was in force until 2007, when it was extended for five years – therefore, it is only in IV 2007 (and not in III 2005) that the higher rate and the reduced percentage could start to apply to it; and it would not be applicable to Concession 1727, which did not undergo extensions, until its incorporation into Contract 51 in October 2012 (IV 2012).

**1.2.** <u>ARGUMENTS</u>

233. The main issue under discussion is the applicable royalty rate (**1.2.1.**) but, as a secondary issue, the percentage of deduction of costs is also debated (**1.2.2.**).

**1.2.1. THE ROYALTY RATE**

234. Art. 16.2 of the Royalties Law foresaw that the percentage for royalties and compensation in the Cerro Matoso mines would be 4% and 4%, respectively – 8%, in total. However, for "future contracts or extensions of the current contract"[163] it would be 7% and 5% for royalties and compensation, respectively – 12%, in total.

**A.** <u>Positions of the Parties</u>

235. The Parties dispute when the higher rate of 12% was applicable:

236. The Respondent considers that it was since the July 2005 Agreements, as they were Agreements that comprehensively modified the Contracts[164], assimilating the situation to a "future contract"[165], in the terminology of Art. 16.2 of the Royalties Law. Moreover, this would have been provided for in Clause 7 (and 6)[166] of the July 2005 Agreements, which explicitly refer to the payment of royalties in accordance with the Royalties Law[167].

---

[161] "*un contrato futuro o prórroga del contrato vigente*". Free translation by the Arbitral Tribunal.
[162] "*nueva concesión*". Free translation by the Arbitral Tribunal.
[163] "*contratos futuros o prórrogas del contrato vigente*". Free translation by the Arbitral Tribunal.
[164] Rejoinder, para. 23.
[165] "*contrato futuro*". Free translation by the Arbitral Tribunal.
[166] The clause shown in brackets refers to the 1727 Concession Agreement.
[167] Rejoinder, para. 29.

237. The Claimant does not interpret the July 2005 Agreements as a "future contract". The July 2005 Agreements only allowed for the application of the Mining Code; in particular, the extension of the duration of the Concession[168].

238. The reference to the application of the Royalties Law, contained in the July 2005 Agreements, simply meant what the Royalties Law itself states: that the royalties in the form in which they were agreed would remain in force until a new concession contract or an extension of the current one[169].

239. The Claimant understands, in fact, that the higher rate would not apply until sometime later:

- In October 2007, the term of Concession Contract 866 was extended; therefore, that would be the moment from which the higher rate of 12% would apply[170].

- Concession 1727 was incorporated into Contract 51 in October 2012; this would have produced a new contract, allowing the 12% royalty rate to be applied.

240. The Claimant's interpretation is supported by Colombia's own conduct:

- Between 2005 and 2012 it was the state that calculated the royalties to be paid, choosing to apply 8% until 2007 for Concession 866 and until 2012 for Concession 1727[171].

- When through Order 50 of August 2011 the state re-assessed royalties for the period 2005 to 2011[172], it only applied 12% to Concession 866 from 2007 onwards and for Concession 1727 it kept it at 8%[173].

## B.   Position of the Arbitral Tribunal

241. The Arbitral Tribunal notes – as the Claimant points out – manifest contradiction in the Respondent's conduct: when settling royalties in the past it chose a certain rate and now it has decided to revise those settlements, intending to apply another, higher rate.

242. The contradiction was also reflected by Order 50 which, when reviewing the settlements made between 2005 and 2011, adjusted the deductible costs due to the detection of certain accounting errors, but applied the rates in their historical form[174].

---

[168] Reply, para. 82.
[169] Reply, para. 86.
[170] Memorial, para. 72.
[171] Claimant's PHB, para. 204.
[172] Doc. C 74.
[173] Reply, para. 122.
[174] Doc. C 74, p. 23.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

Award

243. The Respondent presents two lines of defence: it denies contradictory behaviour (**a.**) and, even if there was contradiction, it presents a justification (**b.**). Neither is persuasive.

## a.    No contradictory behaviour

244. *First*, the Respondent asserts that royalty settlements are made on the basis of the information provided by CMSA[175]. Colombia thus seems to want to absolve itself of any responsibility for the rate applied in the liquidations.

245. The argument does not seem persuasive given that CMSA only provides information on production and costs – the choice of the applicable royalty rate rests with the state, as the Claimant has pointed out[176] (and has not been rebutted to the contrary).

246. *Second*, the Respondent explains that the National Mining Agency could not order the re-assessment of royalties at the 12% rate prior to 2007 for Concession 1727, because it reported no activity,[177] and for Concession 866, because CMSA refused to provide the information to determine the base price[178].

247. The Arbitral Tribunal does not see it this way: as will be set out below, CMSA's refusal to submit historical information on its production to carry out re-assessments has not impeded Colombia from calculating the re-assessments[179].

248. And, in any case, the argument is a *non sequitur*: during the period 2005 to 2007 settlements were done at the time (not by way of re-assessments). Therefore, nothing prevented Colombia from choosing the 12% rate instead of the 8% rate if it considered that this was the one that should be applied.

249. *Finally*, the state specifically denies any contradiction in Order 50 as, in its view, it did not express any opinion as to what the correct royalty rate should be[180].

250. While it is true that the audit that triggered Order 50 only reviewed deductible costs, the Arbitral Tribunal does consider that Order 50 addressed the applicable royalty rate. Order 50's recitals explain the process that led to the audit, the recalculation of royalties based on the audit's findings, and also CMSA's position on the matter. Order 50 contains the following summary of CMSA's position[181]:

> "Recalculating royalties now to eliminate accelerated depreciation would violate those rules and thus the Agreement, and would have the effect of increasing the

---

[175] Counter-Memorial, para. 115.
[176] Reply, para. 92.
[177] Respondent's PHB, para. 83.
[178] Respondent's PHB, para. 84.
[179] Doc. C 39, p. 321.
[180] Rejoinder, para. 32.
[181] Doc. C 74, p. 11.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

basis for calculating royalties prior to October 2007, when the royalty equalled 8%, and decreasing the basis for calculating royalties paid since then, when the effective rate increased to 15% [seems to be a mistake: it should be 12%][182]".

251. Thus, when Order 50 ordered the payment of the reliquidated royalties, it was aware that CMSA understood that the 8% rate was applicable only until 2007 (for Concession 866).

252. Moreover, Order 50, far from correcting CMSA, applied that same rate. Thus, contrary to the Respondent's current suggestion, Order 50 did rule on the applicable royalty rate.

253. In conclusion, the Arbitral Tribunal finds a clear contradiction in the state's conduct as regards the royalty rate it considers applicable.

**b.    Justification**

254. The Respondent asserts that the change of criterion regarding the applicable royalty rate was not capricious, but based on the following justification: in the past it had not noticed that the July 2005 Agreements modified the Concession Contracts in their entirety, thus producing a sort of new contract which would trigger the application of the higher rate provided for in Art. 16 of the Royalties Law.

255. Colombia's defence requires the Arbitral Tribunal to interpret the July 2005 Agreements to uphold its defence, but the proposed interpretation does not appear reasonable (**i.**) and is contrary to the state's own conduct (**ii.**).

**i.    Clauses 7.1.d) and 7.2 of the July 2005 Agreements**

256. The Respondent considers that the wording of clauses 7.1.d) and 7.2 [183] of the July 2005 Agreements, which refer to the Royalties Law as the source of the royalty payment obligation, would be an expression of a common consensus of the parties regarding the existence of new concession contracts.

257. Clause 7.1.d) of the July 2005 Agreements reads as follows:

> "The obligations of the Concessionaire ... are to pay the minimum royalties referred to in Art. 16.2 of the Royalties Law ..."[184].

---

[182] "*Recalcular ahora las regalías para eliminar la depreciación acelerada vulneraría dichas normas y por ende el Acuerdo, y tendría el efecto de aumentar la base de cálculo de las regalías anteriores a octubre de 2007, cuando la regalía equivalía al 8%, y, disminuir la base de cálculo de las regalías pagadas desde entonces, cuando la tasa efectiva aumentó al 15% [parece un error: debiera ser 12%]*". Free translation by the Arbitral Tribunal.

[183] And Clauses 6.1.d) and 6.2 for Concession 1727.

[184] "*Son obligaciones del Concesionario ... pagar las regalías mínimas de que trata el art. 16.2 de la Ley de Regalías…*". Free translation by the Arbitral Tribunal.

258. Clause 7.2 of the July 2005 Agreements provides the following:

> "The amount of royalties and the system for settling and re-assessing them shall be as set out in the [Royalties Law] ... and shall apply throughout the term of this concession.[185]"

259. Clause 7.2 reflects the terminology of Art. 228 of the Mining Code[186]:

> "The amount of royalties and the system for settling and re-assessing them shall be those in force at the time of the concession contract and shall apply during its entire term..."[187].

260. The Arbitral Tribunal takes into consideration the following:

261. The Royalties Law was enacted in 1994 and was immediately applicable to the Concessions. Proof of this is that Art. 16.2 refers to the "percentage for royalties and compensation agreed in the **current contract** for the exploitation of nickel in the mines ... **of Cerro Matoso** ..."[188].  In fact, it is enough to look at a randomly selected royalty settlement from 1997. There one can see that the state undertook to distribute the proceeds between the territorial entities and the National Royalties Fund (*Fondo Nacional de Regalías*), "in accordance with the Royalties Law"[189]. There is no doubt, therefore, that the Royalties Law was applicable to the Concessions from its enactment.

262. Thus, the fact that the July 2005 Agreements mentioned that the payment of royalties would be governed by Art. 16.2 of the Royalties Law (Art. 7.1.d)) and that the amount of royalties and the system for their settlement and re-assessment would be those set out in the Royalties Law, was a simple reflection of reality, and is not in dispute.

263. The Arbitral Tribunal does not consider it reasonable for the state to infer from the reference *in toto* to the Royalties Law a common understanding that the Agreements gave rise to a new concession contract.

### ii.    Contradiction with previous conduct

264. There are two indisputable facts:

---

[185] "*El monto de las regalías y el sistema para liquidarlas y reajustarlas serán los establecidos en la [Ley de Regalías] ... y se aplicarán durante toda la vigencia de la presente concesión*". Free translation by the Arbitral Tribunal.
[186] Doc. C 19.
[187] "*El monto de las regalías y el sistema para liquidarlas y reajustarlas, serán los vigentes en la época del contrato de concesión y se aplicarán durante toda su vigencia ...*". Free translation by the Arbitral Tribunal.
[188] "*porcentaje por regalías y compensaciones pactadas en el* **contrato vigente** *para la explotación de níquel en las minas ...* **de Cerro Matoso** ...". Emphasis added. Free translation by the Arbitral Tribunal.
[189] Doc. C 50, p. 46. "*de acuerdo con la Ley de Regalías*". Free translation by the Arbitral Tribunal.

- 2007 saw the extension of Concession 866, thus allowing the application of the 12% rate of Art. 16.2 the Royalties Law.

- Concession 1727 was incorporated into Contract 51 in IV 2012 constituting a new contract.

265. It was from those two moments[190] – and not before – that the Republic applied the higher rate. This confirms that Colombia never considered that the July 2005 Agreements implied a new contract.

266. Moreover, through Order 50 the state explicitly acknowledged that[191]:

> "As of **October 2007**, the **percentage**, price and settlement of royalties from **Contracts 866** and 1727 are not governed by the 1985 Agreement, but by the **[Royalties] Law**".

267. It follows that the Respondent understood that, prior to that date in 2007, the higher percentage provided for in the Royalties Law was not applicable. And yet at present, as will be seen below, it has been demanding its application from 2005.

* * *

268. The Arbitral Tribunal has concluded that the Respondent has engaged in clearly contradictory behaviour with regard to the application of the royalty rate and the justification it has provided is irrational.

269. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## 1.2.2. THE COST DEDUCTION RATE

270. Art. 23 of the Royalties Law, on the base price for the settlement of royalties, established that "in new concessions or extensions of the current contract ... 75% of the costs ... shall be discounted ...".[192]

271. The Mining Authority applied a 75% cost deduction:

- To Concession 866 from IV 2007, when Contract 866 was extended;

---

[190] See Doc. C 50: pp. 206 to 208 for the settlement of Concession 866 for the third quarter of 2007 (prior to the extension of the deadline) applying 8% and the following settlement for the fourth quarter (after the extension of the deadline) applying 12%. And see Doc. C 50, p. 251 for Concession 1727.

[191] Doc.. C 74. "*[A] partir de octubre de 2007, el porcentaje, precio y liquidación de las regalías de los Contratos 866 y 1727 no se rige por el Acuerdo 1985, sino por la Ley [de Regalías]*". Emphasis added. Free translation by the Arbitral Tribunal.

[192] "*en las nuevas concesiones o en las prórrogas del contrato vigente ... se ... desconta[rá] el 75% de los costos ...*". Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

-   To Concession 1727 from IV 2012, when it was integrated into Contract 51.

272.  Colombia now intends, however, to apply the 75% cost deduction rate to Concession 1727 between IV 2007 and III 2012[193] claiming that, during that period, the Royalties Law was already applicable to it[194].

273.  The Arbitral Tribunal notes contradictory behaviour in the state's conduct, for which it finds no justification: in 2007 there was neither a new concession nor an extension of Concession 1727 that would have allowed the application of Art. 23 of the Royalties Law. And the Arbitral Tribunal has already rejected the reasonableness of the justification that the July 2005 Agreements had the effect of creating a new contract (or new concession) either.

274.  Therefore, the purported re-assessment of royalties for Concession 1727, in the period IV 2007 to III 2012, lowering the percentage of deductible costs to 75%, contradicts the state's previous conduct without any justification to support it.

275.  This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**1.3.  MEASURES RELATING TO THE ROYALTY RATE AND THE DEDUCTION OF EXPENSES**

276.  There are two relevant measures: Resolution 576 (**A.**) and Order 63 (**B.**).

**A.  Resolution 576**

277.  Resolution 576 of the National Mining Agency dates back to 27 September 2018[195]. The Resolution was issued in connection with the process of the settlement of accounts of the Contracts – a topic that will be developed below.

278.  Resolution 576 revises the royalty settlements carried out from IV 2007 to II 2008, and during I 2011 for Concession 1727[196], to apply the elevated rate of 12%. The Arbitral Tribunal finds that royalty settlements were done at the royalty rate chosen by the state. As has been established, it is completely contradictory that the state designated one rate as correct and is now revising that action and replacing the rate with another without providing a reasonable explanation for doing so.

279.  Resolution 576 notes that the July 2005 Agreements entailed a comprehensive modification of the contract, allowing for the application of the royalty rate and

---

[193] C 39, p. 323.
[194] C 39, p. 320.
[195] Doc. C 35.
[196] Doc. C 35, p. 11. H 1, p. 63 by mistake it refers to the period IV 2007 to III 2012.

percentage of deductible costs provided for in Arts. 16.2 and 23 of the Royalties Law, respectively[197].

280.   The Arbitral Tribunal considers that the state's reasoning for applying the higher royalty rate and the reduced percentage of deductible costs to periods in which there had not yet been a "future contract or extension of the current contract", lacks any basis.

281.   This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**B.    Order 63**

282.   Order 63 of the Comptroller General's Office is dated 7 February 2020 and its purpose is to close the preliminary investigation and open the ordinary process of fiscal responsibility, establish CMSA, among others, as a tax owing entity and determine the fiscal detriment of Colombia's state assets to the tune of COP 619,680,857,421[198]. Part of this detriment stems from the review of settlements on account of the royalty rate and percentage of deduction of applicable costs.

283.   Order 63 calculates the royalties of Concession 866 for the period III 2005 to III 2007 at a rate of 12%[199] and also applies this rate to Concession 1727 for the period IV 2007 to IV 2012, deducting only 75% of the costs[200].

284.   The Arbitral Tribunal has already pointed out that the reasoning given by Colombia for applying the higher royalty rate and the lower percentage of deductible expenses, as per Arts. 16.2 and 23 of the Royalties Law, respectively, to Concession 866 prior to IV 2007 and to Concession 1727 prior to IV 2012 is unreasonable.

285.   It should be noted, moreover, that this period is different from that reviewed in Resolution 576 which began in the period IV 2007 – here, the Comptroller General's Office goes back to III 2005, which evidences a lack of consistency in the state's behaviour.

286.   This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**2.    NICKEL REFERENCE PRICE**

287.   The Arbitral Tribunal will first present an account of the factual background (**2.1.**), then it will raise the issue and adopt a position (**2.2.**). Finally, it will set out the measures taken by the state related to this matter (**2.3.**).

---

[197] Doc. C 35, p. 10.
[198] Doc. C 39, p. 407.
[199] Doc. C 39, p. 317.
[200] Doc. C 39, p. 322.

## 2.1. FACTUAL BACKGROUND

288. Much of the factual background is common to the above subject matter (nickel royalty rate and cost deduction percentage) and may therefore be omitted or at least set out in a more summarised form.

289. The Arbitral Tribunal will refer to the initial contractual agreements (**A.**) and to the Royalties Law (**B.**) which, in terms of the reference price, required regulatory development that would not arrive until Resolution 293 (**F.**) and the resolutions of the Mining and Energy Planning Unit (**G.**). However, first it is necessary to relate the impact of the enactment of the Mining Code (**C.**) and of two contractual amendments (**D.** and **E.**).

## A.    Contractual Arrangements (I)

290. Contract 866[201] provided in Clause 16 that, during the exploitation period, the concession holder would pay a royalty on the value at pithead of the gross product of the nickel ore extracted. In determining this value, account was to be taken of average international market prices for nickel (in the percentage contained in ferronickel), as reported in reputable publications.

291. Royalties settled between 1982 and 1985 were done so according to this arrangement.

292. In 1985 CMSA and the Government entered into a specific royalty calculation agreement for Concession 866 "to determine more precisely the factors to be taken into account in calculating the royalty" [the "**1985 Agreement**"][202].

293. The pithead value of the gross nickel product mined was fixed as[203]:

- Nickel processed * reference price (USD) * exchange rate USD/COP

- Minus certain deductible costs.

294. For this chapter of the Award, from the above formula, only the reference price is of interest.

295. The reference price was the average of the nickel prices recorded on[204]:

- London Metals Exchange, as reported in *Metals Week*;

- Europe's free market, as reported in *Metal Bulletin*;

---

[201] Doc. C 8.
[202] Doc. C 13.
[203] Doc. C 13, Clause 1.
[204] Doc. C 13, Clause 1.

- America's free market, as reported in *Metal Bulletin*.

296. Royalties were settled by applying these agreements for 20 years, without any major upheavals.

## B. Royalties Law

297. In 1994 Colombia enacted the Royalties Law.

298. The Royalties Law included, in Art. 23, a formula for the calculation of nickel royalties. Art. 23 established that the basic price at pithead for the settlement of royalties would be established on the basis of the FOB price at Colombian ports, minus 75% of certain costs. The formula was expressed in simple terms and did not specify how the FOB price was to be calculated – this issue was left for future regulatory development.

299. Art. 19 of the Royalties Law provided that the Ministry of Mines would determine the prices of minerals for the purposes of royalty settlements through the issuance of "*providencias*". After a series of delegations of power between different state bodies, it finally turned out to be:

- The National Mining Agency who would develop the way of calculating the FOB price mentioned in Art. 23 of the Royalties Law;

- And, subsequently, once the FOB price was known as an input to the formula in Art. 23 of the Royalties Law, the Mining and Energy Planning Unit (often referred to as the "**UPME**") would set the base price for royalty settlements.

300. In order not to break the timeline, it is sufficient to note here that the new royalty calculation formula of Art. 23 was not immediately applicable to the Concessions:

- Not only because it was not known what the FOB price would be,

- But also, because Art. 23 itself provided that it would only apply to "new concessions or extensions of the existing contract, if any"[205] (*pro memoria*: this has already been addressed in the discussion on the percentage of deductible costs). The Parties are at odds as to when such a "new concession" or an "extension of the existing Contract" occurred, which would trigger the application of the new royalty calculation formula in Art. 23.

---

[205] "*nuevas concesiones o en las prórrogas del contrato vigente, si las hubiere*". Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

## C.    Mining Code

301.  As seen above, in August 2001 Colombia enacted the Mining Code[206]. It was only of mandatory application to new and extended concessions[207]; but allowed concession holders who freely accepted its application to extend their concession for a further 30 years[208]. The possibility of extending the concession was of interest to CMSA.

302.  Note that the terms of the Concessions were:

-    Concession 866: initial duration of 25 years from the start of operation (until 30 September 2007), with a possible extension for a further five years (until 30 September 2012)[209];

-    Concession 1727: duration of 30 years, expiring on the same date of 30 September 2012[210].

303.  CMSA voluntarily opted into the Mining Code regime, as set out below.

## D.    Contractual Arrangements (II)

304.  On 22 July 2005, Colombia and CMSA signed amendments to Contracts 866 and 1727[211] on the occasion of the implementation of the Mining Code; the so-called "July 2005 Agreements".

305.  The July 2005 Agreements aimed at "comprehensively modifying"[212] the Contracts in order to bring their content in line with the Mining Code.

306.  Thus, the duration of Contract 866 and Contract 1727, which expired on 1 October 2012, could be extended for a further 30 years[213].

307.  As for the concession holder's obligations, the most relevant are contained in Clause 7 (and 6): the payment of the minimum royalties under Art. 16 of the Royalties Law[214]; the amount of royalties and the system to settle and re-assess them being the one established in the Royalties Law which "shall be applied during the entire term of this concession"[215].

---

[206] Doc. C 19.
[207] Doc. C 19, Clause 46.
[208] Doc. C 19, Clause 77.
[209] Doc. C 8, Clause 30.
[210] Doc. C 9, Clause 9.
[211] Docs. C 20 and 21, respectively.
[212] "*modificar integralmente*". Free translation by the Arbitral Tribunal.
[213] Doc. C 20, Clause 5 and Doc. C 21, Clause 4.
[214] Doc. C 20, Clause 7.1.d) and Doc. C 21, Clause 6.1.d).
[215] Doc. C 20, Clause 7.2. and Doc. C 21, Clause 6.2. "*se aplicarán durante toda la vigencia de la presente concesión*". Free translation by the Arbitral Tribunal.

308. At the same time, the July 2005 Agreements stated that the 1985 Agreement "which determines the factors to be taken into account in calculating the royalty to be paid by the concessionaire"[216] – which is the formula that had been applied since 1985 – was deemed to be incorporated.

309. As will be seen, the Respondent considers that this comprehensive amendment of the Contracts allows for the application of the formula of Art. 23 of the Royalties Law to commence as of the date of the July 2005 Agreements. The Claimant objects. The Arbitral Tribunal has already stated its position in this regard, rejecting the Respondent's proposition.

**E.  Contractual Arrangements (III)**

310. In February 2005, a benchmark used in the royalty formula contained in the royalty agreement that had applied since 1985 ceased to be published. *Pro memoria*: to determine the price of the mined nickel product at pithead, the 1985 Agreement referred to the price of nickel in three different markets, as reported in certain industry publications.

311. Although the benchmark had disappeared back in February 2005, it was not until August 2011 that CMSA and the mining authority managed to agree on a replacement for the defunct index[217] [the "**2011 Agreement**"].

312. The royalty settlements between 2005 and 2011 had been carried out by averaging only two price indices (the only two that were published). The 2011 Agreement directly mentioned applicable average values, replacing the defunct index – values to be applied retroactively from II 2005, thus correcting the settlements made using only the average of two indices.

313. However, between 2005 and 2011 something else occurred. It should be recalled that Art. 23 of the Royalties Law, which contained a new royalty calculation formula, was not applicable to CMSA as long as there was no new concession or extension of the concession. There are two possible points in time considered by the Parties at which this new concession or extension of the previous one could have taken place:

-    July 2005 (for both Concessions), with the signing of the July 2005 Agreements: this is the Respondent's position, which the Arbitral Tribunal has already rejected;

-    October 2007 (for Concession 866), when Contract 866 was extended – this is the position defended by the Claimant;

---

[216] Doc. C 20, Clause 7.2. and Doc. C 21, Clause 6.2. "*que determina los factores que deben tenerse en cuenta para calcular la regalía que el concesionario debe pagar*". Free translation by the Arbitral Tribunal.
[217] Doc. C 22.

- October 2012 (for Concession 1727), when that concession became part of Contract 51.

314. Whichever Party's position is accepted, what is undeniable is that, at some point between 2005 and 2011, the new Art. 23 formula became applicable (at least for Concession 866, which is the most important one). However, recall that the Art. 23 formula could not be implemented because it required the National Mining Agency to determine how the FOB price should be calculated and then the Mining and Energy Planning Unit to publish base prices using that FOB price.

315. Therefore, with these two changes present (i) the substitution of an index in the contractual royalty formula and (ii) the mandatory application of the legal formula of Art. 23 of the Royalties Law, which was nevertheless impossible to implement because the base prices had not yet been published using the FOB price, the 2011 Agreement included its second clause[218]:

> "The modification [of the price index] shall provisionally apply from March 2005 until such time as the base price for royalty settlements is set by the Mining and Energy Planning Unit ... in accordance with the provisions of Art. 23 [of the Royalties Law], at which time the Mining Authority will implement the provisions of the administrative acts issued for this purpose".

316. The Parties now dispute what is meant by the expression "shall provisionally apply" from March 2005 until the settlement price is fixed.

317. In reality, royalties were calculated according to the formula of the 1985 Agreement, slightly modified by the 2011 Agreement until 2015, when the Mining and Energy Planning Unit published the base settlement price, as will be seen in the following sections.

**F.    <u>Resolution 293</u>**

318. *Pro memoria*: Art. 23 of the Royalties Law had foreseen that the value at pithead would be determined as the FOB price of nickel at Colombian ports minus 75% of certain costs.

319. Law 1530 of 2012 (which regulates the organisation and functioning of the general royalties system), establishes in its Art. 15 that the National Hydrocarbons Agency and the National Mining Agency shall determine the terms and conditions for the determination of the base prices for the settlement of royalties and compensation.

---

[218] "*La modificación [del índice de precios] aplicará provisionalmente desde el mes de marzo del año 2005 hasta el momento en que se fije el precio base de liquidación de regalías por parte de la Unidad de Planeación Minero Energética ... de conformidad con lo dispuesto en el art. 23 [de la Ley de Regalías], momento en el cual la Autoridad Minera hará efectivo lo que se disponga en los actos administrativos que sean expedidos para el efecto*". Free translation by the Arbitral Tribunal.

320. In May 2015, the National Mining Agency issued Resolution 293[219], which developed the calculation of the FOB price of nickel, and did so on the basis of consultancy studies contracted in 2010 and 2012[220].

321. Resolution 293 determined that the FOB nickel price would be the international nickel price minus external transport and insurance costs[221]; and this international nickel price, in turn, was the sum of[222]:

- Average price of nickel on the London Metal Exchange [the "**LME**"];

- Average of the average premiums of the European and North American free markets, as published in *Metal Bulletin*.

322. As will be seen, the Claimant – among other criticisms made – considers that this way of calculating a FOB price does not really result in a FOB price and, therefore, Resolution 293 is contrary to Art. 23 of the Royalties Law.

323. In addition, Resolution 293 established in its Art. 7 that nickel-producing mine owners had to report the costs incurred to the Mining Authority and the Mining and Energy Planning Unit, in order for the latter to publish the base royalty settlement prices. This publication of prices is what the 2011 Agreement referred to as "the base royalty settlement prices set by the Mining and Energy Planning Unit"[223]. *Pro memoria*: royalty settlements have been made according to the formula of the 2011 Agreement, which was applied "provisionally" until the publication of those prices.

324. However, Resolution 293 also foresaw the publication of a series of historical prices since 1994 in its Art. 8 and required nickel-producing miners who, according to Art. 23 of the Royalties Law, had signed concession contracts or had extended them while the law was in force, to report the actual information on their costs since 1994 or since the date of extension of the respective concession contract to the authorities. This information was to be used for the re-assessment of royalties that had been incurred and paid provisionally, with Art. 9 imposing an obligation on mine owners to provide such historical information.

325. The Respondent has demanded that CMSA comply with this obligation and provide its historical information. It has re-assessed previously paid royalties which it nevertheless considers provisional and revisable in the future. The Claimant refuses to accept the re-assessment of royalties that have already been paid and has therefore refused to provide the requested historical information.

---

[219] Doc. C 28.
[220] Doc. C 28, p. 2.
[221] Doc. C 28, p. 4.
[222] Doc. C 28, p. 3.
[223] "*los precios de base de liquidación de regalías fijados por parte de la Unidad de Planeación Minero Energética*". Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

## G.  Mining and Energy Planning Unit Resolutions

326. The Mining and Energy Planning Unit was in charge of publishing the base prices for the settlement of royalties, as foreseen in Resolution 293 of the National Mining Agency, in development of Art. 23 of the Royalties Law.

327. The Mining and Energy Planning Unit published base prices from 2015, for prospective application, from III 2015 onwards. However, in 2017[224] it also published base prices, with retrospective effects, for application to the period IV 2007 to III 2012 – a period for which CMSA had already settled and paid royalties. The validity of this re-assessment of past royalties is one of the issues at stake in this arbitration.

## 2.2.  ARGUMENTS

328. The Parties accept that the formula of Art. 23 of the Royalties Law is not immediately applicable, only being so "to new concessions or extensions of the existing contract"[225].

329. The Arbitral Tribunal has already concluded that any application of Art. 23 of the Royalties Law to a period prior to IV 2007 (Concession 866) and IV 2012 (Concession 1727) is contradictory to the state's own conduct and cannot be justified.

330. The issue is complicated because after those dates, although Art. 23 of the Royalties Law was in theory applicable, in practice it was not possible. It was not until 2015 that the definition of the FOB price referred to in Art. 23 was normatively developed through Resolution 293 – a development that the Claimant considers incorrect (**2.2.1.**) and, in any event, applicable only prospectively (**2.2.2.**).

### 2.2.1. INCORRECT FOB PRICE

331. A nickel ore is extracted from the Cerro Matoso mine and processed into ferronickel. Simply put, royalties are calculated by applying a percentage to the value of the extracted product. The difficulty in determining this value stems from the fact that there is no reference price for ferronickel, as it is a heterogeneous commodity whose value depends on its nickel content[226]. There is, however, a reference price for nickel 1, which is traded on regulated markets. Given this reality, royalties are calculated by applying the reference price of pure nickel (nickel 1) to the amount of nickel contained in ferronickel[227].

---

[224] Resolution 562 (Doc. C 30), as amended by Resolution 293 (Doc. C 24).
[225] "*en las nuevas concesiones o en las prórrogas del contrato vigente*". Free translation by the Arbitral Tribunal.
[226] Claimant's PHB, para. 12.
[227] Reply, para. 126.

332. Art. 23 of the Royalties Law establishes that the basic price at pithead for the settlement of royalties generated by the exploitation of nickel will be based on the weighted average of the FOB price in Colombian ports.

333. The FOB price at Colombian ports was developed in Resolution 293 as the average price of nickel on the LME, plus the average premiums of the Asian and North American markets.

## A. **Positions of the Parties**

334. The Claimant presents a number of arguments to suggest that the development of Resolution 293 was incorrect, all of which are refuted by the Respondent:

335. *First*, it considers that as CMSA is the only nickel producer in Colombia the reference to FOB price in Colombian ports could only be composed of CMSA's ferronickel sales price[228].

336. In the Claimant's view, the fact that Resolution 293 ignores CMSA's sales price and establishes a new formula with reference to international prices to estimate this FOB price is a clear contravention of the mandate of Art. 23 of the Royalties Law[229].

337. Moreover, in its view, it is clear that the Royalties Law did not intend to refer to an international reference price in the case of nickel, since, when it did intend to do so, it was expressly stated, as in Art. 16.9 (as amended by Law 756 of 2002):

> "The value of a gram of gold, silver and platinum at pithead to settle royalties will be 80% of the average international price of the last month, as published by the London Stock Exchange in its Past Meridian version"[230].

338. If the Arbitral Tribunal were to accept that the reference to FOB price in Colombian ports is equivalent to CMSA's sales price, the Claimant argues that the actual sales price should be used including any discount (thus reducing the base price on which royalties are calculated). CMSA sells the ferronickel to another company in the group and applies a 2% price reduction; the Claimant has therefore argued that it is correct to make this deduction[231].

339. The Respondent argues that Art. 23 of the Royalties Law confers sufficient discretion on the mining authorities to determine the methodology for developing the FOB price at Colombian ports as they deem appropriate, so that the reference to international

---

[228] Reply, para. 132.
[229] Reply, para. 139.
[230] "*El valor de gramo oro, plata y platino en boca de mina para liquidar las regalías, será del 80% del precio internacional promedio del último mes, publicado por la bolsa de mercados de Londres en su versión Pasado Meridiano*". Free translation by the Arbitral Tribunal.
[231] Memorial, para. 272.

indices is well within the mandate conferred[232]. As the National Mining Agency explained in a round of public consultations[233]:

> "In order to establish an FOB price, different methodologies can be used to calculate it; in the case of export minerals, such as coal, international indices are used"[234].

340. Moreover, CMSA was involved in the consultation process that ultimately led to the issuance of Resolution 293. And, among the scenarios that CMSA proposed for the determination of the FOB price was alternative 3, which referred to a reference price equivalent to the LME minus transportation and insurance costs [235]. Therefore, it is not true that CMSA's sales price is the only way to establish the FOB price of ferronickel.

341. Finally, if the Arbitral Tribunal were to accept that the FOB price is to be CMSA's sales price, the Respondent submits that the 2% discount that CMSA applies to the sales price should be omitted as it constitutes a *de facto* cost whose deduction is not allowed under the Royalties Law, which sets out the categories of costs that can be deducted[236].

342. *Second*, the Claimant contends that the FOB price developed in Resolution 293 is not, in fact, an FOB price.

343. It argues that the international reference price set out in Resolution 293 could never be indicative of the FOB price, as it would imply transport and insurance costs which would not be present in an FOB price[237].

344. Colombia responds that the FOB price developed in Resolution 293 would be the price at destination, minus distribution costs, and therefore does reflect an FOB price[238].

345. *Third*, ferronickel is typically worth less than nickel, therefore, the estimation of its price through the price of nickel on the LME should be lowered through a discount. Yet Resolution 293 applies a premium to it[239], referring moreover to the American market which is not relevant for CMSA[240]. It even goes against the opinion of its own advisors, who did foresee the application of a discount[241].

---

[232] Rejoinder, para. 64.
[233] Doc. R 46.
[234] "*Para establecer un precio FOB, se puede recurrir a distintas metodologías para su cálculo, en el caso de los minerales de exportación, como lo es el carbón, se utilizan índices internacionales*". Free translation by the Arbitral Tribunal.
[235] Doc. R 42, p. 25.
[236] Memorial, para. 573.
[237] Reply, para. 153.
[238] Counter-Memorial, para. 204.
[239] H 1, p. 129.
[240] H 1, p. 129.
[241] H 1, p. 131.

## B.    Position of the Arbitral Tribunal

346.    None of the Claimant's arguments are convincing:

### a.    FOB price equivalent to CMSA's sale price

347.    The Claimant understands that the only possible "FOB price at Colombian ports for nickel[242]" is the price at which CMSA sells ferronickel, as there are no other nickel exporters in Colombia apart from CMSA.

348.    The Arbitral Tribunal is not convinced.

349.    Art. 23 of the Royalties Law establishes the generic way of setting the basic pithead price for the settlement of the royalties generated by the exploitation of nickel. Unlike Art. 16.2 of the Royalties Law, which referred explicitly and solely to the Cerro Matoso mine, Art. 23 applies to all nickel mining.

350.    The fact that, as of today, the only nickel mine in Colombia is Cerro Matoso does not mean that in the future there may not be other nickel mines – as the Respondent has pointed out[243]. It would therefore make no sense to link the formula for determining the generic nickel royalty to CMSA's specific sales price.

351.    In addition, in a conversation between the National Mining Agency and CMSA, CMSA said[244]:

> "Things are worth what the market wants to pay and not what the company says they are"[245].

352.    The Arbitral Tribunal understands the state's position. In order to avoid having to simply validate the FOB price that CMSA reports as (allegedly) real, the state has chosen to "reconstruct" the FOB price from international references.

* * *

353.    As the Arbitral Tribunal has rejected the idea that the FOB price is equivalent to CMSA's sales price, it is unnecessary to enter into the discussion regarding the various items that should make up that sales price – more specifically, whether or not the 2% marketing commission that CMSA deducts from the ferronickel sales price should be taken into account.

---

[242] Free translation by the Arbitral Tribunal.
[243] Respondent's PHB, para. 98; HT-EN, Day 3, p. 722, ll. 2-10.
[244] Rejoinder, para. 170; Doc. R 26, p. 4.
[245] "*Las cosas valen lo que el mercado quiera pagar y no lo que la empresa diga*". Free translation by the Arbitral Tribunal.

### b.    FOB price via international benchmarks

354.  The Arbitral Tribunal does not consider that the estimation of the FOB price on the basis of international nickel prices in Resolution 293 goes against the mandate of Art. 23 of the Royalties Law:

355.  *First*, the Claimant has not submitted sufficient evidence that when the Royalties Law referred to the FOB price it was (implicitly) excluding any possible reference to international prices.

356.  The Claimant only provides, as support, the wording of Art. 16.9 of the Royalties Law referring to royalties for gold, silver and platinum, which expressly refers to the international price published by the LME.

357.  But, unlike Art. 23 of the Royalties Law, Art. 16.9 was not included in the initial version of the Royalties Law, instead coming from a reform undertaken by Law 756 of 2002[246]. In fact, in the version of the Royalties Law provided in the file[247] there is no reference to international prices. Therefore, the Arbitral Tribunal cannot conclude that in 1994, when Colombia enacted the Royalties Law with its Art. 23 referring to FOB prices, it did so as an option excluding an international price.

358.  *Second*, when CMSA was consulted prior to the issuance of Resolution 293, CMSA itself proposed the reference to international prices as an alternative to calculate the FOB price.

359.  Indeed, when CMSA discussed with the Mining Authority how the formula in Art. 23 of the Royalties Law should be developed, it proposed as scenario 3 using "a reference price that equals that of the LME minus [the] costs of maritime transport and insurance"[248]. CMSA saw no contradiction in translating the FOB price into an international reference price, net of certain costs – which is, in essence, what Resolution 293 does.

### c.    Resolution 293 does not contain an FOB price

360.  Resolution 293 takes a quoted price for nickel on international markets, subtracts a number of costs associated with its export, and thus generates the FOB price. The Claimant considers that the result is not an FOB price.

361.  The Arbitral Tribunal does not view the formula in Resolution 293 as absurd; in fact, it fits in the very visual and simple diagram provided by the Claimant that explains the

---

[246] Doc. C 62.

[247] Doc. C 14.

[248] Doc. R 41, slide 24. "*un precio de referencia que equivale al LME menos [los] costos de transporte marítimo y seguro.*" Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

value/costs chain from the extraction of the mineral through the FOB price to its international quotation to the consignee[249]:



362. By taking the price at destination and subtracting the costs associated with its freight, one arrives at the FOB price.

363. The Claimant, however, argues that Resolution 293 does not reflect an FOB price because it does not deduct the costs associated with freight correctly.

364. The Arbitral Tribunal notes that Resolution 293 establishes that the FOB price of nickel shall be the international price of nickel minus the external transport costs[250], understood as the cost of sea freight[251]. It is not true, therefore, that Resolution 293 does not include these costs in the formula for determining the FOB price.

**d.    Incorrectness of the formula**

365. Finally, the Claimant points to a possible error or unfairness in the determination of the international price of nickel, as set out in Resolution 293.

366. Resolution 293 estimates the international price of nickel as the sum of[252]:

- The monthly arithmetic average price per pound of nickel for three-month sales recorded on the LME;

- The monthly arithmetic average of the European and American free market premiums, which corresponds to the monthly average of the lowest and highest premiums paid for nickel trading published in Metal Bulletin.

367. The Claimant argues that ferronickel is not sold at higher prices than nickel; therefore, it is not correct to apply a premium, as Resolution 293 does, and even less so by reference to the American market, as it is not a relevant market for CMSA.

---

[249] Reply, para. 150.
[250] Doc. C 28, p. 4.
[251] Doc. C 28, p. 3.
[252] Doc. C 28, p. 3.

368. The majority of the Arbitral Tribunal sees it differently[253]:

 -    The inclusion of premiums was already foreseen in the formula contained in the 2011 Agreement accepted by CMSA and, moreover, it is not true that the value of ferronickel is always below that of nickel, with this being accepted by the Claimant itself[254]; therefore, the addition of premiums does not appear to be conceptually flawed.

 -    The quotation of nickel on the American market has been part of the reference price formula since the 1985 Agreement; whether or not it is a relevant market for CMSA, CMSA has historically accepted to include it in the calculation of royalties due.

369. Moreover, the formula set out in Resolution 293 is very similar to the one that CMSA itself proposed in the consultation round as acceptable. It would make no sense for CMSA to have suggested the implementation of an incorrect formula.

370. In addition, the Arbitral Tribunal asked both economic experts to compare how the base price would have been as of 2005, applying Resolution 293 on the one hand, and applying the 1985 Agreement (as amended in the 2011 Agreement) on the other. This is the graph they provided[255]:



*Source: South32 v Colombia – Analysis to Question 5 of PO 5, "Summary" tab.*

371. Both experts recognise that the two formulas are very similar, concentrating on deductible costs as the main point of the difference[256]. This is due to the 1985

---

[253] The arbitrator, Mr. Guido S. Tawil, dissents from the majority opinion on the grounds that, since ferronickel is a Class 2 nickel product, what was appropriate was to apply a discount on the LME cathode nickel price and not a premium, as Corficolombiana and CRU indicated in their final report of December 2012 (Doc. R 32, pp. 60-61 of the report, pp.109-110 of the PDF).

[254] H 1, p. 128.

[255] Joint opinion on Question 5, p. 2.

[256] Joint opinion on Question 5, para. 5.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

Agreement allowing 80% or 100% deduction of costs and Resolution 293 reducing it to 75% (and even 0% for some categories of costs)[257]:

**Table 1: Deductibility Percentage by Cost Category Under Each Regime[5]**

| Cost Categories | Deductibility Percentages | |
| --- | --- | --- |
| | 1985 Agreement | Resolution 293 |
| Mining | 0% | 0% |
| General & Administative | 80% | 0% |
| Marketing | 80% | 0% |
| Handling | 80% | 75% |
| Auxiliary Installations | 80% | 75% |
| Internal Transportation and Port | 100% | 75% |
| Processing | 100% | 75% |

*Source: 1985 Royalty Agreement, pp. 5-6 (**C-13**); Mining Agency Resolution 293, pp. 4-8 (**C-28**).*

372.  This results in the curve of Resolution 293 always being above that of the 1985 Agreement: under Resolution 293 (applying Art. 23 of the Royalties Law) the deductible costs were always lower, so the amount on which royalties are calculated would always be higher.

373.  But the difference between the two regulations, which may be due to the different treatment of deductible costs, is irrelevant to the discussion before the Arbitral Tribunal – the Claimant has not suggested that from the change in the percentage of deductible costs international liability arises[258].

374.  The Claimant's criticism focuses on Resolution 293's calculation of the FOB price. It should be recalled that this FOB price is the result of subtracting from (i) an average international price of class 1 nickel (ii) a series of freight costs. In this respect, both economic experts comment as follows:

375.  (i) Regarding average international prices[259]:

-    The 1985 Agreement fixes the international price as the average of the LME price and the European and American market premiums;

-    Whereas Resolution 293 takes the average of the European and American premiums and adds it to the LME price.

-    According to the experts, "the difference between the two methodologies is marginal"[260].

---

[257] Joint opinion on Question 5, p. 2.
[258] Beyond the discussion in paras. 270 to 274 above on the application of the 75% deduction to Concession 1727 in the period IV 2007 to III 2012.
[259] Joint opinion on Question 5, footnote 4.
[260] Joint opinion on Question 5, footnote 4.

376.  (ii) Regarding freight costs[261]:

-    The 1985 Agreement deducted the actual transport costs of ferronickel;

-    Whereas Resolution 293 takes a minimum between these actual freight costs and the notional costs, calculated on the basis of an international index.

-    In the experts' opinion, "from a practical standpoint, actual costs are almost always lower than theoretical costs, thus making any difference marginal."[262].

377.  Both experts therefore recognise that the formula for determining the reference price – be it that of the 1985 Agreement or that of the FOB price developed in Resolution 293 – is practically identical.

378.  Given that the 1985 Agreement was the fruit of the Parties' agreement and was in force for 30 years, it could hardly be argued that its content was incorrect or resulted in unfair figures, as the Claimant now argues in respect of Resolution 293.

\* \* \*

379.  <u>In conclusion</u>, the majority of the Arbitral Tribunal does not share the Claimant's position and does not find the actions pointed out by the Claimant in the determination of the FOB price contained in Resolution 293 to be absurd or unjust.

**2.2.2. RETROACTIVE IMPLEMENTATION OF RESOLUTION 293**

380.  Resolution 293 was issued in May 2015. Resolution 293 developed the calculation of the FOB price – one of the elements of the royalty settlement calculation, according to Art. 23 of the Royalties Law.

381.  Once the development of the FOB price was enacted, in 2015 the Mining and Energy Planning Unit began to publish the base prices for the settlement of royalties. The application of these base prices to the Concessions is not disputed.

382.  However, in 2017 the Mining and Energy Planning Unit also began to publish base prices to reopen past settlements, specifically for the period IV 2007 - IV 2012. This reopening followed the guidelines set out in Art. 8 (and 9) of Resolution 293, which provided for the publication of a historical series of prices to re-assess provisionally made past settlements. There have also been other state actions that sought to reopen settlements from an even earlier period, from II 2005 to III 2007[263].

383.  The Parties' disagreement focuses on the possibility of reopening past settlements.

---

[261] Joint opinion on Question 5, footnote 4.
[262] Joint opinion on Question 5, footnote 4.
[263] See Cundinamarca Petition (Doc. C 32).

## A.   Positions of the Parties

384.   The Claimant presents a number of arguments, all of which are refuted by the Respondent, to argue that the development of the formula of Art. 23 of the Royalties Law cannot be applied retroactively to periods prior to the enactment of Resolution 293 in 2015:

385.   *First*, it points out that the retroactive application of a rule[264] – as intended by Art. 8 of Resolution 293 itself – goes against the principle of non-retroactivity[265], which is enshrined in Art. 228 of the Mining Code[266]:

> "The amount of royalties and the system for settling and readjusting them shall be those in force at the time of the concession contract and shall apply throughout its term. The modifications on these matters adopted by the law shall only apply to contracts entered into and perfected after its enactment".

386.   *Second*, the Claimant points out that in the 2011 Agreement the methodology according to which royalties were to be provisionally settled until Colombia published the base settlement price that would result from the development of the formula of Art. 23 of the Royalties Law as of March 2005 was agreed upon by CMSA and the state[267]. According to the Claimant, it is not possible now to seek retroactive review of those settlements made pursuant to that agreement[268].

387.   The Respondent considers that the Claimant confuses the term "provisional" ("*provisional*") with "temporary" ("*temporal*")[269]. The royalty settlement formula of the 2011 Agreement would be applied on a "provisional" basis and, therefore, the settlements would be revised once the base settlement prices were published[270]. According to the Respondent, this case is not about retroactively applying a rule, but about honouring the Parties' agreement[271].

---

[264] Reply, para. 98.
[265] Memorial, para. 88.
[266] Doc. C 19. "*El monto de regalías y el sistema para liquidarlas y reajustarlas serán los vigentes a la época del contrato de concesión y se aplicarán durante toda su vigencia. Las modificaciones que sobre estas materias adopte la ley, sólo se aplicarán a los contratos que se celebren y perfeccionen con posterioridad a su promulgación*". Free translation by the Arbitral Tribunal.
[267] Reply, para. 107.
[268] Reply, para. 104.
[269] Rejoinder, para. 47.
[270] Counter-Memorial, para. 126.
[271] Doc. C 107, p. 205.

388. Moreover, CMSA could never have created the expectation that the royalty settlements prior to 2015 were final, as the letters accompanying the settlements themselves warned of their provisional nature[272]:

> "As you are aware, the settlements corresponding to the invoices are provisional until the definitive application of Art. 23 of the Royalties Law is agreed".

389. The Claimant does not interpret the alleged warning in the same way. For the Claimant, it is merely a confirmation of the temporality of the validity of the 2011 Agreement's formula[273]. In addition, in any event, it downplays its significance, arguing that it was a unilateral expression of authority and therefore did not reflect a common agreement. Moreover, it did not appear in all invoices but only in some, and only in respect of Concession 866[274]. Colombia disputes this last assertion by arguing that the phrase was contained in 13 settlements[275].

390. *Third*, the Claimant suggests that Colombia's conduct is inconsistent with the position it defends in this arbitration, because:

- Both the settlements made by the state (until 2012) and the self-assessments made by CMSA and reviewed by the state (between 2013 and 2015) were made according to the formula in the 2011 Agreement[276];

- The state reviewed the royalty settlements made under the 2011 Agreement formula in two inspections that resulted in two orders from the Comptroller General's Office in which no irregularities were found with regard to the reference price applied[277].

391. *Finally*, the Claimant refers to a domestic award[278] issued under the arbitration clause contained in Contract 51, in which the arbitral tribunal ruled that at no time did CMSA and the National Mining Agency agree on the provisional and retroactive payment of royalties for any period; as well as that Art. 8 of Resolution 293 (which obliges the delivery of historical cost information) is not applicable to Contract 51[279]. *Pro memoria*: Contract 51 is the one which, as of 1 October 2012, both Concessions were integrated into.

---

[272] Counter-Memorial, para. 128. Doc. C 50. "*Como es de su conocimiento, las liquidaciones correspondientes a las facturas tienen carácter provisional hasta tanto no se acuerde la aplicación definitiva del art. 23 de la Ley de Regalías*". Free translation by the Arbitral Tribunal.

[273] Reply, para. 183.

[274] Reply, para. 182.

[275] Rejoinder, para. 48.

[276] Memorial, para. 89.

[277] Memorial, para. 89.

[278] Rejoinder, para. 50.

[279] Doc. R 83.

## B.    Position of the Arbitral Tribunal

392. The discussion is complex: the Claimant considers that Art. 8 (and 9) of Resolution 293 intend to apply the content of Resolution 293 to a period prior to that from which Resolution 293 entered into force, and that is true; but the Claimant fails to mention that the purpose of Art. 8 (and 9) is to apply the regulatory development of Art. 23 of the Royalties Law from the date on which that Law entered into force – and not before.

393. The question, therefore, is whether it is possible to review royalty settlements that have already been paid, applying the subsequent development of a law that is in force to points in time prior to the issuance of such development. And this question has been resolved in the (now final) award issued on 27 April 2022, under the arbitration clause of Contract 51, in an arbitration between CMSA and the National Mining Agency [the "**Reference Price Award**"][280] – the relevance of which has not been challenged by the Respondent .[281] Note that the Reference Price Award is the only final judicial decision[282] adopted under Colombian law submitted to the file which deals with the above-mentioned issue and, therefore, the Arbitral Tribunal will rely on its conclusions when undertaking its analysis.

394. The Reference Price Award makes the following analysis:

395. *First*, it proclaims Resolution 293 to be non-retroactive[283]:

> "[The] settlements and payments have binding effect and cannot be modified or altered by any subsequent rule, under penalty of retroactive application of the same and the consequent violation of a constitutionally (Art. 58 of the Political Charter) and legally protected (Law 153 of 1887) acquired right".[284]

396. The Arbitral Tribunal agrees that the prevailing general principle is that of non-retroactivity – a principle with which the Respondent agrees[285]. This principle is enshrined:

-    In Art. 38 of Law 153 of 1887[286]:

---

[280] Doc. R 83.
[281] Rejoinder, paras. 50, 192, 254, 460 and 590; Respondent's PHB paras. 58 y 87.
[282] Arbitral, in this case.
[283] Doc. R 83, p. 70.
[284] "*[Las] liquidaciones y pagos son efectos consolidados que no pueden ser modificados ni alterados por ninguna norma posterior, so pena de aplicación retroactiva de la misma y la consiguiente violación de un derecho adquirido, constitucionalmente protegido (art. 58 de la Carta Política) y amparado legalmente (Ley 153 de 1887)*". Free translation by the Arbitral Tribunal.
[285] Rejoinder, para. 396.
[286] Doc. C 43. Cited in the Memorial, para. 28 and in Doc. R 84, p. 77. "*En todo contrato se entenderán incorporadas las leyes vigentes al momento de su celebración*". Free translation by the Arbitral Tribunal.

> "Every contract shall be deemed to incorporate the laws in force at the time of its conclusion".

- And in Art. 228 of the Mining Code[287]:

> "The amount of royalties and the system for their settlement and readjustment shall be those in force at the time of the concession contract and shall apply throughout its term. The modifications on these matters adopted by the law shall only apply to the contracts entered into and perfected upon its enactment".

397. Consequently, regulations generally have a prospective application into the future, as recognised in Art. 12 of Resolution 293 itself, which states[288]:

> "Validity. This resolution shall be effective from the date of its publication".

398. Although Resolution 293 itself proclaims that it only applies from the date of its publication, in its Art. 8 it intends to extend its effects into the past, as it refers to the publication of a historical price series, with the intention of[289]:

> "carrying out the re-assessment of royalties that have been incurred and paid on a provisional basis [since the entry into force of Art. 23 of the Royalties Law]".

399. And Art. 9 mandates the submission of historical information to develop this historical series of prices.

400. *Second*, the Reference Price Award accepts that the retrospectivity of rules may occur when they apply, as of the time of their entry into force, to legal and factual situations that have been governed by a previous regulation. However, according to the 22 February 2011 ruling of the Constitutional Court, the retrospectivity of a rule is only possible when it is so established and expressly authorised[290].

401. *Third*, applying this jurisprudence, the Reference Price Award analyses the Royalties Law for authorisation of retrospective application, and finds none[291]:

---

[287] Doc. C 19. "*El monto de regalías y el sistema para liquidarlas y reajustarlas, serán los vigentes a la época del contrato de concesión y se aplicarán durante toda su vigencia. Las modificaciones que sobre estas materias adopte la ley, sólo se aplicarán a los contratos que se celebren y perfeccionen a su promulgación*". Free translation by the Arbitral Tribunal.

[288] Doc. C 28. "*Vigencia. La presente resolución rige a partir de la fecha de su publicación*". Free translation by the Arbitral Tribunal.

[289] "*efectuar la reliquidación de regalías que se han causado y pagado de forma provisional [desde la entrada en vigor el art. 23 de la Ley de Regalías]*". Free translation by the Arbitral Tribunal.

[290] Doc. R 83, pp. 77 and 78.

[291] Doc. R 83, p. 78. "*[E]n ningún artículo de la Ley [de Regalías] se le dio alcance retrospectivo al pago de las regalías, en otras palabras, en dicha norma no se estableció que cuando la autoridad competente fijara el precio base de liquidación de las regalías, lo que efectivamente ocurrió años después, el precio nuevo se*

"No article of the [Royalties] Law gave retrospective effect to the payment of royalties, in other words, it did not establish that when the competent authority fixed the base price for the settlement of royalties, which in fact happened years later, the new price would be applied retrospectively and, consequently, the corresponding re-assessment should be made".

402. The Arbitral Tribunal shares this conclusion. Although Art. 19 of the Royalties Law allowed the Ministry of Mines to determine the prices of minerals for the purpose of royalty settlement, the Law did not proclaim the retrospectivity of such determination.

403. The Respondent argues, therefore, that authorisation of the retrospective application of Resolution 293 through Art. 8 (and 9) is not to be found in the Royalties Law, but in an agreement between the Parties. Colombia refers to the 2011 Agreement, which recognises the provisional application of the formula contained in that Agreement[292]:

"The [royalty calculation formula] ... will be applied provisionally from March 2005 until the moment in which the base price for royalty settlement is fixed by the Mining and Energy Planning Unit ... in accordance with the provisions of Art. 23 [of the Royalties Law], at which time the Mining Authority will give effect to the provisions of the administrative acts issued for this purpose".

404. The Reference Price Award has also ruled on this defence, rejecting it[293]. The Reference Price Award interprets the term "provisionally" (*provisionalmente*), used in the 2011 Agreement, in a manner contrary to the interests of the state:

"The Tribunal understands that the provisionality referred to in the [2011 Agreement] refers to the temporary application of the formula. Until when? Until the UPME fixes the base price for royalty settlements. We do not find that from the provisional term agreed for the concession contracts it can be understood that the royalty payment made by the concession holder should be reviewed at the time when the Mining Authority issues the base price for the royalty settlements...."[294].

---

[292] aplicaría de manera retrospectiva y, en consecuencia, debería hacerse la reliquidación correspondiente". Free translation by the Arbitral Tribunal.
[292] "*La [fórmula de cálculo de las regalías] ... aplicará provisionalmente desde el mes de marzo del año 2005 hasta el momento en que se fije el precio base de liquidación de regalías por parte de la Unidad de Planeación Minero Energética ... de conformidad con lo dispuesto en el art. 23 [de la Ley de Regalías], momento en el cual la Autoridad Minera hará efectivo lo que se disponga en los actos administrativos que sean expedidos para el efecto*". Free translation by the Arbitral Tribunal.
[293] Doc. R 83, pp. 49 and 50.
[294] "*El Tribunal entiende que la provisionalidad a que se refiere el [Acuerdo 2011] alude a la aplicación temporal de la fórmula ¿hasta cuándo?, hasta que la UPME fije el precio base de la liquidación de la regalía. No encontramos que del término provisionalidad pactado para los contratos de concesión, pueda entenderse que el pago de las regalías efectuado por el concesionario debía ser revisado al momento en que la Autoridad Minera expidiera el precio base de la liquidación de la regalía ...*". Free translation by the Arbitral Tribunal.

405.    Irrespective of the assessment made in the Reference Price Award, the Arbitral Tribunal notes that the Parties themselves, in this arbitration, accept that the use of the term "provisionally" could be misleading:

-    The Respondent understands that the provisional application implied that it would be reviewed at a later stage, when the base settlement price was fixed;

-    Whereas the Claimant interprets the expression as indicating a temporary (but definitive and non-reviewable) application until the publication of the base settlement price.

406.    This fact in itself is sufficient to dismiss the Respondent's defence – as already pointed out in the Price Reference Award – that the 2011 Agreement contains a pact authorising the retrospective application of Resolution 293; the ambiguity of the terms used rules out the existence of an unequivocal covenant between the parties that could be construed as an exception to the principle of the prospective application of said Resolution.

Respondent's counter-argument

407.    The Respondent insists that its interpretation of the term "provisionally" is correct, and backs this up with 11 letters accompanying the royalty settlement, in which the mining authority warned of the following[295]:

> "As you are aware, the corresponding settlements ... issued since the beginning of the extension, i.e. from 1 October 2007, are provisional until the definitive application of Art. 23 of the Law [on Royalties] is agreed".

408.    The Arbitral Tribunal notes that the warning given by the state dates back to II 2009[296] – a time prior to the 2011 Agreement. It does not therefore seem reasonable that it can be indicative of a common understanding of the Parties on the interpretation to be given to the 2011 Agreement, as the Respondent would have it appear. At most, it would be indicative of the state's unilateral will that the future development of Art. 23 of the Royalties Law would apply to settlements prior to its issuance. But this is not the case either, as will be set out below.

409.    There are minutes of several meetings between Ingeominas (predecessor of the National Mining Agency) and CMSA, prior to the signing of the 2011 Agreement[297]. Of particular interest is Minutes No. 4, in which a representative of CMSA states that

---

[295] "*Como es de su conocimiento las liquidaciones correspondientes ... emitidas desde el inicio de la prórroga es decir a partir del primero de octubre de 2007 tienen carácter provisional hasta tanto no se acuerde la aplicación definitiva del art. 23 de la Ley [de Regalías]*". Free translation by the Arbitral Tribunal.
[296] Claimant's PHB, para. 206.
[297] Doc. C 160.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

Award

"the price [to be] set by UPME cannot be applied retroactively..."[298]. If the state had considered that this statement was incorrect, it would have been expected to verbalise its position. Nevertheless, there is no record of the state contradicting CMSA at that time.

410. <u>In conclusion</u>, the Arbitral Tribunal considers that the Respondent's justification for retrospectively applying Resolution 293 through its Art. 8 (and 9) – and the subsequent Resolution 293 of the Mining and Energy Planning Unit – is unreasonable: the use of the ambiguous term "provisionally" in the 2011 Agreement precludes an assessment of the will of the parties that would allow the retrospective application of Resolution 293 and, moreover, the conduct of the state with respect to its interpretation of the term "provisionally" has been contradictory.

411. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## 2.3.  THE NICKEL REFERENCE PRICE MEASURES

412. The measures that the Claimant alleges violate the BIT relating to the determination of the reference price as the basis for the settlement of nickel royalties are the following:

## A.  Resolution 293

413. National Mining Agency Resolution 293 of 15 May 2015[299] which developed the methodology for determining the FOB price, provided for in Art. 23 of the Royalties Law, establishing the formula for setting the base price for the settlement of nickel royalties.

414. The Claimant considers that Resolution 293 raised irregularities in its development of the FOB price and the majority of the Arbitral Tribunal has rejected this claim[300].

415. The Arbitral Tribunal, however, has considered that Arts. 8 and 9 of Resolution 293 are intended to be applied retroactively, without reasonable justification for doing so being provided.

416. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

---

[298] Doc. R 19. "*el precio [a ser] fijado por la UPME no puede ser aplicado retroactivamente …*". Free translation by the Arbitral Tribunal.
[299] Doc. C 28.
[300] See para. 379 above.

B.    **Mining and Energy Planning Unit Resolutions**

417.    These are the resolutions by which the Mining and Energy Planning Unit published the base prices for the settlement of nickel royalties, in application of the FOB price developed in National Mining Agency Resolution 293.

418.    Two groups are to be distinguished within these resolutions:

419.    *First*, the resolutions that retroactively determined the base prices for the period from IV 2007 to III 2012, such as resolution 562[301], which was revoked and replaced by resolution 293[302].

420.    Although the extension of the term of Contract 866 had already taken place on that date, thus giving rise to the application of Art. 23 of the Royalties Law and the base price referring to FOB prices, Resolution 293 had not yet entered into force. The Arbitral Tribunal has already determined that the justification given by the state to retroactively apply Resolution 293, through its Arts. 8 and 9, as well as all the resolutions of the Mining and Energy Planning Unit (which, in compliance with the mandate of Resolution 293, published the base prices) are not reasonable.

421.    This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

422.    *Second*, the resolutions that published the base price for the settlement of nickel royalties, with application from III 2015 onwards, i.e. from the entry into force of Resolution 293.

423.    The Claimant considered that, since Resolution 293 was affected by irregularities, these resolutions of the Mining and Energy Planning Unit should suffer the same fate[303]. However, as the Arbitral Tribunal has rejected the Claimant's argument on the presence of irregularities in the forward-looking application of Resolution 293, the claim in respect of these resolutions of the Mining and Energy Planning Unit is also cast aside[304].

C.    **Cundinamarca Petition**

424.    In the Cundinamarca Petition of 6 February 2018,[305] the National Mining Agency requested that the judge declare the accounts of the Contracts settled. It did so on the

---

[301] Doc. C 30.

[302] Doc. C 34 – not to be confused with National Mining Agency Resolution 293 (Doc. C 28).

[303] Memorial, para. 92.

[304] The arbitrator, Mr. Guido S. Tawil, considers that the resolutions of the Mining and Energy Planning Unit, which settle royalties using an FOB price formula that he deems to be irregular, are affected by the same irregularity.

[305] Doc. C 32.

basis of Order VSC 351, which took stock of the Contracts and established that CMSA owed certain amounts.

425.  These included unpaid nickel royalties for II 2005 to III 2007, based (retrospectively) on the development of the FOB price as provided for in Resolution 293, plus interest[306].

426.  The Arbitral Tribunal has already ruled on the irregularity surrounding the application of Resolution 293 to the period prior to 2015 – the Cundinamarca Petition does not offer any rational motivation to justify such retroactive application, backdating it to II 2005 – in contradiction, moreover, with Resolution 293 of the Mining and Energy Planning Unit, which only went back to IV 2007.

427.  This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## D.  <u>Resolution 576</u>

428.  Resolution 576 of the National Mining Agency dates back to 27 September 2018[307] and was adopted, as previously set out, within the process of settling the accounts of the Contracts.

429.  Resolution 576 argues that the July 2005 Agreements were a comprehensive amendment of the Contracts and therefore the royalty settlements made from 2005 onwards were provisional[308] and could be revised with regard to the reference price used as a basis for the following periods:[309]

    -    IV 2007 – III 2012 for Concession 866;

    -    IV 2007 – II 2008 and I 2011 for Concession 1727.[310]

430.  The Tribunal has already dismissed the justification underlying the retroactive application of Resolution 293 to review allegedly provisional settlements as unreasonable[311].

431.  It should also be noted that the provisional nature of the settlements made was the argument given in Resolution 576 to retroactively apply the increased royalty rate and the reduced percentage deduction of expenses. This behaviour has already been found to be irregular by the Arbitral Tribunal. Here, the Arbitral Tribunal simply adds that the reasoning is blatantly inconsistent: whether or not the settlement was provisional

---

[306] Doc. C 32, p. 45.
[307] Doc. C 35.
[308] Doc. C 35, p. 10.
[309] Doc. C 35, p. 10
[310] Doc. C 35, p. 11.
[311] See para. 410 above.

because the base price for its calculation was not yet published has nothing to do with the royalty rate freely chosen by the Respondent.

432. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

### E.    **Order 63**

433. Order 63 recalculates royalties for the period IV 2007 to III 2012, applying the reference prices published by the Mining and Energy Planning Unit[312].

434. Any settlement made according to the base prices published as of 2015 referring to previous periods implies a retroactive application of Resolution 293 for which the Arbitral Tribunal has found no reasonable justification on the part of the Respondent.

435. Furthermore, Order 63 established that these royalties were to be calculated according to the formula of Art. 23 of the Royalties Law, i.e. deducting 75% of the costs of furnace processing, handling and transport and port costs[313]; but, these costs "were not clearly demonstrated"[314]: CMSA would not have demonstrated each of the deducted nickel production costs and expenses and, in addition, the accounting information for the years 2009 to 2012 would lack utility to reconcile the figures historically presented for the calculation of the royalties[315].

436. At the same time, Order 63 acknowledged that resolution 293 of the Mining and Energy Planning Unit, which published the base prices for the period IV 2007 to III 2012, "took to be true"[316] the costs indicated by CMSA at the time of settling the royalties[317]. Order 63, however, adopted another clearly contradictory attitude: it extracted from the calculation of Resolution 293 the information on reference prices and applied the royalty percentage directly to those reference prices without deducting any costs[318].

437. The Claimant notes a clear irregularity, as CMSA was entitled to deduct certain expenses[319].

438. And the Arbitral Tribunal agrees: the formula contained in Art. 23 of the Royalties Law clearly establishes that CMSA is entitled to deduct 75% of certain costs and, on the resulting amount, the royalty rate will be applied. The Comptroller General's Office, however, has ignored the only part of the formula that allows the amount of royalties

---

[312] Doc. C 39, p. 323.
[313] Doc. C 39, p. 319.
[314] Doc. C 39, p. 323. "*no fueron claramente demostrados*". Free translation by the Arbitral Tribunal.
[315] Doc. C 39, p. 321.
[316] "*tomó como ciertos*". Free translation by the Arbitral Tribunal.
[317] Doc. C 39, p. 321.
[318] Doc. C 39, p. 321.
[319] Reply, para. 192(e).

to be reduced and that, therefore, operates against the economic interests of the state – thus constituting abusive behaviour.

Respondent's counter-arguments.

439. The Comptroller General's Office has asserted that it is entitled to omit the deduction for the following reasons:

440. *First*, CMSA had not proven every single expense and cost.

441. However, as the Claimant points out, entrepreneurs are not legally obliged to keep the documentary support of their expenses beyond 10 years[320]. This is established in Art. 28 of Law 962 of 2005[321]:

> "The books and papers of the trader shall be kept for a period of 10 years from the date of the last entry, document or receipt...".

442. Taking into consideration the provisions of the aforementioned rule, the Arbitral Tribunal considers that the Respondent has not reasonably justified why such proof is required after more than 10 years.

443. *Second*, the accounting information submitted would be of no use in reconciling the figures presented in the annexes to the quarterly reports used to calculate royalties. The Arbitral Tribunal finds that the accounting information was submitted in the same traditional form[322] and, up to that point, that format had not made it impossible to verify the amounts; moreover:

-   BDO had audited the costs deducted between 2004 and 2008[323];

-   As Order 63 itself acknowledges, the Mining and Energy Planning Unit had validated the amount of costs deducted between IV 2007 and III 2012 in its resolution 293;

-   In Order VSC 351, dated 1 November 2017[324], the National Mining Agency, made the following pronouncement regarding the sufficiency of the accounting information provided by CMSA when taking stock of the balance of Contracts 866 and 1727[325]:

---

[320] Reply, para. 46.
[321] Doc. C 80, p. 4. "*Los libros y papeles del comerciante deberán ser conservados por un período de 10 años contados a partir de la fecha del último asiento, documento o comprobante ...*".
[322] HT-BL, Day 1, p. 380, ll-22; p. 381, ll. 1-7.
[323] Doc. C 107, p. 191.
[324] Doc. C 107.
[325] Doc. C 107, p. 185. "*Con las bases de datos entregados por las empresa en los diferentes ejercicios de fiscalización y solicitadas por los funcionarios de la ANM se procede a efectuar la trazabilidad aleatoria de*

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

"With the databases provided by the companies in the different auditing exercises and requested by the ANM officials, we proceeded to carry out the random traceability of the costs that have been taken as applicable to the royalty settlements, finding that the matrix provided allows, effectively, to trace the costs reported in "Annex A" attached to the royalty settlements, both in the company's accounts and in the 1SAP system, where it is even possible to access a digital copy of the supporting documentation for each cost. This tool has served as an input for officials ... to prepare the review exercises that have been carried out ...".

- The same Order VSC 351 explicitly referred to the cost information provided by CMSA for the period III 2005 to IV 2012 (broader than that for which the Comptroller General's Office omits costs for lack of evidence) explaining that CMSA had delivered a CD with the required information[326] using precisely the format sent by the National Mining Agency in 2015, consisting of two annexes and based on the guidelines of Resolution 293[327]. The National Mining Agency only pointed out that the information from II 2005 to II 2007 was incomplete[328] – nothing was then said by the Agency regarding an alleged insufficiency of the proof of expenditure from IV 2007 to III 2012.

444. <u>In short</u>, Order 63 is contradictory with the state's previous behaviour and is based on the retroactive application of Resolution 293 in order to review the allegedly provisional settlements without any reasonable justification.

445. In addition, the only element favourable to CMSA's interests is omitted from the formula for calculating royalties with an unreasonable justification, thus constituting a clear abuse that results in legal uncertainty.

446. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## 3.   DEDUCTIBLE COSTS

447. The relevant facts (**3.1.**) are shown first, followed by the arguments (**3.2.**).

---

*los costos que han sido llevados como aplicables a las liquidaciones de regalías, encontrándose que la matriz entregada permite, efectivamente, rastrear los costos reportados en el "Anexo A" adjunto a las liquidaciones de regalías, tanto en la contabilidad de la empresa, como en el sistema 1SAP, en el que incluso es posible acceder a una copia digital de los soportes de cada costo. Esta herramienta ha servido de insumo a los funcionarios ... para preparar los ejercicios de revisión que se han realizado ...".* Free translation by the Arbitral Tribunal.
[326] Doc. C 107, p. 207.
[327] Doc. C 107, p. 208.
[328] Doc. C 107, p. 208.

## 3.1. RELEVANT FACTS

448. We will start with a description, as usual, of the most important regulation (**3.1.1.**). A second section will then explain the state's actions with regard to deductible costs (**3.1.2.**).

### 3.1.1. REGULATION

449. The regulation referred to below is not new – it has already been described in the previous sections. However, this time, the narrative focuses on the issue of deductible costs.

## A. Contractual arrangements (I)

450. The 1985 Agreement established in its Clause 1 that the royalty would result from the application of the 8% rate to the pithead value of the gross product of nickel ore extracted, this value being the result of taking the international reference price, converted to COP, multiplying it by the pounds extracted and subtracting the applicable costs.

451. The applicable costs were defined as:

> "Internal and external transport costs, processing costs and all costs incurred after mining of the ore"[329].

452. The 1985 Agreement listed the costs that were deductible and then established the percentage of deduction, which could be 80% or 100%, as follows:

- Marketing and sales: 80%;

- External transport: 100%;

- Internal transport: 100%;

- Processing: 100%;

- General and administration costs: 80%;

- Ancillary facilities: 80%;

- Insurance premiums: 80%;

- Depreciation of process plant and mobile equipment: 100%;

---

[329] "*Costos de transporte interno y externo, los costos de procesamiento y todos aquellos costos que se causen después de la explotación del mineral*". Free translation by the Arbitral Tribunal.

- Depreciation of service buildings, village ("*ciudadela*")*,* roads, bridges and airport and furniture and fixtures: 80%;

- Amortisation of deferred costs: 80%.

453. In the case of a mining operation, it may be surprising to find expenses such as for the depreciation of the village, roads, bridges and airports. These expenses come from additional obligations assumed by CMSA in Clause 14 of Contract 866,[330] for the construction of roads, jetties, an airport runway, a hospital, environmental sanitation works and housing – all for the benefit of the local community.

## B.  Royalties Law

454. Art. 23 of the Royalties Law established that the basic price at pithead was determined as the FOB price minus 75% of the costs of kiln processing, handling, transport and port costs.

## C.  Contractual arrangements (II)

455. The July 2005 Agreements incorporated by reference[331] the royalty calculation factors of the 1985 Agreement.

456. Unlike Contract 866, the July 2005 Agreements did not include obligations to build for the benefit of the community. Thus, when the parties signed the 2011 Agreement, the Agreement stated that costs and expenses related to villages, clubs, educational foundations, etc. could no longer be deducted when calculating the royalty base.

### 3.1.2. STATE ACTIONS ON DEDUCTIBLE COSTS

457. Between 1982 and 2012, the deduction of costs for the purpose of determining the basis for royalty settlements did not pose any difficulties.

458. In 2012, an inspection by the Comptroller General's Office questioned, for the first time, the correctness of historical royalty settlements on the basis of deducted expenses:

459. In 2012 the Comptroller General's Office conducted an inspection of CMSA (the so-called "Special Visit"[332]), in order to review the settlement of royalties made between 1985 and 2013. The 14 observations of the Comptroller's Office were forwarded to the National Mining Agency and CMSA to formulate claims.

460. The file contains a memorandum, dated 7 December 2012, from the National Mining Agency, addressed to the Comptroller General's Office [the "**Memorandum"**], summarising the actions carried out and in which the National Mining Agency gives

---

[330] Doc. C 8.
[331] Clause 7.2 (and 6.2).
[332] "*Visita Especial*". Free translation by the Arbitral Tribunal.

its opinion regarding the inspection carried out by the Comptroller General's Office[333]. The Memorandum addresses the 14 observations, of which only a few are of interest, grouped by the following subject matter:

461. (i) Absence of supporting documentation: when reviewing the amount of the "contractual discount and external transport" applied in the settlements for the years 1998 to 2003, the Comptroller General's Office found that CMSA did not attach the sales contracts supporting these discounts[334].

462. CMSA replied, providing a contract dated 8 December 1999 between Billiton Marketing and Trading C.V. and CMSA and, with regard to earlier contracts, asserted that it had no legal obligation to keep documentation from before 2002, in accordance with Art. 28 of Law 962 of 2005[335]:

> "The books and papers of a salesperson shall be kept for a period of 10 years from the date of the last entry, document or receipt ...".

463. The National Mining Agency did not comment on the duration of the documentary retention and safekeeping obligation; it simply pointed out that, from the contract provided, the values charged were not visible and that that the agreement was simply for charging the average freight price, applying a discount of 3%[336].

464. (ii) The costs applied: the Comptroller General's Office pointed out that in the settlement of royalties for the years 1998 to 2003, general and administrative expenses, insurance premiums, depreciation of non-productive assets, amortisation of deferred assets, building services and external facilities were discounted – all items that are not part of the cost of production of ferronickel[337]. The Comptroller General's Office relied on the cost concept of Decree 2649 of 1993[338].

465. In its response, CMSA referred to the 1985 Agreement, which listed a series of deductible costs, asserting that these were the costs actually deducted[339]. In addition, it pointed out that Decree 2649 of 1993 invoked by the Comptroller General's Office did not exist either in 1970 (the year of Contract 866) or in 1985 (the year of the 1985 Agreement), and adding that the retroactive application of laws was prohibited by Law 153 of 1887, as supported by case law[340].

---

[333] Doc. C 80.
[334] Doc. C 80, p. 3. "*descuento contractual y transporte externo*". Free translation by the Arbitral Tribunal.
[335] Doc. C 80, p. 4. "*Los libros y papeles del comerciante deberán ser conservados por un período de 10 años contados a partir de la fecha del último asiento, documento o comprobante …*". Free translation by the Arbitral Tribunal.
[336] Doc. C 80, p. 5.
[337] Doc. C 80, p. 19.
[338] Doc. C 80, p. 20.
[339] Doc. C 80, p. 21.
[340] Doc. C 80, p. 23.

466. The National Mining Agency took the side of CMSA and pointed out that the payment of royalties was contractually regulated and that the settlement carried out by CMSA followed the methodology agreed in the 1985 Agreement – said Agreement being entered into when Presidential Decree 2053 of 1974 was in force and contemplating the accounting principles generally accepted at that time[341]. Thus, the parties did not differentiate the concept of "cost" from that of "expense", nor did they define it or limit it to a specific set of events giving rise to a cost[342] – they did not, therefore, limit the costs to those strictly associated with the production process, as now claimed by the Comptroller General's Office[343].

467. The National Mining Agency concluded its Memorandum by stating that[344]:

> "The causal relationship between the applicable costs and the production process carried out by CMSA for the production of ferronickel is an inference that is not supported by the norms and conventions that regulated the payment of royalties derived from the exploitation of nickel for the period audited by the [Comptroller General's Office]".

468. From this inspection by the Comptroller General's Office, two parallel lines of investigation would emerge: one by the National Mining Authority (**A.**) and one by the Comptroller General's Office (**B.**).

**A.    The National Mining Agency**

469. The National Mining Agency issued two pronouncements that are relevant to the calculation of deductible expenses:

**a.    Order VSC 26**

470. On 12 March 2015 the National Mining Agency issued Order VSC 26[345].

471. In it, the National Mining Agency explained that, following the Comptroller General's Office's Special Visit, a financial and cost audit of CMSA for the period 1998 to 2003 was contracted and carried out by BDO Audit AGE S.A. ["**BDO**"][346]. The audit was completed in November 2014 and reached the following conclusions (among others):

---

[341] Doc. C 80, p. 24.
[342] Doc. C 80, p. 26.
[343] Doc. C 80, p. 26.
[344] Doc. C 80, p. 26. "*La relación de causalidad entre los costos aplicables y el proceso productivo que adelanta CMSA para la producción del ferroníquel es una inferencia que no encuentra sustento en las normas y convenciones que regularon el pago de regalías derivadas de la explotación de níquel para el período auditado por la [Contraloría]*". Free translation by the Arbitral Tribunal.
[345] Doc. C 26.
[346] Doc. C 26, p. 3.

-   That some costs and expenses applicable for the calculation of royalties were not those contemplated in Contracts 866 and 1727[347] or in the 1985 Agreement[348]: (i) by not presenting a causal relationship with the income from nickel production[349]; (ii) by determining external transport costs by means of percentage estimates in freight and insurance, recovery of provisions and over-estimation of depreciations[350];

-   That it was not possible to establish the accuracy and reasonableness of the expenses deducted from the royalties settled between 1998 and 2001, as CMSA had not provided the documentary support[351].

472.   BDO estimated the royalties foregone at COP 11,210.8 M at nominal value and, at 30 June 2014 value, at COP 48,785.53 M[352]. Of this amount, it would appear that COP 2,426,895,470 would refer to expenses without documentary support[353]. The Order instructed CMSA to pay these amounts[354].

473.   Apparently, CMSA accepted the existence of some minor errors pointed out by BDO, and paid COP 530 M[355] – of the claimed debt, COP 48,259 M remained outstanding.

**b.   <u>Resolution 576</u>**

474.   On 27 September 2018 the National Mining Agency issued Resolution 576[356]. Among other matters discussed, it addressed the improper deduction of costs for the calculation of royalties for the same period from 1998 to 2003. Resolution 576 confirmed that the debt amounted to COP 48.259 billion plus interest[357].

475.   This is the same amount already requested by the National Mining Agency in Order VSC 26.

**B.   <u>The Comptroller General's Office</u>**

476.   The Comptroller General's Office issued two orders affected by the review of royalties on account of deductible costs: Order 217 (**a.**) and Order 63 (**b.**).

---

[347] Doc. C 26, p. 3.
[348] Doc. C 26, p. 5.
[349] Doc. C 26, p. 4.
[350] Doc. C 26, p. 4.
[351] Doc. C 26, p. 4.
[352] Doc. C 26, p. 5.
[353] Doc. C 39, pp. 147 and 148.
[354] Doc. C 26, p. 5.
[355] Doc. C 35, p. 9.
[356] Doc. C 35.
[357] Doc. C 26, p. 10.

a. <u>**Order 217**</u>

477. On 26 February 2018, the Comptroller General's Office issued Order 217 (280 pages long), within the fiscal responsibility process CDME 001-2013 arising from the special audit of Contracts 866 and 1727[358].

478. Order 217 mentions, in its background, the Opening Order of that special audit, dated 17 May 2013[359]. In the Opening Order, the Comptroller determined that, between 1998 and 2003, CMSA applied discounts when calculating royalties on account of general and administrative expenses, insurance premiums, depreciation of non-productive assets, and amortisation of deferred assets in contravention of the 1985 Agreement[360], as the causal relationship with the exploitation of the mineral had not been established[361]. The Opening Order estimated the damage to state assets as a result of the lower royalties income, than that actually owed, at COP 27,429,868,633[362].

479. Order 217 brought that audit process to an end, with a ruling on the fiscal responsibility of CMSA (and other investigated parties). To reach that conclusion, the Comptroller General's Office reviewed each of the categories of incorrectly deducted costs, as mentioned in the Opening Order, and decided whether they were indeed correctly deducted. In that review process, it changed its mind and accepted a large part of the deducted costs, which the Opening Order, otherwise, rejected.

480. Indeed, the Comptroller General's Office allowed the deduction of all expenses except the following:

- Within general and administrative expenses[363]: rejected expenses for charter flights, donations, sports expenses, among others.

- Within the ancillary facilities[364]: the Comptroller General's Office acknowledged that CMSA had acquired infrastructure obligations to the community through Clause 14 of Contract 866, but after comparing these detailed obligations with the deducted expenses, it found that three items of expenditure were not related to any ancillary facilities obligations – these were the administration office, Katuma Club and community development donations.

---

[358] Doc. C 111.
[359] Doc. C 111, p. 11.
[360] Doc. C 111, p. 3.
[361] Doc. C 111, p. 74.
[362] Doc. C 111, p. 13.
[363] Doc. C 111, p. 211.
[364] Doc. C 111, p. 224.

- Within insurance premiums[365]: CMSA had accounted for amounts that were not strictly insurance premiums, such as commissions, bank charges, non-deductible taxes, prepaid medicine and bonus tickets.

481. Thus, the final re-assessment by the Comptroller General's Office (without indexing) was[366]:

| CODIGO | DETALLE | COSTO NO PROCEDENTE SEGÚN LA CGR | REGALIAS POR TRANSFERIR (8%) |
|---|---|---|---|
| 300 | GASTOS GENERALES Y DE ADMINISTRACIÓN | $ 39.397.460.006 | $ 3.151.796.801 |
| 400 | INSTALACIONES AUXILIARES (Oficina de Administración – Club KATUMA – Desarrollo de la Comunidad) | $ 13.923.001.197 | $ 1.113.840.096 |
| 705 | PRIMA DE SEGUROS | $ 6.987.591.799 | $ 559.007.344 |
| | TOTAL | $ 60.308.053.058 | $ 4.824.644.240 |

482. Royalties foregone due to the incorrect deduction of costs, during the period from 1998 to 2003, amounted to COP 4,824,644,240. At indexed value as of 31 January 2018, the result was COP 9,973,669,358[367].

483. The Order ruled that CMSA (among others) had fiscal responsibility for the amount of COP 9,973,669,358, and ordered the draw-down of the judicial guarantee covered by an insurance policy for the same amount[368]. CMSA paid the amount re-assessed in Order 217[369] and started a nullity action before the administrative courts of Cundinamarca (alleging, among other reasons, that the tax liability action was time-barred), which is still pending resolution[370].

484. Note that the Opening Order quantified the same fiscal responsibility at COP 27,429,868,633 while Order 217 quantified it at COP 4,824,644,240 (both values without indexation). Order 217, therefore, reduced the amount owed by CMSA to one fifth.

**b.    Order 63**

485. Order 63 of 7 February 2020[371] intends to re-assess the unpaid nickel royalties between IV 1982 and II 2005 on account of the deducted expenses not causally related to the exploitation. Thus, Order 63 excludes the following expenses:

---

[365] Doc. C 111, p. 226.
[366] Doc. C 111, p. 76.
[367] Doc. C 111, p. 275.
[368] Doc. C 111, p. 277.
[369] Doc. C 118, p. 16.
[370] Doc. C 118.
[371] Doc. C 39.

99

-    Within the group "General and administrative expenses"[372]: Presidency, Technical Vice-Presidency, Finance Vice-Presidency, Human Resources Vice-Presidency, Materials Management, Training and Industrial Safety, Technical Services, Technology Management[373];

-    Within the group "Ancillary Facilities"[374]: *Ciudadela Vivienda*, the Montelíbano Foundation, Club Katuma, Club Jagua, Motel, Commissariat and Community Development[375]; as well as the facilities[376] on site, which include, clinic and medical facilities, a cafeteria and changing rooms[377];

-    Under the heading "Plant at Cartagena dock"[378]: transport of the proportion of iron contained in the ferronickel[379].

## 3.2.  <u>ARGUMENTS</u>

486.  *First*, the positions of the Parties will be presented (**3.2.1.**) and then the Arbitral Tribunal will take its position (**3.2.2.**).

### 3.2.1. POSITIONS OF THE PARTIES

487.  The Claimant considers that the recalculations of royalties from historical periods to adjust deductible expenses are:

-    Inconsistent: in the previous 30 years, Colombia validated, reported and settled deductible expenses[380]; and, moreover, in its Memorandum, the National Mining Agency had agreed with CMSA insofar as not requiring a causal link between deductible expenses and exploitation[381].

-    Incorrect: they required the existence of a causal link between the expenses and the operation, when this is an additional requirement without foundation and never previously required during the 30-year long relationship[382]; moreover, the Comptroller General's Office has no jurisdiction over CMSA[383], and if it had, the claim would be time-barred[384].

---

[372] "*Gastos Generales y de administracion*". Free translation by the Arbitral Tribunal.
[373] Doc. C 39, p. 293 et seq.
[374] "*Instalaciones Auxiliares*". Free translation by the Arbitral Tribunal.
[375] Doc. C 39, p. 295 et seq.
[376] "*Facilidades*". Free translation by the Arbitral Tribunal.
[377] Doc. C 39, p. 297 et seq.
[378] "*Planta a muelle de Cartagena*". Free translation by the Arbitral Tribunal.
[379] Doc. C 39, p. 299 et seq.
[380] Memorial, para. 104.
[381] Memorial, para. 106.
[382] Memorial, para. 106.
[383] Reply, para. 36.
[384] Reply, para. 37.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

- Unreasonable: because they omitted the external transport and insurance costs, due to the lack of documentary support when there was no legal obligation to keep such proof[385].

488. The Respondent denies the above allegations; in its view, the state's conduct was not:

- Inconsistent: the royalty settlements were based on information provided by CMSA, which was not accompanied by supporting documentation[386], the cost breakdown being very simple[387]; therefore, the historical settlements did not validate the correctness of the data provided. In any case, the Comptroller General's Office carries out oversight independent from that of the mining authorities[388] and cannot be bound by the conclusions reached by other bodies[389]. Furthermore, the Comptroller General's Office does have jurisdiction over CMSA[390] and the audit action would not be time-barred[391].

- Incorrect: the 1985 Agreement does include a requirement of cost causation by referring to "costs ... incurred after mining of the mineral"[392]; therefore, the mere fact that a cost falls within the category of deductible costs listed in the 1985 Agreement does not allow its deduction, unless causation is established[393].

### 3.2.2. POSITION OF THE ARBITRAL TRIBUNAL

489. The Arbitral Tribunal finds the following:

490. The Comptroller General's Office carried out the Special Visit in 2012, in which it required CMSA to present proof of the expenses deducted in the settlement of royalties between 1985 and 2003. In other words, the Comptroller General's Office went back 14 years in its investigation and noted (at least) two irregularities:

- Expenses without documentary support;

- Expenses not linked to the operation.

491. These indications of irregularities led to two parallel investigations: one by the National Mining Agency (**A.**) and one by the Comptroller General's Office (**B.**). Both dealt with the same (alleged) irregularities in the same time period.

---

[385] Memorial, para. 105.
[386] Counter-Memorial, para. 117.
[387] Counter-Memorial, para. 117.
[388] Counter-Memorial, para. 107.
[389] Counter-Memorial, para. 249.
[390] Rejoinder, para. 148.
[391] Rejoinder, para. 149 with reference to Order 63, p. 51.
[392] Rejoinder, para. 126. "*los costos ... que se causen después de la explotación del mineral*". Free translation by the Arbitral Tribunal.
[393] Rejoinder, para. 127.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

## A.    National Mining Agency

492.    The National Mining Agency contracted the auditing firm BDO, who noted in their November 2014 report[394] that upward adjustments in the amount of COP 11,210.8 M (nominal value) should be applied to royalties for the period 1998 to 2003 due to[395]:

- The lack of justification for the USD percentage share of freight and insurance (i);

- Applicable costs and expenses not causally related to nickel production revenue, including administrative overheads, ancillary facilities, processing, insurance premiums[396], depreciation[397] and outside facilities[398] (ii).

493.    The National Mining Agency accepted the findings of the audit and in Order VSC 26 translated them into a payment order at (then) present value – the content of Order VSC 26 would be repeated in Resolution 576. The Claimant calls the behaviour of the National Mining Agency as incorrect and inconsistent:

494.    (i) Incorrect, as it ignores freight and insurance costs for lack of proof, when there was no legal obligation to keep documentation beyond 10 years, according to Art. 28 of Law 962 of 2005.

495.    The Arbitral Tribunal is persuaded by this: according to Order VSC 26, the BDO audit formally commenced on 5 November 2013, the auditors were installed at CMSA on 25 November 2013 and the report was submitted a year later[399]. The report does not identify when BDO requested the accounting information, but with the audit having started in November 2013, and royalties being settled on a quarterly basis, CMSA was at that time only obliged to have documentary support for the previous ten years (expenses from I 2004 onwards), i.e. outside the audited period (1998 to 2003).

496.    Order VSC 26 does not provide any motivation or legal support for demanding information that the law does not require to be kept and basing a payment order on this lack of evidence.

497.    (ii) Inconsistent, since in its Memorandum, the National Mining Agency itself had expressed its support for the deduction of the expenses now excluded on the grounds that they were unrelated to the exploitation[400]:

---

[394] Doc. C 84.
[395] Doc. C 84, pp.16 and 41.
[396] Doc. C 84, pp. 28 and 29.
[397] Doc. C 84, pp. 30, 31 and 32.
[398] Doc. C 84, p. 32.
[399] Doc. C 26, p. 3.
[400] Doc. C 80, p. 26. "*La relación de causalidad entre los costos aplicables y el proceso productivo que adelanta CMSA para la producción del ferroníquel es una inferencia que no encuentra sustento en las normas y*

> "The causal relationship between the applicable costs and the production process carried out by CMSA for the production of ferronickel is an inference that is not supported by the norms and conventions that regulated the payment of royalties derived from the exploitation of nickel for the period audited by the [Comptroller General's Office]".

498. The Arbitral Tribunal sides with the Claimant:

- The categories of deductible expenses questioned by the Comptroller General's Office in the Special Visit, which gave rise to the Memorandum in reply, are the same as those mentioned by BDO and incorporated in Order VSC 26 and Resolution 576;

- The reason for their exclusion in both cases was the lack of a link to the exploitation – a reason that the National Mining Agency had rejected as invalid in its Memorandum.

### B.  Comptroller General's Office

499. The Claimant considers that both Order 217 and Order 63 are affected by irregularities: they are contradictory with the state's previous conduct, and with each other (**a.**), they are the result of expired fiscal responsibility actions (**b.**) and initiated against CMSA, a subject in respect of which the Comptroller General's Office has no supervisory jurisdiction (**c.**).

### a.  Contradiction

500. The Arbitral Tribunal will analyse the two Orders separately.

#### i.  Order 217

501. The Comptroller General's Office carried out an audit ("*fiscalización*") process, which concluded on 28 February 2018 with Order 217[401].

502. In Order 217 the Comptroller explained that the starting point for the deduction of costs was the 1985 Agreement which set out eight categories of costs listed from (a) to (h), representing "internal and external transport costs, processing costs and all those costs which are incurred after the mining of the mineral"[402].

---

*convenciones que regularon el pago de regalías derivadas de la explotación de níquel para el período auditado por la [Contraloría]"*. Free translation by the Arbitral Tribunal.

[401] Doc. C 111.

[402] *"costos de transporte interno y externo, los costos de procesamiento y todos aquellos costos que se causen después de la explotación del mineral"*. Free translation by the Arbitral Tribunal.

503.    However, it was not enough for a cost to be formally accounted for under one of the eight categories; it had to be checked whether it was indeed a cost related to the operation.

504.    And so, although originally in its Opening Order, the Comptroller General's Office had valued the under-collected royalties due to deducting costs not related to exploitation at more than COP 27 billion, after a careful item-by-item analysis, the Comptroller General's Office reduced that figure by more than 80%, considerably limiting the expenses to be excluded.

505.    The Claimant submits that Order 217 is in clear contradiction with Order VSC 26 of the National Mining Agency as both resolutions review deductible costs in the same time period, applying the same legal basis, and yet arrive at different results – with vast differences[403].

506.    The Respondent denies any possible contradiction since the National Mining Agency and the Comptroller General's Office act in different spheres of supervision[404] and the findings of one do not bind the other[405]. Colombia, at the same time, acknowledges that this double supervision in parallel can never result in a double compensatory order against CMSA[406].

507.    The Arbitral Tribunal understands that, due to the particularities surrounding the system of public scrutiny in Colombia, situations such as the present one may arise in which two entities review the correctness of the royalties settled during the same period of time. However, if the Respondent itself acknowledges that this duplicity cannot be translated into multiple compensations in favour of the state, it is accepting that the double state review occurs on the same facts and for the same reasons.

508.    In this case, this is precisely the case: it is a review of the correctness of the royalty settlements made in the period 1998 to 2003 on account of deductible costs at the hands of both the National Mining Agency and the Comptroller General's Office.

509.    This being the case, it would be expected that the conclusions reached by one or the other state body would be congruent with each other. But this has not been the case:

-       VSC Order 26 of 12 March 2015 quantified the underpaid collected royalties on account of excess expenses deducted at COP 11,210.8 M (without adjustments); and

---

[403] Claimant's PHB, para. 139.
[404] Counter-Memorial, paras. 107 and 110.
[405] Counter-Memorial, para. 249.
[406] Counter-Memorial, para. 107.

- Order 217 of 26 February 2018 put the shortfall in royalties collected due to improper deduction of costs at COP 4,824.6 M (without adjustments) – i.e. less than half.

510. Note that the National Mining Agency could have reacted to the evidence created by the Comptroller General Office's Order 217 by rectifying its own quantification. But, far from doing so, on 27 September 2018 it would still issue Resolution 576 which upheld the validity of the (high) amount of re-assessment in Order VSC 26.

511. The Respondent has not provided an explanation as to why two bodies conducting the same review reach different conclusions on the amount of royalties unduly foregone by the state.

512. <u>Therefore</u>, the Arbitral Tribunal considers that Colombia has engaged in contradictory conduct.

### ii.   Order 63

513. Order 63 of the Comptroller General's Office of 7 February 2020 re-assesses, among others, the following royalties[407]

- Unpaid nickel royalties between IV 1982 and II 2005 (COP 9,672,273,392): Order 63 revises the costs deducted in that period, applying criteria of causal relationship and relevance to the exploitation of nickel[408].

- Unpaid nickel royalties between III 2005 and III 2007 (COP 221,213,740,897): Order 63 revises the deducted costs by excluding all costs that are not causally related to the exploitation of nickel[409] – such as, within the group "Ancillary Facilities"[410], on-site facilities, including clinic and medical facilities.

514. The Claimant points out the contradiction of Order 63 with respect to two previous decisions of the Comptroller General's Office[411]: Order 1334 and Order 217.

515. The Comptroller General's Office Order 1334 of 9 August 2017[412] mandated the termination of the ordinary fiscal responsibility process against CMSA for an investigation from the period October 2002 to September 2012 on the cost of transport; specifically on whether or not the transport costs associated with the iron contained in the ferronickel could be deducted.

---

[407] Doc. C 39.
[408] Doc. C 39, p. 313.
[409] Doc. C 39, pp. 317 and 318.
[410] "*Instalaciones Auxiliares*". Free translation by the Arbitral Tribunal.
[411] Reply, para. 192(c).
[412] Doc. C 103.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

516. The Arbitral Tribunal is not convinced of the alleged contradiction.

517. The mere fact that both Order 63 and Order 1334 are both concerned with the same period of review does not render them contradictory. As the Respondent rightly points out[413], Order 1334 merely checked whether the transport costs associated with the iron was deductible and did not analyse the causation requirement of the deductible expense – which is the central point of review of Order 63.

518. However, where the Arbitral Tribunal does see a clear contradiction is precisely in the conclusions reached by each Order with respect to the transport costs associated with the iron:

- Order 1334: considers that nickel is not found in a pure form in nature but in direct combination with iron, making it necessary to process the nickel ore extracted and transform it into ferronickel; it being logical and in accordance with the Contracts and the 1985 Agreement that the deduction of internal transport costs be calculated on the ferronickel, as this is the product that allows its international commercialisation – there is no damage to state assets for having discounted the value of internal transport of ferronickel, without deducting the part associated with the iron[414].

- Order 63: CMSA deducted costs for internal transport of ferronickel that included the proportion of the transport of the iron contained in the ferronickel, this being inappropriate[415] and resulting in a damage to state assets of COP 9.417.649.515, which were deducted in excess[416].

519. As has recently been set out, Order 217 of 26 February 2018 analysed the period between 1998 and 2003, reviewing the costs deducted due to the lack of a causal link[417]. This time it does coincide with Order 63 both in the period and in the material object of review.

520. Order 217 is very interesting. Through it, the Comptroller General's Office concluded the process of fiscal responsibility; within this process, the Comptroller General's Office itself had issued an indictment (*Auto de Imputación*) that quantified the financial damage suffered at COP 27,429,868,633[418]. Order 217 ended up quantifying the damage at only COP 4,824,644,240 – the reduction is striking and is due to the fact that the Comptroller General's Office itself, after a more detailed analysis, considered that there were expenses that (contrary to what was initially stated) were correctly deducted. The Comptroller General's Office accepted that CMSA deducted in the calculation of

---

[413] Rejoinder, para. 262.
[414] Doc. C 103, p. 41.
[415] Doc. C 39, p. 299.
[416] Doc. C 39, p. 302.
[417] Doc. C 111.
[418] Doc. C 111, p. 201.

royalties the accounting categories mentioned in the 1985 Agreement[419]. What the Comptroller General's Office argued is that CMSA included items in those line items erroneously. Thus:

- The expenses for donations, sports, charter flights, etc. should not have been counted as general and administrative expenses[420].

- Under the concept of insurance premiums (which are deductible), the Comptroller General's Office considered that other expenses were accounted for that were not insurance premiums[421].

- As for ancillary facilities, which are non-operating expenses but which CMSA was obliged to incur through clause 14 of Contract 866[422], the Comptroller General's Office accepted, in principle, their deduction[423]. The Comptroller General's Office later found that in three cases (administration office, Katuma Club and some donations) there was no such express contractual obligation and therefore decided to eliminate this expense from the computation of royalties[424], accepting however the deduction of the rest of the expenses as it found that the facilities to which the committed expenses referred did indeed exist[425].

521. Comparing Orders 217 and 63, the Arbitral Tribunal finds the following inconsistencies in their treatment of the expenditure group "Ancillary Facilities"[426]:

- Order 217 did not detect any irregularities in the items clinic and medical facilities, cafeteria, or dressing rooms – Order 63 did, however, in the amount of COP 26,867,230,921[427].

- Order 217 considered that the *Ciudadela Vivienda* fell within the obligations of construction of housing for workers and families, to which CMSA committed itself[428] and in a visual inspection it verified that such facilities did indeed exist[429]. Moreover, the Montelíbano School Foundation corresponded to the obligation of construction and maintenance of schools for workers and families

---

[419] Doc. C 111, p. 210.
[420] Doc. C 111, p. 211.
[421] Doc. C 111, p. 226.
[422] Doc. C 111, p. 219.
[423] Doc. C 111, p. 221.
[424] Doc. C 111, pp. 223 and 224.
[425] Doc. C 111, p. 222.
[426] "*Instalaciones Auxiliares*". Free translation by the Arbitral Tribunal.
[427] Doc. C 39, pp. 297 and 298.
[428] Doc. C 111, p. 221.
[429] Doc. C 111, p. 222.

and the school existed and was in operation[430]. However, Order 63 excludes the expenses of both items[431].

522. The following is also striking: CMSA paid the amount fixed in Order 217 of the Comptroller General's Office, by which the latter re-assessed the royalties for the period 1998 to 2003 on account of the non-deductible expenses not being causally related (although it challenged Order 217 in court arguing, among other things, that it had expired). Despite having paid this re-assessment, Order 63 again claims the re-assessment of royalties for the same period and the same cause – the violation of legal certainty is manifest.

\* \* \*

523. <u>In conclusion</u>, the Arbitral Tribunal considers that Orders 217 and 63 are inconsistent with each other and contradictory to the state's previous conduct.

524. The Arbitral Tribunal will assess this irregular conduct in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## b.    **Expiration**

525. According to Art. 9 of Law 610 of 2000, the Comptroller General's Office has five years from the commission of the damaging act to initiate fiscal responsibility proceedings.

526. The Claimant considers that the Comptroller General's Office would be barred from commencing the fiscal actions that resulted in Order 217 (**i.**) and Order 63 (**ii.**) because they would relate to acts that occurred more than five years ago[432]. The Respondent denies this, again invoking the Comptroller General's Office's own opinion[433].

527. Indeed, Art. 9 of Law 610 of 2000 sets time limits for the fiscal action: it will expire if, after five years from the occurrence of the event generating the damage to public assets, no order has been issued to open the fiscal responsibility process.

### i.    **Order 217**

528. Order 217 states in its recitals that the Opening Order (*Auto de Apertura)* which initiated the fiscal responsibility process was dated 17 May 2015[434]; therefore, in application of Art. 9 of Law 610 of 2000, the Comptroller General's Office could only revise the fiscal responsibility of CMSA with respect to acts committed in the previous

---

[430] Doc. C 111, p. 222.
[431] Doc. C 39, p. 295.
[432] Doc. C 118, p. 36. Reply, para. 37.
[433] Rejoinder, para. 148.
[434] Doc. C 111, footnote 15.

five years: that is, until 17 May 2010 – counted by quarters, the first settlement of royalties that could be subject to fiscal action would be that of III 2010.

529. Order 217, however, reviews royalty settlements for full years from 1998 to 2003.

<u>Respondent's counter-argument</u>

530. Order 217 itself defends that the tax liability action is not time-barred. In this respect, Order 217 highlights the last sentence of Art. 9 of Law 610 of 2000[435]:

> "This period shall begin to run for instantaneous events or acts from the day of their performance, and, for complex, successive, permanent or continuous events or acts, from the day of the last event or act".

531. Order 217 considers that no settlement of royalties of the Contracts is definitive, since the concession contract is a successive tract contract, with obligations being fulfilled over time. Only at the end is a balance of everything that occurred in the contract is made[436], with the sums paid and the balances in favour of each of the parties, at which point they become effective[437]. Any payment made during the term of the contract is provisional, being subject to review[438]. It goes on to point out that, in this case, the Contracts were in force until 30 September 2012 and, additionally, had not yet had their accounts settled[439]. Therefore, the Comptroller General's Office can review everything that occurred in its execution, at the time of termination or at the stage of settlement of the accounts of the contract[440].

532. Order 217 also clarifies that it is not necessary to wait for the settlement of the accounts of the contract in order to establish a damage and consequent liability, as the damage may have arisen at any time prior to this[441].

533. In fact, Order 217 identifies the detrimental act to state assets as the inclusion of items that had no causal relationship with the exploitation of the mineral[442].

534. The Arbitral Tribunal is not able to follow the reasonableness of the arguments outlined by the Comptroller General's Office, as shown in the previous paragraphs:

535. Art. 9 clearly determines that the five-year limitation period begins to run from the occurrence of the event causing the damage to state assets. The same article specifies

---

[435] Doc. C 111, p. 252. "*Este término empezará a contarse para los hechos o actos instantáneos desde el día de su realización, y para los complejos, de tracto sucesivo, de carácter permanente o continuado desde la del último hecho o acto*". Free translation by the Arbitral Tribunal.
[436] Doc. C 111, p. 252.
[437] Doc. C 111, p. 253.
[438] Doc. C 111, p. 253.
[439] Doc. C 111, p. 252.
[440] Doc. C 111, p. 254.
[441] Doc. C 111, p. 243.
[442] Doc. C 111, p. 253.

that, in the case of complex, successive, permanent or continuous events, the period will be counted from the last event – meaning that in this type of act it is not possible to determine whether there has actually been a harmful event until the complex event has finished occurring.

536. This is not the case with the Concessions, as the Comptroller General's Office itself has acknowledged: any damage occurring before the settlement of accounts or termination of the contract constitutes a certain event[443]. Moreover, the Comptroller General's Office has had no difficulty in identifying the harmful event: the inclusion of items that had no causal relationship with the exploitation of the mineral[444] – an event that occurred (to its knowledge) with every quarterly royalty settlement between 1998 and 2003.

537. What the Comptroller General's Office fails to reasonably explain is why, if the damage occurred between 1998 and 2003 and the damage is certain, the fiscal responsibility action was not initiated until almost 20 years later.

### ii.    Order 63

538. The Claimant points out that, assuming that the last damaging act would have occurred, at the latest, at the termination of the Contracts, the opening order would have to have occurred by 1 October 2017. However, this did not occur until 7 February 2020 with the issuance of this Order 63[445].

539. The Respondent sees it differently: as Order 63 itself indicates, the last act would have occurred with the issuance of Resolution 576 of the National Mining Agency, on 27 September 2018[446].

540. The Arbitral Tribunal sides with the Claimant.

541. In Order 63 the Comptroller General's Office considers that there were unpaid royalties, thus causing damage to state assets, in the periods from 1982 to 2012, 2005 to 2007 and 2007 to 2012. Even taking only the last year, it would seem that the action should have been initiated five years later, in 2017, and yet this only happened in 2020.

Respondent's counter-arguments

542. The Respondent refers to the Comptroller General's own opinion, contained in Order 63, which gives two reasons to defend the timing of the action:

---

[443] Doc. C 111, p. 253.
[444] Doc. C 111, p. 253.
[445] Reply, para. 37.
[446] Rejoinder, para. 149 with reference to Order 63, p. 51.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

543. *First*, Order 63 states that the Contracts are complex, successive tract contracts in which the last administrative act issued is Resolution 576 of the National Mining Agency[447].

544. The Arbitral Tribunal does not fully understand how an administrative act such as Resolution 576 can be relevant for the purposes of determining the commencement of the time limit for initiating the audit action. According to Art. 9 of Law 610 of 2000, what is relevant to determine this *dies a quo* is the generation of damage to the state. The administrative act of the state related to the settlement of the accounts of the Contracts is totally unrelated to the event generating damage to state assets and, therefore, it would be totally irrelevant to determine the expiry of the time limit for bringing an action for fiscal responsibility.

545. *Second*, Order 63 continues, maintaining that the start of the time limit for the expiry of the tax action has not yet occurred, given that the respective settlements of the accounts of the Contracts have not been issued[448].

546. The argument is difficult to understand: a tax liability action is brought because the state has suffered damage and the occurrence of this damage triggers the start of the limitation period – once the damage has occurred, the Comptroller General's Office has five years to initiate the corresponding tax liability action. It is unreasonable for the Comptroller General's office to claim that there is indeed an actionable damage, but at the same time to claim that the limitation period has not yet begun. The position is manifestly contradictory.

\* \* \*

547. <u>In view of the above</u>, the justification given for considering that Order 217 and Order 63 initiated a tax liability action within the limitation period is not reasonable in accordance with the very technical standards used by the authority for such justification.

548. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**c.   Lack of jurisdiction**

549. According to the Claimant, the Comptroller General's Office lacks the jurisdiction to audit the actions of CMSA, which is a private party with no decision-making power over public assets or funds[449], which has been confirmed by the Constitutional Court[450]. The Respondent denies this and relies on the Comptroller General's own opinion[451].

---

[447] Doc. C 39, p. 51.
[448] Doc. C 39, p. 51.
[449] Reply, para. 36.
[450] Doc. C 61.
[451] Rejoinder, para. 148.

550. The audit action of the Comptroller General's Office is regulated in Law 610 of 2000[452]. Art. 1 of this law defines the process of fiscal liability as follows[453]:

> "The set of administrative actions carried out by the Comptroller General's Office in order to determine and establish the responsibility of public servants and individuals when, in the exercise of fiscal management or on the occasion of such management, they cause damage to the state's assets by action or omission and in a fraudulent or negligent manner".

551. The Comptroller General's Office audits, therefore, not only the responsibility of public servants, but also that of private individuals, when they interact with fiscal management, which is understood, in Art. 3, as[454]:

> "The set of economic, legal and technological activities carried out by public servants and persons governed by private law who manage or administer public resources or funds...".

552. The Comptroller General's Office itself considers that CMSA has the status of fiscal manager, justifying this on the grounds that the settlement of the royalties to be collected by the state depended on the information report provided by CMSA[455].

553. To discredit this conclusion, the Claimant refers to a Constitutional Court judgment: the jurisdiction of the Comptroller General's Office is not universal[456], instead being limited to those individuals who have decision-making power over state funds or assets placed at their disposal and who, in doing so, cause detriment to the state[457].

554. The Arbitral Tribunal does not see the need to rule on the Comptroller General's Office jurisdiction to initiate an action against CMSA because, in any event, as seen above, the actions of the Comptroller General's Office brought to this arbitration show in their content significant irregularities that would allow the assessment of the existence of an internationally wrongful act.

**4.    IRON ROYALTY**

555. The Cerro Matoso mine is a nickel deposit.

---

[452] Doc. C 59.

[453] "*El conjunto de actuaciones administrativas adelantadas por las Contralorías con el fin de determinar y establecer la responsabilidad de los servidores públicos y de los particulares, cuando en el ejercicio de la gestión fiscal o con ocasión de ésta, causen por acción u omisión y en forma dolosa o culposa un daño al patrimonio del Estado*". Free translation by the Arbitral Tribunal.

[454] "*El conjunto de actividades económicas, jurídicas y tecnológicas, que realizan los servidores públicos y las personas de derecho privado que manejen o administren recursos o fondos públicos ...*". Free translation by the Arbitral Tribunal.

[455] Doc. C 39, pp. 355 and 356.

[456] Judgment C-840/01, Doc. C 61, p. 18.

[457] Judgment C-840/01, Doc. C 61, p. 28.

556. Nickel, as far as is known, is present in two types of ores: sulphide and laterite. Laterites can be further broken down into two categories: oxide-associated or sulphide-associated[458]. The Cerro Matoso deposit is oxide-associated laterite[459]. Specifically, the ore mined at the pithead contains 1 – 2% nickel, waste rock, iron oxide and other minerals[460].

557. The type of ore in which the nickel is contained will determine the type of processing it can undergo. For an oxide-based laterite, the only proven production process is the so-called RKEF[461]. This is a combination of a calcination process with a smelting process at very high temperatures, thus melting the ore. As nickel and iron are closely bonded at the molecular level in this ore, they are part of the same structure and, being elements with very similar physiochemical characteristics, they behave similarly during reduction and melting – in other words, it is not possible to reduce nickel without reducing iron at the same time[462].

558. After subjecting the extracted ore to this pyrometallurgical process in a furnace at high temperatures, ferronickel is obtained. The only processed product that can be obtained from the Cerro Matoso deposit is ferronickel[463]. Ferronickel is mainly composed of nickel and iron, in a proportion of approximately 30% and 70%, respectively[464].

559. It should be noted that although ferronickel:

   -    Contains a lower percentage of nickel than pure nickel (or nickel 1); and

   -    Due to its composition, it has more iron than nickel,

   Ferronickel is still considered a nickel product[465] – there is no dispute about it; to be exact, it is so-called nickel 2.

560. The Claimant has confirmed that the ore extracted from the mine is nickel ore, and not iron ore. In order to produce iron, the mined ore would have to have an iron oxide content of around 40%, which the ore from the Cerro Matoso mine does not reach[466].

561. For almost 40 years, CMSA paid nickel royalties only – first at a rate of 8% and then at 12%. In 2017, on the occasion of the settlement of the accounts of the Contracts, the National Mining Agency raised the accrual of iron royalties for the historical period from 1982 to 2012 for the first time[467]. And as of 2019, the state had already claimed

---

[458] Doc. R 83, p. 85.
[459] Doc. R 83, p. 85.
[460] HT-BL, Day 1, p. 29, ll. 19-22.
[461] Rotary Kiln Electric Furnace.
[462] Doc. R 83, pp. 85 and 86.
[463] Doc. R 83, pp. 85 and 86.
[464] Counter-Memorial, para. 69.
[465] Reply, para. 196.
[466] HT-BL, Day 1, p. 29, ll. 10-16.
[467] Doc. C 107.

the payment of quarterly royalties on iron at 5%, which is the percentage of royalties provided for in the Royalties Law for iron, thus accruing since 2012.

562.  In 2020 CMSA paid iron royalties, under protest, for the period IV 2012 to I 2020, as well as in the years 2021 and 2022[468]. CMSA nevertheless initiated arbitration challenging the legitimacy of that claim and won, as acknowledged by the award dated 11 May 2022 between CMSA and the National Mining Agency[469] [the "**Iron Award**"]. The Iron Award is currently under review in a nullity proceeding, which has not been concluded and therefore has not become final[470].

563.  The Arbitral Tribunal will first set out the arguments (**4.1.**) and then analyse the measures strictly linked to the iron royalty (**4.2.**).

**4.1.  <u>ARGUMENTS</u>**

564.  The positions of the Parties (**A.**) and the position of the Arbitral Tribunal (**B.**) are shown below.

**A.  <u>Positions of the Parties</u>**

565.  The Royalties Law establishes royalties for nickel and royalties for iron.

566.  Colombia notes that CMSA sells ferronickel, which is nickel and iron – CMSA does not separate nickel (30%) from iron (70%)[471]; however, CMSA intends to pay royalties only on 30% of its mining production[472], when the correct thing to do would be to apply both royalties and thus tax total production[473].

567.  The Claimant refuses to pay royalties on iron, based on the following arguments, which are refuted by the state:

568.  *First*, Claimant points out that the accrual of royalties for the exploitation of natural resources is an obligation under Art. 360 of the Constitution, which arises only from the exploitation and not from the mere extraction of the mineral[474]. And, in this case, CMSA never commercially exploited the iron separately[475]. There is thus no legal obligation to pay royalties on the iron.

569.  Colombia considers this argument to be completely irrelevant: indeed, the accrual of royalties does not arise from mere extraction, and exploitation is therefore required; but

---

[468] Memorial, para. 132.
[469] Doc. R 84.
[470] Rejoinder Jurisdiction, footnote 177.
[471] Counter-Memorial, para. 70.
[472] Counter-Memorial, para. 69.
[473] Counter-Memorial, para. 70.
[474] Memorial, para. 123.
[475] Memorial, para. 123.

here the exploitation of iron does take place, as part of the ferronickel[476]. In fact, CMSA does not derive any separate economic benefit from nickel either, yet no one disputes that it has to pay royalties on it[477].

570. *Second*, the Claimant does not consider that the payment of royalties on iron can arise from a contractual obligation either: the Concessions acknowledge that the ferronickel mining is of the nickel ore[478]. CMSA pays royalties on the pithead value of the nickel, which also happens to contain iron[479].

571. In response, the Respondent points out that the Contracts recognise a right of CMSA to exploit nickel and the other minerals. Indeed, Contract 51 lists iron as a mineral that is associated or bonded with nickel[480].

572. *Third*, the Claimant argues that, in almost 40 years of previous operation, the state never claimed royalties on the iron[481], despite the audits and investigations carried out[482]. In particular, Comptroller General's Office Order 1334, which closed the investigations into royalties for the period 2002-2012 on the grounds that there were no irregularities[483].

573. The state, on the other hand, does not consider the iron royalty claim to be surprising, as the parties discussed iron royalties during negotiations in 2011 to amend Contract 51 to incorporate the Concessions[484]. There are also minutes of a meeting with Ingeominas discussing the issue of iron royalties[485] and the Comptroller General's Office itself had also discussed the accrual of this royalty[486].

574. *Finally,* the Claimant criticises the iron royalty settlement as incorrect as it uses a local producer for the reference price and does not apply cost deductions[487].

## B.    Position of the Arbitral Tribunal

575. On this point, the Arbitral Tribunal sides with the Claimant.

576. Cerro Matoso was always a nickel mine whose processed ore was marketed as ferronickel. This is a well-established fact, known to the state. The state, for almost 40 years, decided to only tax for the nickel contained within the ferronickel when taxing

---

[476] Rejoinder, para. 168.
[477] Counter-Memorial, para. 75.
[478] Reply, para. 211.
[479] Reply, para. 199.
[480] Counter-Memorial, para. 72.
[481] Memorial, para. 125.
[482] Memorial, para. 126.
[483] Reply, para. 221.
[484] Counter-Memorial, para. 158.
[485] Counter-Memorial, para. 159. Doc. R 24.
[486] Counter-Memorial, footnote 151.
[487] Memorial, para. 131.

its exploitation. This was expressed both in the Contracts (**a.**) and in the Royalties Law (**b.**).

### a.    **The Contracts**

577.    Contract 866 mentioned that its object was to "*obtener el aprovechamiento económico de los depósitos de níquel y demás minerales que se encontraran en [el] terreno* (economically exploit the nickel deposits and other minerals found in the land)"[488]. Contract 1727 contained a similar expression: "*obtener el aprovechamiento total de los yacimientos de níquel que se encontraran en [el] terreno* (to fully exploit the nickel deposits found in the land)"[489].

578.    According to Clause 1 of the 1985 Agreement, a royalty was payable on the value, at pithead, of the gross product of the nickel ore mined.

579.    Contract 51 had as its object the exploration, mining and processing of nickel ore and minerals that are associated or bonded with, or obtained as by-products of, such ore[490]. Clause 11 provided that the royalties payable:

-    For the area of the Concessions: these would be those contemplated in Clause 16 of Contract 866, construed in conjunction with the provisions of the Royalties Law, payable in the manner contemplated in said Contract and in the applicable law in force on the date of signature of Contract 51;

-    For the remainder of the Contract 51 area: if new deposits are discovered and exploited, the royalties will be those provided for in the Royalties Law as in force at the date of signature of Contract 51.

580.    In addition, Addendum No. 4 to Contract 51, signed in 2011 in connection with the imminent incorporation of the areas of the Concessions into Contract 51, contained Clause 10.c) which stated that[491]:

> "In the event that Cerro Matoso begins to exploit minerals other than those it was exploiting under the Concessions, and which are part of the object of the Contract, it shall pay the corresponding royalties as established in the [Royalties] Law...".

581.    Contract 866 already contained a similar regulation when it explained, in Clause 1, that the nickel ore would be processed until it was transformed, at least, into ferronickel; and, if it was found that any of the other minerals found in the area were technically and economically exploitable by separating them from the nickel, CMSA would

---

[488] Doc. C 8, Clause 1. Free translation by the Arbitral Tribunal.
[489] Doc. C 9, Clause 1. Free translation by the Arbitral Tribunal.
[490] Doc. C 17.
[491] "*En caso de que Cerro Matoso inicie el aprovechamiento de minerales distintos al que venía explotando bajo las Concesiones, y que sean parte del objeto del Contrato, pagará las regalías correspondientes según se establezca en la Ley [de Regalías] ...*". Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

assume – after agreement with the Ministry of Mines – any of the relevant obligations in Art. 6 of Decree 292 of 1968 (to carry out in Colombia the transformation of minerals and to sell the products in Colombia for use in the national industry as raw material).

582. As a result of the foregoing:

583. There seems to be no doubt that the exploitation of the minerals from the Cerro Matoso mine has been the same since 1982: nickel ore transformed into ferronickel, which gave rise to the payment of nickel royalties. In order for the state to claim further, additional royalties, CMSA had to (i) succeed in separating the other minerals from the extracted nickel ore and (ii) economically exploit those minerals.

584. Contractually, the parties therefore acknowledged that the exploitation of ferronickel only gave rise to the payment of nickel royalties. For CMSA to also pay iron royalties, it had to separate the iron from the nickel ore and market it individually – something that has not happened. Nor can it happen, since, as the Ministry of Mines acknowledged, the areas exploited by CMSA do not contain economically exploitable deposits other than nickel ore and explicitly stated that iron is not an exploitable mineral in that mine[492].

### b.    Royalties Law

585. Art. 16 of the Royalties Law stipulates that the exploitation of nickel and iron would give rise to the payment of minimum royalties, at 12% and 5%, respectively. This is a generic regulation.

586. Next, Art. 16.2 refers specifically to the Cerro Matoso mine. Knowing that the product that CMSA sells is ferronickel, the Royalties Law refers to "the exploitation of nickel in the nickel mines in Cerro Matoso"[493].

587. If, as the Respondent now suggests, the legal basis for requiring royalties on iron is the Royalties Law, it is inexplicable that the latter did not provide in Art. 16.2, when referring to the specific case of the Cerro Matoso mine, that, in the case of the commercialisation of ferronickel, royalties would accrue for both nickel and iron. But this was not the case: it only referred to nickel royalties.

\* \* \*

588. <u>In short,</u> the Colombian state, both in its contractual regulation with CMSA and in its legal regulation, considered that the exploitation of the Cerro Matoso mine was of nickel ore, and that:

- Both the (minimum) iron content in that mined nickel ore;

---

[492] Decision of 5 July 1984, cited in Doc. C 39, pp. 136-137.
[493] "*la explotación de níquel en las minas de níquel en cerromatoso*". Free translation by the Arbitral Tribunal.

117

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

-   And the (majority) iron content in processed and traded ferronickel,

were elements of little relevance for the purpose of royalty payments.

589.  And this makes perfect economic sense:

590.  The value of ferronickel is determined by the amount of nickel it contains. It is for this reason that the Contracts and Resolution 293 set the reference price for the payment of royalties for ferronickel through the price of pure nickel, quoted on international markets.

591.  All experts and witnesses confirmed at the Hearing that, assuming that ferronickel has a ratio of 30% nickel and 70% iron, 100 kg of ferronickel was, in general terms, **worth less** than 30 kg of pure nickel.[494]

592.  This shows that:

-   Iron in ferronickel does not add value; in fact, one of the experts consulted by the state in the process of adopting Resolution 293 confirmed that "the impact of the value of iron on the ferronickel price is marginal"[495] and CMSA itself explained that, when the percentage of iron exceeds 70%, it weighs down the market price[496].

-   In the absence of separate iron marketing, the value of the ferronickel was fully taxed with a nickel royalty, using the international price of pure nickel as the basis for taxation. The Respondent's allegation that CMSA is profiting economically from iron mining without paying royalties for doing so is not true: CMSA pays royalties for the full value of the ferronickel it sells (the Claimant even argues that it pays for more value than the ferronickel actually has).

593.  This has been confirmed by the Iron Award. This award states that the National Mining Agency, in demanding iron royalties[497]:

> "In addition to disregarding norms such as the [Royalties] Law... they also disregard the Contract in which a royalty was agreed for the exploitation of the object of the Contract".

---

[494] HT-BL, Day 2, p. 55, ll. 13-22; p. 56, ll. 1-20.
[495] Doc. CLEX 6, p. 29. "*el impacto del valor del hierro en el precio de ferroníquel es marginal*". Free translation by the Arbitral Tribunal.
[496] Doc. R 26, p. 3.
[497] Doc. R 84, p. 80. "*[A]demás de desconocer las normas como la Ley [de Regalías] ... también desconocen el Contrato en el que se pactó una regalía por la explotación de que trata dicho objeto contractual*". Free translation by the Arbitral Tribunal.

594. <u>Therefore</u>, the Arbitral Tribunal considers that the state's change of opinion as to what is the mineral exploited in the Cerro Matoso mine, for the purposes of calculating royalties, lacks a legal and economic basis and is contradictory to its previous conduct.

595. Furthermore, the Arbitral Tribunal finds that, with the collection of the nickel royalties, the state has obtained royalties on the full value of the product obtained from the mineral; it would therefore be abusive to double tax this value.

596. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

### 4.2.  THE IRON ROYALTY MEASURES

597. Of all the measures that the Claimant considers to be in breach of the BIT, those that are affected by the iron royalty are:

### A.  Cundinamarca Petition

598. In the Cundinamarca Petition of 6 February 2018[498] the National Mining Agency sought to re-assess iron royalties for the period 1982 to 2012, in the amount of COP 2,426,895,470, plus interest[499].

### B.  Order 63

599. Order 63 of 7 February 2020 settled royalties on iron accrued in the same period IV 1982 to III 2012 at COP 2,426,895,470.

### C.  Order VSC 206

600. In Order VSC 206 of 23 August 2019[500] the National Mining Agency demanded from CMSA the iron royalty declaration and payment forms for the period covering IV 2012 to II 2019.

### D.  Order VSC 62

601. By Order VSC 62 of 11 March 2020[501] the National Mining Agency reiterated the above request and extended it to III and IV 2019.

* * *

602. The Arbitral Tribunal has determined that the claim for royalties on the iron contained in ferronickel is irregular conduct by the Colombian state, as it consists of an unjustified

---

[498] Doc. C 32.
[499] Doc. C 32, p. 45.
[500] Doc. C 124.
[501] Doc. C 129.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

and contradictory change of position leading to double taxation of the same value, and that these four measures that settle royalties on iron are also tainted with irregularity in this respect for the same reasons.

603. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**5.    SETTLEMENT OF THE ACCOUNTS OF THE CONTRACTS**

604. The factual background of the case is presented first (**5.1.**) and then the measures concerned (**5.2.**).

**5.1.    FACTUAL BACKGROUND**

605. The July 2005 Agreements provide for the following[502]:

> "1. Upon termination of this contract for any reason, the parties shall sign a Statement in which the final settlement of the accounts of the contract and the fulfilment of all the obligations of the Concessionaire, in particular the following, shall be recorded in detail:
>
> (a) Receipt by the Grantor of the area covered by the contract and the mine, indicating the technical, physical and environmental conditions in which it is located. The latter in accordance with the provisions of the competent environmental authority.
>
> (b) Evidence of the Concessionaire's compliance with all its employment obligations, or acknowledgment of its failure to do so.

---

[502] Doc. C 20, Clause 21 and Doc. C 21, Clause 20 (with internal reference to Clause 6.1.d). "*1. A la terminación del presente contrato por cualquier causa, las partes suscribirán un Acta en la cual deberá constar detalladamente la liquidación definitiva del mismo y el cumplimiento de todas las obligaciones a cargo del Concesionario, en especial de las siguientes:*
*(a) El recibo por parte de la Concedente del área objeto del contrato y de la mina, indicando las condiciones técnicas, físicas y ambientales en que se encuentra. Estas últimas de acuerdo con lo que establezca la autoridad ambiental competente.*
*(b) Las pruebas por parte del Concesionario del cumplimiento de todas sus obligaciones laborales, o la constancia de su no entrega.*
*(c) El cumplimiento de todas las obligaciones consignadas en la cláusula 7.[1.d], dejando constancia de las condiciones de cumplimiento y del detalle de las obligaciones incumplidas, sobre las cuales la Concedente tomará las acciones que procedan.*
*2. Si el Concesionario no comparece a la diligencia en la cual se habrá de levantar el Acta de Liquidación, la Concedente suscribirá el acta y se harán efectivas las garantías correspondientes si procediere. La no comparecencia del Concesionario no es por sí sola causal para hacer efectiva las garantías*". Free translation by the Arbitral Tribunal.

(c) Compliance with all the obligations set out in clause 7.[1.d], stating the conditions of compliance and the details of the unfulfilled obligations, in respect of which the Grantor shall take the appropriate action.

2. If the Concessionaire does not attend the proceedings in which the Settlement Statement is to be drawn up, the Grantor shall sign the statement and the corresponding guarantees shall be enforced, if applicable. The non-attendance of the Concessionaire is not in itself a reason to enforce the guarantees".

606. Clause 7.1(d) referred to in paragraph (c) reads as follows[503]:

"Pay the minimum royalties referred to in Art. 16.2 of the [Royalties] Law ...".

607. It is undisputed that Contracts 866 and 1727 were terminated on 30 September 2012 and that, as of 1 October 2012, the Concessions were integrated into Contract 51.

608. At some point, presumably towards the end of 2015, the National Mining Agency contacted CMSA to draft the statement of settlement of accounts of the Contracts – the one referred to in the July 2005 Agreements. The record shows that the parties set in writing a deadline of 15 January 2016 to sign said statement[504] – a deadline that was extended on 14 January 2016 by three months[505], but at the end of this period the parties had also failed to sign the settlement statement[506].

609. On 1 November 2017 the National Mining Agency issued Order VSC 351 aggregating the remaining balances of Contracts 866 and 1727[507], noting that there were obligations to be fulfilled by CMSA whose compliance was pending verification – among others:

- Possible royalty balances from 1982 to 1997 and from 2009 to 2012[508];

- Payment of final royalties between 2005 and 2007 in accordance with Resolution 293[509]; and

- Iron royalties[510].

---

[503] "*Pagar las regalías mínimas de que trata el artículo 16.2 de la Ley [de Regalías] ...*". Free translation by the Arbitral Tribunal.
[504] Doc. C 32, p. 28.
[505] Doc. C 32, p. 29.
[506] Doc. C 32, p. 30.
[507] Doc. C 107.
[508] Doc. C 32, p. 32.
[509] Doc. C 32, p. 42.
[510] Doc. C 32, p. 87.

610. And on 6 February 2018 the National Mining Agency initiated a court action to settle the accounts of the Contracts[511] (the so-called "Cundinamarca Petition"), reopening royalty payments in the manner outlined in Order VSC 351.

611. The same year, on 27 September, the same National Mining Agency issued Resolution 576[512], liquidating the royalties pending payment, according to the re-assessments that had been made.

612. Two years later, the Comptroller General's Office would issue Order 63[513] containing a reopening of royalty settlements of a similar scope, taking into account the previous proceedings.

## 5.2. SETTLEMENT AND TRANSVERSAL MEASURES

613. Of all the measures that the Claimant claims are in breach of the BIT there are three which transversally affect two or more of the four matters discussed above (namely: the royalty rate and percentage of deductible costs, the reference price, the deductible costs and the iron royalties) as a result of the settlement of the accounts of the Contracts: the Cundinamarca Petition (**5.2.1.**), Resolution 576 (**5.2.2.**) and Order 63 (**5.2.3.**).

### 5.2.1. CUNDINAMARCA PETITION

614. In the Cundinamarca Petition of 6 February 2018[514] the National Mining Agency, relying on VSC Order 351 which took stock of the Contracts, requested the judicial declaration of settlement of the accounts of the Contracts[515] and, following this, the owing by CMSA of:

- Unpaid nickel royalties for the years 2005 to 2007, based (retrospectively) on the development of the FOB price, as provided for in Resolution 293, plus interest[516];

- Nickel royalties from IV 1982 to IV 1997 and from I 2009 to III 2012, with interest[517]: the National Mining Agency pointed out that these periods had not been audited with regard to the expenses deducted, due to CMSA's failure to provide information, and therefore requested that accounting tests be carried out to verify that there were no erroneous costs or that they had no causal relationship[518];

---

[511] Doc. C 32.
[512] Doc. C 35.
[513] Doc. C 39.
[514] Doc. C 32.
[515] Doc. C 32, p. 46.
[516] Doc. C 32, p. 45.
[517] Doc. C 32, p. 44.
[518] Doc. C 32, p. 35.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

- Iron royalties from 1982 to 2012, in the amount of COP 2,426,895,470, plus interest[519].

615. The Arbitral Tribunal has already ruled on the irregularities affecting the merits of these royalty re-assessment requests.

616. But, regardless of this, the Claimant disputes the legitimacy of the settlement claims contained in the Cundinamarca Petition (**A.**) and, in any event, asserts that the action was brought when it was already time-barred (**B.**).

## A.    Propriety of the contractual settlement of accounts

617. *First*, the positions of the Parties (**a.**) and thereafter the Arbitral Tribunal's position (**b.**) are presented.

## a.    Positions of the Parties

618. The Claimant considers that the settlement of the accounts of the Contracts that Colombia now intends to carry out is entirely artificial, as the exploitation of the two Concessions continues under Contract 51[520].

619. And, in fact, it has only served as a pretext to reopen royalty settlements going back 40 years[521]. That should not be the purpose of the act of settling a contract; said act is designed to formally terminate environmental obligations and to procure the reversion of public assets to the state[522].

620. The Respondent relies on clause 21.1c) of the July 2005 Agreements to justify its right to use the contractual accounts settlement procedure to verify CMSA's performance of its obligations, including the payment of royalties[523].

621. It also argues that the payment of royalties is an imprescriptible and unavoidable constitutional obligation[524] and relies on two Colombian court decisions to support this assertion[525].

622. The Claimant does not see it that way, and challenges this alleged imprescriptibility of the royalty claim. In the absence of a specific time limit contained in the Mining Code, the generic 10-year time limit of the Civil Code is applicable[526]. The Claimant asserts that Colombia had within its power – and in fact exercised – its oversight and audit

---

[519] Doc. C 32, p. 45.
[520] Reply, para. 48.
[521] Reply, para. 49.
[522] Reply, para. 42 with reference to Doc. C 165 with the judgment of the Council of State (*Consejo de Estado*).
[523] Counter-Memorial, para. 131.
[524] Counter-Memorial, para. 74.
[525] **Docs. RL 106 and 115**.
[526] Reply, para. 21.

rights over the Contracts[527]; that it now appears to claim that it exercised them insufficiently does not justify it disregarding the limitation period and claiming what it did not ask for at the time[528].

**b.    Position of the Arbitral Tribunal**

623.    The Parties' dispute is really twofold: *first*, whether the act of settling the accounts of an administrative contract can have as its object the reopening of past liquidations and, *second*, whether, even if it were possible, the action for claiming royalties would be time-barred.

624.    *Firstly*, through clause 21.1.c) of the July 2005 Agreements, the Respondent invokes its right to review, through the settlement statement, the fulfilment of all royalty payment obligations, recording the conditions of fulfilment and the details of those not fulfilled.

625.    The Claimant does not deny that this is the wording of the July 2005 Agreements, but asserts that it is not possible to claim, on account of the settlement, breaches that were never noticed before.

626.    With regard to the act of settling, both Parties have invoked the same doctrinal article "*La Liquidación del contrato estatal* (The Settlement of the Accounts of State Contracts)"[529], and the case law cited therein, as support for their respective positions. Therefore, both Parties accept that the doctrinal opinion contained in such article serves as a reference for the Arbitral Tribunal's position.

627.    The Arbitral Tribunal considers that the doctrinal article seems to agree with the Claimant when it establishes that, by its very nature, the settlement of the accounts of a contract does not give the entity the power to unilaterally establish liability for a breach, as this should have been done beforehand, in the manner authorised by law – for example, by means of the administrative act declaring the breach[530].

628.    Therefore, according to the doctrine, any breach by CMSA of its contractual obligations, such as the payment of royalties as agreed, should have been claimed at the time of the breach. The settlement statement would simply record, at the end of the contract, whether or not the breach had been remedied.

629.    But this is not what happened here. It was only on the occasion of the settlement of the accounts of the Contract that the state decided to review *ex novo* all royalty payments made in the past, starting from the first day of exploitation back in 1982.

---

[527] Reply, para. 30.
[528] Reply, para. 27.
[529] **Doc. RL 129**.
[530] **Doc. RL. 129**, p. 6.

630.    *Second*, the Claimant submits that, even if it were possible to re-assess previously paid royalties on account of the settlement of the accounts of the contract, such a claim would be time-barred.

631.    The Claimant points out that the applicable limitation period, in the absence of a specific one in the Mining Code, would be the generic one of 10 years. The Respondent does not dispute that if a limitation period were applicable that would be the case, but denies the main premise: that a royalty claim action is subject to any limitation period at all.

632.    The Respondent has provided in support of its defence a response from the National Mining Agency to a consultation[531] and a judgment[532]. This evidence points out that state property is inalienable and imprescriptible, which prevents private parties from taking control of it through acquisitive prescription (*usucapión*)[533]. Actions related to the subsoil and the rights linked to it are not time-barred[534] and royalties, as consideration for the exploitation of non-renewable natural resources, are also imprescriptible[535].

633.    The Arbitral Tribunal does not consider that the evidence provided by the Respondent really helps to clarify the issue: it is not a question of whether the state loses, due to the passage of time, the right to claim a royalty, as a benefit for the exploitation of a resource it owns – here the state has in fact regularly collected royalties for 40 years for the exploitation of the Cerro Matoso mine.

634.    For its part, the Claimant has also submitted a court judgment[536] which distinguishes between fiscal property (imprescriptible) and property for public use and wasteland (imprescriptible and inalienable). With respect to fiscal property, the domain is exercised in the same way as private property[537] and any action in this respect is subject to the rules of a limitation period under Art. 44 of Law 446 of 1998[538]. In the case analysed in the judgment, there is a claim by the electricity company against the state for the unpaid portion of the subsidised electricity tariff, which the state had undertaken to pay and failed to do so. The electricity company asserted that any action related to this subsidy, which is a state asset, was not time-barred, and the judgment overruled it on the grounds that it was a fiscal asset which, although imprescriptible, was not inalienable – only imprescriptible **and** inalienable assets escaped the limitation period[539].

---

[531] **Doc. RL 106**.
[532] **Doc. RL 115**.
[533] **Doc. RL 106**, p. 5.
[534] **Doc. RL 106**, p. 5.
[535] **Doc. RL 106**, p. 6. **Doc. RL 115**, p. 35.
[536] Doc. C 151.
[537] Doc. C 151, p. 2.
[538] Doc. C 151, p. 5.
[539] Doc. C 151, p. 4.

635. This judgment is closer to the present case, in which the state is claiming what it considers to be the missing payment of a past royalty that has already been paid. A royalty that translates into partially enforced monetary compensation – which as a fungible asset is a disposable fiscal asset, as recognised by the judgement – and, therefore, the corresponding action would be subject to the rules of limitation periods.

636. Moreover, the National Mining Agency itself, in the evidence referred to by the Respondent, acknowledges that in the exercise of the function of collecting the consideration arising from the mining titles (royalties), the mining authority is subject to the provisions of the debt collection and portfolio management procedures of Law 1066 of 206[540], which is five years from the expiry of the deadline for declaring[541]. Whether the limitation period is five years or ten years, as the Claimant argues, is somewhat irrelevant, given that the Cundinamarca Petition is from 2018 and seeks to reopen liquidation from 1982.

637. Therefore, the evidence provided by both Parties seems to indicate that a claim for additional royalties to those already paid in the past would be an action which is subject to a limitation period.

638. Be that as it may, the Arbitral Tribunal cannot lose sight of the fact that the discussion centres on whether the state has a maximum time limit to claim against CMSA for a previously paid royalty settlement which it now considers to be partially incorrect. The Arbitral Tribunal sees no reason why this action should not be subject to a limitation period that would provide certainty to the relationship between the Parties in circumstances such as those in which there has been performance of the contract. Otherwise, and as the Claimant points out[542], the state would be undermining the principle of legal certainty: the mining title holder would have paid quarterly royalties according to the settlement done by the state and yet would lack certainty as to whether that settlement at some point became final or could be reopened at any time by the state – even 40 years later.

Respondent's counter-argument

639. The evidence invoked by the Respondent submits that any mining title holder must know that throughout the term of the contract it is obliged to pay the consideration in the manner and within the time period in which it has to make the payments and, therefore, the Mining Authority would be entitled to demand any royalties due[543].

640. Even assuming this were the case, the above premise would only apply to quarterly royalty settlements. Indeed, according to Decree 145 of 1995 and Decree 0600 of 1996, which regulate the Royalties Law, royalties must be paid during the ten working days

---

[540] **Doc. RL 106**, p. 9.
[541] **Doc. RL 106**, p. 10.
[542] H 1, p. 172.
[543] **Doc. RL 106**, p. 9.

following the end of the corresponding quarter[544]. That is the extent of the foreseeability required of any mining company: if it exploits a natural resource belonging to the state it is to be expected that the state will claim the corresponding royalty. But it should also be expected that, if the mining owner regularly pays its quarterly royalty according to a settlement known to the state, it can be certain that after a certain period of time the state will not be able to claim new payments on account of royalties already settled and accepted without objection by the state.

\* \* \*

641.   <u>In conclusion</u>, the Arbitral Tribunal considers, on grounds including the doctrine invoked by both Parties, that the state's decision to reopen past royalties following a process of settlement of the accounts of the Contracts, even beyond the time established for such settlements to be considered final, is not reasonably justified.

642.   The Respondent's position has the effect of undermining legal certainty, since the mining owner who regularly pays consideration for the exploitation of a natural resource would never have certainty as to the sufficiency and finality of the payment made.

643.   This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## B.   <u>Limitation period for pursuing a judicial settlement of accounts</u>

644.   The Arbitral Tribunal shall set out the positions of the Parties (**a.**) and then its own position (**b.**).

## a.   <u>Positions of the Parties</u>

645.   The Claimant explains that the Contracts are not ordinary administrative contracts, subject to administrative law, but are mining contracts, governed by the Mining Code; and the Mining Code does not provide for the procedure of settlement of the accounts of the contract, nor, therefore, a time limit[545]. However, being a procedure agreed in the July 2005 Agreements, the Claimant accepts that it should be carried out[546].

---

[544] **Doc. RL 106**, p. 4.
[545] Claimant's PHB, para. 236.
[546] Claimant's PHB, para 236.

646. Art. 297 of the Mining Code refers to the provisions of the Administrative Code[547] as regards governmental procedure and legal actions; with Art. 164.2.j.v being of relevance[548]:

> "The claim must be presented (with it otherwise being time-barred) ... within two years, which shall begin to run ... in [contracts] requiring the settlement of their accounts, ... [at] the end of two months from the expiry of the period agreed for doing so bilaterally or, failing that, [at] the end of the four months following the termination of the contract".

647. As the Contracts terminated on 30 September 2012, the Claimant adds a further four months to reach a bilateral agreement and two more months for the mining authority to unilaterally settle the accounts of the Contracts. From there it adds two more years, leading to 6 April 2015 being the date from which legal action to request settlement would be time-barred[549].

648. The Respondent relies on a different law[550]. Colombia invokes Art. 11 of Law 1150/2007 with its general provisions on public procurement[551]. Art. 11 deals with the time limit for the settlement of the accounts of contracts, which shall be as agreed and, in the absence of agreement, four months after the expiry of the contract. In the absence of agreement on the settlement, the state entity will have two months to unilaterally settle the accounts of the contract. Once this period has expired, the petition for judicial settlement may be filed at any time within the following two years.

649. Colombia points out that it reached an agreement with CMSA to settle by mutual agreement by 15 April 2016, to which date the two months for unilateral settlement (15 June 2016) are added, and the two-year period to settle would thus expire on 15 June 2018 – as the request for judicial settlement was filed in February 2018 it would have been timely[552].

650. The Claimant downplays the relevance of the agreement reached to settle the accounts of the Contracts by mutual agreement, as it considers that, the limitation period having expired one year earlier, such an agreement could not revive a settlement action that was already time-barred[553].

---

[547] Doc. C 200.
[548] Claimant's PHB, para. 240. "*La demanda deberá ser presentada (so pena de que opere la caducidad) ... en dos años que se empezarán a contar ... en los [contratos] que requieran de liquidación, ... [al] término de dos meses contados a partir del vencimiento del plazo convenido para hacerlo bilateralmente o, en su defecto, [al] término de los cuatro meses siguiente a la terminación del contrato*". Free translation by the Arbitral Tribunal.
[549] Claimant's PHB, para. 241.
[550] Respondent's PHB, para. 44.
[551] It seems that the Respondent is referring to Law 1150/2007, which introduces measures for efficiency and transparency in Law 80 of 1993 and establishes other general provisions on contracting with public assets.
[552] Respondent's PHB, para. 45.
[553] Claimant's PHB, para. 244.

b.    **Position of the Arbitral Tribunal**

651.    Although the Parties have invoked different rules for the calculation of the legal term to carry out the settlement of the accounts of the Contracts, the time periods used by each Party are similar: the Contracts did not foresee a term for settling, therefore, as a matter of law, there would be four months after termination to settle by mutual agreement, two more months for the Administration to do so unilaterally, and, finally, two years for any of the parties to request that it be done judicially. This period leads, according to the Claimant's calculations, to 6 April 2015. At that date, the legal action to settle the accounts of the Contracts would have expired and there is no dispute that, at that date, neither the state nor CMSA had initiated such legal action.

652.    The Respondent ignores this entire calculation because it contends that the premise is wrong, because, in this case, there was an agreement on the deadline to settle. A few days after the action allegedly expired, CMSA and the National Mining Agency agreed to settle the accounts of the Contracts by mutual agreement, with a deadline of 15 April 2016 – something that was not achieved. From then on, the unilateral settlement period and the two years to initiate legal action would begin. According to this view, the Cundinamarca Petition would have been filed on time.

653.    The issue debated between the Parties is whether the agreement between the parties could reopen the legal time limits to allow the judicial settlement action to be brought, when the action had already expired. The Respondent has submitted the doctrinal article "*La liquidación del contrato estatal* (The Settlement of the Accounts of State Contracts)"[554], as support for its position and, interestingly, the Claimant has also found support for its position in the same doctrine[555]. Therefore, both Parties accept that the doctrinal opinion contained in said article serves as a reference for the Arbitral Tribunal's position.

654.    The doctrinal article provides a clear answer to the Parties' debate, with jurisprudential support:

> "[I]t must be made clear that, two years after the termination of the contract, neither the contractor can demand settlement and/or damages, nor the administration can do so, since in such a case any action (or rather, process) that the parties could have brought based on the contract will be time-barred"[556].

> "The contracting parties may carry out [the settlement] by mutual agreement or the administration may do unilaterally, since the ultimate aim is for the accounts

---

[554] **Doc. RL 129**.
[555] Claimant's PHB, footnote 477.
[556] Judgments of 29 January 1988 and 16 November 1989, cited in **Doc. RL 129**, p. 9. "*[D]ebe quedar claro que, transcurridos dos años desde la terminación del contrato, ni el contratista podrá exigir la liquidación y/o los perjuicios, ni la administración efectuarlo, pues en tal caso habrá caducado cualquier acción (o mejor, proceso), que las partes pudieran promover con fundamento en el contrato*". Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

of the contract to be settled and that outstanding obligations be defined. It should be noted, however, that ... this power subsists only during the two years following the expiry of this obligation, which is none other than the limitation period for the exercise of the contractual action"[557]

655.    The main conclusion is that, once the two-year limitation period has expired, no legal action for settlement of the accounts of a Contract can be brought, even if after those two years the parties had tried to agree on settlement – once the limitation period has expired, it cannot be reopened through the parties' consent.

656.    The same doctrinal article also cites the Council of State, which has ruled on several occasions on settlement time limits, warning that their non-observance created legal uncertainty[558].

657.    It would seem, therefore, that according to the doctrinal opinion cited by both Parties as an authoritative source, the legal action to settle the accounts of the Contracts would have expired on 6 April 2015 irrespective of any subsequent agreements reached by the Parties. This is a date well before the Cundinamarca Petition, which initiated the legal action for the settlement of the accounts of the Contracts.

658.    <u>All of the foregoing</u> leads the Arbitral Tribunal to conclude that the state, neither in its pleadings nor in the evidence, has adequately justified under objective criteria that the legal action to settle the accounts of the Contracts had not lapsed.

659.    This situation will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

**5.2.2. RESOLUTION 576**

660.    National Mining Agency Resolution 576 is dated 27 September 2018[559]. The resolution sets out in its recitals the assessment of the Contracts that the Vice-Presidency of the National Mining Agency carried out on 1 November 2017 and that was included in the Cundinamarca Petition[560]. After that, the resolution "proceeds to declare and collect those economic obligations derived from the execution of the Contracts"[561].

---

[557] Judgment of 16 August 2001, cited in **Doc. RL 129**, pp. 10 and 11. "*Pueden practicar [la liquidación] los contratantes por mutuo acuerdo o la administración unilateralmente, ya que el fin último es que el contrato se liquide y se definan las prestaciones a cargo de las partes. Debe advertirse, sin embargo, que ... esa facultad subsiste sólo durante los dos años siguientes al vencimiento de esa obligación, que no es otro que el término de caducidad para el ejercicio de la acción contractual*". Free translation by the Arbitral Tribunal.

[558] With reference to the Judgment of 3 May 1990. **Doc. RL 129**, footnote 11.

[559] Doc. C 35.

[560] Doc. C 35, p. 7.

[561] Doc. C 35, p. 8. "*procede a declarar y cobrar aquellas obligaciones económicas derivadas de la ejecución de los Contratos*". Free translation by the Arbitral Tribunal.

661. In this re-assessment exercise, the National Mining Agency claims royalties for the period[562]:

   - IV 2007 to II 2008 and I 2011 by applying the 12% royalty rate and deduction of 75% of costs, for Concession 1727;

   - IV 2007 to III 2012 applying the reference price according to the development of the FOB price of Resolution 293;

   - I 1998 to IV 2003 revising the deductible costs that are not causally related.

662. The Arbitral Tribunal has already noted above that Resolution 576's treatment of the substantive issues shows irregularities.

663. This irregular conduct will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

## 5.2.3. ORDER 63

664. The Comptroller General's Office Order 63 is dated 7 February 2020 and is 410 pages long[563].

665. The purpose of Order 63 is to close the preliminary investigation and open the ordinary fiscal responsibility process, to declare CMSA, among others, as alleged fiscal responsible parties, and to establish Colombia's loss in revenue in the amount of COP 619,680,857,421[564]. This figure is broken down into the following concepts[565]:

   - Unpaid nickel royalties between III 2005 and III 2007 (COP 221,213,740.897): Order 63 adjusts the costs deducted in that period, applying the 12% royalty rate and excluding all those not causally related to the exploitation of nickel[566] (such as, within the group "*Instalaciones Auxiliares*" (Auxiliary Facilities), the on-site facilities, including clinic and medical facilities, cafeteria and changing rooms[567], only allowing the deduction of 75% of those costs[568]).

   - Unpaid nickel royalties between IV 2007 to III 2012 (COP 366,367,947,662): Order 63 calculates the royalties that should have been paid, applying the base prices published by the Mining and Energy Planning Unit for that period

---

[562] Doc. C 117, p. 12.
[563] Doc. C 39.
[564] Doc. C 39, p. 407.
[565] Doc. C 39, p. 330.
[566] Doc. C 39, pp. 317 and 318.
[567] Doc. C 39, p. 314.
[568] Doc C 39, p. 322.

according to the formula of Art. 23 of the Royalties Law, without deducting any costs, on the understanding that they were not proven[569].

- Unpaid nickel royalties between IV 1982 and II 2005 (COP 9,672,273,392): Order 63 revises the costs deducted in that period, applying criteria of causal relationship and relevance to the exploitation of nickel[570].

- Unpaid iron royalties between IV 1982 and III 2012 (COP 2,426,895,470): Order 63 takes the percentage of iron royalties provided for in the Royalties Law (5%) and applies it from the beginning of the exploitation, on the basis that CMSA unjustifiably benefited from the use of state-owned iron in the exploitation of ferronickel[571].

666.    The Arbitral Tribunal has already noted irregularities in the treatment given by Order 63 to the substantive issues and the reasons given to justify the initiation of the action outside the limitation period.

667.    However, aside from that, the Claimant points out that Order 63 is a contradictory act as far as the settlement of the accounts of the Contracts is concerned. It is inconsistent with the state's previous conduct, especially Resolution 576, and there is an overlap between the two[572]. And Resolution 576 would, in turn, be contradictory to the Cundinamarca Petition[573] and this, in addition, would overlap with Order 63.[574]

668.    The Arbitral Tribunal has already determined that the existence of a double level of state scrutiny, at the hands of the National Mining Agency and the Comptroller General's Office, cannot at any time justify the existence of contradictory conduct in the review of royalties for the same period for the same reasons[575].

669.    This section of the Award deals with the state's measures taken in connection with the settlement of the accounts of the Contracts that looked back and claimed from CMSA any possible re-assessment of royalties that might be outstanding, regardless of their age, before CMSA could be released from the Contracts.

670.    But in each of these proceedings – namely the Cundinamarca Petition, Resolution 576 and Order 63 – the state reached contradictory conclusions as to the periods during which re-assessments could be made and the amount CMSA owed for them.

---

[569] Doc C 39, p. 323.
[570] Doc. C 39, p. 313.
[571] Doc C 39, p. 324.
[572] Memorial, paras. 66 and 98. Reply, paras. 13 and 282.
[573] H 1, p. 141.
[574] Memorial, paras. 13 and 134.
[575] See paras. 506 *et seq* above.

671. For clarity, the following table details the reasons why each measure decided to carry out a re-assessment, the review period and the amounts claimed[576] :

| | Royalty rate and % deductible costs | Reference price | Deductible costs | Iron |
|---|---|---|---|---|
| Cundinamarca Petition | | II 2005 – III 2007 (both Concessions) | IV 1982 – IV 1997<br><br>I 2009 – III 2012 | III 1982 – III 2012 COP 2.426.895.470 |
| Resolution 576 | IV 2007 – II 2008, I 2011 (Concession 1727) | IV 2007 – III 2012 (Concession 866) COP 120.728.618.468<br><br>IV 2007 – II 2008 and I 2011 (Concession 1727) COP 4.378.558.956 | I 1998 – IV 2003 COP 48,259,546,243.47 | |
| Order 63 | IV 2005 – III 2007 (both Concessions)<br><br>IV 2007 – III 2012 (Concession 1727) | IV 2007 – III 2012 (both Concessions) COP 366.367.947.662 | IV 1982 – II 2005 COP 9.672.273.392<br><br>III 2005 – III 2007 COP 221,213,740,897 | IV 1982 – III 2012 COP 2.426.895.470 |

672. The Respondent has not offered an explanation that adequately justifies why in each of these three measures the state body, in order to declare the settlement of accounts the Contracts, re-assessed the (allegedly) outstanding royalties in such a different manner, thus amounting to contradictory behaviour.

---

[576] Prepared by the Arbitral Tribunal on the basis of the information contained in the file.

673. This irregularity will be assessed in section V.2.2.2.1 below to determine whether it contravenes the standards of the BIT.

# V.2.2. VIOLATION OF THE BIT

674. The Claimant considers that the above measures all violated the following standard contained in Art. II. 3 and 4 of the BIT:

> "Each Contracting Party shall accord fair and equitable treatment and full protection and security in its territory to investments of investors of the other Contracting Party.
>
> 4. For greater certainty:
>
> a. The concepts of "fair and equitable treatment" and "full protection and security" do not require additional treatment to that required in accordance with international law;
>
> b. "Fair and equitable treatment includes the prohibition against the denial of justice in criminal, civil, or administrative proceedings in accordance with the principle of due process embodied in the main legal systems of the world;
>
> [...]".

675. The debate between the Parties revolves around: what is the material content of the obligation to provide fair and equitable treatment ["**FET**"] (**1.**); and, whether the measures described above constitute a breach of that material content (**2.**).

## 1. SCOPE OF FET

676. The debate is motivated by the addition of Art. II.4.a) of the BIT (quoted in simplified form):

> "For greater certainty … the concept of FET does not require additional treatment to that required in accordance with international law".

677. The BIT, as the Respondent correctly points out, sets a ceiling as to the concrete protection that FET translates into: it will not include more protection than that which applies under international law[577].

678. The question is whether this ceiling measures up to the minimum standard of treatment and, if so, what would be the protected content.

---

[577] H 2, p. 64.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

## 1.1. POSITIONS OF THE PARTIES

679. The Claimant believes, supported by previous decisions[578] that, as the "minimum standard of treatment" is a well-established concept, any expression that departs from its literal meaning must be understood as guaranteeing greater protection. And, in fact, there are at least three other investment promotion and reciprocal protection agreements signed by Colombia that explicitly mention the minimum standard of treatment – this one, however, does not. Therefore, it must be concluded that FET includes greater protection than the minimum standard.

680. The Respondent finds doctrinal support for the contention that the BIT only grants the minimum standard of treatment[579]. Furthermore, it dismisses the awards on which the Claimant relies because it considers that these awards addressed the expression "principles of international law" – which is not the same expression used in the BIT[580].

681. The Claimant posits, citing other awards[581], that the content of the minimum standard of treatment converges with the traditional FET standard. Thus: respect for legitimate expectations, the guarantee of a stable and transparent legal and economic environment and acting in good faith, as well as the prohibition of arbitrariness, would all be obligations arising from this minimum standard of treatment[582].

682. The Respondent does not fully agree, as it considers that respect for legitimate expectations and a stable legal framework are not contained in the minimum standard of treatment; but a prohibition on arbitrariness, manifest abuse, prejudice, lack of due process and violation of natural justice are[583]. The Respondent also accepts that one of the purposes of the BIT is the establishment of a fair and transparent legal framework that provides protection and security in the treatment of investments[584]. It goes on to assert that Art. II of the BIT serves precisely the purpose of creating conditions of legal certainty, so that investments are not hindered by arbitrary or discriminatory measures[585].

683. And, with particular regard to the prohibition on arbitrariness, the Respondent advocates the application of a high standard: mere incorrectness with respect to local law will not give rise to a violation of FET[586]; an arbitrary act would only be arbitrary if it consciously departs from due process, clashes with a sense of legal propriety[587], or

---

[578] **CLA Doc 71**, *Vivendi* (*Partial Award on Liability*); **CLA Doc 94**, *Global Securities (Award)* and **CLA Doc 90**, *Crystallex* (*Award*).
[579] **Doc. RL 110**.
[580] H 2, p. 66.
[581] **Doc. CLA 140**, *Rusoro Mining* (*Award*); **Doc. CLA 91**, *Murphy* (*Final Partial Award*), **Doc. CLA 50** *Rumeli Telekom* (*Award*) and **Doc. RL 23**, *Biwater Gauff* (*Award*).
[582] H 1, p. 72. Citing **Doc. CLA 154**.
[583] H 2, p. 68.
[584] Rejoinder, para. 305, citing Constitutional Court Judgment **Doc. RL-89**.
[585] Rejoinder, para. 306. citing Constitutional Court Judgment **Doc. RL-89**.
[586] **Doc. CLA 128**, *ECE* (*Award*).
[587] **Doc. RL 78**, *ELSI* (*Award*).

disregards contractually agreed obligations[588], and is also based on discretion, prejudice or personal preference[589].

684. The Claimant agrees that a measure will be arbitrary if it is not based on legal standards but on discretion[590] and adds that it will also be arbitrary if it is manifestly inconsistent, thus giving rise to considerable confusion and uncertainty[591].

## 1.2. DECISION OF THE ARBITRAL TRIBUNAL

685. The debate between the Parties as to whether the FET of the BIT is limited to the minimum standard of treatment or whether it includes additional obligations is in fact academic, as both Parties agree that the FET of the BIT (whatever its content) protects against arbitrary treatment (**A.**) and that through it the state undertakes to provide conditions of legal certainty to prevent arbitrariness from becoming an impediment (**B.**).

## A.   Arbitrary treatment

686. Arbitrary treatment is described by Prof. Schreuer as[592]:

-    A measure that is not based on legal standards, but on discretion, prejudice or personal preferences;

-    A measure taken for reasons other than the ones stated;

-    A measure taken in violation of due process and proper procedure.

687. The obligation to comply with due process was developed in *Glencore*: due process requires the administrative body to give each party an opportunity to present its case and to provide adequate evidence[593].

688. *Cairn* adds that the retroactive application of the law is arbitrary as it clashes with the rule of law and legal correctness[594]. *Bilcon* also has no hesitation in branding changes in the legal framework that operate retroactively as breaches of the international minimum standard[595].

---

[588] *A contrario*, **Doc. CLA 96**, *Glencore* (*Award*), para. 1555 (H 2, p. 96).
[589] **Doc. CLA 64**, *EDF* (*Award*).
[590] **Doc. CLA 64**, *EDF (Award)*, para. 303.
[591] **Doc. CLA 64**, *EDF (Award)*, para. 820.
[592] **Doc. RL 122**, pp. 71-72.
[593] **Doc. CLA 96**, *Glencore (Award)*, para. 1318.
[594] **Doc. CLA 99**, *Cairn* (*Award*), para. 1816.
[595] **Doc. CLA 87**, *Bilcon* (*Partial Award on Jurisdiction and Liability*) para. 572.

689. And *Von Pezold* confirms that arbitrariness is a violation of FET. Therefore, a state is expected to behave "in a consistent, even handed, unambiguous ... manner"[596].

690. So far, there is agreement between the Parties. However, there is a whole series of other awards, the relevance of which is controversial:

*Cargill*

691. The *Cargill* case has been the subject of extensive debate between the Parties as to its development of the concept of arbitrariness. *Cargill* begins its analysis on the premise of two other earlier decisions:

- *ELSI*: arbitrariness, ambiguity and inconsistency is conduct that consciously departs from due process, which clashes with, or at least challenges, the notion of legal correctness[597];

- *S.D. Myers*: in determining the existence of arbitrariness, it is important to look at whether the state made many potentially controversial decisions, and in doing so appears to have made mistakes, misjudged the facts, relied on erroneous economic theory ... and ultimately made decisions that were ineffective or even counterproductive[598].

692. On this basis, *Cargill* concludes that, in order to find arbitrariness in administrative or legal policy, it is not enough that there is an inconsistent or questionable application of administrative or legal policy; there must be a repudiation of the ultimate purpose or objective of such policy or a manifest subversion of national law or policy, guided by ulterior motives[599].

693. The Respondent derives from *Cargill* a heightened standard for assessing arbitrariness[600], and the Claimant, however, is not blind to the fact that *Cargill* relies on *ELSI* and *S.D. Myers*, which adopt an ordinary standard[601].

694. The Arbitral Tribunal considers that the debate is to a certain degree pointless, as the Arbitral Tribunal is not called upon to judge the arbitrariness of a certain administrative or legal policy implemented by Colombia, focusing on its purpose; there is no doubt that the objective of the National Mining Agency and the Comptroller General's Office's conduct was to maximise the state's revenue from royalties and to avoid a loss of assets. The question at hand is whether, in pursuit of that (legitimate) aim, it acted arbitrarily.

---

[596] **Doc. CLA 88**, *Von Pezold (Award)*, para. 546.
[597] **Doc. RL 32**, *Cargill* (Award), para. 291.
[598] **Doc. RL 32**, *Cargill* (Award), para. 232.
[599] **Doc. RL 32**, *Cargill* (Award), para. 293.
[600] **Doc. CLA 64**, *EDF* (Award).
[601] Reply, para. 265.

### *Saluka*

695. In *Saluka,* the Arbitral Tribunal considered that when the state adopts decisions that vary in their content, that are even contradictory and show inconsistent behaviour this constitutes a breach of FET[602]. The Respondent downplays *Saluka* because it considers that the quotation refers to frustration of legitimate expectations (which it considers outside the FET granted by the BIT), and not to arbitrariness[603]. The Arbitral Tribunal does not see it this way.

696. *Saluka* points out that the state's conduct was unfair and inequitable[604]; in particular, it frustrated good faith efforts to overcome the banking crisis, as the state failed to deal with the proposals in a fair, equitable, transparent and consistent manner, and unreasonably refused to engage in proper communication.

697. The Arbitral Tribunal does not interpret the above paragraph as indicating that the FET violation stemmed exclusively from a frustration of legitimate expectations. The fact that the state acts in a partial, inequitable, non-transparent, inconsistent and unreasonable manner, as described by the arbitral tribunal, is a paradigm of arbitrary behaviour. This arbitrariness may, in addition, generate a frustration of legitimate expectations, but this frustration will be a consequence of the arbitrariness and, of course, does not eliminate it.

### *Eco Oro*

698. In *Eco Oro*, in the view of the majority of the arbitral tribunal, the state acted arbitrarily. The state's actions were grossly inconsistent, gave rise to considerable confusion and uncertainty, and amount to manifest arbitrariness and grossly unfair behaviour[605].

699. In other words, *Eco Oro* determined that state bodies must act in a coordinated, consistent and coherent manner in order to avoid confusion and uncertainty and thus be labelled as arbitrary.

700. The Respondent objects to the Arbitral Tribunal being able to rely on the *Eco Oro* opinion for two reasons – but neither is convincing:

701. *First*, that the paragraphs cited by the Claimant refer to frustration of legitimate expectations, not arbitrariness[606].

702. The Arbitral Tribunal notes that the paragraphs cited by the Claimant fall within a section devoted to the analysis of whether the frustration of legitimate expectations,

---

[602] **Doc. CLA 36**, *Saluka* (*Partial Award*), paras. 417 to 419.
[603] Rejoinder, para. 400.
[604] **Doc. CLA 36**, *Saluka* (Partial Award), para. 407.
[605] **Doc. CLA 154**, *Eco Oro (Decision on Jurisdiction, Merits and Quantification Guidelines)*, paras. 820 and 821.
[606] Rejoinder, para. 388.

suffered by the investor, was acceptable from an international law perspective[607]. The Respondent infers from this that any conclusion reached in that section would merely express views on the frustration of legitimate expectations. However, the Arbitral Tribunal, for the reasons stated above, disagrees: frustration of legitimate expectations is the result of conduct. This conduct may or may not be arbitrary; and the fact that it may also be the cause of such frustration does not diminish the arbitrariness.

703. *Second*, the Respondent has argued that the decision in *Eco Oro* has been the subject of profound criticism[608]. To this end, it cites two newspaper articles. The Arbitral Tribunal has analysed the articles, and it is clear from their content that the criticism does not refer to the point at issue here, but to whether, despite the fact that the treaty in question was a new generation treaty, with areas of exclusion, in respect of which the state was free to regulate without thereby incurring a violation of international standards, the award nevertheless found that such a violation had occurred[609].

704. The object of criticism thus has nothing to do with the decisions in that award that are of interest to this one: the description of arbitrary conduct that gives rise to a violation of the treaty.

705. The relevance of the decision in *Eco Oro is* further reinforced by the fact that the treaty applicable in this case (the Canada-Colombia Free Trade Agreement)[610] and this Treaty have common elements in the regulation of the FET standard.

\* \* \*

706. The Arbitral Tribunal subscribes to the case development of the concept of arbitrariness outlined in the previous paragraphs: manifestly arbitrary measures are those that deviate from the applicable law and are abusive, discretionary and lack motivation or legal motivation in such a way as to be capricious, are grossly unfair, openly inconsistent or contradictory with previous conduct and all this in a manner that defies the very notion of legal correctness.

707. The Arbitral Tribunal adds that:

- Arbitrariness in the actions of public authorities undermines the rule of law.

- Arbitrariness is diametrically opposed to the concept of legal propriety.

---

[607] Paras. 806 *et seq*.
[608] Rejoinder, para. 389.
[609] Doc. R 79, p. 1. Doc. C 82, p. 1.
[610] **Doc. CLA 154**, *Eco Oro* (*Decision on Jurisdiction, Merits and Quantification Guidelines*), para. 700 citing Canada-Colombia treaty ("The concepts of 'fair and equitable treatment' and 'full protection and security' do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens."); BIT, Art. II.4 ("For greater certainty ... the concept of [FET] do[es] not require additional treatment to that required in accordance with international law").

- Decisions based on arbitrariness will be surprising, completely unpredictable and create legal uncertainty.

- Whoever participates in a procedure that ends in an arbitrary decision, will have acted defenceless as the analysis of his arguments will not have been the guide for the decision.

708. For all these reasons, the Arbitral Tribunal confirms that arbitrary action undoubtedly constitutes a violation of FET.

**B.    Legal certainty**

709. As discussed above, linked to the notion of arbitrariness is that of legal certainty, as an arbitrary act will create legal uncertainty.

710. Thus, the creation of legal uncertainty through an arbitrary act also constitutes a violation of FET. The Colombian Constitutional Court, when interpreting the scope of the BIT, pointed out that Art. II serves the purpose of promoting legal certainty.

711. This is recognised more broadly in *Cairn* when the tribunal asserts that individuals are entitled to predictability of the legal consequences of their conduct[611]. And, in this way, the principle of legal certainty or security finds protection within FET[612].

712. It follows that both Parties accept that arbitrary state behaviour that violates legal certainty could be contrary to FET[613].

\* \* \*

713. The following is an analysis of whether the nine measures adopted by Colombia, described in depth in the previous section of this Award and which have presented irregularities, fit within the standard for a breach of FET.

**2.    VIOLATION OF FET**

714. The Arbitral Tribunal has detected irregularities in the behaviour of Colombian state bodies, which affected CMSA. The irregularities dealt with one or more of the following matters (**2.1.**) and constitute a violation of FET (**2.2.**):

---

[611] **Doc. CLA 99**, *Cairn* (*Award*), para. 1740.
[612] **Doc. CLA 99**, *Cairn* (*Award*), para. 1740.
[613] Reply, para. 272; Rejoinder, para. 306.

## 2.1. ISSUES

715. Five matters are concerned: applicable rate and percentage deduction of expenses (**A.**), the reference price (**B.**), deductible costs (**C.**) and the iron royalty (**D.**), in addition to the settlement of the accounts of the Contracts (**E.**).

## A.   Applicable rate and percentage of deduction of expenses

716. The applicable nickel royalty rate was stated in the Contracts and in the 1985 Agreement as 8%. The percentage deduction of expenses varied and could be 80% or 100%.

717. Art. 16.2 of the Royalties Law raised the rate to 12%, and this higher rate was only applicable after the extension of the concession contract or the conclusion of a new contract. The same occurred in Art. 23 with the percentage of deductible expenses, which was reduced to 75%.

718. In reality, the higher 12% and 75% rate of deductible expenses were applied to the quarterly royalty settlements:

- For Concession 866, since IV 2007 when the term of Contract 866 was extended;

- For Concession 1727, since IV 2012 when that concession area was incorporated into Contract 51.

719. And in Ingeominas Order 50 of 2011 the state ruled on the correctness of the applicable royalty rate, claiming the 12% rate for Concession 866 only from 2007 onwards[614], and maintaining the rate for Concession 1727 at 8%[615].

720. The state now intends to increase the royalties owed under past, previously carried out settlements on account of the 12% rate and the 75% deduction of expenses:

- Resolution 576 of the National Mining Agency reviewed the settlements made for Concession 1727 during the period IV 2007 to III 2012.

- Comptroller General's Office Order 63 upheld the re-assessment of the period IV 2007 to III 2012 for Concession 1727 and added the period IV 2005 to III 2007 for Concession 866.

721. The common justification provided by the Respondent is that the July 2005 Agreements would constitute a "new contract" for the purposes of the Royalties Law, therefore, the 12% higher rate and 75% deductible expenses provided for in the Royalties Law were

---

[614] Doc. C 74.
[615] Reply, para. 122.

applicable since 2005. And that the 2011 Agreements would have made any royalty settlement provisional and therefore reviewable.

722. The Arbitral Tribunal has already determined that the state's actions imply the **retroactive application of arts. 16 and 23 of the Royalties Law** to contracts underway prior to the entry into force of the law, in violation of **legal certainty** and based on an **unreasonable justification** and completely **contradictory** to the Respondent's own previous conduct. Moreover, it is **blatantly inconsistent**:

- It was the state that included the royalty rate in the settlement formula, therefore, the rate chosen is assumedly in accordance with that which the state considered applicable. However, it is now advocating that another one – different from the one chosen at the time – should have been applied.

- The claim that the settlements were provisional until the new base prices were published in accordance with Resolution 293 in no way affects the royalty rate: even if the settlements had been revisable in the future on account of the reference price, the royalty rate would still be an independent element of such reference price in the royalty calculation formula.

## B.  Reference price

723. Art. 23 of the Royalties Law foresees a new formula for the calculation of nickel royalties, to be applied as soon as the contract is extended, or new concessions are obtained. This would not occur until IV 2007 for Concession 866 and IV 2012 for Concession 1727.

724. The new formula had to be developed in further regulation. This took 21 years to occur. In the meantime, two contractual amendments occurred:

- July 2005 Agreements: provided that the formula for the calculation of royalties remained the same as in the 1985 Agreement;

- 2011 Agreement: established that the royalty calculation formula of the 1985 Agreement, amended in one point, would be **applied provisionally** until the pending regulatory development. The Arbitral Tribunal has **rejected** the Respondent's position suggesting that the 2011 Agreement resulted in a **clear pact between the parties** to retrospectively apply the future regulatory development that would come with Resolution 293, and the Respondent's **conduct** with respect to its interpretation of the terms of the 2011 Agreement **was not consistent** with that advanced in this arbitration.

725. (i) The formula of Art. 23 of the Royalties Law, regulating the FOB price, was developed in 2015 by Resolution 293 of the National Mining Agency. The majority of the Arbitral Tribunal has rejected any irregularities in its development.

726. Based on Resolution 293, the Mining and Energy Planning Unit has published resolutions for the period III 2015 onwards, establishing the base price for the settlement of royalties. This implies a forward-looking application of Resolution 293. The majority of the Arbitral Tribunal has not detected any irregularities in these resolutions.

727. (ii) **Resolution 293** also established, in its **Art. 8**, that it would publish a series of historical prices for the re-assessment of past royalties, from the date on which the Royalties Law became applicable. To this end, **Art. 9** required the submission of historical data on production and costs.

728. Following this instruction, through its own **resolution 293**, the **Mining and Energy Planning Unit** has also published base royalty settlement prices for the period prior to III 2015. **And Resolution 576** and **Order 63** re-assess royalties for the period IV 2007 to III 2012, applying these new base prices published by the Mining and Energy Planning Unit[616]. And the **Cundinamarca Petition** intends to do the same for the period II 2005 to III 2007.

729. All these actions imply the **retroactive application** of Resolution 293, **without an express agreement** or **authorisation in the regulation** to do so.

730. And the **Cundinamarca Petition** seeks to do so to a period in which Art. 23 of the **Royalties Law** that gave rise to Resolution 293 was **not even applicable**, which is therefore **blatantly inconsistent** and **contradictory** to resolution 293 of the Mining and Energy Planning Unit.

## C. Deductible costs

731. The 1985 Agreement provided for the deduction of certain costs to determine the basis on which to apply the royalty rate in the royalty payment formula.

732. Following a Special Visit by the Comptroller General's Office to CMSA in 2012, the question arose as to whether for the costs to be deductible, these had to be causally related to the operation.

733. The National Mining Agency responded, in a Memorandum, that the 1985 Agreement did not establish such a requirement and that the deductions made by CMSA had been made in accordance with regulations.

734. In **Order VSC 26** of 12 March 2015, the National Mining Agency changed its mind and re-assessed royalties for the period I 1998 to IV 2003 in order, among other things, to exclude costs (supposedly) lacking a causal relationship with the exploitation; this being **openly contradictory** with respect to its previous conduct. The same Order VSC 26 disregarded the costs of freight and insurance for lack of proof although there was

---

[616] Resolution 576 only does so for the period IV 2007 to II 2008 and I 2011 for Concession 1727.

no legal obligation at that time to keep the supporting record. Therefore, it was a decision that **demanded compliance with a non-existent legal obligation without providing a reasonable justification,** thus leaving CMSA **defenceless** and **violating legal certainty** and **due process**.

735. **Resolution 576** of the National Mining Agency claims the same amount[617] for resettlement and is affected by the **same irregularities**.

736. The **Cundinamarca Petition** is a legal action brought by the National Mining Agency to obtain the judicial settlement of the accounts of the Contracts. As a result of this settlement, it seeks to review the costs deducted in the periods IV 1982 to IV 1997 and I 2009 to III 2012, questioning their causality and thus showing the **same irregularities** already noted.

737. **Order 217** of the Comptroller General's Office contradicts the conclusions reached in Order VSC 26, **constituting an openly contradictory action** by the state.

738. Likewise, **Order 217** and **Order 63** re-assess royalties for the period I 1998 to IV 2003 and the Respondent has **not provided a reasonable justification** demonstrating that those fiscal responsibility **actions** initiated were not **time-barred**, thus **causing legal uncertainty** and **defencelessness** to those who are forced to defend themselves against a claim based on events that occurred 30 years ago, violating the principle of **due process**.

739. In addition, **Order 63** revises the same period already subject to re-assessment by Order 217 and whose sentence had **already been paid** by CMSA. The state thus tried to tax the same period twice for the same reason, resulting in a manifest **abuse** and a **violation of legal certainty**.

740. In its determination of deductible costs **Order 63** incurs in **evident contradictions:**

   - Regarding the opinion of the National Mining Agency, shown in the Memorandum, on the requirement of causality of expenditure, over the same time period;

   - Regarding the period that merits investigation for the same cause, according to the National Mining Agency;

   - Regarding the re-assessment of royalties carried out by the National Mining Agency and the Comptroller General's Office itself in Order 217, for the same cause;

---

[617] Except for a minimal part paid by CMSA voluntarily, as a matter independent of the causality requirement between expenditure and operation.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

- With regard to Order 1334 of the Comptroller General's Office concerning the deductibility of the cost of transport corresponding to iron.

741. Order 63 also presents irregularities in its decision to omit deductible costs for the period IV 2007 to III 2012 due to insufficient evidence: it considers the evidence of expenses to be insufficient due to the format in which it was presented. In view of this insufficient evidence, it omitted the deduction of costs from the formula for calculating the royalty. This behaviour is **abusive**, as the state radically fails to apply the only part of the royalty calculation formula that benefits CMSA and to which CMSA is entitled according to Art. 23 of the Royalties Law. Moreover, this decision is **blatantly contradictory**:

- With the BDO audit which partially coincides with the period under review and yet managed to review the costs;

- With resolution 293 of the Mining and Energy Planning Unit which published base prices using the cost information provided;

- With Order VSC 351 of the National Mining Agency that validated the adequacy of the format in which CMSA presented the accounting information.

**D.    Iron royalty**

742. CMSA mines a nickel ore deposit. Nickel is present in the ore in a close molecular bond with iron oxide. After iron and steel processing, the ore is transformed into ferronickel, which is the product marketed by CMSA. In the Cerro Matoso deposit there is no other mineral that can be exploited apart from nickel, and this mineral, because of its intrinsic characteristics, cannot be processed into any product other than ferronickel.

743. For 40 years CMSA has only paid nickel royalties, as provided for in the Contracts and the Royalties Law. Nickel royalties are calculated on the value of the nickel contained in the ferronickel, this being the element that gives value to ferronickel. The iron contained in ferronickel does not add value to ferronickel.

744. 40 years later, the state claims iron royalties for the first time, based on the proportion of iron contained in the ferronickel, on the grounds that CMSA would be profiting from the exploitation of this state-owned iron without contributing in return.

745. The Arbitral Tribunal has concluded that the iron royalty claim is contrary to the Parties' agreement contained in the Contracts and the Royalties Law and, therefore, is a claim **without a legal and economic basis**. Moreover, it is **abusive** to tax the value of ferronickel with this new royalty when such value is already fully levied by the nickel royalty.

746.   The **Cundinamarca Petition**, **Orders 206 and 62** of the National Mining Agency and **Order 63** of the Comptroller General's Office, which claim royalties on iron, evidence the irregularities pointed out.

## E.    Cross-cutting settlement measures

747.   Through the **Cundinamarca Petition**, the state initiated a lawsuit to settle the accounts of the Contracts. And within this lawsuit it sought to reopen past royalty settlements.

748.   The Arbitral Tribunal has concluded that the reopening of the settlement of royalty claims resulting from the settlement of a contract has no reasonable and consistent justification according to the applicable standards. Nor has the Arbitral Tribunal found sufficient legal grounds to support, as the Respondent claims, that the royalty claim was initiated within the limitation period. As the Colombian Council of State itself argues[618], this action represents a violation of legal certainty. This causes clear defencelessness especially when, through this review of royalties, the state seeks to reassess events that took place 30 years earlier. All of this leads to a violation of the principle of due process.

749.   Likewise, these **same irregularities** affect **Resolution 576 and Order 63**, which also seek to reopen royalty settlements on account of the settlement of the accounts the Contracts. Moreover, the three measures are **openly contradictory**, as they determine in different ways the reasons for the reopening of the settlements, the periods over which they operate and the amounts that are due.

## 2.2.   ASSESSMENT OF THE VIOLATION

750.   The Claimant has qualified the above measures as arbitrary for being unreasonable[619], lacking justification[620], and not being based on legal standards[621], allowing retroactive regulatory application[622], for being inconsistent with prior conduct of the state[623] and contrary to due process[624] as well as for violating legal certainty[625].

751.   The Tribunal agrees, having described the irregularities, noted in the previous section, as follows:

-      Blatantly inconsistent actions;

-      Actions lacking a basis within the applicable standards;

---

[618] With reference to the Judgment of 3 May 1990. **Doc. RL 129**, footnote 11.
[619] H 1, pp. 150, 176 y 180.
[620] H 1, p. 161.
[621] H 1, pp. 122, 150, 168, 177 y 197.
[622] H 1, pp. 149 y 150.
[623] H 1, pp. 141 y 197.
[624] H 1, pp. 161 y 174
[625] H 1, pp. 161 y 174.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

- Actions which are manifestly contradictory or have contradictory reasoning;

- Actions resulting from judicial and/or administrative proceedings without reasonable justification as to the tardiness of the claims brought.

752. Resulting in:

- Discretionary and capricious behaviour;

- Legal uncertainty;

- Defencelessness and violation of due process;

- Abusive claims.

753. The Arbitral Tribunal also considers that:

- The retroactive application of the law is not only unlawful conduct, but also creates absolute uncertainty as to which legal framework was applicable, resulting in total defencelessness; the state applies a law that did not exist to legal situations or relationships already developed under a different law – thus affecting basic notions of legal certainty;

- Blatantly inconsistent reasoning is tantamount to an absence of reasoning and a decision lacking reasoning exposes the subjects affected by that decision to arbitrary outcomes;

- Contradictory decisions create a sense of deviation from the law, subjectivism and of capricious elements in decision-making by public authorities who, judging the same alleged irregularities, arrive at different conclusions;

- Decisions that have no basis in the applicable standards or apply them in a grossly erroneous manner are discretionary;

- The limitation period serves the dual purpose of, (i) sanctioning the inactivity of the holder of an action or a right, imposing the consolidation of a legal relationship, thus contributing to the legal security of the counterparty; and (ii) ensuring that a citizen has ample possibilities to defend himself – possibilities that diminish as time goes by. Ignoring the principle of the limitation period, especially when a long time has passed, means initiating an action in which the citizen's ability to defend himself will be seriously impaired and the decision adopted by the public authorities in this process will not, therefore, be the result of an adversarial procedure in which the principles of due process have been guaranteed as they should be;

- Admitting as the only possible evidence documents whose legal retention obligation has expired places the person under investigation in a situation of

148

absolute lack of defence and results in abusive state behaviour contrary to due process;

- The abusive claims are not the result of the correct application of the law, but of the exploitation of a position of superiority of the public authorities vis-à-vis the investigated party.

754. The Arbitral Tribunal finds that the above conduct resulted in state actions that undermine the very notion of legal correctness, and the irregularities meet the requirements of the high standard that the Respondent itself recognises as applicable for state conduct to reach the threshold required to become an internationally wrongful act.

755. <u>In conclusion</u>, the Arbitral Tribunal finds that Colombia has breached Art. II.3 of the BIT, by which it committed to provide fair and equitable treatment to British investors, through the following measures [the "**Measures in Breach**"]:

- Arts. 8 and 9 of Resolution 293 (of the National Mining Agency);

- resolution 293 (of the Mining and Energy Planning Unit);

- Order VSC 26;

- Order 217;

- Orders VSC 206 and 62;

- Cundinamarca Petition;

- Resolution 576;

- Order 63.

756. On the other hand, a majority of the Arbitral Tribunal has decided that Resolution 293 of the National Mining Agency, in its development of the FOB price[626], as well as the resolutions of the Mining and Energy Planning Unit issued for the period III 2015 onwards, are acts that do not lead the Arbitral Tribunal to believe that Colombia has violated Art. II.3 of the BIT.

---

[626] This is not the case with Arts. 8 and 9 on the publication of historical price series and the requirement to provide historical data for the purpose of royalty re-assessments, in retrospective application of Resolution 293.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Award

# V.2.3. CLAIM FOR COMPENSATION

757. *Chorzów* points out that compensation for damages must be sufficient to "wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed"[627].

758. Both Parties have referred to *Chorzów*[628] as a benchmark for compensation:

   - The Claimant relies on the principle of full compensation for its claim for damages[629].

   - The Respondent has not denied the relevance of *Chorzów* for the principle of full reparation; it has only questioned whether restitution is an available remedy in investment arbitration[630].

759. Based on the principle of full reparation, the Claimant claims compensation, as a consequence of a breach of FET, which is essentially divided into two categories: the damage that has already occurred (**1.**) and that which it alleges is yet to come (**2.**).

## 1. HISTORICAL DAMAGES

760. The Claimant seeks an award of USD 90 M for overpaid royalties. But for the Measures in Breach, CMSA would not have made such a disbursement[631].

761. The Arbitral Tribunal will first analyse the monetary claim (**A.**) and then calculate the amount actually due (**B.**) and specify the award (**C.**).

## A. The claim

762. The claimed amount of USD 90 M arises from three sets of measures[632]:

   - (i) Reference price due to application of the FOB price: Resolution 293 of the National Mining Agency and the resolutions of the Mining and Energy Planning Unit for the period III 2015 onwards;

   - (ii) Deduction of costs: Comptroller General's Office Order 217;

   - (iii) Iron royalty: all iron royalty payments made under, *inter alia*, National Mining Agency Orders 206 and 62.

---

[627] **Doc. CLA 1**, *Chorzów* (*Award*), p. 47.
[628] **Doc. CLA 1**, *Chorzów* (*Award*).
[629] Memorial, para. 239.
[630] Rejoinder, para. 528.
[631] Claimant's PHB, para. 261.
[632] Joint Valuation Model, Control Panel.

763. The Arbitral Tribunal has previously stated that:

764. (i) In a decision adopted by majority, it does not find any irregularity in the setting of the FOB reference price in Resolution 293 of the National Mining Agency and that its prospective application, from III 2015 onwards, through resolutions of the Mining and Energy Planning Unit, does not involve any irregularity either.

765. The majority of the Tribunal therefore decides that there is no award for damages under this heading. The Arbitral Tribunal notes that this was the largest category of damages for which the Claimant sought compensation.

766. (ii) The recalculation of past royalties, on account of deductible costs, carried out by Order 217 of the Comptroller General's Office took place through a fiscal liability action which the Arbitral Tribunal has considered to be an arbitrary measure, in violation of the BIT.

767. The amount claimed for this item is USD 5,143,261 valued as of 27 July 2023[633].

768. (iii) The claim for royalties on iron lacks a legal basis and constitutes an abuse, since the royalty on nickel is already levied on the full value of ferronickel. Therefore, the Arbitral Tribunal has understood this to be an arbitrary measure, in violation of the BIT.

769. The amounts claimed for this item are USD 647,007 and USD 101,800 valued as of 27 July 2023[634].

## B.    <u>Quantification</u>

770. The Arbitral Tribunal is called upon to compensate the Claimant for the amount CMSA paid for royalties claimed in three of the Measures in Breach.

771. According to the record CMSA paid:

   - COP 10,114,904,678 on 18 May 2018 to settle the payment of Order 217[635];

   - COP 2,986,706,855 on 24 April 2020, to settle iron royalties for the period IV 2012 to IV 2019[636]; this amount included interest for late payment and, apparently, this was calculated in excess of what was actually due, so the National Mining Agency returned COP 963,921,751.66[637]. In total, therefore, CMSA paid COP 2,022,785,104[638].

---

[633] Joint Valuation Model, Control Panel.
[634] Joint Valuation Model, Control Panel.
[635] Doc. CLEX. 19.
[636] Doc. CLEX. 20.
[637] Compass Lexecon ER I, footnote 83 adds, in error, "million" after the figure.
[638] Joint Valuation Model, Iron 1982-22.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

- Quarterly, iron royalties accrued between I 2020 and I 2022 totalling COP 475,689,658[639].

772. The iron royalty payments led, in turn, to a reduction of the income tax from which CMSA benefited[640]. The economic experts agree that the damage should be calculated net of this tax effect.[641]

773. Below is a summary table of the payments made:

| | Date of payment | Period | Amount (in COP) | Tax rate | Net amount (in COP) |
|---|---|---|---|---|---|
| Order 217 | 18.05.2018 | I 1998 – IV 2003 | 10,114,904,678 | N/A | |
| Order VSC 206 Order VSC 62 | 24.04.2020 | IV 2012 – IV 2019 | 2,022,785,104 | N/A | |
| Iron royalties | 24.04.2020 | I 2020 | 51,082,430 | 32% | 34,736,052 |
| | 13.07.2020 | II 2020 | 49,356,468 | 32% | 33,562,398 |
| | 14.10.2020 | III 2020 | 53,264,284 | 32% | 36,219,713 |
| | 18.01.2021 | IV 2020 | 30,870,342 | 31% | 21,300,536 |
| | 16.04.2021 | I 2021 | 39,686,623 | 31% | 27,383,770 |
| | 15.07.2021 | II 2021 | 53,786,385 | 31% | 37,112,606 |
| | 14.10.2021 | III 2021 | 54,337,546 | 31% | 37,492,907 |
| | 17.01.2022 | IV 2021 | 63,748,251 | 35% | 41,436,363 |
| | 18.04.2022 | I 2022 | 79,557,329 | 35% | 51,712,264 |

---

[639] Joint Valuation Model, Iron 1982-22.
[640] Not so with the payment of Order 217, as it had retroactive effects (see note in Joint Valuation Model, Costs 1998-03).
[641] Joint Valuation Model, Iron 1982-22.

<u>The debate</u>

774. The first point of disagreement between the economic experts concerns the currency in which these historical damages should be calculated:

   - The Claimant submits that, even if the damage was incurred in COP, it should be converted to USD at the historical point in time and that USD amount will accrue interest at the WACC until the present[642];

   - The Respondent submits that the amounts should remain in COP and be brought to the present by applying 12% simple interest, at which time they should be converted to USD[643].

775. The Claimant points out that the primary obligation of a state to allow full reparation of a damage to take place is to make financial compensation[644]. The Respondent has not denied this.

776. *First*, the Arbitral Tribunal considers, in application of the above premises, that, to the extent that the excessive royalty payment was made in COP, the damage occurred in COP and, therefore, there is no reason to convert the currency to USD at the historical moment of occurrence of the damage.

777. *Second*, as to the rate of capitalisation, 12% interest is the simple rate that Colombia charges as default interest[645]. It seems reasonable that this is the same rate to be paid on the COP amounts it has pocketed as a consequence of the adoption of measures contrary to the BIT.

778. According to the Joint Valuation Model, prepared by both economic experts, as of 27 July 2023, the total amounts in COP would amount to: 16,416,628,853 (Order 217) and 3,218,389,887 (iron royalties)[646].

779. 27 July 2023 is the notional Award date, or valuation date, used by the experts in their Joint Valuation Model.

---

[642] Overview of Joint Valuation Model, p. 8.
[643] Overview of Joint Valuation Model, p. 8.
[644] Claimant's PHB, para. 168.
[645] Kaczmarek ER I, para. 377.
[646] Joint Valuation Model, Control Panel.

## C.    Award

780. The Claimant, South32 Investments Limited, the parent company of CMSA, is the one seeking compensation. The Respondent has not objected, but has pointed out that two adjustments should be made to the awarded amount:

781. (i) Adjustment for withholding tax on dividends: both experts seemingly accept the hypothesis that the damage suffered by South32 Investments Limited due to the excess royalties paid by its subsidiary, CMSA, would have resulted in a lower value of dividends receivable.

782. According to the information provided by the experts[647], from 2017 onwards, Colombia started taxing dividends, applying a withholding tax of 5% between 2017 and 2018, 7.5% in 2019, 10% between 2020 and 2022, and 20% thereafter. Since the withholding tax is currently 20%, the Respondent requests that the Tribunal reduce the compensation owed in the same proportion[648].

783. The experts have not followed the Respondent's suggestions, but instead have applied the withholding tax in force at the time each royalty settlement was paid: 5% in 2018 when Order 217 was paid[649] and 10% between 2020 – 2022 when the iron royalty settlements were paid[650]. The Arbitral Tribunal considers the adjustment as calculated by the experts to be correct, ensuring that the amount of historical damages is as close as possible to reality.

784. Thus, the amounts of Order 217 and of the iron royalties, adjusted by the withholding tax, are as follows: COP 15,595,797,410 and COP 2,896,550,898, respectively[651]; in total, COP 18,492,348,308.

785. (ii) Ownership adjustment: South32 Investments Limited owns almost all, but not all, of CMSA; both experts agree that the amounts should be reduced by the missing 0.06%[652], meaning that all amounts are to be multiplied by 99.94%. Thus, damages are reduced to COP 18,481,252,899.

786. The Respondent, which did object to the historical costs being converted to USD, does not seem to object to the award being in USD.

---

[647] Overview of Joint Valuation Model, para. 12.
[648] Respondent's PHB, para. 209.
[649] Joint Valuation Model, Cost 1998-03, Cell L6 is the result of the following formula incorporating a 5% retention, highlighted in red and bold:
=IF('Control Panel'!$E$58="COP";H6/I6;J6*K6)*(1-CHOOSE('Control Panel'!$D$71;**0,05**;0))
[650] Joint Valuation Model, Iron 1982-22, Column P includes in its formula a retention of 10%. See, for example, the formula for I 2020 (Cell P14), with the 10% retention highlighted in red and bold:
=IF('Control Panel'!$E$58="COP";N14*O14;L14/M14)*(1-CHOOSE('Control Panel'!$D$71;**0,1**;0))
[651] Joint Valuation Model, Control Panel.
[652] Overview of Joint Valuation Model, para. 11.

787. As of the notional date of the Award, the Claimant's damages amount to USD 4,519,417, according to the Joint Valuation Model. This is the amount which this Award orders to be paid.

<u>Alleged prematurity</u>

788. The Arbitral Tribunal is not oblivious to the Respondent's jurisdictional objection that any payment order would be premature, as the Measures in Breach at issue are pending before Colombian courts.

789. The Respondent relies on *Achmea* and *BBVA* to support its objection[653]. However, neither of these citations actually seems relevant:

- In *Achmea* the arbitral tribunal noted that a claim for expropriation where the seizure has not occurred is premature[654] – the Arbitral Tribunal is inclined to agree, but in this case a violation of the BIT by expropriation is not at issue;

- In *BBVA,* the arbitral tribunal referred to a penalty, the imposition of which it did not judge under the treaty[655], being challenged before the courts and which, as the judicial outcome was unknown, was an accounting contingency that the arbitral tribunal omitted when determining the fair market value of the shareholdings[656]. It thus agreed with the investor that it should not reduce the compensable damage[657]. The relevance of this case for the purposes invoked is questionable. Even though the award would appear to recognise that the prematurity of a claim for a penalty whose harm had not materialised, it ultimately recognised that the effect of the future penalty should not adversely affect the value compensable to the investor. In any event, those facts are far removed from the present case, because the Arbitral Tribunal has indeed ruled that Orders 217, 206 and 62 violate the BIT and, moreover, CMSA has indeed paid the amounts identified in those violative rulings.

790. Therefore, the Arbitral Tribunal finds that the amount awarded constitutes damage suffered by CMSA (and, in a slightly reduced form, by the Claimant), as a result of Measures in Breach of the BIT (Orders 217, 206 and 62 and the iron royalties) – the claim is thus not premature.

791. That being said, it is true that:

- Comptroller General's Office's Order 217 is currently under judicial review[658];

---

[653] Respondent's PHB, para. 40.
[654] **Doc. RL 50**, *Achmea* (*Decision on Jurisdiction and Admissibility*), para. 236.
[655] **Doc. RL 127**, *BBVA* (*Award*), para. 651.
[656] **Doc. RL 127**, *BBVA* (*Award*), paras. 908 y 911.
[657] **Doc. RL 127**, *BBVA* (*Award*), paras. 651 y 652.
[658] Counter-Memorial, para. 250.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

Award

- The iron royalty claim contained in the National Mining Agency's Orders 206 and 62 was rejected in the Iron Award, whose annulment is under judicial review[659].

792. If successful in any of these proceedings, CMSA cannot seek compensation for the same measures beyond 0.06% of the amount of damages, as 99.94% of its damages will already have been compensated to its parent company, South32 Investments Limited, with the payment of the amounts awarded in this Award. In the event of seeking further compensation once the amounts ordered in this Award are paid, the Respondent shall always have the possibility to prove before local courts that this Award has been duly complied with and exhibit proof of payment and of raising any defences that may be appropriate.

793. And, in fact, the Claimant has acknowledged as much when it states that, in the event of obtaining the compensation sought in this arbitration, such an order would make the Claimant whole[660].

## 2. FUTURE DAMAGES

794. The Claimant also seeks compensation for three other sets of damages:

- For the Measures in Breach that have not yet been enforced, the Claimant requests their revocation and/or cessation (**A.**);

- In the event that Colombia does not cease and decides to continue with the enforcement of the Measures in Breach, as well as with the settlement of nickel royalties applying the FOB price of Resolution 293[661] and demanding iron royalties[662], it requests compensation (**B.**);

- The Claimant requests compensation in the event that the above indemnities are diminished by the effect of taxation, (**C.**).

## A. Petition for revocation and/or cessation of the Measures in Breach

795. The Claimant requests that the Arbitral Tribunal order the National Mining Agency, the Comptroller General's Office and the Mining and Energy Planning Unit to cease any action in violation of the BIT and, in particular, to proceed with the revocation of[663]:

- Order VSC 26 of the National Mining Agency;

---

[659] Rejoinder Jurisdiction, footnote 177.
[660] Memorial, para. 266.
[661] Compass Lexecon ER I, para. 54.
[662] Compass Lexecon ER I, para. 61.
[663] Claimant's PHB, para. 261..

-    Resolution 293 of the National Mining Agency;

-    Cundinamarca Petition of the National Mining Agency;

-    Resolution 576 of the National Mining Agency and the withdrawal of any opposition to CMSA's attempts to review its validity;

-    Order 63 of the Comptroller General's Office.

796.    The Respondent opposes this request because it considers that the BIT does not provide for cessation and non-repetition as possible remedies[664]. And, in the absence of an agreement in this regard in the BIT, the principle of state sovereignty applies, which prevents the Arbitral Tribunal from issuing this type of order that revokes measures[665]. This, it claims, is what *Eiser*[666]*, Cube*[667]*, RREEF*[668]*, Masdar*[669] recognise.

797.    The Claimant, for its part, cites *Cairn*[670] which does contain a cessation and non-repetition order; but the Respondent criticises the citation of *Cairn* as misguided, since it is an annulled award in a case where the state did not object to the cessation and non-repetition order[671].

798.    The Arbitral Tribunal notes that Colombia's main point of concern is that the Arbitral Tribunal could order the revocation of the measures. The Respondent rejects this possibility, relying on a whole series of awards that have denied "restitution" as an appropriate remedial action, defending the sovereignty of the state to maintain its regulatory framework as it sees fit.

799.    The case at hand is different, as the measures whose revocation or cessation the Claimant seeks are not purely legislative acts. They are fundamentally measures that quantify CMSA's debt for the reopening of the royalty settlement. Unlike in the cases cited by the Respondent, it is not a question of the Arbitral Tribunal ordering the repeal of general legislation with effects on third parties. But it is also true that Resolution 293 could have theoretical application to third party nickel producers.

800.    The *Cairn* case, insofar as its factual basis, is much closer to the present case. That arbitral tribunal ordered the state to neutralise the effects of an illegitimate tax claim by revoking it, and to refrain from pursuing such a claim by any other means[672]. The fact that the award was annulled does not seem to be a strong point either, especially

---

[664] Respondent's PHB, para. 196.
[665] Respondent's PHB, para. 197.
[666] **Doc. RL 66**, *Eiser* (*Award*), para. 425.
[667] **Doc. RL 75**, *Cube* (*Decision on Jurisdiction, Liability and Partial Decision on Amount*), para. 460.
[668] **Doc. RL 71**, *RREEF* (*Decision on Liability and the Principles of Quantum*), para. 473.
[669] **Doc. RL 69**, *Masdar* (*Award*), para. 562.
[670] Claimant's PHB, para. 172.
[671] Respondent's PHB, para. 198.
[672] **Doc. CLA 99**, *Cairn* (*Award*), p. 581.

when the Respondent has also invoked annulled awards[673]. That being said, it is true that in *Cairn* the state did not object to a revocation order – the award itself acknowledges as much[674] and in this case it did.

801. In view of the foregoing, the Arbitral Tribunal is prepared to show deference to Colombia's sovereignty and not order the intended revocation of the measures.

802. The Claimant has also presented a request for a cessation and non-repetition order which raises an additional difficulty.

803. The Claimant relies[675] on Art. 30 of the ILC Articles[676]:

> "Cessation and non-repetition
>
> The State responsible for the internationally wrongful act is under an obligation (a) to cease that act, if it is continuing; and (b) to offer appropriate assurances and guarantees of non-repetition, if circumstances so require".

804. The Respondent denies that the action contained in Art. 30 is available to the Claimant; in its view, it only applies to inter-state disputes, as it is contained in Part Two of the ILC Articles[677]. The Respondent bases its argument on Art. 33.1 of the ILC Articles:

> "The obligations of the responsible State set out in this part may be owed to another State, to several States, or to the international community as a whole, depending in particular on the character and content of the international obligation and on the circumstances of the breach".

805. The Arbitral Tribunal notes that the official commentary of the ILC Articles seems to agree with the Respondent in relation to Art. 28[678]:

> "[...] Part Two has a more limited scope. It does not apply to obligations of reparation to the extent that these arise towards or are invoked by a person or entity other than a State."

Claimant's counter-argument

806. The Claimant considers that the ILC Articles reflect principles of customary international law in matters of state responsibility as has been recognised by previous awards, and are therefore applicable[679].

---

[673] See **Doc. RL 50**, *Achmea (Decision on Jurisdiction and Admissibility)*.
[674] **Doc. CLA 99**, *Cairn (Award)*, para. 1871.
[675] Claimant's PHB, para. 171.
[676] **Doc. CLA 19**.
[677] Counter-Memorial, para. 451.
[678] **Doc. CLA-019**, pp. 87 – 88.
[679] Reply, para. 466.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

807. In this regard, the Arbitral Tribunal notes that cases such as *Quirobax* point out that the rules contained in Part Two of the ILC Articles have served as a guide for many tribunals in investor-state arbitrations[680] And, according to *Quirobax*, the decisive factor is whether the action pursued would also have value in a dispute between an investor and a state[681].

808. The Tribunal does not consider that, in the present case, the proposed cessation order can have a reciprocal value for the investor and the state: it is very broad and includes not only the suspension of the execution of resolutions and orders containing royalty re-assessments, but also the abandonment of and/or waiver of legal actions.

809. The Arbitral Tribunal, not being called upon to decide on the legality of the Measures in Breach under local law, sees no reason nor value for the state in preventing jurisdictional actions which do have to decide on such legality from taking their course. Therefore, the Tribunal does not consider that Part Two of the ILC Articles is of any use in the present case.

810. That being said, the Arbitral Tribunal has already judged the Measures in Breach to be contrary to the BIT. As pointed out in *Glencore*[682] in a similar situation: the Colombian authorities should take into consideration the Arbitral Tribunal's ruling on the Measures in Breach in their future actions.

**B.     Compensation for future damages**

811. There are three groups of damages which have not yet occurred and which the Claimant seeks to be compensated. Before going into their analysis (**b.**), the Arbitral Tribunal has to address the Respondent's objection to the adequacy of this type of claim for compensation (**a.**).

**a.     Objection**

812. The claim for future damages has a value of around USD 350 M[683]. Despite its significance, it has not been the most debated issue between the Parties.

813. The Respondent outlines some arguments to oppose this claim for damages, which the Arbitral Tribunal will analyse in detail, taking into account the relevance of the claim for damages. The Arbitral Tribunal notes that, for the majority of its members, none of these arguments are convincing:

---

[680] **Doc. CLA 137**, *Quirobax (Award)*, para. 555.
[681] **Doc. CLA 137**, *Quirobax (Award)*, paras. 559 and 560.
[682] **Doc. CLA 96**, *Glencore (Award)*, para. 1673.
[683] USD 73,615,156 for the application of the Resolution 293 FOB price in the determination of the reference price (Joint Valuation Model, Control Panel, Forward Looking Damages with Extension) + USD 276 M for the enforcement of the Measures in Breach (H 1, p. 199).

814. *First*, Colombia emphasises that the damage claimed is entirely hypothetical and uncertain; therefore, the claim for compensation is wholly inappropriate and infringes on state sovereignty[684].

815. The Arbitral Tribunal has determined the existence of Measures in Breach, which already quantify the royalties being claimed[685]. And the state's enforcement of these Measures in Breach is a foreseeable scenario, in view of the fact that the state has already tried to enforce one of them (Order 576, through Payment Order 692[686]), warning of the possibility of "*secuestro, avalúo y remate de los bienes* (seizure, appraisal and foreclosure of the assets)" of CMSA[687], in the event of non-payment.

816. The majority of the Arbitral Tribunal considers that all the elements necessary to hold the state liable for the damage caused by the implementation of the Measures in Breach are already contained in this Award – the causal link between the internationally wrongful act and the damage has been established.

817. If Colombia finally enforces the Measures in Breach, the damage, already anticipated in the content of the Measures in Breach, will occur. The damage, in that case, and once the Measures in Breach are enforced, will be certain.

818. The existing uncertainty to date only affects the materialisation of the damage. However, in the view of the majority of the Tribunal, there is no element of the causal chain leading to this damage on the existence and imputability of which the Arbitral Tribunal has not already ruled.

819. The majority of the Arbitral Tribunal considers that the difficulty that typically surrounds claims for future damages lies in the fact that there are elements of uncertainty that may affect the causation of the damage and on which the Arbitral Tribunal has not yet decided because it is unaware of them. This is not the case here, in the opinion of the majority of the Arbitral Tribunal, since the Tribunal has already stated that the re-assessment of royalties in the Measures in Breach constitutes an internationally wrongful act whose damage is already pre-determined.

820. The only pending matter is for the state to enforce the Measures in Breach and for CMSA to pay the corresponding re-assessment. These are future events which, although they have not yet occurred, do not require a new pronouncement by the Arbitral Tribunal to know whether they will form part of the causal chain – indeed, they will.

---

[684] Respondent's PHB, para. 206.
[685] Except for Resolution 293 of the Mining and Energy Planning Unit which determines base prices retrospectively.
[686] Doc. C 195.
[687] Doc. C 196, Art. 5.

821. Moreover, the Claimant has expressed its concern that, if the Tribunal were to reject the claim for compensation, it would be leaving a part of the dispute unresolved[688]. And the majority of the Tribunal agrees: in such a situation, it would make no sense to force the Claimant to commence another arbitration, simply to obtain an award of compensation for the damage that is already fixed and whose attribution the majority of the Tribunal considers to have already been decided by the Award.

822. Nor does the majority of the Arbitral Tribunal consider that the claim infringes on the sovereignty of the state, as it is a pecuniary sentence, for an amount to be determined in the future.

823. *Second*, the Respondent criticises the Claimant for failing to provide precedents granting a request similar to the one now claimed[689]. The Respondent points out that the three awards cited by the Claimant[690] simply order states to compensate the investor in the event that the state decides to tax the compensation ordered in the award. For the Respondent, the present case is different, as it is a matter of ordering compensation for future damages[691].

824. The Arbitral Tribunal has reviewed the awards cited by the Claimant and the majority of its members consider them sufficiently relevant:

- In those cases, the arbitral tribunals already anticipated that any tax levied on the compensation ordered would constitute a violation of "the obligations assumed in the BITs", as "the compensation actually paid would be less than that set out in [the] award"[692]; in this case, the Arbitral Tribunal has determined that the Measures in Breach are contrary to the BIT.

- In those cases, there was uncertainty as to whether the harm would materialise, as the state had not yet levied any tax on the compensation; in this case, there is no certainty that the harm will materialise either, as the Measures in Breach have not been enforced.

- In those cases, the arbitral tribunals decided to order future compensation, for the amount that would ultimately result, should the damage occur; in this case, the majority of the Arbitral Tribunal is called upon to do the same: should the state enforce the Measures in Breach, it must compensate the Claimant for the damage caused.

825. Moreover, the majority of the Arbitral Tribunal notes that, while the Respondent questions the relevance of the awards invoked by the Claimant for only dealing with

---

[688] Memorial, para. 241.
[689] Counter-Memorial, para. 508.
[690] **Doc. CLA 96**, *Glencore* (*Award*); **Doc. CLA 97**, *Opera Fund* (*Award*) and **Doc. CLA 92**, *Tenaris* (*Award*).
[691] Counter-Memorial, para. 509.
[692] **Doc. CLA 92**, *Tenaris* (*Award*), para. 789; see also **Doc. CLA 96**, *Glencore* (*Award*), para. 1630 and **Doc. CLA 97**, *Opera Fund* (*Award*), para. 746. Free translation by the Arbitral Tribunal.

tax indemnities, the Respondent itself has not cited any award in which an arbitral tribunal has refused to order the payment of indemnities once the internationally wrongful act and the causal link have been established – which is the case here.

826. At most, therefore, the lack of precedent would indicate that the issue Claimant raises here, regarding compensation for future damage, is exceptional.

827. But although exceptional, it is not unique. The awards cited by the Claimant are joined by another: *Lion*[693]*, which is summarised below:

### *Lion*

828. *Lion* is a case of denial of justice that led to the improper cancellation of a real estate mortgage in favour of the investor. The investor initiated – among other things – foreclosure proceedings, which it was forced to withdraw in order to commence investment arbitration. This withdrawal would foreseeably entail legal fees that were yet to be awarded. The arbitral tribunal considered that, in the absence of wrongdoing on the part of the state, the investor would not have been forced to commence such legal proceedings, nor to withdraw from them in order to be able to go to arbitration, and therefore considered that the legal fees it was ordered to pay in the future should be part of the compensation[694]:

> "Full reparation requires that Mexico assume the obligation of reimbursing Lion for such Legal Fees, in the amount finally established by the Mexican Courts and actually paid by Lion to the Debtor".

829. The majority of the Tribunal considers that in that case, as in this one, the arbitral tribunal had no qualms about ordering compensation for a future damage arising from a pending decision which had neither been quantified nor materialised, since it was sufficient to have determined that it would be the consequence of an internationally wrongful act attributable to the state.

830. *Third*, Colombia also points out that any future damages will be suffered by CMSA and not the Claimant[695].

831. The majority of the Arbitral Tribunal does not share this criticism: all the measures analysed by the Arbitral Tribunal in past sections – whether already implemented and thus constituting a materialised damage, or yet to be implemented – affected CMSA monetarily. The damage caused (or to be caused) to the Claimant is through its shareholding in CMSA. But the Respondent has not disputed that the Claimant lacked a cause of action for that reflective damage. There is no reason, therefore, to deny it in respect of future harm.

---

[693] *Lion (Award)*.
[694] *Lion (Award)*, para. 838.
[695] Rejoinder, para. 585.

832. *Finally*, the Republic argues that the request for compensation could be duplicative, as some of the Measures in Breach overlap with each other in their scope[696].

833. The Arbitral Tribunal does not consider that there is a risk of duplication in the compensation that the Claimant could obtain for future damages. While it is true that the Measures in Breach overlap – in whole or in part – in one or more of the four matters at issue (namely: applicable rate and percentage cost deduction, reference price, deductible costs and iron royalty), it is the Colombian state that must ensure that it does not tax twice for the same concept. If the state were, however, to double tax, the Claimant would be entitled to a double indemnity, as the damages would also be doubled.

**b.    Future damages**

834. The Claimant seeks compensation for future damages, with accrual of interest[697].

835. This claim for future damages concerns two types of damages:

-    The first is the harm that will arise if Colombia continues to calculate nickel royalties by applying the FOB price formula contained in Resolution 293, and claims iron royalties of USD 73,570,987 (i);

-    The second is the harm that will arise if Colombia does not cease enforcement of the Measures in Breach and imposes the payments provided for in the Measures in Breach on CMSA (ii).

836. (i) The majority of the Arbitral Tribunal has already rejected that the development of the FOB price contained in Resolution 293 constitutes an internationally wrongful act; therefore, that category of alleged future damages cannot be compensable according to the view of the majority.

837. With respect to the iron royalty claim, the Arbitral Tribunal has indeed found that it constitutes a breach of the BIT. But, insofar as the damage has not yet occurred, the Arbitral Tribunal cannot order the Respondent to proceed immediately with its payment. The majority of the Arbitral Tribunal considers, however, that it can recognise that when the damage occurs because CMSA pays royalties on the iron, the state will have an obligation to compensate the Claimant for the damage suffered.

838. (ii) When the state enforces the Measures in Breach and, as a result, CMSA pays new royalty settlements, the majority of the Tribunal believes that the state must compensate the Claimant for the damage suffered.

---

[696] Counter-Memorial, para. 510.
[697] Note that the Claimant also requested a payment order as a consequence of the implementation of the price methodology contained in Resolution 293 of the National Mining Agency, which, not being part of the Measures in Breach, lapses.

839. <u>Therefore</u>, by majority, the Arbitral Tribunal orders Colombia to hold South32 Investments Limited harmless from any damages it may suffer as a result of CMSA paying iron royalties and/or nickel royalty re-assessments contained in any of the Measures in Breach.

840. The damage suffered by CMSA does not translate into full damage to the Claimant. The Respondent has already pointed out that the Claimant's damage is reduced both by the percentage at which the state taxes dividend income and by the percentage of ownership which is 0.06% short of full ownership. The Arbitral Tribunal specifically asked at the Hearing what adjustments were necessary to translate CMSA's damage into the investor's reflexive damage[698], but none of the experts pointed to any other adjustments.

841. The majority of the Tribunal orders that compensation shall therefore be calculated as follows:

842. *First*, the amount paid by CMSA due to the enforcement of a Measure in Breach:

   - Will be converted to USD;

   - Will be reduced by the percentage at which the state taxes income obtained through dividends;

   - Will be multiplied by 99.94% (the percentage of ownership held by South32 Investments Limited in CMSA).

843. In the case of the iron royalty, moreover, and as already seen in the analysis of the historical damage, CMSA accounted for it as an expense, which led to a reduction of the income tax that should now be deducted from the compensation to be received[699]. Therefore, to the extent that future iron royalty payments lead to an income tax rebate, that amount should first be reduced by the applicable income tax percentage. Once the amount net of the tax's impact is obtained, it shall be converted into USD and reduced based on the tax on dividends and ownership.

844. *Secondly*, the resulting amount shall bear interest which shall be quantified in the manner set out in section V.3.2 below.

**C.    Compensation for tax lien**

845. The Claimant requests that the Arbitral Tribunal declare that the payment due under the Award shall be free of Colombian taxes, and that Colombia may not deduct amounts from the compensation it is ordered to pay, on account of the deduction of taxes. And,

---

[698] HT-BL, Day 2, p. 193, ll. 4-22, p. 194, ll. 1-2.
[699] See para. 772 above.

if not, that the Arbitral Tribunal hold the Claimant harmless for any taxes that the Colombian state may levy on the compensation obtained.

846. The request seeks to prevent Colombia from taxing the compensation paid, in addition to the existing taxes that have already been taken into account when quantifying the compensation. *Pro memoria*, the amounts are already net of the dividend tax – the only Colombian tax, identified by the economic experts, which is currently relevant.

847. By ordering Colombia to pay compensation net of this tax, Colombia is *de facto* taxing the compensation due with the only tax that is currently in force.

848. The Claimant seeks to prevent Colombia from extending its revenue-raising powers beyond this tax, which has already been levied. And the Arbitral Tribunal agrees with the Claimant that it would be wrong to do so, without compensating the investor again.

849. The BIT states in Art. VI.4, devoted to compensation due for expropriation (there is no reason to doubt that this commitment does not extend to compensation due for any other violation of the BIT) that the compensation must be fully realisable. Colombia therefore undertook to pay full compensation.

850. The Arbitral Tribunal considers that, if the state were free to tax the compensation to be pocketed by the Claimant, the requirement of full compensation would be frustrated. In order to ensure full and effective compensation, the amounts ordered to be paid by this Award must be considered net of further Colombian tax levies.

851. In turn, the Claimant asks to be held harmless for any tax liability that may arise in the United Kingdom for double taxation as a result of the Measures in Breach.

852. This request, however, is different. Whether the compensation received as a result of this Award is taxed in the United Kingdom is beyond the jurisdiction of this Tribunal and cannot give rise to liability on the part of Colombia. This was also the understanding of *Glencore*[700] and *Opera Fund*[701] – two decisions on which the Claimant itself relies[702].

---

[700] **Doc. CLA 96**, *Glencore (Award)*, paras. 1625 *et seq*.
[701] **Doc. CLA 97**, *Opera Fund (Award)*, para. 705.
[702] Claimant's PHB, para. 178.

# V.3. <u>COSTS AND POST-AWARD INTEREST</u>

1. <u>**COSTS OF THE ARBITRATION**</u>

853. In this section of the Award, the Arbitral Tribunal shall establish and allocate the costs of this arbitration ["**Costs of the Arbitration"**]. The Arbitral Tribunal shall first determine the applicable rules as well as each category of Costs of the Arbitration (**1.1.**): the fees and expenses of the arbitrators and ICSID and the expenses incurred by the Parties for their defence in the arbitration. The Arbitral Tribunal shall then briefly summarise the Parties' claims in respect of the Costs of the Arbitration (**1.2.**). Finally, the Arbitral Tribunal shall award the Arbitration Costs accordingly (**1.3.**).

1.1. <u>APPLICABLE RULES</u>

854. Art. 61.2 of the ICSID Convention and Rule 28.1 of the Arbitration Rules govern the determination and award of costs.

855. Art. 61.2 of the ICSID Convention provides as follows:

> "[T]he Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

856. Rule 28.1 of the Arbitration Rules provides as follows:

> "Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties:
>
> (a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;
>
> (b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties."

857. The Arbitration Costs include:

- The fees and expenses of the arbitrators and the administrative fees and expenses charged by ICSID ["**Administrative Costs**"] (**A.**); and

- Reasonable expenses incurred by the Parties for their defence in the arbitration ["**Legal Costs**"] (**B.**).

## A.    Administrative Costs

858.    Art. 60 of the ICSID Convention provides as follows:

> "(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.
>
> (2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or the Tribunal concerned upon the fees and expenses of its members".

859.    In this regard, Procedural Order No. 1 stated that:

> "3.1 The fees and expenses of each Tribunal Member shall be determined and paid in accordance with the ICSID Schedule of Fees and the Memorandum on Fees and Expenses of ICSID Arbitrators in force at the time the fees and expenses are incurred.
>
> 3.2 Under the current Schedule of Fees, each Tribunal Member receives:
>
> 3.2.1 US$3,000 for each day of meetings or each eight hours of other work performed in connection with the proceedings or pro rata; and
>
> 3.2.2 Subsistence allowances, reimbursement of travel, and other expenses pursuant to ICSID Administrative and Financial Regulation 14."

860.    The ICSID Schedule of Fees changed on 1 July 2022 [the "**Schedule of Fees**"]. The Schedule of Fees provides as follows:

> "Members receive a fee of US$500 for each hour of work performed in connection with the proceeding, including each hour spent participating in hearings, sessions and meetings.
>
> 2. When travelling for hearings, sessions or meetings held away from the member's city of residence, the member receives a fee of US$250 for each hour spent travelling, either by air or by ground, to and from the location of the hearing, session or meeting. Any claim for such fees shall be calculated based on the time spent in transit, as evidenced by the relevant ticket.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

     3. Any work performed during travel may be charged at the hourly rate for work (US$500) in lieu of the hourly rate for travel (US$250)".

861. In addition to the above provisions, the Schedule of Fees deals with the *per diem* allowance (section II), travel expenses (section III) and other reimbursable expenses (section IV).

862. Furthermore, Rule 47.l.j of the Arbitration Rules provides that the Award must contain "any decision of the Tribunal regarding the cost of the proceeding".

863. In accordance with the foregoing, the fees accrued and expenses incurred by the Arbitral Tribunal and the Assistant to the Tribunal have been as follows:

|  | Fees (USD) | Expenses (USD) |
|---|---|---|
| **Guido Tawil** | 201,975.00 | 11,855.45 |
| **Andrés Jana** | 240,375.00 | 8,757.85 |
| **Deva Villanúa** | 424,000.00 | 25,575.91[703] |
| **Francisca Seara Cardoso** |  | 8,364.81 |
| **Total** | 866,350.00 | 54,554.02 |

864. Finally, ICSID's fees and expenses are as follows:

|  | Administrative Charges (USD) | Direct Expenses (USD) |
|---|---|---|
| ICSID | 220,000.00 | 82,745.75 |

865. In total, the fees and expenses of the members of the Tribunal and the fees and expenses of ICSID in accordance with the above provisions amount to USD 1,223,649.77.

---

[703] The expenses of the President of the Tribunal include the costs of the English translation of the Award, which amounted to USD 11,600.

866. In accordance with Procedural Order No. 1, the Parties made an initial deposit of USD 400,000 (USD 200,000 each)[704]. This amount is in addition to the USD 25,000 registration fee paid by the Claimant at the outset of the proceedings. During the course of the proceedings, the Parties made additional deposits of USD 500,000, USD 200,000 and USD 300,000, respectively[705]; these amounts were paid in halves between the Parties. The entire Administrative Costs are therefore covered by the deposits made by the Parties. In total, the amount incurred by each Party was USD 611,824.89 by the Claimant and USD 611,824.89 by the Respondent. ICSID will reimburse the remaining balance to the Parties in proportion to the payments that they advanced. The final financial statement for the case will be sent to the Parties separately.

## B.    **Legal Costs**

867. On 25 August 2023, the Parties filed their Briefs for Costs [the "**Claimant's Costs**" and "**Respondent's Costs**"].

868. The Claimant submitted the following breakdown of its legal and other costs:

| | (USD) |
|---|---|
| Lawyers' fees | 6.286.658,09 |
| Expert fees | 1.587.663,97 |
| Other expenditure | 298.371,63 |
| Advances to ICSID | 725,000[706] |
| **Total** | **8,897,693.69** |

869. In turn, the Respondent claimed to have incurred the following legal and other costs:

---

[704] Letter to the Parties dated 17 November 2020.
[705] Letter to the Parties dated 19 March 2024.
[706] The Tribunal has included the updated amount of the Advances to ICSID, taking into account the payments of the additional deposits made by South32 after the submission of Claimant's Costs. The total amount is also increased by said update.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

| | (USD) |
|---|---|
| Lawyers' fees | 2.701.300 |
| Expert fees and expenses | 595.000 |
| Other expenditure | N/A |
| Advances to ICSID | 700.000[707] |
| **Total** | **3,996,300** |

870.  In addition, the Respondent declared the following additional expenses in COP:

| | (COP) |
|---|---|
| Lawyers' fees | 279.890.431 |
| Expert fees and expenses | N/A |
| Other expenditure | 12.132.826,47 |
| **Total** | **292.023.257,47** |

## 1.2. REQUESTS FROM THE PARTIES

871.  Both Parties have applied for costs against the other party.

872.  The Claimant has formulated it as follows[708]:

---

[707] The Tribunal has included the updated amount of the Advances to ICSID, taking into account the payments of the additional deposits made by Colombia after the submission of Respondent's Costs. The total amount is increased by said update.

[708] Claimant's Costs, para. 1, Free translation by the Arbitral Tribunal.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

"Claimant respectfully requests that the Tribunal order Colombia to bear the Claimant's costs in their entirety. Claimant seeks reimbursement of the following costs:

(a) the advances paid for the fees and expenses of the members of the Tribunal and ICSID's administrative fees;

(b) the legal fees of Claimant's counsel in this arbitration, namely Freshfields Bruckhaus Deringer US LLP, Dechamps International Law and Posse Herrera Ruiz, and associated disbursements;

(c) the fees and costs of the Claimant's independent experts Compass Lexecon;

(d) the fees and costs of consultants that provided hearing services to the Claimant, namely consultants from FTI Consulting, Inc (who provided trial director services during the hearing) and Evoke Legal, LLC (who provided visual graphic presentation services); and

(e) the travel costs and other expenses incurred by Claimant's witnesses and party representatives."

873. The Respondent has made the following request[709]:

"In all events, order the Claimant to pay all costs and expenses of this arbitration proceedings, plus pre-award and post-award interest thereon until the date of payment".

## 1.3. DECISION OF THE ARBITRAL TRIBUNAL

874. Art. IX.12 of the BIT states that:

"Before ruling on the merits, the tribunal shall, if it deems it to be necessary and appropriate in the circumstances, rule on the preliminary questions of competence and admissibility. When deciding on any objection of the respondent, the tribunal shall rule on the legal costs and costs of arbitration incurred during the proceedings, considering whether or not the objection prevailed. The tribunal shall consider whether either the claim of the claimant or the objection of the respondent is frivolous or an abuse of process, and shall provide the disputing parties a reasonable opportunity for comments. In the event of a claim which is frivolous or an abuse of process, the tribunal shall award costs against the claimant."

875. Beyond the above guidelines, the Arbitral Tribunal has discretion in determining how to apportion the Arbitration Costs.

---

[709] Respondent's PHB, para 214(d). Free translation by the Arbitral Tribunal.

876. The Arbitral Tribunal finds that the Respondent's jurisdictional objections were rejected and that the Claimant's substantive claims were partially granted. In view of this, the majority of the Arbitral Tribunal considers that the Respondent should be ordered to pay costs in order for the Claimant to obtain timely relief.

877. Taking into account the overall pleading and evidentiary effort made by the Parties, the practical utility of such effort, and the relative victory of the Claimant, as well as the fact that none of the claims or objections can be considered as frivolous or constituting an abuse of process, the majority of the Arbitral Tribunal finds that the Respondent should bear USD 5,050,000 in Arbitration Costs.

878. The above figure arises from the fact that, in relation to Legal Costs:

    - The Claimant was entirely victorious against the jurisdictional objections raised by the Respondent; the majority of the Arbitral Tribunal has decided to compensate the Claimant in the amount of USD 1,000,000 for this;

    - On the merits, the Claimant has persuaded the Arbitral Tribunal of the existence of the Measures in Breach contrary to Art. II.3 of the BIT, but not of the unlawfulness of the regulatory development of the FOB price contained in Resolution 293 and implemented through resolutions of the Mining and Energy Planning Unit; the majority of the Arbitral Tribunal has considered that a compensation of USD 3,300,000 should be sufficient to cover the work done on the issues on which it has prevailed;

    - Finally, with regard to compensation, the Arbitral Tribunal finds that: (i) within the historical damages, practically all of them were due to the development of the FOB price contained in Resolution 293 and in the resolutions of the Mining and Energy Planning Unit – and these damages have been rejected by majority; (ii) it has also rejected the request for revocation and cessation of the Measures in Breach; and (iii) although the majority of the Arbitral Tribunal has agreed to order that the Claimant be held harmless in respect of future damages, the majority has excluded from these damages those related to the FOB price, which accounts for slightly more than one third of such future damages; the majority of the Arbitral Tribunal decides that the Claimant be compensated at USD 300,000 for this.

879. Note that the resulting amount is close to the amount paid by the Respondent in its defence. This fact reinforces – without being decisive – the reasonableness of the amount arrived at by the majority of the Arbitral Tribunal.

880. As to the USD 725,000 that the Claimant has paid to ICSID as Administrative Costs, and in view of Claimant's overall success, the majority of the Arbitral Tribunal orders the Respondent to bear USD 450,000 and to compensate the Claimant in that amount.

881.   There remains only one outstanding question: whether in the document production exercise the Arbitral Tribunal has noticed any reason that could lead it to consider that one Party should compensate the other for the expenses incurred during such exercise. This is not the case: the behaviour displayed by the Parties was very balanced and proper.

## 2.   INTEREST

882.   The Claimant requests that the amounts ordered to be paid by this Award bear interest[710] – a request to which the Respondent has not objected.

883.   The dates and amounts, relevant for accrual, shall be:

-   23 July 2023 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 4,519,417;

-   21 June 2024 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 5,050,000;

-   The date on which CMSA disburses any amount claimed in the unenforced Measures in Breach and for iron royalties, until Colombia pays South32 Investments Limited that amount converted to USD, net of dividend withholding, and multiplied by 99.96% – this amount being the principal amount on which interest will accrue.

884.   The question at issue between the Parties is the applicable interest rate. The Claimant suggests that it be CMSA's WACC compounded semi-annually[711]. The Respondent, in commenting on the capitalisation interest rate, shows its preference for the annual average of the U.S. Prime rate plus 2%[712].

885.   The Arbitral Tribunal considers that CMSA's WACC is irrelevant for the purpose of compensating the risk of non-payment of a debt that Colombia has vis-à-vis South32 Investments Limited (and not CMSA). It therefore chooses the Respondent's option which, although it was offered by the Respondent for the calculation of the capitalisation of the historical damages in USD, the Arbitral Tribunal sees no reason why it could not be equally appropriate for the calculation of the post-award interest.

886.   The Respondent's suggested calculation method, with half-yearly capitalisation, also appears to be correct.

---

[710] Claimant's PHB, para. 261.
[711] Claimant's PHB, para. 261.
[712] Overview of Joint Valuation Model, para. 25.

# VI. <u>DECISION</u>

887. For all the above reasons, the Arbitral Tribunal:

1.  Unanimously declares the jurisdiction and competence of the Arbitral Tribunal to hear the present dispute.

2.  Unanimously declares that Colombia has breached Art. II.3 of the BIT.

3.  By majority, orders Colombia to:

    (i)  Hold South32 SA Investments Limited harmless in USD by the percentage resulting from deducting the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays in execution of:

         -   resolution 293 of the Mining and Energy Planning Unit, which applies Arts. 8 and 9 of Resolution 293 of the National Mining Agency;

         -   Order VSC 26;

         -   Cundinamarca Petition;

         -   Resolution 576;

         -   Order 63.

    (ii)  Hold South32 SA Investments Limited harmless in USD by the percentage that results from deducting the tax benefit obtained from the payment of the iron royalties, the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays for the iron royalty settlements.

4.  Unanimously orders Colombia to pay South32 SA Investments Limited USD 4,519,417.

5.  By majority, orders Colombia to pay South32 SA Investments Limited USD 5,050,000 in Arbitration Costs.

6.  Unanimously orders the payment of interest at a rate equal to the average annual U.S. Prime rate plus 2%, compounded semi-annually, on:

- USD 4,519,417 accruing from 23 July 2023 until the date of actual payment;

7. By majority, orders the payment of interest at a rate equal to the average annual U.S. Prime rate plus 2%, compounded semi-annually, on:

    - The amounts resulting from items 3.(i) and (ii) above from the date on which Cerro Matoso S.A. pays the settlement until the date of actual payment by Colombia;

    - USD 5,050,000 from 21 June 2024 to the date of actual payment.

8. Unanimously declares that the payment award contained in paragraph 887(4) of this Award is made net of any taxes that Colombia may impose on the compensation received by South32 SA Investments Limited and orders Colombia to hold South32 SA Investments Limited harmless with respect to any tax that Colombia may impose on the compensation awarded.

9. By majority, declares that any other payment ordered in this Award aside from that in paragraph 887(4) is made net of any taxes that Colombia may impose on the compensation received by South32 SA Investments Limited and orders Colombia to hold South32 SA Investments Limited harmless with respect to any tax that Colombia may impose on the compensation awarded.

10. By majority, it rejects all other claims.

\* \* \*

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

**[Signature page follows. References made to footnotes therein reflect the
numbering in the Spanish version of the Award. In the English version, such
references should be read as related to footnotes 253 and 304].**

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**



_____
Prof. Dr. Guido S. Tawil
Arbitrator
*Subject to the partial dissent reflected in*
*footnotes 233 and 279*

Date:  7 June 2024

_____
Prof. Andrés Jana Linetzky
Arbitrator
*Subject to the attached dissenting opinion*

Date:

_____
Ms. Deva Villanúa
President of the Tribunal

Date:

177

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)

**Award**

| | |
|---|---|
| _____ | _____ |
| Prof. Dr. Guido S. Tawil | Prof. Andrés Jana Linetzky |
| Arbitrator | Arbitrator |
| *Subject to the partial dissent reflected in footnotes 233 and 279* | *Subject to the attached dissenting opinion* |
| Date: | Date:    10 June 2024 |

_____
Ms. Deva Villanúa
President of the Tribunal

Date:

178

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Award**

_____

Prof. Dr. Guido S. Tawil
Arbitrator
*Subject to the partial dissent reflected in*
*footnotes 233 and 279*

Date:

_____

Prof. Andrés Jana Linetzky
Arbitrator
*Subject to the attached dissenting opinion*

Date:

_____

Ms. Deva Villanúa
President of the Tribunal

Date: 7 June 2024

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**SOUTH32 SA INVESTMENTS LIMITED**

Claimant

and

**REPUBLIC OF COLOMBIA**

Respondent

**ICSID CASE NO. ARB/20/9**

---

# DISSENTING OPINION OF THE ARBITRATOR ANDRÉS JANA LINETZKY

---

*Date sent to the parties:* 21 June 2024.

# INDEX

I.    INTRODUCTION ................................................................................. 1

II.   THE DISPUTE ................................................................................... 1

III.  DISSENTING OPINION ON THE CLAIM FOR CONTINGENT FUTURE DAMAGES 2

    III.1    ABSENCE OF LEGAL GROUNDS TO ORDER FUTURE DAMAGES ............... 5

        a.   The future damages sought by the Claimant are uncertain and hypothetical. Awarding such damages is not consistent with the provisions of the Treaty and the principles applicable to damages compensation............................................ 5

            i.   The Claimant's claim for contingent future damages lacks the essential elements for awarding compensatory damages under the rules that govern economic damages ....................................................... 5

            ii.  An order for future compensation for damages that have not materialised is inconsistent with the express terms of the Treaty.................................. 8

            iii. The Claimant claims compensation for reflective losses, which increases the uncertainty as to the existence of damages.......................................... 9

        b.   There is no legal basis or precedents for granting the indemnity order sought by the Claimant ............................................................................ 10

    III.2    SYSTEMIC IMPLICATIONS................................................................ 13

IV.  DISSENTING OPINION ON THE NATURE OF THE MEASURES THAT MAY GIVE RISE TO INTERNATIONAL RESPONSIBILITY OF THE STATE............................... 15

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

## I.    INTRODUCTION

1.    I concur with the Majority on many of the conclusions reflected in the Award. However, to my regret and very respectfully, I cannot share my colleagues' decision to award an indemnity for future damages. That decision constitutes the critical disagreement that separates me from the Majority and which has compelled me to issue this partial dissenting opinion pursuant to Article 48(4) of the ICSID Convention.

2.    This opinion focuses on substantiating my dissent with respect to the Award's order granting the indemnity sought by the Claimant, which is discussed in section III of this opinion. In addition to my disagreement on that issue, and although I agree with the Majority on the overall determination that the Respondent has breached Article II.3 of the Treaty, I note that I do not share some of the reasons on which the Majority bases this conclusion, as I will discuss in section IV of this opinion.

## II.    THE DISPUTE

3.    In order to allow for a better understanding of my position, I will summarise here the underlying dispute between the Parties, only to the extent relevant for the purposes of this opinion.

4.    The present dispute relates to the indirect shareholding of South32 SA Investments Limited, the Claimant, in the Colombian company, Cerro Matoso S.A. ("**CMSA**") which operates and has operated a nickel mine in northern Colombia (the "**Cerro Matoso Project**"), on the basis of three concession contracts (the "**Contracts**").[1] Two of these contracts have already expired. CMSA currently continues to operate the Cerro Matoso Project under the terms of the third contract.

5.    Under the Contracts, CMSA has paid and will continue to pay certain royalties on the exploited mineral resources. The amount payable by CMSA for such royalties, historically and going forward, is at issue before Colombian courts, administrative authorities and local arbitral tribunals, and before the Arbitral Tribunal in this investment arbitration. Similarly, the minerals that should be subject to such royalties,[2] and the interpretation and application of the legal frameworks governing their calculation, are in dispute between the Parties in this arbitration.

6.    The Claimant has alleged that certain actions of the Colombian authorities and entities in applying, reviewing and supervising the settlement of the Contracts and payment of the

---

[1] The Contracts comprise (i) Concession Contract 866 of 1963 (C-0007); (ii) Concession Contract 1727 of 1971 (C-0009); and (iii) Exploration and Exploitation Contract 051-96M of 1996 (C-0017). *See also* Additional Agreement to Concession 866, 22 July 1970 (C-0008); Agreement between CMSA and the Ministry of Mines, 23 August 1985 (C-0013); Amendment to Concession 866, 22 July 2005 (C-0020); Amendment to Concession 1727, 22 July 2005 (C-0021); Agreement between CMSA and Ingeominas of 30 August 2011 (C-0022); Amendment to Contract 51, 27 December 2012 (C-0025).

[2] In particular, whether it should apply only to nickel or also to iron.

1

aforementioned royalties are contrary to the terms of the Treaty[3] as they violate the obligation to accord a fair and equitable treatment.

7.     As a result of this violation, the Claimant claims historical damages allegedly suffered due to an inadequate or incorrect application of the regulatory framework applicable to royalties for nickel and the reimbursement of royalties paid for iron.

8.     In addition, the Claimant seeks an order to revoke and cease certain measures or conduct of the Respondent and its institutions, or, alternatively, that it be granted a guarantee or an indemnity in respect of damages that may arise in the future as a consequence of the measures it alleges to be in breach of the Treaty.

## III.     DISSENTING OPINION ON THE CLAIM FOR CONTINGENT FUTURE DAMAGES

9.     As part of its request for relief, the Claimant has requested that the Tribunal order the Respondent to "cease any and all actions in furtherance of its breaches of the Treaty,"[4] and in the event that Colombia decides to maintain the allegedly unlawful actions and measures, that the Tribunal issue an order "provid[ing] full reparation for its breaches" setting out that the Respondent shall "fully indemnify and hold Claimant harmless in respect of any payments that CMSA may be ordered to make in respect of Colombia's unlawful Measures."[5]

10.    The Respondent opposes this request arguing, *inter alia*, that the damage for which compensation is sought is hypothetical and uncertain and that the compensation sought infringes the state's sovereignty.[6]

11.    The Award rejects the Claimant's request for revocation and cessation and accepts, by a Majority, the recognition of damages that "have not yet occurred",[7] which could result in a significant compensation in favour of the Claimant in accordance with paragraph 887.

12.    In order to facilitate the reading of this opinion, I transcribe below paragraphs 815 to 820 of the Award, which contain the relevant part of the Majority's decision:

> *815.  The Arbitral Tribunal has determined the existence of Measures in Breach, which already quantify the royalties being claimed. And the state's enforcement of these Measures in Breach is a foreseeable scenario, in view of the fact that the state has already tried to enforce one of them (Order 576, through Payment Order 692),*

---

[3] Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia signed on 17 March 2010, in force since 10 October 2014 ("Treaty") (C-0001).
[4] Claimant's PHB, ¶ 261(b)(ii).
[5] Claimant's PHB, ¶ 261(c)(ii).
[6] Respondent's PHB, ¶¶ 205-206.
[7] Award, ¶ 811.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

*warning of the possibility of "secuestro, avalúo y remate de los bienes (seizure, appraisal and foreclosure of the assets)" of CMSA , in the event of non-payment.*

*816. The majority of the Arbitral Tribunal considers that all the elements necessary to hold the state liable for the damage caused by the implementation of the Measures in Breach are already contained in this Award – the causal link between the internationally wrongful act and the damage has been established.*

*817. If Colombia finally enforces the Measures in Breach, the damage, already anticipated in the content of the Measures in Breach, will occur. The damage, in that case, and once the Measures in Breach are enforced, will be certain.*

*818. The existing uncertainty to date only affects the materialisation of the damage. However, in the view of the majority of the Tribunal, there is no element of the causal chain leading to this damage on the existence and imputability of which the Arbitral Tribunal has not already ruled.*

*819. The majority of the Arbitral Tribunal considers that the difficulty that typically surrounds claims for future damages lies in the fact that there are elements of uncertainty that may affect the causation of the damage and on which the Arbitral Tribunal has not yet decided because it is unaware of them. This is not the case here, in the opinion of the majority of the Arbitral Tribunal, since the Tribunal has already stated that the re-assessment of royalties in the Measures in Breach constitutes an internationally wrongful act whose damage is already pre-determined.*

*820. The only pending matter is for the state to enforce the Measures in Breach and for CMSA to pay the corresponding re-assessment. These are future events which, although they have not yet occurred, do not require a new pronouncement by the Arbitral Tribunal to know whether they will form part of the causal chain – indeed, they will.* [8]

13.    In addition, on future damages related to iron royalties, the Majority considers that:

*837. With respect to the iron royalty claim, the Arbitral Tribunal has indeed found that it constitutes a breach of the BIT. But, insofar as the damage has not yet occurred, the Arbitral Tribunal cannot order the Respondent to proceed immediately with its payment. The majority of the Arbitral Tribunal considers, however, that it can recognise that when the damage occurs because CMSA pays royalties on the iron, the state will have an obligation to compensate the Claimant for the damage suffered.*

*838. […] When the state enforces the Measures in Breach and, as a result, CMSA pays new royalty settlements contrary to this Award, the majority of the Tribunal believes that the state must compensate the Claimant for the damage suffered.*

---

[8] Award, ¶¶ 815-820 (footnotes omitted).

*839. Therefore, by majority, the Arbitral Tribunal orders Colombia to hold South32 Investments Limited harmless from any damages it may suffer as a result of CMSA paying iron royalties and/or nickel royalty re-assessments contained in any of the Measures in Breach.*

*840. The damage suffered by CMSA does not translate into full damage to the Claimant. The Respondent has already pointed out that the Claimant's damage is reduced both by the percentage at which the state taxes dividend income and by the percentage of ownership which is 0.06% short of full ownership[...].[9]*

14.    On this basis, in paragraph 887(3)(i)-(ii) of the Award, the Majority orders Colombia to:

*(i)    Hold South32 SA Investments Limited harmless in USD by the percentage resulting from deducting the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays in execution of:*

-    *resolution 293 of the Mining and Energy Planning Unit, which applies Arts. 8 and 9 of Resolution 293 of the National Mining Agency;*

-    *Order VSC 26;*

-    *Cundinamarca Petition;*

-    *Resolution 576;*

-    *Order 63.*

*(ii)    Hold South32 SA Investments Limited harmless in USD by the percentage that results from deducting the tax benefit obtained from the payment of the iron royalties, the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays for the iron royalty settlements.[10]*

15.    I disagree with the decision to grant the Claimant's claim for an indemnity for future damages, for reasons of a legal nature that also have systemic consequences, which can be summarised as follows.

   i.    *Absence of a legal basis to order the indemnity.* The rules governing damages in international investment arbitration do not allow compensation for uncertain or contingent damages that do not meet the requirement of materialisation of the damage and the existence of a causal link with the wrongful act. In the opinion of the undersigned, there is no legal basis under international law that grants the Tribunal the authority to issue an indemnity order to the State, requiring it to guarantee the investor the payment of future contingent damages arising from actions not yet enforced.

---

[9] Award, ¶¶ 837-840 (footnotes omitted).
[10] Award, ¶ 887(3)(i)-(ii).

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

ii.   *Systemic implications.* In the opinion of the undersigned, the lack of a legal basis for
      issuing the Majority Order raises serious systemic issues that affect the State's
      sovereignty, as it results in inappropriate interference with legal proceedings and actions
      pending before national courts and local arbitral tribunals in Colombia.

## III.1  ABSENCE OF LEGAL GROUNDS TO ORDER FUTURE DAMAGES

### a.   The future damages sought by the Claimant are uncertain and hypothetical. Awarding such damages is not consistent with the provisions of the Treaty and the principles applicable to damages compensation

   i.   *The Claimant's claim for contingent future damages lacks the essential elements for
        awarding compensatory damages under the rules that govern economic damages*

16.   The rules governing compensatory damages require as *sine qua non* elements, the
      materialisation and proof of the damage as well as the existence of a causal link between the
      international wrongful act and the injury suffered.[11] The damages claimed by the Claimant
      as future damages are uncertain and hypothetical, and granting them contravenes the
      principle of full reparation, accepted by both Parties, as I will explain below.

17.   First, given that there is no certainty as to whether and how the Respondent will enforce the
      Measures, or whether such enforcement will ultimately lead to harmful consequences for the
      investor, there is also no certainty as to the occurrence of the damage. In other words, we are
      dealing with a hypothetical or contingent damage that has not yet occurred and whose
      occurrence is uncertain.

18.   With regard to this point, the Majority acknowledges that the State actions that could
      eventually result in damages to the Claimant are "pending" since neither has the State
      enforced the Measures in Breach, nor has CMSA paid the corresponding resettlements.[12]
      However, the Majority considers that this element is not an obstacle to accepting the
      Claimant's request for compensation, since the damage is foreseeable, given that it will
      materialise in the event that the Respondent finally enforces the Measures.[13] Thus, the
      Majority considers that the uncertainty surrounding the claim for future damages lies in the
      "materialisation of the damage".[14]

19.   The alleged foreseeability of the damage which the Majority emphasises, does not remedy
      the aforementioned situation. The foreseeability of damages is usually one of the conditions
      for their reparation. However, by itself, the foreseeability of future damages does not verify

---

[11] *See e.g. Murphy Exploration & Production Company International v. Republic of Ecuador* (PCA Case No. 2012-16) Final Partial Award, 6 May 2016, ¶ 487 (CLA-0091), *citing BG Group plc v. Argentina*, UNCITRAL, Final Award, 24 December 2007, ¶¶ 428-429 (CLA-0046); *Khan Resources Inc, Khan Resources B.V., CAUC Holding Company Ltd. v. Mongolia, MonAtom LLC* (PCA Case No. 2011-09), Award on the Merits, 2 March 2015, ¶ 375 (RL-0055).
[12] *See* Award, ¶ 820.
[13] *See* Award, ¶¶ 820 and 815.
[14] Award, ¶ 818.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

their existence or justify their compensation. Damages that have already materialised and were foreseeable must be compensated, but the fact that it might be foreseeable that damages in the future might occur does not make them existent. In other words, foreseeability is not a sufficient basis for compensating damages that have not yet materialised.

20. In sum, since uncertain or contingent damages are not compensable, there is no basis that permits awarding such damages by granting an anticipated order that guarantees their compensation.

21. In my view, this position is also supported by the tribunal's award in *BBVA v. Bolivia*, invoked by the Respondent when arguing that the Claimant's claim is not ripe for adjudication.[15] In that case, the tribunal rejected the respondent's request to consider within the decision determining the extent of damages a penalty that was undergoing judicial review as such penalty was not final and constituted a contingent liability.[16]

22. Without prejudice to the considerations that the Award makes with respect to the referred case,[17] in the opinion of the undersigned, *BBVA* highlights the fact that possible future contingent damages whose occurrence depends on possible future conduct or decisions of the State, whether of its executive or judicial branch, cannot be the object of compensation because, being contingent, they are uncertain or hypothetical, and therefore speculative.

23. The *BBVA* tribunal's decision not to consider contingent situations in determining damages is not unique. The tribunals in *Murphy* and *Khan Resources* explicitly recognise that under international law, speculative, remote or uncertain damages are not subject to compensation.[18] These decisions recognise that the damage must be a consequence or proximate cause of the wrongful act and that it is for the claimants to prove that they have suffered the injury they allege. This in my view reaffirms that compensation for future damage whose occurrence is uncertain is not permitted under international law.

24. Second, the Majority considers that, although the basis for compensation lies in future events of uncertain occurrence, if these events were to take place, they would not require a new ruling by the Arbitral Tribunal in order to know whether they would form part of the causal

---

[15] *See*, Respondent's PHB, ¶¶ 40, 61.

[16] *Banco Bilbao Vizcaya Argentaria (BBVA) S.A. v. Plurinational State of Bolivia (ICSID Case No. ARB(AF)/18/5)*, Award, 12 July 2022, ¶¶ 651-652 (RL-0127).

[17] *See,* Award, ¶ 789.

[18] *Murphy Exploration & Production Company International v. Republic of Ecuador* (PCA Case No. 2012-16) Partial Final Award, 6 May 2016, ¶ 487 (CLA-0091) *("This approach is consistent with the general requirement for awarding damages for violations of international obligations that any compensable damage must not be too speculative, remote, or uncertain.")* citing in turn *BG Group plc v. Argentina*, UNCITRAL, Final Award, 24 December 2007, ¶¶ 428-429 (CLA-0046) ("*The damage, nonetheless, must be the consequence or proximate cause of the wrongful act. Damages that are 'too indirect, remote, and uncertain to be appraised' are to be excluded. In line with this principle, the Tribunal would add that an award for damages which are speculative would equally run afoul of 'full reparation' under the ILC Draft Articles*"); *Khan Resources Inc, Khan Resources B.V., CAUC Holding Company Ltd. v. Mongolia, MonAtom LLC* (PCA Case No. 2011-09), Award on the Merits, 2 March 2015, ¶ 375 (RL-0055) *("The burden of proof falls on the Claimants to show that they have suffered the loss they claim. The standard of proof required is the balance of probabilities. This, of course, means that damages cannot be speculative or uncertain.")*.

chain. In the Majority's view, this situation is equivalent to making the ruling in the future and would be sufficient to establish the causal link between the Measures in Breach and the damage that the future enforcement of such measures could cause.[19]

25.    In my opinion, however obvious it may seem, there can be no causal link if the damage has not materialised. The risk that harm may occur in the future cannot, as is also obvious, satisfy causation of an effect that the action has not produced. There will only be causation when the action translates into or materialises in concrete damage and the causal link can be examined and determined. In the instant case, we are not dealing with damages that have been caused but with potential or contingent damages, which makes it impossible to render a definitive ruling on the causation of the damage.

26.    As will be examined in detail below, the reflective nature of the losses claimed by the Claimant makes the uncertainty as to the causality of harm even more problematic, as there are possible future events that could affect the dividends to which the Claimant could be entitled from the profits it earns from CMSA, its investment vehicle.

27.    Third, I consider that awarding hypothetical and uncertain damages contradicts the basic principles of compensation for damages and the principle of full reparation,[20] which require compensation for all the damage actually suffered: not a peso less, but not any more either.

28.    In particular, the function of compensation in investment arbitration is to compensate for actual losses suffered as a result of an international wrongful act. In other words, the compensation corresponds to the economically assessable loss which a claimant has actually suffered. It is not about punishing the responsible State, nor does compensation have an exemplary character in order to avoid or promote certain standards of conduct.

29.    Under this premise, compensation can only be calculated on the basis of the actual harm caused to the investor's interests. Once this harm or damage exists and is known, and the causal link with the internationally wrongful act is established, the quantification of compensation must be made with the objective of "wip[ing] out all the consequences of the illegal act and reestablish[ing] the situation which would, in all probability, have existed if that act had not been committed."[21]

30.    Thus, in accordance with this principle of full reparation, recognised as applicable by both Parties,[22] the reparation to be granted has a direct relationship with and depends on the existence, extent and verification of the damage produced. Therefore, the principle of full reparation requires compensation for the actual losses of the injured party, since only by

---

[19] *See* Award, ¶¶ 817 and 821.

[20] *See* Counter-Memorial, ¶ 470, where this argument is raised.

[21] *Case Concerning the Factory at Chorzów* (Germany/Poland), ICCJ Series A, No. 17, Judgment of 13 September 1928 (CLA-0001) ("*The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed* [...]").

[22] Memorial, ¶ 239; Rejoinder, ¶ 528.

verifying the extent of the damage can one be certain to award compensation that will wipe out the consequences of the international breach. In summary, condemning the State in respect of a loss that is still uncertain to guarantee its payment in the event that it may occur, contradicts the principles required for awarding compensation for damages.

ii.    *An order for future compensation for damages that have not materialised is inconsistent with the express terms of the Treaty*

31.    As part of its assessment of the jurisdictional objections raised by the Respondent, the Tribunal has considered whether the text of the Treaty admits the possibility of seeking remedies or reparations other than monetary compensation. Without prejudice to that matter and having regard to the Tribunal's finding in paragraph 186 of the Award, it is clear, in my view, that the award of pecuniary compensation for harm that has not occurred, and is uncertain and hypothetical as to its occurrence, is not consistent with the terms of the Treaty. As expected under the principles governing the reparation of damages in international law, there are several provisions of the Treaty that lead to the understanding that claims for damages must relate to existing or material harm.

32.    Pursuant to Article IX.4 of the Treaty, the Notification of Intent, which must be submitted by the investor to the State six months before filing the Request for Arbitration, must contain, *inter alia*, "the estimated value of the damages and compensation sought."[23]

33.    This provision, by requiring the investor to specify, prior to the commencement of the arbitration, the estimate of its damages and the compensation it seeks, is indicative, in my view, that the damages that have not materialised are not capable of being compensated through a claim for reparation under this Treaty.

34.    This interpretation is also consistent with the terms of Articles IX.7 and IX.14 of the Treaty.

35.    According to Article IX.7, "[t]he investor may only submit the Request for Arbitration if it has submitted the Notification of Intent in accordance with [Article IX.4] and the term established therein has elapsed."[24]

36.    Article IX.14 provides that "[a]n investor may not submit the Notification of Intent, and therefore may not invoke the international arbitration procedures set out in this Article, if more than five (5) years have elapsed since the date the investor had knowledge or ought to have had knowledge of the alleged violation of this Agreement <u>and</u> of the alleged losses and damages" [emphasis added].[25]

37.    The three aforementioned Treaty provisions, *i.e.*, Article IX, paragraphs 4, 7, and 14, emphasise that the damage must exist, must have materialised and must be known to the Claimant in order to be the subject of a compensation order by the Arbitral Tribunal in this

---

[23] Treaty, Article IX.4 (C-0001).
[24] Treaty, Article IX.7 (C-0001).
[25] Treaty, Article IX.14 (C-0001).

arbitration. Therefore, granting an order for future compensation for damages that have not materialised is not consistent with the express terms of the Treaty.

iii.    *The Claimant claims compensation for reflective losses, which increases the uncertainty as to the existence of damages*

38.    The uncertain and contingent nature of damages is reinforced in a claim, such as the present one, in which the investor claims damages for purely reflective losses, *i.e.*, damages arising from potential losses or damages suffered by an entity or vehicle owned by the Claimant.

39.    This leads to difficulties of awarding compensation for potential or hypothetical damages being not only theoretical, but also manifesting themselves in the eventual calculation of damages.

40.    In cases of claims for pure reflective losses such as the present one, the claimants' harm typically takes the form of a decrease in free flow of dividends, and consequently, any damages are generally subject to the existence and amount of profits in the local company that can be translated into dividend payments to the investor-shareholder.

41.    Thus, in order to identify Claimant's reflective damage, it is essential to first determine the economic situation of the local investment vehicle, in this case, CMSA, and to calculate the free flow of dividends on that basis. The profit of the local entity, and thus the potential dividends, can only be determined once the fiscal year is closed and this profit is determined under the applicable legal and accounting rules, in this case, Colombian regulations. In other words, this cash flow can only be calculated once the annual results of the company are determined and the level of profits identified. Prior to that, it will not be possible to establish whether the harm to the investment vehicle also resulted in harm to the investor-claimant and what its amount is. To assume that all of the alleged harm to the local investment vehicle is free flow of dividends is, in my view, premature and speculative in the presence of a contingent harm that, should it occur, could be affected by supervening factors.

42.    In response to this argument by the Respondent, who has pointed out that any future damages will be suffered by CMSA and not the Claimant[26], the Majority considers that the indirect nature of the damage is manifest in both historical and future damages, and that since the Respondent has not disputed that the Claimant lacked a cause of action for the former, there is no reason why the reflective nature of the reparation should preclude compensation for the latter.[27]

43.    I consider this response unsatisfactory as it misses the crux of the Respondent's argument. With regard to historical damages, the rules and principles applicable to the compensation of monetary damages, subject to the arguments of the disputing Parties and their experts, allow the Arbitral Tribunal to estimate the historical damages that South32 may have suffered as a result of CMSA being affected by the challenged Measures. However, when

---

[26] See Award, ¶ 830.
[27] See Award, ¶ 831.

there are several corporate levels between the Claimant and the investment vehicle, as in the case of CMSA and South32,[28] the reflective nature of the Claimant's claim turns the claim for future damages into an exercise with speculative elements. This is because each level of the corporate structure has the potential to add an additional degree of uncertainty as to what magnitude of harm will ultimately result in profitability and dividend distributions to the investor-Claimant, South32.

44.   In this regard, the Respondent appropriately distinguishes between the existence of damage and proof of the extent or magnitude of damage.[29] The proof of historical damages involves an exercise of persuasion, estimation and calculation within the power of the Parties, upon which the Arbitral Tribunal makes certain inferences in order to establish the damage suffered by the Claimant and calculates compensation.  However, if the damage does not exist because it is contingent on future actions, the Tribunal cannot initiate this exercise without entering into determinations based on conjecture that may or may not turn out to be true, and which could be affected by supervening events with unknown effects.

45.   Accordingly, in the case of a claim of reflective damage that requires the determination of the local company's profits in order to determine the free flow of dividends, and thus consequently the damage suffered by the investor, the uncertain and hypothetical character of the damage is heightened.

   **b.   There is no legal basis or precedents for granting the indemnity order sought by the Claimant**

46.   In paragraph 887 3(i) and (ii), the Majority has issued an order to the Respondent requiring it to indemnify the investor in respect of damages that could eventually be caused if certain measures that the Tribunal found to be in breach were to materialise. This indemnity order or guarantee of compensation for uncertain and hypothetical damages lacks support under international investment law.

47.   I consider that there are good reasons for this lack of support. The Majority's decision transforms the Respondent, a sovereign State, into a guarantor of the investor in respect of any damage that might occur in the event of it taking certain actions or proceeding in a certain way. That nature of guarantee or compensation obligation, resulting in an indemnity, would require – in my view – the agreement of the Parties to the Treaty, the disputing Parties, or an explicit legal rule, in this case, international. None of these exist in the case under consideration and, therefore, the Arbitral Tribunal lacks the authority to grant such order.

48.   Moreover, the Majority's order would, to my knowledge, be unprecedented in investment arbitration as well as unprecedented under general international law.

49.   To my understanding, there have been no awards rendered to date in international foreign investment arbitration that have issued a decision granting an indemnity, *i.e.*, ordering the

---

[28] See Award, ¶ 106.
[29] Counter-Memorial, ¶ 469.

State to guarantee monetary compensation to the investor in the event that it suffers damages in the future, which at the date of the award were contingent.  Although there have been ICSID awards in which tribunals have included payment conditions in their operative part, to my knowledge, no investment arbitral tribunal has ordered an "indemnity" that places the State in the position of indemnity guarantor for actions it has not enforced and with respect to future damages which are potential and uncertain.

50.    The Majority does not share this assessment and in paragraph 824 concludes that the decisions invoked by the Claimant in support of its request for an indemnity are "sufficiently relevant."[30]

51.    I disagree with what is stated therein. Having reviewed each of these decisions, I consider that none of them orders an indemnity for future damages or orders a party to pay compensation in the future subject to the contingency of the materialization of damages. On the contrary, in these cases, the tribunals have sought to confirm the application of the principle of full reparation, ensuring that the respondent States should not undermine it by means of burdensome tax measures applied to the compensation ordered after the award has been issued. These cases considered real losses effectively suffered and already quantified.[31]

52.    Furthermore, the Majority reproaches the Respondent for not having been able to cite "any award in which an arbitral tribunal has refused to order the payment of indemnities once the internationally wrongful act and the causal link have been established – which is the case here."[32]  Subsequently, the Majority acknowledges that the Claimant's claim for future damages is exceptional and adds that "while exceptional, it is not unique."[33] In support of

---

[30] Award, ¶ 824.

[31] *See* **Tenaris** ("*Esto significa que <u>dichas cuantías son las que realmente deben entrar en el patrimonio de las Demandantes</u>, personas jurídicas que no tienen su residencia fiscal en Venezuela. [...] Si la indemnización pudiera quedar sujeta a tributación en Venezuela, y Venezuela pretendiera aplicar una compensación entre la indemnización y el tributo, la indemnización efectivamente pagada sería menor a la establecida en este Laudo y la República Bolivariana estaría incumpliendo las obligaciones asumidas en los AAPRI.*" (*Tenaris SA and Talta - Trading e Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/12/23) Award, 12 December 2016, ¶¶ 788 and 789 (CLA-0092), emphasis added); **Glencore** ("*If Colombia were to impose or deduct a tax on Claimants' award, Colombia could reduce the compensation 'effectively' received by Prodeco. A reductio ad absurdum proves the point: Colombia could practically avoid the obligation to pay Claimants the restitution awarded by fixing a 99% tax rate on income derived from compensations issued by international tribunals, thereby ensuring that Prodeco would only effectively receive a restitution of 1% of the amount granted [...].] In conclusion, the Tribunal, <u>in order to guarantee that Claimants receive full reparation</u> for Colombia's international wrong, [...], orders Respondent to indemnify Claimants with respect to any Colombian taxes in breach of such principle.*") (*Glencore International AG and CI Prodeco SA v. Republic of Colombia*, (ICSID Case No. ARB/16/6), Award, 27 August 2019, ¶¶ 1626 and 1630 (CLA-0096), emphasis added); **OperaFund** ("*To the Tribunal, it is clear that Spain as the Respondent is <u>to pay the entire amount of damages</u> and cannot charge and deduct Spanish taxes on the amount awarded. [...]. Therefore, [...] the Tribunal concludes and will expressly provide in the dispositive of this Award that the Award is made net of all taxes and/or withholdings by Spain, and Spain is ordered to indemnify Claimants for any tax liability or withholding that may be imposed in Spain.*") (*OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain* (ICSID Case No. ARB/15/36), Award, 6 September 2019, ¶ 705 (CLA-0097), emphasis added).

[32] Award, ¶ 825.

[33] Award, ¶ 827.

its conclusion, it invokes *Lion v. Mexico* at paragraphs 828 and 829 of the Award considering that that the referred tribunal orders compensation for future damage.

53.   First, in my view, the exceptional nature and lack of precedent confirms the Respondent's position, thus the Respondent cannot be hold accountable for not providing precedent to the contrary. In other words, as the Claimant's request is unprecedented or at least exceptional, has no explicit normative basis, and there are no arbitral decisions making a specific analysis in this regard, the burden of proof cannot fall on the Respondent but on the petitioner of such an order.

54.   Second, the tribunal in the *Lion* case, a proceeding under the Additional Facility Rules, in my understanding, does not order compensation for damages whose existence is uncertain, potential or contingent on the Respondent's conduct either. On the contrary, as in the above-mentioned awards, it is again a matter of embracing and properly applying the principle of full reparation for the totality of the damage. The tribunal ordered compensation, leaving pending only the calculation of the quantum of a damage whose existence has been established and whose causal link is identifiable and has been determined. None of these requirements are met in our case, therefore that award is not an applicable precedent.[34]

55.   In addition, I consider that in any event the value of the *Lion* Award for this arbitration, in whichever sense, should be approached cautiously by the Arbitral Tribunal because although it is a public award, it was not submitted by either of the Parties and has not been the subject of discussion by them.

56.   The duty of arbitrators to ensure the effectiveness of their decisions may require a tribunal to take into account rules that it must consider *sua sponte* or principles of international law governing the interpretation of investment treaties, irrespective of what is alleged by the disputing Parties. Thus, while I share the position of many tribunals that consider that the principle of *iura novit arbiter* should be considered in investment arbitration, this principle is subject to certain limitations, such as the equality and adversarial principles, and the prohibition of surprise decisions.

57.   To make a determination on the basis of an award that is not on the record to resolve a disputed issue, especially when the existence of precedent is debated – a point on which there is no consensus among the members of the Tribunal – would be, in my view, problematic in light of the aforementioned constraints.

---

[34] *Lion Mexico Consolidated L.P. v. United Mexican States* (ICSID Case No. ARB(AF)/15/2) Award, 20 September 2021; *See* ¶ 836, in which the Tribunal makes express reference to the principle of full reparation citing Chorzów in support of its decision, and ¶ 838, stating that "[*l*]*a reparación integral requiere que México asuma la obligación de reembolsar a Lion dichos Honorarios Legales, en el monto que finalmente establezcan los tribunales Mexicanos y que efectivamente pague Lion al Deudor.*"

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

## III.2 SYSTEMIC IMPLICATIONS

58. Responding to one of the Respondent's arguments,[35] the Majority asserts that the Claimant's claim for an indemnity for future damages does not undermine the State's sovereignty as it is a pecuniary award, for an amount to be determined in the future.[36]

59. I disagree with this statement and conclusion of the Majority, as in my understanding, the claim for indemnity for future damages does represent an undue interference with the State's sovereignty:

    i. Subjecting the State to guarantee compensation for damages to an investor that could result from State measures, but which have not yet materialised, may be considered an intervention in the prerogatives of its public power.

    ii. The Majority's indemnity order for future damages risks putting the authorities and judges called upon to rule on such measures in a complex position, exposing them to international harm to the State unless they stay proceedings or rule against the State. Thus, ordering the State to adopt a certain conduct with respect to issues being debated in Colombian domestic courts, administrative institutions and arbitral tribunals may have the effect of being tantamount to dictating a particular result to those courts, institutions and tribunals. Inappropriate intervention in local proceedings and actions is exacerbated where anticipated compensation obligations have been established and quantified for actions not yet enforced, as in the present case.

    iii. Moreover, this interference has the aggravating factor of placing local authorities and judges in a situation of potential liability if they proceed with currently pending proceedings. If local judges rule against the State – on the basis of the order issued by the Majority – they could incur liability if there is no structure in place that authorises judges and other authorities considering the issues in dispute to take into account the decisions of international tribunals. On the other hand, if the judge reaches a decision that has a result that is inconsistent with the Majority's Order, the State will be obliged to hold the investor harmless by paying the alleged future damages ordered by the Majority.

60. This element is magnified in a situation such as the present one, in which the Treaty that grants the authority to such international tribunal contains a provision – Article IX.13 – that expressly excludes the jurisdiction of the Arbitral Tribunal to rule on the measures as a matter of domestic law. According to the Award, this provision should be interpreted in the sense that "the consideration that the Arbitral Tribunal may make of Colombian law or in relation to the Contracts limits its effects on the present case under the BIT."[37]

---

[35] See Respondent's PHB, ¶ 205 ("[E]*ste reclamo [de indemnidad] no solo es completamente improcedente, sino que su otorgamiento atentaría directamente contra la soberanía de Colombia.*")
[36] Award, ¶ 822.
[37] Award, ¶ 179.

61. In addition, as set out in paragraph 821 of the Award, the Tribunal by Majority has decided to grant the Claimant's claim for future damages, accepting its argument that failure to do so would be "leaving a part of the dispute unresolved."[38] The Majority considers that "it would make no sense to force the Claimant to commence another arbitration, simply to obtain an award of compensation for the damage that is already fixed and whose attribution the majority of the Arbitral Tribunal finds has already been decided in the Award."[39]

62. First, I consider that it is not for the Arbitral Tribunal to provide assurances or compensatory guarantees to one of the disputing Parties in respect of damages that have not occurred, in order to spare it the cost and difficulties of advancing a new claim. In my view, it is not the function of the Tribunal to prevent the Parties from bringing a new dispute or initiating other proceeding(s) in the future. Tribunals in investment arbitration are called upon to decide the dispute between the parties in accordance with the applicable law and within the limits imposed by the authority delegated to them.

63. Notwithstanding this, in my view, the indemnity order carries the risk of creating the opposite situation to the one indicated by the Majority, and instead of reaching a final resolution of the dispute between the Parties, it could lead to further disputes between them.

64. On the one hand, the implementation of a decision that lacks precedent will be subject to debate. To cite a few examples, discussions could arise if any event, large or small, happens that may impact the calculation basis indicated by the Majority. It is not possible to anticipate all of the calculation issues that may in the future give rise to discussions between the Parties on the application of the formula, especially given what has already been noted with respect to reflective damages.

65. In addition, it seems debatable to me whether the indemnity order for future damages can be considered a pecuniary obligation under Article 54 of the ICSID Convention. An indemnity claim such as the one advanced by the Claimant, seeks a declaration that the Respondent has a certain legal position, that of a guarantor, and that subsequently entails an obligation to compensate if the allegedly guaranteed conduct materialises at some point in the future.

66. As is well known, according to Article 54 of the ICSID Convention only "pecuniary obligations" imposed by the award shall be treated by all Contracting States to the Convention "as if it were a final judgment of a court in that State." In other words, the self-contained enforcement system of the ICSID Convention only covers pecuniary relief, so the indemnity Order, if it is considered that it imposes a guarantee obligation, may not be covered by the enforcement mechanism of Article 54 of the Convention.

67. This poses additional difficulties based on Article IX.10 of the Treaty. According to that provision, arbitral awards shall be enforced, where required, in accordance with the domestic law of the Contracting Party in whose territory the investment was made. How could an indemnity obligation issued by an international arbitral tribunal be enforced in accordance

---

[38] *See* Award, ¶ 821, citing, Memorial, ¶ 241.
[39] Award, ¶ 821.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

with the domestic law of Colombia? The Parties have not provided the Tribunal with information on this element, which in itself is sufficient to further generate disputes between the Parties and may give rise to additional claims.

68. On account of my dissent regarding the admissibility of the Claimant's indemnity request, I further disagree with the Majority's decision regarding the costs of the arbitration.

## IV.  DISSENTING OPINION ON THE NATURE OF THE MEASURES THAT MAY GIVE RISE TO INTERNATIONAL RESPONSIBILITY OF THE STATE

69. As mentioned in the introduction, I concur with the Majority on the final decision of the Arbitral Tribunal to find that the Respondent has breached Article II.3 of the Treaty, as set out in paragraph 887.2 of the Award. This being the case considering that the actions and conduct attributable to the Respondent, considered in their final outcome, meet the requirements of the standard for State conduct to constitute an international wrongful act under the Treaty.

70. However, I respectfully disagree with the Majority's assessment and analysis of some of the State's measures, actions and conduct, as I will express in the subsequent paragraphs, which merit the following considerations.

71. Throughout the proceeding, the Respondent has argued that some of the contested Measures cannot give rise to international responsibility of the State as they do not represent State actions capable of resolving a dispute, result in an enforceable State order, or give rise to damage.[40] As part of those arguments, the Respondent has maintained that the Cundinamarca Petition is not a final measure with respect to the settlement of the Contracts, nor does it order a payment to CMSA.[41]

72. In the Award, the Arbitral Tribunal partially accepts this assertion, describing the Cundinamarca Petition as an act by which the National Mining Agency "requested [before] a judge"[42] or "initiated a court action"[43] to settle the Contracts. However, immediately thereafter, the Majority assesses the Cundinamarca Petition as if it were a final measure by stressing that in that act the Authority "does not offer any rational motivation to justify" the application of Resolution 293 to the period prior to 2015,[44] and on that basis later concludes that the Cundinamarca Petition violates the Treaty, since "the reopening of the settlement of the royalty claims on the occasion of the settlement of a contract has no reasonable and consistent justification, according to the applicable standards."[45]

73. In other words, the Award, both in the paragraphs cited above and subsequently, does not indicate that the Cundinamarca Petition does not resolve the reopening of the settlement. On

---

[40] PHB, Republic of Colombia ¶¶ 41-48.
[41] PHB, Republic of Colombia, ¶¶ 41-43.
[42] Award, ¶ 424.
[43] Award, ¶ 610.
[44] Award, ¶ 426.
[45] Award, ¶ 748.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

the contrary, the Cundinamarca Petition is the initiation of a legal action by the mining authority before an administrative tribunal, which contains certain arguments and which includes, among its claims, the resettlement of the Contracts in accordance with certain parameters, without this having ultimately occurred, nor having given rise to a payment. It will be up to the judge to decide whether the judicial settlement of the Contracts is appropriate, and if so, how it will be carried out, given the absence of agreement between the parties in this regard.

74. In my view, the act of initiating a legal action – in this case before administrative tribunals – together with the submission of arguments or claims as part of that legal action, such as the claim to resettle the Contracts, cannot, in the present case, by its very nature, give rise to international responsibility of the State or constitute a breach of an international obligation. For this reason, I disagree with the Majority's decision, reflected in paragraphs 748, 751 and 753, to hold that the initiation of a legal action, *i.e.*, the action of bringing the Cundinamarca Petition before the courts, is, by itself, sufficient to give rise to an arbitrary act in breach of the standard of fair and equitable treatment.

75. Second, and considering the Parties' arguments, the Arbitral Tribunal analyses the timeliness of the Cundinamarca Petition. The Tribunal concludes that, under Colombian administrative law, the legal action that allowed to claim the settlement of the Contracts expired in 2015, that is, three years prior to the filing of the Cundinamarca Petition in 2018, regardless of any subsequent agreements reached by the parties.[46] In light of this determination, the Majority concludes that putting forward claims outside the limitation period is, in and of itself, an arbitrary act, which would give rise to an international wrongful act under the Treaty.[47]

76. In my view, the act of submitting a legal claim, even if it could be considered under local law that the limitation period has expired, does not *per se* constitute arbitrary treatment that would violate the standard of fair and equitable treatment under the Treaty.

77. This is even more so in the present case, since there is an agreement between the Parties that could support the State authority's decision to submit the Cundinamarca Petition on the grounds that it was within the legal time limit. Therefore, the conduct of the National Mining Agency cannot be characterized as grossly unfair, manifestly inconsistent or in defiance of the notion of legal correctness, and therefore cannot constitute an international wrongful act, as defined by the Majority, as it does not meet the threshold required to become an international breach.

78. Finally, I also disagree with the Majority regarding the decision to consider that the Colombian authorities' contractual interpretation of the term "provisional" contained in

---

[46] Award, ¶ 657. *See also*, Award, ¶ 649 ("*Colombia points out that it reached an agreement with CMSA to settle by mutual agreement until 15 April 2016, to which date the two months for unilateral settlement (15 June 2016) are added, and the two-year period to settle would thus expire on 15 June 2018 – as the request for judicial settlement was filed in February 2018 it would have been timely*").
[47] Award, ¶¶ 751 and 753.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

Clause 2 of the Parties' 2011 Agreement[48] constitutes a State conduct that meets the threshold required to become an international wrongful act.

79.  For the purpose of understanding my dissenting opinion, I will explain in the following paragraphs the discussion between the Parties on this point concerning revisions of settlements already made in the past. Clause 2 of the 2011 Agreement states:

> *La modificación [del índice de precios] aplicará provisionalmente desde el mes de marzo [...] del año 2005 hasta el momento en que se fije el precio base de liquidación de regalías por parte de la Unidad de Planeación Minero Energética [...] de conformidad con lo dispuesto en el artículo 23 [de la Ley de Regalías], momento en el cual la Autoridad Minera[] hará efectivo lo que se disponga en los actos administrativos que sean expedidos para el efecto.*[49]

The reference price, referred to in the above clause, was finally set in May 2015 by the National Mining Agency through Resolution 293.

80.  According to the Respondent, once Resolution 293 was issued, the relevant Colombian authorities could review and recalculate the royalties paid in the past in accordance with the new formula, since the settlement previously made was "provisional" and therefore reviewable under the 2011 Agreement. According to the Claimant, the agreement does not allow for a review and reassessment of royalties, but rather establishes the methodology according to which royalties were to be provisionally settled as of March 2005 and until Colombia published the new reference settlement price, which it did through Resolution 293.[50]

81.  It follows from the above that the Claimant understands the term "provisional" as a synonym for "temporary" (but definitive and not subject to revision), whereas the Colombian National Mining Authority understood it as an antonym of "definitive", so that the provisional application implied that it would be reviewed later, when the reference settlement price was fixed.[51]

82.  Faced with this dispute, the Arbitral Tribunal notes that "the Parties themselves, in this arbitration, accept that the use of the term 'provisionally' could be misleading,"[52] but the Majority finds that "the Respondent's justification for retrospectively applying Resolution 293 [...] is unreasonable."[53]

---

[48] *See* Agreement between CMSA and Ingeominas of 30 August 2011 (C-0022).
[49] Agreement between CMSA and Ingeominas of 30 August 2011, Clause 2 (C-0022).
[50] Reply, ¶ 107.
[51] For more detail, *see* Award, ¶¶ 384-391.
[52] Award, ¶ 405.
[53] Award, ¶ 410. In particular, the Arbitral Tribunal looks to the analysis and conclusion reached by a local arbitral tribunal constituted under the arbitration clause of the existing concession contract to determine that said contract did not allow for a future revision of royalties that had already paid. *See* Award, ¶¶ 392-411, and Award of 27 April 2022 (R-0083).

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Dissenting Opinion of Arbitrator Andrés Jana Linetzky

83.  I consider that, as the Respondent submits, the question for the Arbitral Tribunal to answer in the face of this discrepancy is whether the Colombian authorities' interpretation of the adverb "provisionally" can be considered an arbitrary conduct that contravenes the fair and equitable treatment standard of the Treaty and international law.

84.  Thus, considering that both the Parties and the Arbitral Tribunal agree that both interpretations were and are plausible and that the term is ambiguous, in my view, it cannot be concluded that the Colombian authorities, in making the above contractual interpretation, engaged in arbitrary conduct that may constitute a violation of Fair and Equitable Treatment under the Treaty, in accordance with the content of that standard as developed in paragraphs 706 and 707 of the Award.

85.  In this regard, the fact that the Tribunal disagrees with Colombia's interpretation of that contractual provision, determining that it does not permit the retrospective application of Resolution 293 under the "2011 Agreements", is not sufficient to meet the threshold of a breach of the Treaty. It should be noted in this regard that, as the Award points out,[54] the fact that a conduct may be considered irregular under domestic law parameters is not sufficient to constitute a breach of the fair and equitable treatment standard.

\*\*\*

86.  For the reasons mentioned in section III, I dissent from the Majority's opinion in section V.2.3.2. (B) corresponding to paragraphs 811 to 844 and reflected in the operative section at paragraphs 887.3(i) and (ii) of the Award. In my view, the Arbitral Tribunal should have rejected the Claimant's claim for an indemnity for future damages. In light of my dissent regarding the Claimant's indemnity request, I further disagree with the Majority's decision on the costs of the arbitration. For the same reasons, I further disagree with the Majority's decision to order interest in respect of each of the referred orders and the decision recorded in paragraph 887.9 of the Award.

87.  In addition, for the reasons indicated in section IV above, I also disagree with part of the Majority's conclusions on the nature of State conduct that may give rise to international responsibility of the State. In my view, the Tribunal should have concluded that neither the filing of the Cundinamarca Petition before the administrative judge nor the Colombian authorities' contractual interpretation of the term "provisional" in an agreement between the Parties, can give rise to arbitrary conduct that would constitute a breach of an international obligation of the Colombian State. Accordingly, my concurrence with the decision on liability in the Award must be understood as qualified by what is stated in section IV of this partial dissenting opinion, in particular with respect to paragraphs 406, 410, 748, 751, 753 and 755 of the Award.

*[Signature page follows]*

---

[54] Award, ¶ 168.

Prof. Andrés Jana Linetzky
Arbitrator

Date:   10 June 2024

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### SOUTH32 SA INVESTMENTS LIMITED

### v.

### REPUBLIC OF COLOMBIA

### (ICSID CASE NO. ARB/20/9) – Rectification

I hereby certify that the attached documents are true copies of the English and Spanish versions of the Tribunal's Decision on the Request for Rectification dated 29 January 2025.

Martina Polasek
Secretary-General

Washington, D.C., 29 January 2025

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**SOUTH32 SA INVESTMENTS LIMITED**

Claimant

and

**REPUBLIC OF COLOMBIA**

Respondent

**ICSID CASE NO. ARB/20/9 – RECTIFICATION**

---

# DECISION ON REQUEST FOR RECTIFICATION

---

*Members of the Tribunal*
Ms. Deva Villanúa, President of the Tribunal
Prof. Guido S. Tawil, Arbitrator
Prof. Andrés Jana Linetzky, Arbitrator

*Secretary of the Tribunal*
Ms. Catherine Kettlewell

*Assistant to the Tribunal*
Ms. Francisca Seara Cardoso

*Date of dispatch to the parties:* 29 January 2025

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

## REPRESENTATION OF THE PARTIES

*Representing South32 SA Investments Limited*:

Mr. Nigel Blackaby KC
Ms. Caroline Richard
Ms. Maria Julia Milesi
Ms. Rosario Galardi
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

*Representing the Republic of Colombia*:

Mr. César Palomino
General Director of the Agencia Nacional de
Defensa Jurídica del Estado
Mr. Yebrail Haddad
Ms. Juana Martínez Quintero
Ms. María Lucía Casas
Mr. Andrés Reina
Agencia Nacional de Defensa Jurídica del
Estado
Carrera 7 No. 75-66 – 3er piso
Bogotá, Colombia

Ms. Paola Santanilla
Director of Foreign Investment, Services
and Intellectual Property
Ministerio de Comercio, Industria y Turismo
Calle 28 #13 A-15
Primer Piso
Local No. 1
Bogotá, Colombia

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# INDEX

**TABLE OF ABBREVIATIONS/DEFINED TERMS** .................................................... IV

**LIST OF CASES CITED** .................................................................................... VI

**I.    INTRODUCTION** ...................................................................................... 1

**II.   PROCEDURAL HISTORY** ........................................................................ 2

**III.  RELEVANT PROVISIONS** ....................................................................... 4

**IV.   PARTIES' POSITIONS** ............................................................................ 5

    1.   Paragraphs 739 and 822 .................................................................... 5

    2.   Paragraph 883 ..................................................................................... 5

    3.   Paragraph 887(3) ................................................................................ 6

**V.    ANALYSIS** ............................................................................................ 11

    1.   Applicable standard ......................................................................... 11

    2.   Paragraphs 739 and 822 .................................................................. 12

    3.   Paragraphs 883 and 887(6) ............................................................ 12

    4.   Paragraph 887(3) .............................................................................. 13

        4.1.   Identification of an error ......................................................... 13

        4.2.   Alleged changes to the methodological approach ............................ 14

        4.3.   Rectification to clarify the Tribunal's approach ............................ 14

        4.4.   Need to avoid future enforcement issues ..................................... 15

        4.5.   Decision ................................................................................. 16

**VI.   COSTS** .................................................................................................. 17

    1.   Costs of rectification ....................................................................... 17

        1.1.   Applicable rules ...................................................................... 17

        1.2.   Claimant's position ................................................................. 18

        1.3.   Respondent's position ............................................................ 19

        1.4.   Tribunal's decision ................................................................. 20

**VII.  DECISION** ............................................................................................ 21

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# TABLE OF ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| ANDJE | *Agencia Nacional de Defensa Jurídica del Estado* (National Agency for the Legal Defense of the State) |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 10 April 2006 |
| Award | Award rendered by the Tribunal on 21 June 2024 |
| Claimant's Rectification Costs | Claimant's Statement of Costs of 4 November 2024 |
| Colombia, Respondent or the Republic | The Republic of Colombia |
| Decision | The current decision on the Request for Rectification |
| Disputed Paragraph | Para. 887(3) of the Award |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 |
| ISCID or the Centre | International Centre for Settlement of Investment Disputes |
| Parties | Claimant and Respondent jointly |
| Rectification Costs | Statements of Costs of 4 November 2024 |
| Rejoinder | Respondent's Rejoinder to the Reply of 15 October 2024 |
| Reply | Claimant's Reply to the Response of 1 October 2024 |
| Request for Rectification | Claimant's Request for Rectification of 2 August 2024 |
| Respondent's Rectification Costs | Respondent's Statement of Costs of 4 November 2024 |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

| | |
|---|---|
| Response | Respondent's Response to the Request for Rectification of 17 September 2024 |
| South32 or Claimant | South32 SA Investments Limited |
| Treaty or the BIT | Bilateral Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia signed on 17 March 2010 |
| Tribunal | Tribunal in this case, composed of Ms. Deva Villanúa, Prof. Dr. Guido S. Tawil and Prof. Andrés Jana Linetzky |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# LIST OF CASES CITED

| | |
|---|---|
| ***Gavazzi*** | *Marco Gavazzi and Stefano Gavazzi v. Romania*, ICSID Case No ARB/12/25, Decision on Rectification, 13 July 2017. Accesible at: https://www.italaw.com/sites/default/files/case-documents/italaw9508.pdf. |
| ***Gold Reserve*** | *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No ARB(AF)/09/1, Decision Regarding the Claimant's and the Respondent's Requests for Corrections, 15 December 2014. Accesible at: https://www.italaw.com/sites/default/files/case-documents/italaw4079.pdf . |
| ***Infracapital*** | *Infracapital F1 S.à r.l. and Infracapital Solar B.V v. Kingdom of Spain*, ICSID Case No ARB/16/18, Decision on the Requests for Rectification, 26 September 2023. Accessible at: https://italaw.com/sites/default/files/case-documents/180320.pdf. |
| ***Ickale*** | *İçkale İnşaat Limited Şirketi v. Turkmenistan*, ICSID Case No ARB/10/24, Decision on Claimant's Request for Supplementary Decision and Rectification of the Award, 4 October 2016. Accessible at: https://italaw.com/sites/default/files/case-documents/italaw7611.pdf. |
| ***IC Power*** | *IC Power Ltd and Kenon Holdings Ltd v. the Republic of Peru*, ICSID Case No ARB/19/19, Decision on the Requests for Rectification and Clarification, 3 May 2024. Accessible at: https://www.italaw.com/sites/default/files/case-documents/italaw180938.pdf. |
| ***Philip Morris*** | *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No ARB/10/7, Decision on Rectification, 26 September 2016. Accessible at: https://www.italaw.com/sites/default/files/case-documents/italaw7585.pdf. |
| ***Watkins Holding*** | *Watkins Holding S.À.R.L et al v. Kingdom of Spain*, ICSID Case No ARB/15/44, Decision on Spain's Request for Rectification of the Award, 13 July 2020. Accessible at: https://www.italaw.com/sites/default/files/case-documents/italaw11742.pdf. |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# I.  INTRODUCTION

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ["**ICSID**" or the "**Centre**"] on the basis of the Bilateral Agreement for the Promotion and Protection of Investments between the Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia signed on 17 March 2010 [the "**Treaty**" or the "**BIT**"] which entered into force on 10 October 2014, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 [the "**ICSID Convention**"].

2.    The claimant is South32 SA Investments Limited ["**South32**" or the "**Claimant**"], a limited liability company incorporated under the laws of England and Wales, with registered office in London and with commercial activities in the United Kingdom.

3.    The respondent is the Republic of Colombia ["**Colombia**", the "**Respondent**" or the "**Republic**"].

4.    Claimant and Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (ii).

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# II. <u>PROCEDURAL HISTORY</u>

5.  On 27 March 2020 the Secretary-General of ICSID registered the Request for Arbitration submitted by South32 SA Investments Limited against the Republic of Colombia. The Tribunal was constituted and the proceedings began on 17 November 2020.

6.  On 21 June 2024 the Tribunal presided by Ms. Deva Villanúa, and also comprising Profs. Guido S. Tawil and Andrés Jana Linetzky [the "**Tribunal**"], rendered its award [hereafter the "**Award**"].

7.  On 2 August 2024, pursuant to Art. 49(2) of the ICSID Convention and Rule 49 of the ICSID Rules of Procedure for Arbitration Proceedings of 10 April 2006 ["**Arbitration Rules**"], Claimant submitted a request for rectification of the Award ["**Request for Rectification**"], accompanied by the lodging fee in accordance with Arbitration Rule 49(1)(d).

8.  On 5 August 2024 the Acting Secretary-General registered Claimant's Request for Rectification pursuant to Arbitration Rule 49(2)(a) and transmitted a copy of the Request for Rectification, together with the notice of registration, to each member of the Tribunal.

9.  On 6 August 2024 the Tribunal set out a procedural calendar under which it invited the Republic to submit a response to the Request for Rectification by 27 August 2024. This would then be followed by a reply to the response, if Claimant so wished. In the event that South32 filed a reply, Colombia had the option to submit a rejoinder.

10. On 17 August 2024 Colombia requested an extension until 27 September 2024 to produce its response. Claimant rejected the length of the requested extension, proposing that the Republic be granted until 10 September 2024.

11. On 23 August 2024 the Tribunal issued its decision on the extension request, granting Colombia until 17 September 2024 to produce the response.

12. On 17 September 2024 Respondent filed its Response to Claimant's Request for Rectification ["**Response**"].

13. On 19 September 2024 the Tribunal asked Claimant to indicate whether it intended to submit a reply to the Response. This was confirmed by South32 on 23 September 2024.

14. On 1 October 2024 Claimant filed its reply to the Response ["**Reply**"].

15. On 15 October 2024 Respondent submitted its rejoinder to the Reply ["**Rejoinder**"].

16. On 21 October 2024 the Tribunal invited the Parties to simultaneously present their statements of costs ["**Rectification Costs**"].

17. On 4 November 2024 the Parties filed their Rectification Costs ["**Claimant's Rectification Costs**" and "**Respondent's Rectification Costs**"].

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

18.    On 11 November 2024 the Republic provided further comments on Claimant's Rectification Costs. Upon the Tribunal's invitation, Claimant set out its comments in response.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# III. <u>RELEVANT PROVISIONS</u>

19.    For the purpose of this Decision, the relevant provisions regarding rectification are the following:

20.    Art. 49(2) of the ICSID Convention:

> "The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered".

21.    Arbitration Rule 49(1):

> "Within 45 days after the date on which the award was rendered, either party may request, pursuant to Article 49(2) of the Convention, a supplementary decision on, or the rectification of, the award. Such a request shall be addressed in writing to the Secretary-General. The request shall:
>
> […]
>
> (c) state in detail:
>
> > (i) any question which, in the opinion of the requesting party, the Tribunal omitted to decide in the award; and
> >
> > (ii) any error in the award which the requesting party seeks to have rectified; and
>
> (d) be accompanied by a fee for lodging the request".

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# IV. <u>PARTIES' POSITIONS</u>

22.   Claimant's Request for Rectification gives rise to three separate groups of proposed amendments: the proposed rectification of paras. 739 and 822 to amend the translation of the word "*condena*" in the English version of the Award (**1.**); the changing of the date of accrual in para. 883 (**2.**) and the rectification of the dipositive part of the Award, namely para. 887(3) (**3.**).

## 1.   <u>PARAGRAPHS 739 AND 822</u>

### A.   <u>Claimant's position</u>

23.   Claimant is of the view that the word "*condena*" has been mistranslated in para. 739 of the Award[1] and believes that the following change should be made to the English version of the Award[2]:

> "In addition, **Order 63** revises the same period already subject to re-assessment by Order 217 and whose ~~sentence~~ payment order had **already been paid** by CMSA. The state thus tried to tax the same period twice for the same reason, resulting in a manifest **abuse** and a **violation of legal certainty**"[3].

24.   Similarly, Claimant takes issues with the translation of "*condena*" in para. 822 of the Award[4]:

> "Nor does the majority of the Arbitral Tribunal consider that the claim infringes on the sovereignty of the state, as it is a pecuniary ~~sentence~~ order, for an amount to be determined in the future".

### B.   <u>Respondent's position</u>

25.   Colombia does not object to "*condena*" being translated as "payment order" and "order" respectively, believing that the requests fall under the scope of rectification under Art. 49(2) of the ICSID Convention[5].

## 2.   <u>PARAGRAPH 883</u>

### A.   <u>Claimant's position</u>

26.   Claimant requests the following amendment to para. 883 of the Award[6]:

---

[1] Request for Rectification, para. 13.
[2] Request for Rectification, para. 15.
[3] The changes in red within Section IV represent Claimant's proposed changes to the Award.
[4] Request for Rectification, paras. 14 – 15.
[5] Response, para. 11.
[6] Request for Rectification, para. 17.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Decision on Request for Rectification

"The dates and amounts, relevant for accrual, shall be:

- ~~23 July 2023~~ 27 July 2023 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 4,519,417;

- 21 June 2024 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 5,050,000;

- The date on which CMSA disburses any amount claimed in the unenforced Measures in Breach and for iron royalties, until Colombia pays South32 Investments Limited that amount converted to USD, net of dividend withholding, and multiplied by 99.96% – this amount being the principal amount on which interest will accrue".

27.    Claimant argues that date reflected in para. 883 of the Award, that being "23 July 2023", likely reflects a typo as the notional valuation date used for the calculation of interest on the damages owed was 27 July 2023 – as acknowledged by the Tribunal through the use of this date in other sections of the Award[7].

## B.    **Respondent's position**

28.    As with respect to paras. 739 and 822, Colombia does not oppose the correction of para. 883 to take into account the correct valuation date, arguing that it amounts to a "clerical, arithmetical or similar" error pursuant to Art. 49(2) of the ICSID Convention[8].

## 3.    PARAGRAPH 887(3)

## A.    **Claimant's position**

29.    Claimant argues that para. 887(3) of the Award ["**Disputed Paragraph**"] requires further clarification for the future indemnity to have full effect. The Claimant proposes the following amendment[9]:

"By majority, orders Colombia to:

(i)    Hold South32 SA Investments Limited harmless in ~~USD by the percentage resulting from deducting the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on~~ the amount that Cerro Matoso S.A. pays in execution of:

-    resolution 293 of the Mining and Energy Planning Unit, which applies Arts. 8 and 9 of Resolution 293 of the National Mining Agency;

-    Order VSC 26;

---

[7] Request for Rectification, para. 16, *citing* Award, paras. 767, 778, 779.
[8] Response, para. 11.
[9] Request for Rectification, para. 21.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

- Cundinamarca Petition;

- Resolution 576;

- Order 63~~;~~

Such indemnity shall be:

- First, converted to USD (at the exchange rate applicable on the date of payment);

- Then, reduced by the percentage at which the state taxes income obtained through dividends; and

- Then, multiplied by 99.94% (the percentage of ownership held by South32 Investments Limited in CMSA).

(ii) Hold South32 SA Investments Limited harmless in ~~USD by the percentage that results from deducting the tax benefit obtained from the payment of the iron royalties, the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on~~ the amount that Cerro Matoso S.A. pays for the iron royalty settlements.

Such indemnity shall be:

- First, reduced to the extent that Cerro Matoso S.A.'s iron royalty settlement payments lead to any income tax rebate for Cerro Matoso S.A.;

- Then, converted to USD (at the exchange rate applicable on the date of payment);

- Then, reduced by the percentage at which the state taxes income obtained through dividends; and

- Then, multiplied by 99.94% (the percentage of ownership held by South32 Investments Limited in CMSA)".

30. Claimant believes that it is not unambiguously clear in either language version of the Award that the wording of the Disputed Paragraph properly reflects the Tribunal's methodology for calculating the future indemnity to be paid by Colombia[10] as expressed in paras. 841 to 843[11]:

"841. The majority of the Tribunal orders that compensation shall therefore be calculated as follows:

842. *First*, the amount paid by CMSA due to the enforcement of a Measure in Breach:

- Will be converted to USD;

---

[10] Request for Rectification, para. 20.
[11] Request for Rectification, para. 18.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

- Will be reduced by the percentage at which the state taxes income obtained through dividends;

- Will be multiplied by 99.94% (the percentage of ownership held by South32 Investments Limited in CMSA).

843. In the case of the iron royalty, moreover, and as already seen in the analysis of the historical damage, CMSA accounted for it as an expense, which led to a reduction of the income tax that should now be deducted from the compensation to be received. Therefore, to the extent that future iron royalty payments lead to an income tax rebate, that amount should first be reduced by the applicable income tax percentage. Once the amount net of the tax's impact is obtained, it shall be converted into USD and reduced based on the tax on dividends and ownership".

31. Claimant suggests that its proposed changes merely reflect *verbatim* the Tribunal's methodology as set out in the aforementioned paragraphs[12].

32. South32 draws particular attention to the phrase "[h]old harmless … by the percentage …", suggesting that an indemnity is an amount of money rather than a percentage. It also believes that the Disputed Paragraph leaves the exact amount on which the adjustments must be made unclear, as it first states the adjustments that need to be made prior to indicating the amount on which they must be carried out[13].

33. Thus, the proposed changes aim to ensure that there are no issues when enforcing the indemnity before the courts[14].

## B.   <u>Respondent's position</u>

34. Respondent opposes Claimant's request to rectify this paragraph, considering it as falling outside the scope of Art. 49(2) of the ICSID Convention[15] and Arbitration Rule 49(1)[16] for failing to identify an outright error that meets the requirements of the former provision.

35. Therefore, and in accordance with "arbitral practice", Respondent believes that a rectification request must meet two criteria[17]:

- Contain a clerical, arithmetical or similar error; and

- Be related to an accessory aspect of the award.

36. But here, Respondent argues, Claimant originally only identified an "ambiguity", rather than an error, without framing the alternate conclusion which an enforcing court may be drawn

---

[12] Reply, para. 18.
[13] Reply, para. 9.
[14] Request for Rectification, para. 21.
[15] Response, para. 14.
[16] Response, para. 15.
[17] Response, para. 17.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

to[18]. This, it suggests, is acknowledged by South32 through it later characterising its request to rectify the Disputed Paragraph as one to correct an error in its Reply[19]. What's more, Claimant fails to identify how the original wording of the Disputed Paragraph could affect the Tribunal's ordered indemnity[20]. Thus, Respondent claims that South32 in fact seeks to redraft the Tribunal's orders.

37.   Furthermore, Respondent argues that rectifying para. 887(3) would have the effect of modifying an essential part of the Award and is anyhow unnecessary due to the Tribunal's reasoning in paras. 841 to 843 largely corresponding to the description in the Disputed Paragraph[21]; there is therefore no error to be amended.

38.   Regarding Claimant's argument that the use of the word "percentage" is particularly confusing, Colombia fails to find a justification for such reasoning. Instead, it suggests that the word is unambiguous, meaning a number that is a proportion or a fraction of an amount, and is consistent anyhow with its use in para. 842 of the Award[22].

39.   The second limb of Colombia's argument, as set out in its Response, is that Claimant is in fact concealing an attempt to recharacterise the Tribunal's methodological approach regarding the indemnity against the payment of future iron royalties[23]. Respondent puts particular emphasis on Claimant's proposal to change the reference to a "tax benefit" to that of a "tax rebate", arguing that it could have a material impact on South32's future indemnities[24].

40.   This argument was disputed by Claimant who suggested that there is no material difference between the use of "tax rebate" and "tax benefit", pointing to the presence of "tax benefit" within para. 843 of the Award – which neither Party has sought to rectify. It therefore inferred that the Tribunal has used the two terms interchangeably. Nevertheless, Claimant is willing to modify its Request for Rectification to include the term "tax benefit" in order to allay Colombia's concerns[25].

**C.   Other decisions**

41.   Claimant finds support for the carrying out the proposed rectification in previous decisions:

42.   It cites *Infracapital* as an example of a minor adjustment to an award in order to better reflect the tribunal's methodology to calculate damages – despite its reasoning being evident from its analysis[26]. Similarly, South32 finds support for its position in *Ickale*, where it was decided that a correction to a paragraph which incorrectly reflected the conclusion of its analysis

---

[18] Response, para. 20.
[19] Rejoinder, para. 14.
[20] Rejoinder, para. 15.
[21] Response, paras. 23 – 24.
[22] Rejoinder, para. 16.
[23] Response, para. 27.
[24] Response, paras. 31 – 33.
[25] Reply, paras. 19 – 20.
[26] Reply, paras. 11 – 12.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

comprised a "clerical, arithmetical or similar" error[27]. The Republic avers that *Infracapital* and *Ickale* lack relevance for the current proceedings insofar as South32, unlike the parties seeking rectification in said cases, has failed to identify an error as required under Art. 49 of the ICSID Convention[28].

43. Claimant finds that, as demonstrated by *IC Power*, the need to avoid future enforcement issues forms a relevant part of a tribunal's analysis when making a decision according to Art. 49 of the ICSID Convention[29]. In contrast, Colombia alleges that the tribunal made the necessary rectification in response to a difference of interpretation between the parties – rather than to deal with enforcement related concerns. In the present dispute, there is no dispute between the Parties regarding the interpretation of the Disputed Paragraph and therefore no need to carry out a rectification[30].

44. Respondent, in turn, finds support in *Watkins Holding* to argue that any recharacterisation of the Tribunal's methodological approach in damages quantification is outside the scope of a request for rectification[31]. Similarly, the tribunal in *Gavazzi* rejected part of a rectification request aimed at clarifying the wording of the award, rather than correcting a clerical or arithmetical error[32].

45. The Republic also cites the case of *Philip Morris* as evidence of a tribunal finding the existence of various potential interpretations of a paragraph irrelevant[33]. South32 finds the case inapposite given that rectification was sought because of an alleged mischaracterisation of a party's argument, which the tribunal found not to have occurred, instead being the result of a "'strained reading of the statements' in the award"[34]. Colombia downplays Claimant's argument, emphasising that the tribunal agreed that the claimant's consideration of how the paragraphs would be interpreted was immaterial[35].

---

[27] Reply, paras. 13 – 14.
[28] Rejoinder, para. 21.
[29] Reply, paras. 15 – 16.
[30] Rejoinder, paras. 22 – 24.
[31] Response, para. 26.
[32] Rejoinder, para. 19.
[33] Response, para. 22.
[34] Reply, para. 17.
[35] Rejoinder, para. 25.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# V.  ANALYSIS

## 1.  APPLICABLE STANDARD

46.    Art. 49(2) of the ICSID Convention establishes the following:

> "The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered".

47.    Similarly, Arbitration Rule 49(1) provides as follows:

> "Within 45 days after the date on which the award was rendered, either party may request, pursuant to Article 49(2) of the Convention, a supplementary decision on, or the rectification of, the award. Such a request shall be addressed in writing to the Secretary-General. The request shall:
>
> (a) identify the award to which it relates;
>
> (b) indicate the date of the request;
>
> (c) state in detail:
>
>> (i) any question which, in the opinion of the requesting party, the Tribunal omitted to decide in the award; and
>>
>> (ii) any error in the award which the requesting party seeks to have rectified; and
>
> (d) be accompanied by a fee for lodging the request".

48.    There is no dispute between the Parties that the Request for Rectification was filed within 45 days of the Award's issuance and accompanied by the required lodging fee. It is also not disputed that the Parties have the right to pursue rectification in accordance with Arbitration Rule 49(1).

49.    The core of the debate between the Parties in relation to para. 887(3) revolves around whether or not Claimant has pursued the rectification of "clerical, arithmetical or similar errors", as per Art. 49(2) of the ICSID Convention.

50.    As set out in Procedural Order No. 1, the procedural languages of the arbitration are both English and Spanish, with both language versions of the Award being equally authentic[36].

---

[36] Procedural Order No. 1, paras. 12.1 and 12.14.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

As an integral part of the Award[37], this decision on Claimant's Request for Rectification ["**Decision**"] is also issued in both procedural languages. This being the case, the Tribunal believes that it is prudent to also assess the relevance of the Spanish version of the ICSID Convention which translates "clerical, arithmetical or similar error[s]" as "*errores materiales, aritméticos o similares*".

51.    The Tribunal notes the potential differing rectification standard that can be derived from the use of the terms "clerical" and "*material*". However, both Parties have debated whether the proposed changes to the Disputed Paragraph amount to a "clerical, arithmetical or similar" error, with no reference to the Spanish version being made. Furthermore, as recognised in *Philip Morris* in analogous circumstances, and according to Art. 33(4) of the Vienna Convention on the Law of Treaties, when there is a conflict between the two language versions the meaning which "best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted". In accordance with the principle of finality of the award, as recognised by the ICSID Convention itself[38], the use of the word "clerical" has best regard to the purpose of the treaty, as it refers to an unintentional error related to documentation or administrative tasks, perfectly aligned with an arithmetical error as set out in Article 49(2) of the ICSID Convention.

52.    Therefore, for the purpose of this Decision, attention shall be given to the English version of the Article.

**2.    PARAGRAPHS 739 AND 822**

53.    The Tribunal acknowledges that Respondent is in agreement with Claimant that amending the translation of the word "*condena*" in the Spanish version of the Award as "payment order" and "order", respectively, meets the requirements of Art. 49(2) of the ICSID Convention. The Tribunal concurs with the Parties in this regard and finds that an "error" has been identified pursuant to Arbitration Rule 49(1) – that being a mistranslation into English of the word "condena" from the Spanish version of the Award. Therefore, South32's request to rectify paras. 739 and 822 of the Award is hereby upheld.

**3.    PARAGRAPHS 883 AND 887(6)**

54.    The Tribunal notes that Colombia agrees with Claimant's proposed amendment to para. 883 of the Award. The Tribunal also notes, however, that the same error is present in para. 887(6) insofar as the Tribunal ordered:

> "the payment of interest at a rate equal to the average annual U.S. Prime rate plus 2%, compounded semi-annually, on:
>
> - USD 4,519,417 accruing from 23 July 2023 until the date of actual payment;"

---

[37] ICSID Convention, Art. 49(2).
[38] ICSID Convention, Art. 53.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

55.    The Tribunal finds that in its proposed changes to para. 883 Claimant has identified a "clerical, arithmetical or similar error" and therefore accepts its rectification. As was correctly identified by Claimant, 27 July 2023 is the notional valuation date used as the basis for the experts' calculations in the Joint Valuation Model of the same date[39].

56.    Para. 887(6) also contains such an error which, despite not being raised by the Parties, needs rectification. As per Art. 49(2) of the ICSID Convention the Tribunal is instructed, upon the request of a party, to rectify "**any** clerical, arithmetical or similar error" – irrespective of whether said error is identified by the Parties. This being so, para. 887(6) is similarly amended so that interest accrues from 27 July 2023.

## 4.    PARAGRAPH 887(3)

57.    In its analysis of the Parties' arguments regarding the Disputed Paragraph, the Tribunal will first discern whether an alleged "error" has correctly been identified (**4.1.**). It will then ascertain whether the proposed changes constitute a change to the Tribunal's methodological approach (**4.2.**) and whether clarifying said approach constitutes a rectifiable error (**4.3.**). Finally, it will address whether the need to avoid future enforcement issues is a relevant consideration in the Tribunal's analysis (**4.4**) before setting out its decision (**4.5.**).

### 4.1.    IDENTIFICATION OF AN ERROR

58.    The first point of contention between the Parties surrounds whether Claimant has identified the "error" which it wishes to be rectified in its Request for Rectification, as per the requirements of Arbitration Rule 49(1).

59.    Claimant explains that para. 887(3) holds Claimant to be indemnified in a percentage that results after the application of compensation formula and that difficulties may arise at the enforcement stage because a "percentage" is not a unit of compensation.

60.    Respondent focuses on the fact that Claimant has failed to identify a specific "error" within its Request for Rectification[40], instead choosing to refer to the need to "unambiguously give effect to the tribunal's intention" and to avoid any future enforcement issues[41]. It highlights that there is no possible error or unambiguity, as both Parties are in agreement as to what the Award decided.

61.    The Tribunal finds that Art. 49(2) of the ICSID Convention allows the rectification of any "clerical, arithmetical or **similar** error". Claimant seems to be including its rectification request in the latter category: the error would consist of a choice of words in the Award which does not correctly reflect the Tribunal's previous findings.

62.    The Tribunal decided in paras. 841 to 843 of the Award that Claimant was to be kept indemnified in an as-yet undetermined amount that would be determined by applying a

---

[39] Award, para. 779.
[40] Rejoinder, para. 14.
[41] Request for Rectification, para. 21.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

certain formula, which included percentages which reflect Claimant's ownership in CMSA and the rate at which the state levies taxes on the income obtained via dividends. It was, therefore, clear that the Tribunal was ordering Respondent to hold Claimant indemnified in an amount of money. Since para. 887(3) of the Award literally orders Respondent to hold Claimant indemnified in a percentage, Claimant believes that the Decision does not correctly reflect the Tribunal's previously explained finding.

63.    The Tribunal is, in view of this, satisfied that Claimant has identified an error which may potentially require rectification, pursuant to Arbitration Rule 49(1).

## 4.2.    ALLEGED CHANGES TO THE METHODOLOGICAL APPROACH

64.    One element of Respondent's argument for rejecting the changes to the Disputed Paragraph is the idea that Claimant is intending to change the Tribunal's methodological approach through its amendments. Colombia draws particular attention to the change in phrasing that would occur, if Claimant's proposal was accepted, from "tax benefit" to "tax rebate"[42]. Claimant ultimately agreed to amend its proposed changes in order to maintain the reference to "tax benefit"[43]. The matter, therefore, has been dealt with.

65.    Putting the debate around the use of "tax rebate" aside, the Tribunal does not find that Claimant, through its proposed changes to the Disputed Paragraph, intends to amend its methodological approach. As rightly noted by Claimant[44], the proposed changes largely quote *verbatim* the Tribunal's approach as set out in paras. 841 to 843 of the Award and are, therefore, consistent with its methodology.

## 4.3.    RECTIFICATION TO CLARIFY THE TRIBUNAL'S APPROACH

66.    Claimant turns to the decision in *Infracapital* to support its proposition that awards may be rectified in order to clarify the methodology used to calculate damages despite its methodology being "evident"[45]. Similarly, it gives *Ickale* as an example of the rectification of a drafting error which resulted in an incorrect description of the conclusion of its analysis[46].

67.    Respondent, on the other hand, asserts that these cases can be differentiated from the present one as South32 has failed to identify an error under Art. 49(2) of the ICSID Convention[47]. In support of its argument, it refers to *Gavazzi,* in which the tribunal rejected a requested amendment for attempting to simply clarify, rather than rectify, the wording[48] and *Philip Morris*, where the tribunal found the potential varying interpretations of a paragraph to be irrelevant.

---

[42] Response, paras. 29 – 33.
[43] Reply, para. 20.
[44] Reply, para. 18.
[45] Reply, paras. 11 – 12.
[46] Reply, paras. 13 – 14.
[47] Rejoinder, para. 21.
[48] Rejoinder, para. 19.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

68.   Claimant is correct in asserting that the tribunal in *Infracapital* carried out a rectification in order to "properly reflect its analysis and conclusion"[49]. Although comparisons can be drawn with Claimant's proposed changes, the change carried out in *Infracapital* rectified an error, rather than mere ambiguity, and was limited to the substitution of a word – rather than a wholesale redrafting of the paragraph, as Claimant now requests.

69.   Similarly, in *Ickale*, although the rectification made was more extensive[50], it responded to errors in the drafting instead of merely enhancing the paragraph's readability.

70.   This is consistent with the decision in *Gavazzi*, whereby the tribunal rejected the claimants' proposed amendment due to it merely seeking to clarify something that they acknowledged was self-evident[51].

71.   The majority of the tribunal in *Philip Morris* agreed that there being multiple possible interpretations does not constitute a valid reason for rectification[52].

72.   As set out in *Gold Reserve*, the purpose of rectification is to "ensure that the true intentions of the tribunal are given effect"[53].

73.   In view of the above, the Tribunal notes that previous tribunals have accepted rectification requests to provide clarity, to the extent that:

   -   They were needed to reflect the tribunal's analysis and conclusion so as to ensure that the true intentions of the tribunal are given effect;

   -   The meaning of the paragraphs whose clarification was sought was not self-evident; and

   -   The scope of redrafting was limited in its extension.

**4.4.   NEED TO AVOID FUTURE ENFORCEMENT ISSUES**

74.   As an additional consideration, South32 argues that the Tribunal should consider the need to avoid future enforcement issues. Claimant provides the example of the decision in *IC Power*, in which the tribunal failed to reaffirm that the pre-award interest it had ordered should be calculated at the date of the award and be compounded in the dispositive part of the award[54]. Despite both requirements being discernible from its earlier reasoning, rectification was ordered in order to avoid "uncertainties and problems in the event of enforcement of the [a]ward"[55].

---

[49] *Infracapital* (*Decision on the Requests for Rectification*), para. 80.
[50] *Ickale* (*Decision on Claimant's Request for Supplementary Decision and Rectification of the Award*), para. 135.
[51] *Gavazzi* (*Decision on Rectification*), paras. 72 and 74.
[52] Rejoinder, para. 25.
[53] *Gold Reserve* (*Decision Regarding the Claimant's and the Respondent's Requests for Corrections*), para. 38.
[54] Reply, para. 15.
[55] *IC Power* (*Decision on the Requests for Rectification and Clarification*), para. 37.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

75. The Tribunal agrees with the principle that ensuring the Award can be properly enforced is a relevant consideration when assessing whether an error should be rectified. However, the Tribunal acknowledges the differing context in *IC Power*, as noted by Colombia, in that there was disagreement between the parties of that case regarding the interpretation of a paragraph[56]. In the current proceedings, the Parties broadly agree on the interpretation of the Disputed Paragraph, with Claimant instead alleging that its wording is not unambiguously clear.

### 4.5. DECISION

76. The Tribunal agrees with Claimant that an "error" has been identified as per Arbitration Rule 49(1) and Art. 49(2) of the ICSID Convention.

77. References to holding South32 harmless by a "percentage" within the Disputed Paragraph represent a drafting error insofar as an indemnity is an amount, rather than a percentage. The Tribunal accepts that that the word "percentage" be replaced with "amount", to properly give effect to the Tribunal's true intentions, as expressed in paras. 841 to 843 of the Award, and to, eventually, facilitate the enforcement of the Award.

78. As to the remainder of the proposed changes, the Tribunal finds them unsuitable, as they imply substantive redrafting of self-evident paragraphs – thereby not meeting the required standard to warrant rectification. As previously stated, changes that merely increase the Disputed Paragraph's legibility exceed the scope of Art. 49(2) of the ICSID Convention.

79. For the reasons set out *supra*, the Tribunal finds that the requirements of Art. 49(2) of the ICSID Convention and Arbitration Rule 49(1) have both been met in relation to the use of "percentage" in the phrase "hold South32 SA Investments Limited harmless in USD by the percentage …" as used within para. 887(3). Therefore, the Tribunal upholds Claimant's proposed amendment to the Disputed Paragraph in this regard, whilst rejecting all further changes to the subparagraph.

---

[56] *IC Power* (*Decision on the Requests for Rectification and Clarification*), para. 31.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# VI. <u>COSTS</u>

**1.    <u>COSTS OF RECTIFICATION</u>**

80.    In this section of the Decision, the Tribunal shall establish and allocate the costs of this rectification procedure ["**Costs of Rectification**"]. The Tribunal shall first determine the applicable rules as well as each category of Costs of Rectification (**1.1.**): the fees and expenses of the arbitrators and the expenses incurred by the Parties for their defence in the rectification procedure. The Tribunal shall then briefly summarise the Parties' claims in respect of the Costs of Rectification (**1.2. and 1.3.**). Finally, the Tribunal shall award the Costs of Rectification accordingly (**1.4.**).

**1.1.    <u>APPLICABLE RULES</u>**

81.    As per Arbitration Rules 47(1)(j) and 49(4) the Tribunal must make a decision on the Costs of Rectification.

82.    Additionally, Art. 61.2 of the ICSID Convention provides as follows:

> "[T]he Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award".

83.    The Costs of Rectification include:

-    The fees and expenses of the arbitrators ["**Administrative Costs**"] (**A.**); and

-    Reasonable expenses incurred by the Parties for their defence in the rectification proceedings ["**Legal Costs**"] (**B.**).

**A.    <u>Administrative Costs</u>**

84.    The fees accrued and expenses incurred by the Tribunal have been as follows:

|  | Fees (USD) | Expenses (USD) |
|---|---|---|
| **Guido Tawil** | 7,500- | 61.85- |
| **Andrés Jana** | 2,750- | - |

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
Decision on Request for Rectification

| | | |
|---|---|---|
| **Deva Villanúa** | 13,000- | 53.26- |
| **Total** | 23,250- | 115.11- |

85.    In total, the fees and expenses of the members of the Tribunal amount to USD  23,365.11.

86.    Thus, the entire Administrative Costs are therefore covered by the remaining balance in the account held by ICSID for this case[57]. ICSID will reimburse the remaining balance to the Parties in proportion to the payments that they advanced, after the deduction of the Administrative Costs. The final financial statement for the rectification proceedings will be sent to the Parties separately.

**B.    Legal Costs**

87.    On 4 November 2024, the Parties filed their Rectification Costs.

88.    Claimant submitted the following breakdown of its legal and other costs[58]:

| | (USD) |
|---|---|
| Lawyers' fees | 100,138.16 |
| Lodging Fee | 10,000 |
| **Total** | **110,138.16** |

89.    In turn, Respondent claimed to have incurred USD 684.28 in Legal Costs[59].

**1.2.    CLAIMANT'S POSITION**

90.    Claimant requests that the Tribunal[60]:

---

[57] In accordance with para. 866 of the Award, at the closing of the main proceeding there was a remaining balance from the deposits of advance funds made by the Parties throughout the main proceeding, which is yet to be reimbursed and is sufficient to cover the Administrative Costs related to the Request for Rectification.
[58] Claimant's Rectification Costs, para. 5.
[59] Respondent's Rectification Costs, para. 2.
[60] Reply, para. 24(d).

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

> "ORDER Colombia to pay all of the costs and expenses associated with these proceedings under Article 49 of the ICSID Convention, including Claimant's legal fees and costs, the fees and expenses of the Tribunal and ICSID's other costs".

91.  As the basis for its request that Colombia be ordered to pay all the Costs of Rectification, Claimant argues that the Tribunal should take into account the meritorious nature of both South32's arbitration claim and its Request for Rectification. It also seeks to highlight the Republic's "obstructive conduct" due to the length of its deadline extension request to present its Response and the frivolous content of its pleadings. For these reasons, Claimant believes it should not have to bear the costs of the rectification of what are ultimately clerical errors in the Award[61].

92.  As for the difference between its own Legal Costs and those of Colombia, South32 suggests that any comparison is unwarranted as Respondent did not engage external counsel and its submissions were limited to objecting to its Request for Rectification, placing the onus on Claimant to defend its pleading. In any case, the Republic's comments on its Legal Costs should be rejected outright for stemming from an unauthorised communication[62].

### 1.3.  RESPONDENT'S POSITION

93.  Respondent has requested that the Tribunal[63]:

> "Order Claimant to pay all the costs and expenses associated with these proceedings under Article 49 of the ICSID Convention, including the Republic of Colombia's legal fees, the expenses of the Tribunal, and ICSID's other costs".

94.  Additionally, Colombia has requested that Claimant be ordered to pay interest on its Legal Costs[64].

95.  Colombia argues that the supposed lack of merit of Claimant's arguments, and irrelevance of its presented case law, mean that the Costs of Rectification should be fully assigned to South32. Regarding its deadline extension request, it believes that it was fully justified as the *Agencia Nacional de Defensa Jurídica del Estado* ["**ANDJE**"] was attempting to retain external counsel – ultimately failing to do so, resulting in ANDJE having to present its pleadings in these proceedings in order to avoid any undue delay. Respondent seeks to contrast its behaviour, agreeing to two of the three rectification requests and presenting reasonable objections to the third, with that of Claimant – filing an unsupported Request for Rectification and unnecessarily extending the proceedings by demanding a second round of submissions[65].

---

[61] Reply, paras. 22 – 23.
[62] Claimant's email of 11 November 2024.
[63] Rejoinder, para. 35(ii).
[64] Respondent's Rectification Costs, para. 3.
[65] Rejoinder, paras. 28 – 34.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

96.    Regarding the appropriateness of Claimant's Legal Costs, the Republic finds them to be excessive relative to the filing of two pleadings of limited length; even more so considering that it was South32's decision to proceed with a second round of pleadings on rectification[66].

**1.4.    TRIBUNAL'S DECISION**

97.    As per Art. 61(2) of the ICSID Convention, the Tribunal has broad discretion when apportioning the Costs of Rectification between the Parties.

98.    Seeing as both Parties were successful in convincing the Tribunal of the merits of elements of their arguments regarding rectification, as well as the analogous evidentiary effort made by the Parties, the Tribunal finds that each Party shall bear its own Legal Costs and share the Administrative Costs in equal measures, totalling 11,682.55 per Party.

99.    In reaching this decision the Tribunal took into account:

-    The Parties' good faith: although Claimant was fully successful in all but one of its requested amendments, Respondent did not oppose the amendment of three of the four paragraphs. Similarly, South32 accepted the maintenance of the reference to "tax benefit" within para. 887(3); and

-    The Tribunal does not find either of the Parties' arguments to be frivolous nor does it perceive evidence of "obstructive conduct" by Respondent in the length of its request for a deadline extension to produce its Response or by Claimant in its decision to file its Reply. The fact that Colombia was ultimately unable to obtain external legal counsel, instead being represented by the ANDJE, seems *prima facie* to uphold Respondent's argument that the extension was due to an inability to obtain external legal counsel.

100.    Seeing as each Party will bear the burden of its own Legal Costs, whether Claimant's are excessive, or if interest should accumulate on them, are no longer relevant. Therefore, the Tribunal does not deem it necessary to opine on such matters.

---

[66] Respondent's email of 11 November 2024.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

# VII.    DECISION

101.  For all the above reasons, the Tribunal unanimously[67]:

1.    RECTIFIES the English version of para. 739 of the Award as follows:

"In addition, **Order 63** revises the same period already subject to re-assessment by Order 217 and whose ~~sentence~~ payment order had **already been paid** by CMSA. The state thus tried to tax the same period twice for the same reason, resulting in a manifest **abuse** and a **violation of legal certainty**".

2.    RECTIFIES the English version of para. 822 of the Award as follows:

"Nor does the majority of the Arbitral Tribunal consider that the claim infringes on the sovereignty of the state, as it is a pecuniary ~~sentence~~ order, for an amount to be determined in the future".

3.    RECTIFIES para. 883 of the English and Spanish versions of the Award as follows:

"The dates and amounts, relevant for accrual, shall be:

- ~~23 July 2023~~ 27 July 2023 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 4,519,417;

- 21 June 2024 until the date of payment to South32 Investments Limited, in respect of a principal amount of USD 5,050,000;

- The date on which CMSA disburses any amount claimed in the unenforced Measures in Breach and for iron royalties, until Colombia pays South32 Investments Limited that amount converted to USD, net of dividend withholding, and multiplied by 99.96% – this amount being the principal amount on which interest will accrue".

"*Las fechas e importes, relevantes para el devengo serán:*

*- El ~~23 de julio de 2023~~ 27 de julio de 2023 hasta la fecha de pago a South32 Investments Limited, respecto a un principal de USD 4.519.417;*

*- El 21 de junio de 2024 hasta la fecha de pago a South32 Investments Limited, respecto a un principal de USD 5.050.000;*

*- La fecha en que CMSA desembolse cualquier cantidad reclamada en las Medidas Violatorias aún no ejecutadas y por regalías del hierro, hasta que Colombia pague a South32 Investments Limited aquella cantidad convertida a USD, deducida la retención*

---

[67] The arbitrator Prof. Andrés Jana wishes to convey that, without prejudice to his position with respect to the Award, as contained in his Dissenting Opinion, he concurs with the contents of the present Decision.

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

*por dividendos, y multiplicada por 99,96% – siendo este importe el principal sobre el que se devengarán intereses*".

4.    RECTIFIES para. 887 of the English and Spanish versions of the Award as follows:

"For all the above reasons, the Arbitral Tribunal

(3) By majority, orders Colombia to:

(i)    Hold South32 SA Investments Limited harmless in USD by the ~~percentage~~ amount resulting from deducting the percentage withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays in execution of:

-    resolution 293 of the Mining and Energy Planning Unit, which applies Arts. 8 and 9 of Resolution 293 of the National Mining Agency;

-    Order VSC 26;

-    Cundinamarca Petition;

-    Resolution 576;

-    Order 63.

(ii)    Hold South32 SA Investments Limited harmless in USD by the ~~percentage~~ amount that results from deducting the percentage tax benefit obtained from the payment of the iron royalties, the withholding tax on dividends in force and multiplying the percentage of ownership of Cerro Matoso S.A. held by South32 SA Investments Limited, on the amount that Cerro Matoso S.A. pays for the iron royalty settlements".

[…]

(6) Unanimously orders the payment of interest at a rate equal to the average annual U.S. Prime rate plus 2%, compounded semi-annually, on:

-    USD 4,519,417 accruing from ~~23 July 2023~~ 27 July 2023 until the date of actual payment;"

"*Por todas las razones expuestas, el Tribunal Arbitral:*

*(3) Por mayoría, ordena a Colombia a:*

*(i)    Mantener a South32 SA Investments Limited indemne en USD por el ~~porcentaje~~ importe que resulte de deducir ~~la~~ el porcentaje de retención sobre dividendos vigente y multiplicar el porcentaje de propiedad sobre Cerro Matoso S.A. detentado por South32 SA Investments Limited, sobre el importe que Cerro Matoso S.A. pague, en ejecución de:*

-    *resolución 293 de la Unidad de Planeación Minero Energética, en aplicación de los arts. 8 y 9 de la Resolución 293 de la Agencia Nacional de Minería;*

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

- *Auto VSC 26;*

- *Petición Cundinamarca;*

- *Resolución 576;*

- *Auto 63.*

(ii) *Mantener a South32 SA Investments Limited indemne en USD por el ~~porcentaje~~ importe que resulte de deducir el porcentaje de beneficio fiscal obtenido del pago de las regalías sobre el hierro, la retención sobre dividendos vigente y multiplicar el porcentaje de propiedad sobre Cerro Matoso S.A. detentado por South32 SA Investments Limited, sobre el importe que Cerro Matoso S.A. pague por las liquidaciones de regalías sobre el hierro.*

*[...]*

*(6) Por unanimidad, ordena pagar intereses a un tipo equivalente a la media anual del U.S. Prime rate aumentado en un 2%, capitalizado semestralmente, sobre:*

- *USD 4.519.417, devengándose desde el ~~23 de julio de 2023~~ 27 de julio de 2023 hasta la fecha de pago efectivo;"*

5.    DECIDES that each Party shall bear its own Legal Costs and half of the Administrative Costs.

6.    REJECTS any other claims.


\* \* \*


**[Signature page follows.]**

**Decision on Request for Rectification**

_____          _____
Prof. Dr. Guido S. Tawil                    Prof. Andrés Jana Linetzky
Arbitrator                                             Arbitrator

Date:  21 January 2025                    Date:

_____
Ms. Deva Villanúa
President of the Tribunal

Date:

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

_____

Prof. Dr. Guido S. Tawil
Arbitrator

Prof. Andrés Jana Linetzky
Arbitrator

Date:

Date:   21 January 2025

_____

Ms. Deva Villanúa
President of the Tribunal

Date:

25

*South32 SA Investments Limited v. Republic of Colombia*
(ICSID Case No. ARB/20/9)
**Decision on Request for Rectification**

Prof. Dr. Guido S. Tawil
Arbitrator

Prof. Andrés Jana Linetzky
Arbitrator

Date:

Date:

Ms. Deva Villanúa
President of the Tribunal

Date: 21 January 2025