# Exhibit C

The Agreement was
previously published as
Colombia No. 1 (2014)
Cm 8887



Treaty Series No. 24 (2014)

# Bilateral Agreement

for the Promotion and Protection of Investments between the Government
of the United Kingdom of Great Britain and Northern Ireland and
Republic of Colombia

Bogota, 17 March 2010

[The Agreement entered into force on 10 October 2014]

*Presented to Parliament*
*by the Secretary of State for Foreign and Commonwealth Affairs*
*by Command of Her Majesty*
*November 2014*

Cm 8973



© Crown copyright 2014

This publication is licensed  under the terms of the Open Government Licence v3.0 except where otherwise stated. To view this licence, visit www.nationalarchives.gov.uk/doc/open-government-licence/version/3/ or write to the Information Policy Team, The National Archives, Kew, London TW9 4DU,  or email: psi@nationalarchives.gsi.gov.uk

Where we have identified any third party copyright information you will need to obtain permission from the copyright holders concerned.

This publication is available at www.gov.uk/government/publications

Any enquiries regarding this publication should be sent to us at Treaty Section, Foreign and Commonwealth Office, King Charles Street, London, SW1A 2AH

Print ISBN 9781474112536
Web ISBN 9781474112543

Printed in the UK by the Williams Lea Group on behalf of the Controller of Her Majesty's Stationery Office

ID P02699000   11/14   44831   19585

Printed on paper containing 30% recycled fibre content minimum

**BILATERAL AGREEMENT FOR THE PROMOTION AND PROTECTION OF INVESTMENTS BETWEEN THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND AND REPUBLIC OF COLOMBIA**

The Government of the United Kingdom of Great Britain and Northern Ireland and the Republic of Colombia hereinafter referred to as the "Contracting Parties";

Desiring to intensify the economic cooperation to mutual benefit of both Contracting Parties;

Intending to create and maintain favourable conditions for the investments of investors of one Contracting Party in the territory of the other Contracting Party;

Recognising the need to promote and protect foreign investments with the aim to stimulate individual business initiative and to foster the economic prosperity of both Contracting Parties;

Have agreed as follows;

ARTICLE I

**Definitions**

For the purposes of this Agreement:

1.  Investor

    The term "investor" means:

    (a)  In respect of the United Kingdom: Physical persons deriving their status as United Kingdom nationals from the law in force in the United Kingdom; and corporations, firms and associations incorporated or constituted under the law in force in any part of the United Kingdom or in any territory to which this Agreement is extended in accordance with the provisions of Article XIV, which have their registered office, central administration, or principal place of business, as well as substantial business activities, in the territory of the United Kingdom or in any territory to which this Agreement is extended in accordance with the provisions of Article XIV;

    (b)  In respect of Colombia: Natural persons of Colombia who, according to the law of Colombia, are considered to be its nationals; and legal entities including companies, corporations, commercial associations and other organisations, constituted or otherwise organised according to the law of Colombia which have their seat, as well as substantial business activities, in the territory of Colombia.

3

This Agreement shall not apply to investments made by natural persons who are nationals of both Contracting Parties.

2.    Investment

    (a)   Investment means every kind of economic asset, owned or controlled directly or indirectly, by investors of a Contracting Party in the territory of the other Contracting Party, in accordance with the law of the latter, including in particular, but not exclusively, the following:

        (i)   movable and immovable property, as well as any other rights *in rem*, including property rights;

        (ii)   shares in, and stocks and debentures of, a company and any other kind of economic participation in a company;

        (iii)   claims to money or to any performance under contract having an economic value;

        (iv)   intellectual property rights, including, among others, copyrights and related rights, and industrial property rights such as patents, technical processes, manufactures' brands and trademarks, trade names, industrial designs, know-how and goodwill;

        (v)   business concessions granted by law, administrative acts or contracts including concessions to explore, grow, extract or exploit natural resources.

    (b)   Investment does not include:

        (i)   public debt operations;

        (ii)   claims to money arising solely from:

            a   commercial contracts for the sale of goods and services by a national or legal entity in the territory of a Contracting Party to a national or a legal entity in the territory of the other Contracting Party; or

            b   credits granted in relation to a commercial transaction.

    (c)   A change in the manner in which assets have been invested or re-invested does not affect their status as investments under this Agreement, provided that the assets still fall within the definition contained in this Article and the investment is made in accordance with the law of the Contracting Party in whose territory the investment has

been admitted. The term "investment" includes all investments, whether made before or after the entry into force of this Agreement.

    (d)    In order to qualify as an investment under this Agreement, an asset must have the minimum characteristics of an investment, which are the commitment of capital or other resources and the assumption of risk.

3.    Returns

The term "returns" means the amounts yielded by an investment during a specific period of time and includes in particular, but not exclusively, profits, dividends and interests, capital gains, royalties and fees.

4.    Territory

The term "territory" means:

    (a)    In respect of the United Kingdom: Great Britain and Northern Ireland, including the territorial sea and maritime area situated beyond the territorial sea of the United Kingdom which has been or might in the future be designated under the national law of the United Kingdom in accordance with international law as an area within which the United Kingdom may exercise rights with regard to the sea-bed and subsoil and the natural resources and any territory to which this Agreement is extended in accordance with the provisions of Article XIV; and

    (b)    In respect of the Republic of Colombia: In addition to its continental territory, the archipelago of San Andres, Providencia and Santa Catalina, the Island of Malpelo, and all the other islands, islets, keys, headlands and shoals that belong to it, as well as airspace and maritime areas over which it has sovereignty or sovereign rights or jurisdiction in accordance with its domestic law and international law, including applicable international treaties.

## ARTICLE II

### Promotion, Admission and Protection of Investments

1.    Each Contracting Party, shall in its territory encourage investments of investors of the other Contracting Party and shall admit them in accordance with its law.

2.    Each Contracting Party shall protect within its territory investments made in accordance with its law by investors of the other Contracting Party and shall not impair by discriminatory measures the management, maintenance, use, enjoyment, extension, sale and liquidation of said investments.

5

3.    Each Contracting Party shall accord fair and equitable treatment and full protection and security in its territory to investments of investors of the other Contracting Party.

4.    For greater certainty:

(a)    The concepts of "fair and equitable treatment" and "full protection and security" do not require additional treatment to that required in accordance with international law;

(b)    "Fair and equitable treatment" includes the prohibition against the denial of justice in criminal, civil, or administrative proceedings in accordance with the principle of due process embodied in the main legal systems of the world;

(c)    A determination that there has been a breach of another provision of this Agreement or another international agreement does not establish that the obligation to accord fair and equitable treatment has been breached;

(d)    The "full protection and security" standard does not imply, in any case, a better treatment to that accorded to nationals of the Contracting Party in whose territory the investment has been made.


ARTICLE III

**National Treatment and Most Favoured Nation Provisions**

1.    Each Contracting Party shall grant to the investments of investors of the other Contracting Party made in its territory, a treatment not less favourable than that accorded, in like circumstances, to investments of its own investors or to investments of investors of another third State, whichever is more favourable to the investor.

2.    The most favourable treatment to be granted in like circumstances referred to in this Agreement does not encompass mechanisms for the settlement of investment disputes, such as those contained in Articles IX and X of this Agreement, which are provided for in treaties or international investment agreements.

6

ARTICLE IV

**Exceptions**

1.     The provisions of this Agreement relative to the grant of treatment not less favourable than that accorded to investors of either Contracting Party or of any third State shall not be construed so as to preclude the adoption or enforcement by a Contracting Party of measures which are necessary to protect national security, public security or public order.

2.     The provisions of this Agreement shall not be construed to oblige one Contracting Party to extend to investors of the other Contracting Party the benefits of any treatment, preference or privilege, resulting from:

    (a)     any existing or future customs, economic or monetary union, a common market or a free trade area or similar international agreement to which either of the Contracting Parties is or may become a party, and includes the benefit of any treatment, preference or privilege resulting from obligations arising out of an international agreement or reciprocity arrangement of that customs, economic or monetary union, common market or free trade area; or

    (b)     any international agreement or arrangement relating wholly or mainly to taxation or any domestic legislation relating wholly or mainly to taxation.

3.     The provisions of this Agreement shall not be construed so as to prevent the United Kingdom from implementing any requirements resulting from the United Kingdom's membership of the European Union with respect to measures prohibiting, restricting or limiting the movement of capital to or from any third State.

4.     Where, in exceptional circumstances, payments and capital movements cause or threaten to cause serious difficulties for the operation of monetary policy or exchange rate policy in either Contracting Party, the Contracting Party concerned may take safeguard measures with regard to payments and capital movements.

Such measures shall be temporary, non-discriminatory, and of general application; such measures shall not be arbitrary and shall not exceed what is necessary to deal with the difficulties.

As soon as practicable after a Contracting Party adopts a measure under this Article, that Contracting Party shall inform the other Contracting Party of the justification for the measures adopted, as well as the scope and relevance of such measures.

ARTICLE V

**Free Transfer of Investments and Returns**

1.    Each Contracting Party shall in respect of investments and returns and without unjustified delay allow investors of the other Contracting Party to effect, in a freely convertible currency, transfers, including but not limited to:

    (a)   investments as defined in Article I;

    (b)   the principal amount and additional sums necessary for maintaining, increasing and developing the investment;

    (c)   returns as defined in Article I;

    (d)   payments pursuant to foreign loans;

    (e)   funds yielded from settlement of disputes and compensation, as provided for in Articles VI, VII and IX;

    (f)   proceeds from the sale of all or any part of the investment, or from the partial or complete liquidation of the investment; and

    (g)   salaries and remunerations received by the employees hired overseas in connection with an investment.

2.    Unless otherwise agreed by the investor, transfers shall be made in conformity with the current market exchange rate on the day of transfer, in accordance with the law of the Contracting Party in whose territory the investment has been made.

3.    Notwithstanding the provisions of this Article, a Contracting Party may condition or prevent a transfer through the equitable, non-discriminatory and good faith application of its laws relating to:

    (a)   bankruptcy proceedings, company restructuring or insolvency;

    (b)   compliance with judicial, arbitral or administrative decisions and awards; and

    (c)   compliance with labour or tax obligations.

ARTICLE VI

**Expropriation**

1.    Investments of investors of a Contracting Party in the territory of the other Contracting Party shall not be the subject of nationalisation, direct or indirect expropriation, or any measure having similar effects (hereinafter "expropriation") except for reasons of public purpose or social interest (which shall have a meaning compatible with that of "public purpose"), in accordance with due process of law, in a non-discriminatory manner, in good faith and accompanied by prompt, adequate and effective compensation.

2.    For the purposes of this Agreement, it is understood that:

   (a)    indirect expropriation results from a measure or series of measures of a Contracting Party having an equivalent effect to direct expropriation without formal transfer of title or outright seizure;

   (b)    the determination of whether a measure or series of measures of a Contracting Party constitute indirect expropriation requires a case-by-case, fact based inquiry into various factors including, but not limited to the scope of the measure or series of measures and their interference with the reasonable and distinguishable expectations concerning the investment;

   (c)    non-discriminatory measures that the Contracting Parties take for reasons of public purpose or social interest (which shall have a meaning compatible with that of "public purpose") including for reasons of public health, safety, and environmental protection, which are taken in good faith, which are not arbitrary, and which are not disproportionate in light of their purpose, shall not constitute indirect expropriation.

3.    The compensation shall amount to the fair market value of the investment immediately before the expropriatory measures were adopted or immediately before the expropriatory measures became public knowledge, whichever is the earlier (hereinafter the "date of value"). For the sake of clarity, the date of value shall be applied to assess the compensation to be paid regardless of whether the criteria specified in paragraph 1 of this Article have been met.

4.    The fair market value will be calculated in a freely convertible currency, as per the exchange rate on the date of value. The compensation shall include interest at a commercial rate fixed in accordance with the market criteria for that currency, accrued from the date of expropriation until the date of payment. The compensation shall be paid without unjustified delay, be fully realisable and freely transferable.

5.     The legality of the measure and the amount of the compensation may be challenged before the judicial authorities of the Contracting Party adopting it.

6.     Subject to this Article, the Contracting Parties may establish monopolies and reserve strategic activities depriving investors from developing certain economic activities.

7.     The Contracting Parties confirm that issuance of compulsory licenses granted in accordance with the World Trade Organization Agreement on Trade Related Aspects of Intellectual Property Rights, may not be challenged under the provisions set out in this Article.

## ARTICLE VII

### Compensation for Damages or Losses

1.     Investors of a Contracting Party whose investments in the territory of the other Contracting Party suffer losses due to war, armed conflict, revolution, state of national emergency, insurrection, civil disturbances or other similar events, shall be accorded by the latter Contracting Party treatment, as regards restitution, indemnification, compensation or other settlement, no less favourable than that which the latter Contracting Party accords to its own investors or to investors of any third State.

2.     Without prejudice to paragraph (1) of this Article, investors of one Contracting Party who in any of the situations referred to in that paragraph suffer losses in the territory of the other Contracting Party resulting from:

    (a)    requisitioning of their investment by its forces or authorities; or

    (b)    destruction of their investment by its forces or authorities, which was not caused in combat action or was not required by the necessity of the situation;

shall be accorded restitution or adequate compensation.

## ARTICLE VIII

### Investment and Environment

Nothing in this Agreement shall be construed to prevent a Party from adopting, maintaining, or enforcing any measure that it considers appropriate to ensure that an investment activity in its territory is undertaken in a manner sensitive to environmental concerns, provided that such measures are non-discriminatory and proportionate to the objectives sought.

10

ARTICLE IX

**Settlement of Disputes between one Contracting Party and an Investor of the other Contracting Party**

1.    Any disputes arising between an investor of a Contracting Party and the other Contracting Party in connection to the interpretation or application of this Agreement, including a claim that the latter Contracting Party has breached an obligation under this Agreement, shall be settled, as far as possible, amicably. Any dispute shall be notified by submitting a written notification ("Notification of Dispute").

2.    With regard to acts of a governmental authority, in order to submit a claim to arbitration or to a local court or administrative tribunal in accordance with this Article, local administrative remedies shall be exhausted, should it be required by the law of the Contracting Party. Such procedure shall in no case exceed six (6) months from the date of the written notification by the investor.

3.    Disputes between an investor of one Contracting Party and the other Contracting Party which have not been settled in accordance with paragraph (1) or paragraph (2), shall, after a period of six (6) months from the Notification of Dispute, be submitted to the local courts or to international arbitration if the investor concerned so wishes.

4.    Where the dispute is referred to international arbitration, the investor shall give the Contracting Party written notification of its intent to do so at least six (6) months in advance ("Notification of Intent"). Such a notification shall indicate the name and address of the disputing investor, the provisions of the Agreement which it deems to be breached, the facts which the dispute is based on, the estimated value of the damages and compensation sought. The investor and the Contracting Party concerned in the dispute may agree to refer the dispute either to:

    (a)    the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington DC on 18 March 1965 and the Additional Facility for the Administration of Conciliation, Arbitration and Fact-Finding Proceedings);

    (b)    the Court of Arbitration of the International Chamber of Commerce;

    (c)    an international arbitrator or ad hoc arbitration tribunal to be appointed by a special agreement or established under the Arbitration Rules of the United Nations Commission on International Trade Law; or

11

(d)   a tribunal constituted in accordance with the Rules of Arbitration of the arbitral institution in the Contracting Party in whose territory the investment is made, as specified in Schedule 1 to this Agreement.

5.    If after a period of three (3) months from the Notification of Intent to submit the dispute to international arbitration there is no agreement to one of the above alternative procedures, the dispute shall at the request in writing of the investor concerned ("Request for Arbitration") be submitted to arbitration under the arbitration rules of the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington DC on 18 March 1965 and the Additional Facility for the Administration of Conciliation, Arbitration and Fact-Finding Proceedings).

6.    Nothing in this Article shall be construed as to prevent the parties to a dispute from referring their dispute, by mutual agreement, to *ad hoc* mediation or conciliation before or during the arbitral proceedings.

7.    The investor may only submit the Request for Arbitration if the investor has submitted the Notice of Intent in accordance with paragraph (4) of the present article and the term established therein has elapsed.

8.    Each Contracting Party hereby gives in advance its irrevocable consent to the submission of a dispute of this nature to any of the arbitral proceedings established in paragraph 4(a) to (d) of this Article.

9.    Once the investor has submitted the dispute to one of the procedures in paragraphs 3 and 4, the choice of the procedure shall be final.

10.    Arbitration awards shall be final and binding for the disputing parties and shall be enforced when required, in accordance with the law of the Contracting Party in whose territory the investment was made.

11.    The Contracting Parties shall refrain from pursuing through diplomatic channels matters related to disputes between a Contracting Party and an investor of the other Contracting Party submitted to court proceedings or international arbitration in accordance with the provisions of this Article, unless one of the parties to the dispute has failed to comply with the court decision or arbitral award, under the terms established in the respective decision or arbitral award.

12

12.    Before ruling on the merits, the tribunal shall, if it deems it to be necessary and appropriate in the circumstances, rule on the preliminary questions of competence and admissibility. When deciding on any objection of the respondent, the tribunal shall rule on the legal costs and costs of arbitration incurred during the proceedings, considering whether or not the objection prevailed. The tribunal shall consider whether either the claim of the claimant or the objection of the respondent is frivolous or an abuse of process, and shall provide the disputing parties a reasonable opportunity for comments. In the event of a claim which is frivolous or an abuse of process, the tribunal shall award costs against the claimant.

13.    The tribunal shall not be competent to rule on the legality of a measure taken by a Contracting Party as a matter of domestic law.

14.    An investor may not submit the Notification of Intent, and therefore may not invoke the international arbitration procedures set out in this Article, if more than five (5) years have elapsed since the date the investor had knowledge or ought to have had knowledge of the alleged violation of this Agreement and of the alleged losses and damages.


ARTICLE X

**Settlement of Disputes between the Contracting Parties**

1.    Disputes arising between the Contracting Parties regarding the interpretation or application of this Agreement shall be settled as far as possible through direct negotiations.

2.    If an agreement is not reached within six (6) months from the date on which the dispute was notified, any of the Contracting Parties may submit the dispute to an ad-hoc Arbitration Tribunal, in accordance with the provisions of this Article.

3.    The tribunal shall be comprised of three members and, unless otherwise agreed by the Contracting Parties, shall be established as follows: within two (2) months from the date of the receipt of the request for arbitration, each Contracting Party shall appoint an arbitrator. Those two arbitrators shall then, within three (3) months from the date of the last appointment, agree upon a third member who shall be a national of a third State with which both Contracting Parties maintain diplomatic relations, and who shall chair the tribunal. The appointment of the Chair shall be approved by the Contracting Parties within thirty (30) days of his nomination.

4.    If the necessary appointments are not made within the deadline specified in paragraph (3) of this Article, either Contracting Party, unless otherwise agreed, may request the President of the International Court of Justice to make the necessary appointments. If the President of the International Court of Justice is prevented, for any reason, from performing the above-mentioned duty or if that person is a national of either Contracting Party, the appointments shall be made by the Vice-President of the International Court of Justice, and if the latter is prevented or if that person is a national of either Contracting Party, the appointments shall be made by the member of the International Court of Justice next in seniority, who is not a national of either of the Contracting Parties.

5.    The tribunal shall decide the dispute based on the provisions of this Agreement and principles of public international law applicable to the subject matter. The tribunal shall reach its decisions by a majority of votes and shall determine its own procedural rules.

6.    Each of the Contracting Parties shall equally bear the costs of the arbitrators and the arbitral proceeding, unless otherwise established. The decisions of the tribunal shall be final and binding for the Contracting Parties.


ARTICLE XI

**Subrogation**

1.    If one Contracting Party or its designated Agency ("the first Contracting Party") makes a payment under an indemnity given in respect of insurance against non commercial risk for an investment in the territory of the other  Contracting Party ("the second Contracting Party"), the second Contracting Party shall recognise:

  (a)    the assignment to the first Contracting Party by law or by legal transaction of all the rights and claims of the party indemnified; and

  (b)    that the first Contracting Party is entitled to exercise such rights and enforce such claims by virtue of subrogation, to the same extent as the party indemnified.

2.    The first Contracting Party shall be entitled in all circumstances to the same treatment in respect of:

  (a)    the rights and claims acquired by it by virtue of the assignment; and

  (b)    any payments received in pursuance of those rights and claims;

as the party indemnified was entitled to receive by virtue of this Agreement in respect of the investment concerned and its related returns.

14

ARTICLE XII

**Other Provisions**

If the provisions of law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement contain rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rules shall to the extent that they are more favourable prevail over the present Agreement.

ARTICLE XIII

**Scope of Application**

1.    This Agreement is applicable to existing investments at the time of its entry into force, as well as to investments made thereafter in the territory of a Contracting Party in accordance with the law of the latter by investors of the other Contracting Party.

2.    For greater certainty, the provisions of this Agreement shall not apply to claims arising out of events which occurred, or to claims which had arisen, prior to its entry into force.

3.    Except as set out in this Article, this Agreement shall not apply to taxation measures.

4.    Article VI and Article IX shall apply to a taxation measure alleged to be an expropriation. If an investor invokes Article VI as the basis of a claim under Article IX, that investor must, at the time of submitting its Notification of Dispute, refer the issue of whether the tax measure concerned involves an expropriation to the competent tax authorities of the Contracting Parties listed in Schedule 2 to this Agreement. In case of such referral, the competent authorities of the Contracting Parties shall consult. If, within six (6) months of the referral, they have not reached an agreement that the measure does not involve an expropriation, the investor may pursue the dispute settlement procedure under Article IX.

5.    For greater certainty, nothing in this Agreement shall affect the rights and obligations of any Contracting Party under any international agreement or arrangement relating wholly or mainly to taxation. In the event of any inconsistency between this Agreement and any such agreement or arrangement, that agreement or arrangement shall prevail over this Agreement to the extent of the inconsistency.

6.    Nothing contained in this Agreement shall prevent a Contracting Party from taking measures, in accordance with its law, with respect to the financial sector for prudential reasons, including those measures aimed at protecting investors, depositors, insurance takers or trustees, or to safeguard the integrity and stability of the financial system. Where such measures do not conform with the provisions of this Agreement, they shall not be used as a means of avoiding a Contracting Party's commitments or obligations under this Agreement.

7.    No provision of this Agreement shall be construed to afford protection to investments made with capital or assets derived from illegal activities.

ARTICLE XIV

**Territorial Extension**

At the time of entry into force of this Agreement, or at any time thereafter, the provisions of this Agreement may be extended to such territories for the international relations of which the Government of the United Kingdom is responsible as may be agreed between the Contracting Parties in an Exchange of Notes, provided that the Contracting Parties shall not agree to extend the provisions of this Agreement in accordance with this Article unless they have complied with their applicable internal constitutional requirements.

ARTICLE XV

**Final Provisions**

1.    The Contracting Parties shall notify each other of the compliance of the internal requirements of each of the Contracting Parties in connection with the entry into force of this Agreement. This Agreement shall enter into force sixty (60) days after the receipt of the latter notification.

2.    This Agreement shall remain in force for a ten (10) year period and shall be extended indefinitely thereafter. After ten (10) years, this Agreement may be denounced at any time by any of the Contracting Parties, by serving a twelve (12) month prior notice, sent through diplomatic channels.

3.    With respect to investments admitted before the date on which the notice of termination of this Agreement becomes effective, the provisions of this Agreement shall remain in force for an additional term of fifteen (15) years from such a date.

4.    With regard to Article I paragraph 2(b)(i), on request of a Contracting Party five (5) years after the entry into force of this Agreement or at any time thereafter the Parties shall consult with a view to assessing whether Article I paragraph 2(b)(i) remains appropriate.

16

5.    If, as a consequence of the United Kingdom's membership of the European Union, the United Kingdom wishes to propose an extension of the scope of Article IV paragraph 3, consultations on this issue shall be held between the Contracting Parties.

In witness whereof, the undersigned, duly authorised thereto by their respective Governments, have signed this Agreement.

Done in duplicate at Bogata on this seventeenth day of March 2010; in the English and Spanish languages, both texts being equally authoritative.

**For the Government of the United Kingdom of Great Britain and Northern Ireland:**

**For the Republic of Colombia:**

**JOHN DEW**

**LUIS GUILLERMO PLATA**

17

SCHEDULE 1

The United Kingdom: the London Court of International Arbitration

The Republic of Colombia: the Conciliation and Arbitration Centre of the Chamber of Commerce of Bogota.

SCHEDULE 2

For purposes of Article XIII paragraph 4:

Competent authorities means

    (a)    in the case of the United Kingdom, the Commissioners for Her Majesty's Revenue and Customs or their authorised representative.

    (b)    in the case of the Republic of Colombia, the *Viceministerio Técnico del Ministerio de Hacienda y Crédito Público*.

or their successors.

ISBN 978-1-4741-1253-6

